## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | |
|---|---|
| CHARLES HARMON, BRIAN COBLE, ASUR VALLEJOS, DAVID LAWRENCE, individually and as representatives of a class of participants and beneficiaries of the Shell Provident Fund 401(k) Plan, | Civil Action No. |
| *Plaintiffs*, | COMPLAINT—CLASS ACTION |
| v. | JURY TRIAL DEMANDED |
| SHELL OIL COMPANY, CYNTHIA A.P. DEERE, SCOTT G. BALLARD, PAUL GOODFELLOW, RHOMAN J. HARDY, EILEEN M. PERILLO, CHRISTOPHER B. RICE, SUSAN M. WARD, GLENN T. WRIGHT, FIDELITY INVESTMENTS INSTITUTIONAL OPERATIONS COMPANY, INC., FMR LLC, FIDELITY BROKERAGE SERVICES LLC, FIDELITY PERSONAL AND WORKPLACE ADVISORS LLC, FIDELITY INVESTMENTS LIFE INSURANCE COMPANY, FIDELITY PERSONAL TRUST COMPANY FSB, AND ALL OTHER UNKNOWN PLAN ADMINISTRATORS AND TRUSTEES OF THE SHELL PROVIDENT FUND FROM 2014 TO THE PRESENT. | |
| *Defendants*. | |

1.  Plaintiffs Charles Harmon, Brian Coble, David Lawrence, and Asur Vallejos individually and as representatives of a class of participants and beneficiaries of the Shell Provident Fund 401(k) Plan (the "Plan"), bring this action under 29 U.S.C. §1132(a)(2) and (3) on behalf of the Plan against Defendants Shell Oil Company, Cynthia A.P. Deere, Scott G. Ballard, Paul Goodfellow, Rhoman J. Hardy, Eileen M.

1

Perillo, Christopher B. Rice, Susan M. Ward, Glenn T. Wright, all other unknown plan administrators and trustee of the Shell Provident Fund 401(k) Plan from January 1, 2014 to the present, (collectively "Shell Defendants"), FMR LLC, Fidelity Investment Institutional Operations Company, Inc., Fidelity Brokerage Services LLC, Fidelity Personal and Workplace Advisors LLC, Fidelity Investment Life Insurance Company, and Fidelity Personal Trust Company FSB, (collectively "Fidelity Defendants") for violations of ERISA's[1] fiduciary duties and prohibited transactions rules.

2. ERISA's fiduciary duty is ""the highest known to law." *Sommers Drug Stores Co. Employee Profit Sharing Tr. v. Corrigan Enterprises, Inc.*, 793 F.2d 1456, 1468 (5th Cir. 1986) (quoting *Donovan v. Bierwirth,* 680 F.2d 263, 272 n. 8 (2d Cir. 1982)). The Plan's fiduciaries, including Defendants, are obligated to act for the exclusive benefit of participants and beneficiaries and to ensure that Plan expenses are reasonable and the Plan's investments are prudent.

3. The marketplace for retirement plan services is established and competitive. Multi-billion-dollar-defined contribution plans, like the Plan, have tremendous bargaining power to obtain high-quality, low-cost administrative, managed account, and investment management services. But instead of using the Plan's bargaining power to benefit participants and beneficiaries, Shell Defendants allowed unreasonable expenses to be charged to participants for administration of the Plan and managed account services, failed to even monitor numerous funds in the Plan

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.

2

at all, and retained poorly performing investments that similarly situated fiduciaries removed from their plans.

4.   Even worse, Shell Defendants allowed the Fidelity Defendants to use Plan participants' highly confidential data, including social security numbers, financial assets, investment choices, and years of investment history to aggressively market lucrative non-Plan retail financial products and services, which enriched Fidelity Defendants at the expense of participants' retirement security.

5.   To remedy these breaches of duty, Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plan, bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan profits made through Shell and Fidelity Defendants' use of Plan assets. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

6.   This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

7.   This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the subject Plan is administered, where at least one of the alleged breaches took place, and where at least one defendant resides.

## PARTIES

### The Shell Provident Fund 401(k) Plan

8.  The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

9.  The Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1).

10. The Plan provides for retirement income for eligible employees of Shell Oil Company. Employees are immediately eligible to participate in the Plan on the first day after the first hour of employment.

11. A participant's retirement income depends upon contributions from each employee, employer matching contributions, and from the performance of the Plan's investment options, net of fees and expenses.

12. The Plan has a massive amount of participants' retirement assets at stake, representing the retirement income of a large number of participants and retirees. As of December 31, 2014, the Plan had $10.5 billion in assets and 36,898 participants with account balances. It is one of the largest defined contribution plans in the United States, ranking in the largest 1/100th of all defined contribution plans based on total plan assets that filed a Form 5500 with the Department of Labor, which is a required filing by defined contribution plans governed by ERISA. Plans of such great size are commonly referred to as "jumbo plans" or "mega plans".

### Plaintiffs

13. Charles Harmon resides in Liberty, Texas, and is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become

4

eligible to receive benefits under the Plan. Mr. Harmon invested in the Plan's
LifePath 2025 Retirement fund.

14. Brian Coble resides in Seattle, Washington, and is a participant in the Plan
under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become
eligible to receive benefits under the Plan. Mr. Coble utilized managed account
services provided by Financial Engines in the Plan. Mr. Coble invested in the Mid-
Cap Equity Index Fund, BlackRock EAFE Equity Index Fund, Emerging Markets
Index Fund, U.S. Equity Index, U.S. Equity Market Fund, U.S. Debt Index, Mr.
Lawrence invested in imprudent investments in the Plan that went unmonitored by
Plan fiduciaries, including, but not limited to, Fidelity Low-Priced Stock Fund and
Fidelity U.S. Bond Index Fund.

15. David Lawrence is a current Shell employee residing in, Martinez, California
and is a participant in the Plan under 29 U.S.C. §1002(7) because he and his
beneficiaries are or may become eligible to receive benefits under the Plan. Mr.
Lawrence utilized managed account services provided by Financial Engines in the
Plan. Mr. Lawrence invested in numerous imprudent investments in the Plan that
went wholly unmonitored by Plan fiduciaries, including, but not limited to, Fidelity
Select Defense and Aerospace Portfolio, Fidelity Select IT Services Portfolio,
Fidelity Select Biotech Portfolio, Fidelity Real Estate Investment Portfolio, Fidelity
Mortgage Securities Fund, Fidelity Corporate Bond Fund, Fidelity Long-Term
Treasury Bond Index, Fidelity Puritan Fund, Fidelity Emerging Markets Index
Fund, Fidelity International Index Fund, Fidelity Total International Index Fund,

5

Fidelity Total Market Index Fund, Fidelity Growth Company Commingled Pool, Fidelity Blue Chip Growth Commingled Pool, and the Morgan Stanley Institutional Fund, Inc. Growth Portfolio.

16. Asur Vallejos is a former Shell employee and resides in, Lake Elsinore, California and is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

## Defendants

17. Shell Oil Company is a corporation with its office and principal place of business in Houston, Texas and incorporated in Delaware. Shell Oil Company is the Plan sponsor under 29 U.S.C. §1002(16). Shell Oil Company is also the employer of certain of the other Plan fiduciaries. As alleged herein, Shell Oil Company is a fiduciary under 29 U.S.C. §1002(21)(A) because it exercises discretionary authority or discretionary control respecting management of the Plan, exercises authority or control respecting management or disposition of Plan assets, or has discretionary authority or discretionary responsibility in the administration of the Plan.

18. According to the Plan's Summary Plan Descriptions, the Plan is administered by the Plan Administrator and Trustees. The Plan Administrator and the Trustees each have authority to control and manage the operation and administration of the plan, and discretion to interpret plan provisions. The Plan Administrator and Trustees are all Shell employees.

19. The Plan's administrator is currently Cynthia A.P. Deere, a Shell executive.

20. The Plan's Trustees are Scott G. Ballard, Paul Goodfellow, Rhoman J. Hardy, Eileen M. Perillo, Christopher B. Rice, Susan M. Ward and Glenn T. Wright. All Trustees are Shell employees and, upon information and belief, Shell executives.

21. As alleged herein, the Plan Administrator and Trustees are fiduciaries to the Plan because they exercised discretionary authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of its assets, and have discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

22. Because the specific action taken by each Shell Defendant is not divulged to Plan participants and is not otherwise publicly known, Plaintiffs cannot fully allege specifically how each Shell Defendant acted as described herein, and therefore refer to Shell Defendants collectively herein, unless otherwise specified.

23. Fidelity Investments Institutional Operations Company Inc. ("FIIOC") is a corporation with its office and principal place of business in Covington, Kentucky and incorporated in Massachusetts. FIIOC is the Plan's recordkeeper. As alleged herein, FIIOC exercises authority or control respecting management or disposition of Plan assets under 29 U.S.C. §1002(21)(A)(i).

24. FMR, LLC is a corporation with its office and principal place of business in Boston, Massachusetts and incorporated in Delaware.

25. Fidelity Brokerage Services LLC is a corporation with its office and principal place of business in Rhode Island and incorporated in Delaware.

7

26. Fidelity Personal and Workplace Advisors LLC is, upon information and belief, a corporation with its principal place of business and incorporated in Massachusetts.

27. Fidelity Investments Life Insurance Company is a corporation with its principal place of business in Rhode Island and, upon information and belief, incorporated in Utah.

28. Fidelity Personal Trust Company, FSB is a federal savings bank with, upon information and belief, its principal place of business in New Hampshire.

29. FIIOC, Fidelity Brokerage Services LLC, Fidelity Personal and Workplace Advisors LLC, Fidelity Investments Life Insurance Company and Fidelity Personal Trust Company, FSB are all wholly-owned subsidiaries of FMR, LLC. Upon information and belief, all Fidelity entities named herein share 10 percent of more of their profits with FMR, LLC. Collectively, FMR, LLC and all wholly-owned subsidiaries named herein are referred to as "Fidelity Defendants."

30. As alleged herein, Fidelity Defendants are parties in interest with respect to the Plan.

31. As alleged herein, the Fidelity Defendants worked in concert to appropriate and use sensitive, highly confidential Plan participant data to solicit the purchase of nonplan retail financial product and services for its own benefit.

## ERISA'S FIDUCIARY STANDARDS

32. ERISA imposes strict fiduciary duties of loyalty and prudence upon the Shell Defendants and FIIOC as fiduciaries of the Plan. 29 U.S.C. §1104(a)(1). The statute states, in relevant part, that:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(A)     for the exclusive purpose of

      (i)     providing benefits to participants and their beneficiaries; and

      (ii)     defraying reasonable expenses of administering the plan;

[and]

(B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

33. Under ERISA, fiduciaries that exercise any authority or control over plan assets, including, but not limited to, the selection of plan investments and service providers, must act prudently and for the *exclusive* benefit of participants in the plan, monitor the funds in the plan and remove imprudent or excessively expensive funds. Fiduciaries cannot act for the benefit of third parties including service providers to the plan such as recordkeepers, affiliated businesses, such as brokerage firms, or managed account service providers and those who provide investment products. Fiduciaries must ensure that the amount of fees paid to those service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

34. An ERISA "trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). Prudence requires a review at "regular intervals." *Id.* When making investment decisions, an ERISA fiduciary "is duty-bound "to make such investments and only such investments as a prudent [person] would make of his own property. . . ."" *In re Unisys*, 74 F.3d 420, 434 (3d Cir. 1996) (quoting Restatement (Second) of Trusts § 227 (1959)). "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *Id.* at 435. A defined contribution plan fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Instead, fiduciaries must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original); *see also* 29 C.F.R. § 2550.404a-1; DOL Adv. Opinion 98-04A; DOL Adv. Opinion 88-16A. Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones" within a reasonable time. *Tibble*, 135 S. Ct. at 1828–29.

35. ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

10

In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]

(2)     if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

36. The general fiduciary duties imposed by 29 U.S.C. §1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. §1106, and are considered *per se* violations because they entail a high potential for abuse. Section 1106(a)(1)(D) states that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect – transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."

37. 29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the

11

fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

38. 29 U.S.C. §1132(a)(3) authorizes a plan participant to bring a civil action to enjoin any act or practice which violates ERISA or the terms of the plan or to obtain other appropriate equitable relief—including from non-fiduciaries—to redress such violations or to enforce ERISA or the terms of the plan.

## FACTS APPLICABLE TO ALL COUNTS

39. "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008). In the private sector, such plans have largely replaced the defined benefit pension plans that were America's retirement system when ERISA was enacted in 1974. The consulting firm Towers Watson studied Fortune 100 companies from 1985 to 2012, and found that the type of retirement plan offered by the companies has essentially flipped over the last 3 decades. Whereas in 1985, 89 of the Fortune 100 companies offered a traditional DB plan, in 2012, only 11 of the Fortune 100 companies offered defined benefit plans to newly hired employees. Thus, defined contribution plans have become America's retirement system.

40. A fundamental difference between traditional pension plans and defined contribution plans is that in the former the employer's assets are at risk. In a defined contribution plan, it is the employees and retirees' funds at risk.

41. Each participant in a defined contribution plan has an individual account, and directs plan contributions into one or more investment options in a lineup chosen by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to

the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826.

42. Most of the fees assessed to participants in a defined contribution plan are attributable to two general categories of services: plan administration (including recordkeeping), and investment management. Since the early 2000s, managed account services make up a third category of fees assessed to participants. These expenses "can sometimes significantly reduce the value of an account in a defined-contribution plan." *Id.*

43. The plan's fiduciaries have control over these expenses. The fiduciaries are responsible for hiring administrative service providers, such as recordkeepers, and negotiating and approving those service providers' compensation. The fiduciaries also have exclusive control over the menu of investment options to which participants may direct the assets in their accounts. Those selections each have their own fees which are deducted from the returns that participants receive on their investments. The fiduciaries are responsible for hiring managed account providers and negotiating and approving those service providers' compensation.

44. These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of *28%* in savings at retirement. U.S. Dep't of Labor, *A*

*Look at 401(k) Plan Fees,* at 1–2 (Aug. 2013).[2] Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control these costs and ensure that participants pay no more than a reasonable level of fees. This is particularly true for multi-billion dollar plans like the Plan, which have the bargaining power to obtain the highest level of service and the very lowest fees. The fees available to multi-billion dollar retirement plans are orders of magnitude lower than the much higher retail fees available to small investors.

45. The entities that provide services to defined contribution plans have an incentive to maximize their fees by putting their own higher-cost funds in plans, collecting the highest amount possible for recordkeeping and managed account services, rolling Plan participants' money out of the Plan and into proprietary IRAs, soliciting the purchase of wealth management services, credits cards and other retail financial products, and maximizing the number of non-Plan products sold to participants. For each additional dollar in fees paid to a service provider, participants' retirement savings are directly reduced by the same amount, and participants lose the potential for those lost assets to grow over the remainder of their careers. Accordingly, participants' retirement security is directly affected by the diligence used by plan fiduciaries to control, negotiate, reduce the plan's fees, and safeguard plan assets.

46. Fiduciaries must be cognizant of providers' self-interest in maximizing fees, and cannot simply accede to the providers' desires and recommendations for the

---

[2] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

plan—*e.g.*, proprietary funds and managed account services that will maximize the provider's fees and unrestricted access to Plan participant's confidential information to sell non-Plan retail products and financial management services—without negotiating or considering alternatives. In order to act in the exclusive interest of participants and not in the service providers' interest, fiduciaries must negotiate as if their own money and information is at stake. Instead of simply accepting the investment funds, fees and relinquishment of confidential data for marketing purposes sought by these conflicted providers, fiduciaries must consider whether participants would be better served by using alternative investment products or services and avoid enabling the use of participant data for any purpose outside the Plan.

## I.    Investment options in defined contribution plans

47. Defined contribution fiduciaries determine the available investment options in a plan. Each investment option is typically a pooled investment product, such as a mutual fund, and invests in a diversified portfolio of securities in a broad asset class such as fixed income, bonds, or equities.

48. Defendants select investment options into which participants' investments are directed. Defendants also select those investment options that are removed from the Plan. These investments are designated by Shell Defendants as designated investment alternatives offered under the Plan.

49. Mutual fund fees are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the mutual fund deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis

points (bps).[3] The fees deducted from a mutual fund's assets reduce the value of the shares owned by fund investors.

50. Some mutual funds engage in a practice known as "revenue sharing." In a revenue-sharing arrangement, a mutual fund pays a portion of its expense ratio to the entity providing administrative and recordkeeping services to a plan, putatively as compensation for providing those services. Mega plans, such as the Plan, can command much lower fees than retail investors. The duty of prudence includes a duty to be cost-conscious and "to minimize costs," because "[w]asting beneficiaries' money is imprudent[.]" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) (quoting Unif. Prudent Investor Act §7). The difference in fees between a mutual fund's retail and institutional share classes is often attributable to revenue sharing. To illustrate, a fund's retail share class may have an expense ratio of 100 bps, including 25 bps of revenue sharing, while the institutional share charges 75 bps, with no or lesser revenue sharing. The presence of revenue sharing thus provides an incentive for administrative service providers to recommend that the fiduciary select the recordkeepers proprietary higher-cost funds, including in-house funds of the administrative service provider that pay the provider revenue sharing. "[V]ery little about the mutual fund industry," including revenue sharing practices, "can plausibly be described as transparent[.]" *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 907 (7th Cir. 2013).

---

[3] One basis point is equal to 1/100th of one percent (or 0.01%).

51. A fiduciary "has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1828. Defined contribution plan fund selections must be the result of a detailed due diligence process that considers factors such as risk, investment return, and expenses of available investment alternatives, and the fiduciary must give "appropriate consideration" to "the role the investment or investment course of action plays . . . in the plan's investment portfolio," 29 C.F.R. §§2550.404a-1(b)(i)-(ii). Fiduciaries cannot discharge their duties "by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker*, 569 F.3d at 711. This removes the benefit of pooling assets consistent with the size of the Plan.

## A. Shell Defendants used an obsolete, imprudent structure for the Plan's investment menu.

52. Since 2014, Shell Defendants have retained over 300 designated investment options in the Plan, most of which are Fidelity's proprietary mutual funds. Shell Defendants refer to these investments as the "Fund Window."

53. Shell Defendants agreed to allow Fidelity to automatically put its mutual funds in the Plan without any initial screening process by Shell Defendants to determine whether the funds are prudent options for participants to invest their retirement assets.

54. Shell Defendants also retained these funds in the Plan without conducting any ongoing monitoring of the funds in the Fund Window to ensure that they remain prudent. Assembling a haphazard lineup of over 300 options, most that were

17

proprietary to Fidelity—and shifting to participants the burden to screen those options for prudence—reflects an imprudent investment selection and monitoring process.

55. At all relevant times, each investment in the "Fund Window" was a designated investment alternative in the Plan that required oversight by the Plan's fiduciaries.

56. Despite failing to monitor or remove any fund in the Fund Window, Shell Defendants utilized their discretion and made decisions related to investments in the Fund Window. For example, among others, as of December 31, 2014 the Plan retained the Fidelity Blue Chip Growth Fund—Class K mutual fund in the Fund Window. By December 31, 2018, the Shell Defendants caused the Fidelity Blue Chip Growth Fund to move to a commingled pool structure.

57. By 2012, only a few Fidelity clients still used an investment structure similar to the Plan's Fund Window, and Fidelity no longer offered the investment structure to new clients. Consultants and legal advisors throughout the industry told those very few plan sponsors that retained fund windows that they had a duty to monitor funds in the window and remove imprudent ones.

58. In contrast to the Plan's 300-fund investment structure, T. Rowe Price surveyed its defined contribution recordkeeping clients and found that the average number of investment options ranged from 13.6 in 2008 to 16.2 in 2017. According to Callan Investments Institute's 2015 Defined Contribution Trends survey, defined contribution plans in 2014 had on average 15 investment options, excluding target

18

date funds. See Callan Investments Institute, *2015 Defined Contribution Trends,* at 28 (2015).[4] This number of options is the output of an evaluation and selection by prudent fiduciaries of prudent investment choices in each investment style and appropriate asset class that allows plan participants to construct an appropriate asset allocation. It also enhances plan fiduciaries evaluation of the investment in the plan. Indeed, since it is the fiduciaries in a plan who ERISA holds to a standard of a prudent financial expert, it is important for fiduciaries to perform that selection and evaluation role for the exclusive benefit of participants, who are not financial experts.

59. Despite including over 300 funds in the Plan, Shell Defendants did not monitor any funds in the "Fund Window" and failed to remove any funds from the fund window.

60. By 2014, similarly situated fiduciaries who diligently monitored and reviewed their plans' investments had eliminated fund windows and transferred the assets in such windows to investments in similar asset classes within their plans' core menu of approximately 13 to 16 investments (not including target date funds).

61. Had Shell Defendants engaged in a reasoned decision making process consistent with similarly situated defined contribution plan fiduciaries, Shell Defendants would have concluded that participants' interests would be better served by eliminating the unmonitored fund window and moving to a fund lineup of 13 to 16 investments spanning each investment style and appropriate asset class

---

[4] Available at https://www.callan.com/research/files/990.pdf.

consistent with plan sponsor fiduciary practices. Shell Defendants' failure to engage in that process and to eliminate the Fund window of wholly unmonitored funds caused the Plan and its participants to lose over $158.1 million compared to what those assets would have earned in an alternative, prudent lineup utilized by other plan sponsors.

**B. Apart from the above, Shell Defendants retained numerous imprudent investments in the Plan.**

62. Apart from the imprudent structure of the unmonitored Fund Window, Shell Defendants' failure to regularly monitor and review each of the Plan's designated investment options on an ongoing basis caused the Plan to retain numerous funds that consistently failed to meet performance objectives, exposed plan participants to excessive unmonitored risks, lacked a sufficient performance history to conduct due diligence, or experienced other significant negative qualitative events such as departures of key investment personnel. Had Shell Defendants conducted the type of investment process used by knowledgeable and diligent fiduciaries of similar defined contribution plans, these options would have been eliminated from the Plan or replaced. Shell Defendants' failure to do so caused the Plan substantial losses compared to prudent alternative investments that were available to the Plan.

63. Contrary to the practices of knowledgeable and diligent fiduciaries, Defendants included excessively risky and inappropriate sector and regional funds in the Plan, including but not limited to, the Fidelity Select Automotive Portfolio and Fidelity Latin America Fund. Shell Defendants did not assess the role of these

excessively risky funds in the Plan, but instead added to the Plan every sector and regional fund Fidelity offered.

64. Sector and regional funds' prospectuses disclose that the funds' investments are concentrated in a particular sector or region. Fidelity's sectors funds are generally referred to as Fidelity Select funds. These funds expose investors to a variety of extraordinary risks. For example, due to its significant risk level, the 2015 prospectus for the regional Fidelity Latin America Fund noted special considerations for the fund that would require close quantitative and qualitative monitoring by a fiduciary: "As an emerging market, Latin America historically suffered from social, political, and economic instability. For investors, this has meant additional risk caused by periods of regional conflict, political corruption, totalitarianism, protectionist measures, nationalization, hyperinflation, debt crises, sudden and large currency devaluation, and intervention by the military in civilian and economic spheres. For example, the government of Brazil imposes a tax on foreign investment in Brazilian stocks and bonds, which may affect the value of a fund's investments in the securities of Brazilian issuers."[5] The prospectus further noted that "Latin American faced significant economic difficulties and some economies fell into recession as the recent global crisis tightened international credit supplies" and that "[a] number of Latin American countries are among the largest debtors of developing countries and have a long history of foreign debt and default."[6] Shell Defendants did not monitor or evaluate any of these risks. From

[5] Fidelity's Diversified International Equity Funds Prospectus, December 30, 2015.
[6] *Id*.

2014 to the present certain Latin American countries who made up the Fidelity Select Latin America Fund, such as Argentina, experienced, and continue to experience, significant political, economic and social instability, which Shell Defendants did not monitor, and which harmed the fund's performance and reduced participants' retirement savings.

65. Shell Defendants also failed to monitor mutual fund performance for investments in the Plan. For example, the Templeton Developing Markets Trust significantly underperformed its prospectus benchmarks for the 1-, 5- and 10-year periods in 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014 and 2015.[7] Other prudent investment professionals reviewed this type of information and took action by removing the fund from their plans. Indeed, many other Plan sponsors removed the Templeton Developing Markets Trust mutual fund from their plans during this period. However, Shell Defendants did not evaluate this investment to determine whether it should be removed from the Plan after many *years* of significant underperformance. Instead, by December 31, 2015 over $2.5 million in Plan assets remained in the Templeton Developing Markets Trust and $3.4 million by December 31, 2018.

66. Shell Defendants retained numerous underperforming funds in the Plan. While the Plan contained many additional funds with significant underperformance, the following table provides an example of investments with a sustained history of underperformance , in the Plan as of the start of 2014, based on

---

[7] Templeton Developing Markets Trust Prospectuses, April 28, 2011; April 26, 2012; April 29, 2013; April 28, 2014; and April 27, 2015.

the performance reported in each investments prospectus which provides 1, 5 and

10 year performance:

| Investment | Ticker | Prospectus Benchmark | 5-Year Performance | 10-Year Performance |
|---|---|---|---|---|
| **Alger Mid Cap Growth** | AMGOX | Russell Midcap Growth Index | -2.10% | -2.78% |
| **Fidelity Asset Manager 50%** | FASMX | S&P 500 Index | -4.55% | -1.82% |
| **Fidelity Asset Manager 70%** | FASGX | S&P 500 Index | -2.25% | -1.62% |
| **Fidelity Blue Chip Value** | FBCVX | Russell 1000 Value Index | -1.84% | -2.32% |
| **Fidelity Canada** | FICDX | S&P/TSX Composite Index | -3.18% | -0.49% |
| **Fidelity Disciplined Equity (K)** | FDEKX | S&P 500 Index | -2.61% | -2.38% |
| **Fidelity Emerging Asia** | FSEAX | MSCI AC (All Country) Asia ex Japan Index | -4.19% | -0.05% |
| **Fidelity Equity Dividend Income (K)** | FETKX | Russell 3000 Value Index | -1.21% | -1.94% |
| **Fidelity Export & Multinational (K)** | FEXKX | S&P 500 Index | -1.06% | -2.40% |
| **Fidelity Focused High Income** | FHIFX | The BofA Merrill Lynch BB US High Yield Constrained Index | -2.75% | -1.60% |
| **Fidelity Fund (K)** | FFDKX | S&P 500 Index | -1.42% | -1.84% |
| **Fidelity Global Commodity Stock** | FFGCX | MSCI ACWI Index | -9.48% | Insufficient Performance History |

| | | | | |
|---|---|---|---|---|
| **Fidelity Growth Strategies (K)** | FAGKX | Russell Midcap Growth Index | -3.32% | -2.40% |
| **Fidelity Latin America** | FLATX | MSCI EM (Emerging Markets) Latin America Index | -2.28% | -1.97% |
| **Fidelity Select Environment and Alternative Energy** | FSLEX | S&P 500 Index | -5.74% | -1.32% |
| **Fidelity Select Financial Services** | FIDSX | S&P 500 Index | -5.17% | -6.49% |
| **Fidelity Select Gold** | FSAGX | S&P 500 Index | -25.79% | -6.93% |
| **Fidelity Stock Selector Large Cap Value** | FSLVX | Russell 1000 Value Index | -2.52% | -1.19% |

67. Shell Defendants' failure to remove these underperforming funds resulted in significant losses of Plan participants' retirement savings, as quantified below.

68. Standard fiduciary best practices for the selection and retention of an investment option dictate that a fund's time-weighted returns over a relevant period must compare favorably with the performance of the appropriate benchmark index or passively managed equivalent. Experts in the industry state that when an actively managed fund underperforms the proper benchmark for three-years trailing, then it is highly unlikely it will outperform in the future, including over the five-year trailing period. When the fund's prior rolling performance falls below the benchmark over a three-year period, the fiduciary should remove the fund from the defined contribution plan. Moreover, the path to meeting this criterion includes

24

several other triggers (such as qualitative concerns and risk assessments) whereby the fiduciary would have initiated other analysis and communicated accordingly to the underperforming manager.

69. Shell Defendants did not evaluate historical underperformance or determine whether any fund in the Fund Window should be removed from the Plan, nor did the Shell Defendants evaluate any other triggers on the path to three years of underperformance. A prudent fiduciary would have removed trailing 3-year historically underperforming funds by 2014 and on an ongoing basis to the present. Because Shell Defendants did not monitor any of the funds in the Fund Window, Shell Defendants retained investments in the Plan with significant underperformance over many periods, including the 1-, 3-, 5-, 10-year periods and since the inception of some investments.

70. To enable a fiduciary to conduct adequate due diligence on an investment, the fund must have a performance history long enough to perform an analysis. An active fund without any performance history should not be added to a defined contribution plan. A prudent investment professional normally requires a relevant performance history to consider a fund a candidate for a defined contribution plan. Numerous industry texts and plan consultants require performance history of at least five years for an actively managed fund to enable the fiduciary to evaluate the investment process of the investment manager, risk and return characteristics of the fund, and the adherence to the fund's investment style and strategy over a full

market cycle.[8] Having inadequate performance history eliminates the ability of the fiduciary to perform proper performance evaluation of the fund manager and to make informed decisions about the prospect of future performance. Adding funds without performance history amounts to a gamble on the fund managers' ability to produce returns in excess of the benchmark—a reckless gamble with participants' retirement savings.

71. Shell Defendants added and retained investments in the Plan without sufficient performance history to conduct fiduciary due diligence. For example, by 2014 the Strategic Advisers Income Opportunity Fund of Funds (which is a proprietary Fidelity investment managed through its wholly-owned subsidiary Strategic Advisors) had less than two years of performance history, but was retained by Shell Defendants.

72. Shell Defendants also did not monitor and evaluate funds for significant qualitative concerns. For example, Bill Gross was known as the "Bond King" on Wall Street. Gross left his company, PIMCO, in 2014 and joined Janus Henderson. Upon Gross' departure, plan sponsors throughout the country started evaluating, and removing, PIMCO's Total Return Fund, the fund that Bill Gross previously operated. By September 2014, industry consultants were advising plan fiduciaries to remove the PIMCO Total Return Fund from their Plan, and plan sponsors were

---

[8] *See*, *e.g.*, What Bill Gross's Pimco Departure Means for Your 401(k), Jessica Toonkel, Rueters, September 30, 2014, available at https://money.com/bill-grosss-leaving-pimco-401k-retirement/. (CEO of a retirement plan consultant stating "We have to see at least a three-year track record and we actually prefer five").

following that advice on a large scale basis.[9] Instead of evaluating whether the
PIMCO Total Return Fund should be removed from the Plan upon Gross'
departure—a significant qualitative event—or after subsequent underperformance,
Shell Defendants did nothing. Instead of removing the PIMCO Total Return Fund,
Shell Defendants permitted Plan participants to continue investing over $59 million
in the PIMCO Total Return Fund, causing over $3.4 million in losses to the Plan
and Plan participants' retirement savings by failing to remove the fund.

73.   Shell Defendants' retention of underperforming funds, sector and regional
funds, funds without a sufficient performance history, and failure to eliminate the
over 300-option Fund Window diverged from the practices and actions of
knowledgeable and diligent fiduciaries of similar defined contribution plans. As of
2014, only a handful of plans retained certain funds that the Plan retained, and
most other plan fiduciaries had removed these types of funds by 2014. For example,
of the 10 retirement plans with over $1 billion in assets that had the Fidelity Select
Automotive Portfolio, a sector fund, in their Plan as of 2010, 8 had removed the
investment by 2015. The Alger Mid Cap Growth Institutional Fund significantly
underperformed its benchmark prior to and through the start of 2014, but remained
in the Plan. Other plans and general investors fled the failing Alger Mid Cap
Growth funds. Total net assets in the mutual fund from all investors, not just the
Shell Plan or defined contribution plans generally, fell from $820 million in 2010 to

---

[9] *See, e.g., id* (2014 article discussing multiple retirement plan consultants advising plan sponsors to
remove the PIMCO Total Return Fund based on Gross' departure and underperformance against
peers).

$155 million by 2014. Instead of removing this imprudent investment from the Plan, Shell Defendants permitted $4.9 million in Plan assets to remain in this investment as of December 31, 2014, resulting in losses to Plan participants' savings.

74. Shell Defendants also maintained multiple target date funds in the Plan that the Shell Defendants did not monitor. Prudent fiduciary practice dictates having only one set of target date funds in a plan that is thoroughly monitored by plan fiduciaries. Shell Defendants completely failed to monitor the high-cost, proprietary Fidelity Lifecycle Funds (both actively and passively managed), which under-performed compared to the Plan's lower-cost Lifepath Target Retirement Funds.

75. Shell Defendants' failure to monitor funds in the Fund Window and to remove imprudent investments as described herein caused the Plan and its participants to lose over $222.4 million in retirement savings.

## II.   Managed account services and fees in defined contribution plans

76. Managed account providers generally offer the same basic services—initial and ongoing management of a 401(k) plan participant's account. Managed accounts are investment services under which providers make investment decisions for specific participants to allocate their retirement savings among a mix of assets, commonly referred to as asset allocation. Managed account providers In 401(k) plans limit the investment options they consider to those funds chosen by the plan sponsor to create Plan participants' asset allocations. Thus, managed account service providers create a fund of a plan's funds for plan participants.

77. The Plan's managed account service provider, Financial Engines, limits its investment recommendations to the investment alternatives available in the Plan.

78. Most managed account service providers, including Financial Engines and its competitors, utilize computer programs based on modern portfolio theory and Monte Carlo simulations to create plan participants' asset allocations. Financial Engines' registered investment advisor representatives can modify client-directed inputs but not outputs and recommendations from the software program.

79. Plan participants can allocate any percentage of their portfolio or contributions to managed account services. Managed account service providers act as fiduciaries with respect to the investment advice their software systems provide retirement plan participants.

80. Plan sponsors can contract directly with a managed account provider to offer services to plan participants. Alternatively, some managed account providers use "subadvised" arrangements to offer their services. In a subadvised arrangement, the plan sponsor retains the ultimate decision-making power on whether to offer managed accounts and the fees charged to participants. Plan sponsors can also contract with multiple managed account providers, only incurring a fee if Plan participants utilize the managed account services, thus increasing access to managed account providers and spurring competition without incurring additional fees.

81. The Plan contracted directly with its managed account service provider, Financial Engines.

82. Managed account service providers use two types of information strategies to create asset allocations for participants. The first type of strategy is referred to as customized service—allocating a participant's account based solely on age or other factors that can be easily obtained from the plan's recordkeeper, such as gender, income, current account balance, and current savings rate. The other strategy is referred to as personalized service, which purports to take into account additional personal information to inform asset allocations, such as risk tolerance or spousal assets.

83. From 2012 to 2014, managed account service providers that offer a personalized service reported that generally fewer than one-third, and sometimes fewer than 15 percent of Plan participants using the managed account service furnish this personalized information. United States Government Accountability Office, Report to Congressional Requesters, 401(K) PLANS, Improvements Can be Made to Better Protect Participants in Managed Accounts, June 2014, available at https://www.gao.gov/assets/670/66431.pdf (hereinafter "2014 GAO Study"). When the personalized data is used, asset allocations are nearly the same (less than a 5 percent difference), or do not change, from the customized services asset allocation decisions. *Id.* Therefore, when a Plan sponsor selects a managed account provider that charges for personalized services, participants are not getting the full value of the services for which they are paying an unnecessarily higher fee.

84. Additionally, without personalized information from Plan participants, managed accounts are similar to other lower-cost asset allocation solutions. For

example, target-date funds, like managed accounts, provide simple investment portfolio decisions for Plan participants by providing a professionally managed asset allocation that is targeted to participant time horizons with a professional managing the asset allocation glide path. Indeed, Financial Engines cites target-date funds as potential substitutes for its portfolio management services in its 2016 Form 10-K.

85. Customized and personalized managed accounts often offer little to no advantage over lower-cost funds of funds, such as target-date funds, risk-based funds and balanced funds. Vanguard reported in August 2013 that managed account services generally return less than or equal to the returns of Vanguard's lower-cost professionally managed allocation products, such as target-date funds, risk-based funds and balanced funds.[10] Nonetheless, managed account participants with lower rates of return still pay substantial additional fees for managed account services compared to the fees they would incur for target-date funds, risk-based funds and balanced funds. Prudent fiduciaries consider whether the managed account service is providing plan participants value beyond substitute lower cost alternatives, such as target date funds.

---

[10] Vanguard, *Professionally Managed Allocations and the Dispersion of Participant Portfolios* (Valley Forge, PA; August 2013).



Figure 8: Example of Annualized Rates of Return from One Record Keeper for Different Types of Professionally Managed 401(k) Portfolios, 2007-2012, Net of Additional Fees

Source: GAO representation of Vanguard returns data. | GAO-14-310

86. Plan sponsors, as fiduciaries of 401(k) plans, are required to act prudently in selecting and monitoring managed account providers, including monitoring managed account providers' fees in relation to the services provided, and the performance of the managed account providers in relation to other alternative, lower-cost products.

87. The 2014 GAO study cites information stating that the additional fee a participant generally pays for a managed account is the primary disadvantage of managed account services.

88. Each managed account provider's publicly filed Form ADV disclosure states that all managed account service fees are negotiable. The fees are charged through various methods: a flat fee, a capped percentage of assets under management, a

tiered assets-under-management fee, an uncapped percentage of assets under management fee, or some combination. Therefore, two participants with a similar balance but a different provider, or a fee that was not negotiated, can pay vastly different amounts for the same service. *See* 2014 GAO Study.

89. As of 2014, managed account providers that did not charge a flat rate charged fees ranging from 8 basis points to 100 basis points of a participant's account balance. *See* 2014 GAO Study The provider that participated in the 2014 study that used a flat fee charged $20 per participant for each participant that utilized the managed account service. The table below, created by the Government Accountability Office during a study of managed account fees in 2014, shows the difference in fees for participants with an account balance of $10,000 or $500,000 at the start of the class period.

**Table 4: Example of Variation in 401(k) Plan Managed Account Fees**

| Provider | Type of fee | Example of annual fee charged on $10,000 account balance | Example of annual fee charged on $500,000 account balance |
|---|---|---|---|
| A | Flat fee | $20 | $20 |
| B | Variable fee,[a] capped[b] | $25 | $250 |
| C | Variable fee | $10 | $500 |
| D | Variable fee, direct arrangement[c] | As low as $8 | As low as $400 |
| | Variable fee, subadvised arrangement[d] | As high as $40 | As high as $2,000 |
| E | Variable fee, tiered,[e] default[f] | As high as $35 | As high as $1,100 |
| | Variable fee, tiered, opt-in[f] | As high as $60 | As high as $2,350 |
| F | Variable fee, tiered | Averages $45-$50 | Averages $2,250-$2,500 |
| G | Variable fee, default | As low as $45 | As low as $2,250 |
| | Variable fee, opt-in | As high as $55 | As high as $2,750 |
| H | Variable fee, large plan | As low as $25 | As low as $1,250 |
| | Variable fee, small plan | As high as $100 | As high as $5,000 |

Source: GAO analysis of managed account provider case studies.  |  GAO-14-310

90. To demonstrate the impact of fees, the below illustration shows the impact of a participant charged an additional annual fee of 8 to 100 basis point of their

account balance against what the participant would pay in other investments

without the managed account fee:



Figure 10: Variation in Additional Participant Fees Paid for a Managed Account Over a 20-Year Period Given Different Fee Rates

Source: GAO analysis of information from providers and published data on managed account fees and returns. | GAO-14-310

91. The 2014 GAO Study reported that there are few independent sources of

comprehensive and consistent information on managed account fees charged by

providers that participants could use to compare fees across providers, and that

even fee information provided in managed account providers' SEC filings was

confusing or incomplete.

92. Because managed account service providers obscure their fees, the duty of a

plan sponsor—held to the standard of a prudent expert under ERISA—is to

carefully analyze fees charged by multiple providers. The only way for a Plan

sponsor to accurately compare fees of managed account providers is to perform

competitive bidding through a request for proposal. In November 2017, retirement

plan investment advisor Cammack Retirement Group stated that managed account

service provider contract terms and fees are a major fiduciary concern and described

the importance of conducting an RFP for managed account services to show a due

diligence process by interviewing vendors and "test-driving" their respective

products. John Buckley, Fiduciary Considerations When Adding and Reviewing

Managed Accounts, Cammack Retirement Group, November 2017.[11]

93. From the early 2000s to the present, as recordkeeping fees compressed,

managed account services have become more utilized in defined contribution plans

and competition for managed account services has increased. For example, as of

2019, based on Form ADVs of managed account providers that did not charge a flat

rate, fees were as low as 3 basis points, compared to a low of 8 basis points in 2014.

Financial Engines 2016 Form 10-K references a "downward pressure on fees we

charge for services." Therefore, in order to capture market conditions and negotiate

current fees, prudent practice requires that Plan sponsors conduct requests for

proposals for managed account services every three to five years.

### A. Shell Defendants failed to monitor Financial Engines fees and caused Plan participants to pay excessive managed account fees.

94. The Plan's managed account service provider, Financial Engines, charges

Plan participants on an uncapped percentage of assets basis. The Financial Engines

fees are as follows: 35 bps per year for the first $100,000 in a participant account; 30

---

[11] Available at https://cammackretirement.com/knowledge-center/insights/fiduciary-considerations-when-adding-and-reviewing-managed-accounts

bps per year on $100,000.01 to $250,000.00; and 25 bps per year for any amount over $250,000.00. The fee is deducted quarterly.

95. Managed account fees are subject to economies of scale. Participants in large plans can obtain significantly lower fees than participants in small plans. *See* 2014 GAO Study.

96. Financial Engines' fees in the Plan are excessive. Financial Engines charged Plan participants over 350% more than other managed account providers that provide a similar service. For example, Morningstar Retirement Manager charges retirement plan participants in large plans, such as the Plan, fees as low as 5 basis points for managed account services. Russell Investments Capital, LLC charges as low as 3 basis points for large plans, and no greater than 28 basis points for managed account services in any plan. ProManage provides managed account services for as low as 5 basis points. GuidedChoice charges less than 45 basis points for any size plan, and the fee is only applied to the first $100,000 in assets. In total, Plan participants paid from $7.8 million to $9.3 million per year to Financial Engines.

97. Financial Engines cites Morningstar, GuidedChoice and ProManage, LLC as direct competitors in a "competitive industry" in Financial Engines' 2016 Form 10-K. The managed account service of each of these providers, as well as Russell, is superior or at least equal in quality to Financial Engines' managed account service.

36

98. Based on publicly available information on the Plan's 2016 Form 5500 and Financial Engines Form 10-K, the Plan is one of the single largest sources of revenue to Financial Engines for professional management fees.

99. Shell Defendants never investigated Financial Engines' growing revenue or determined whether Financial Engines' fees were reasonable.

100. Because Financial Engines' fees were so excessive, and because of kickbacks in the form of revenue sharing charge it paid the Plan's recordkeeper, Plan participants paid FIIOC, via Financial Engines, from $2.5 to $3.8 million in excessive fees. This arrangement was part of an undisclosed business relationship. As described more fully below, these fees were all unnecessary because FIIOC's recordkeeping platform had already incurred the one-time fee to integrate with Financial Engines' systems and the $2.5 to $3.8 million fees represents virtually pure additional profit for FIIOC, beyond its already excessive recordkeeping fees, paid by Plan participants.

101. Because the specific amount of assets under management by Financial Engines is not divulged to Plan participants and is not otherwise publicly known, Plaintiffs cannot ascertain the additional amount of Plan losses beyond the pure profit paid to FIIOC, which were incurred by Plan participants that utilized managed account services.

## III. Recordkeeping fees and fiduciary practices

102. Recordkeeping is a service necessary for every defined contribution plan. The recordkeeper keeps track of the amount of each participant's investments in the various options in the plan, and typically provides each participant with a

quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about the plan and to review their accounts. The recordkeeper may also provide access to investment education materials or investment advice. These services are largely commodities, and the market for recordkeeping services is highly competitive.

103.     There are numerous recordkeepers in the marketplace who are capable of providing a high level of service to a jumbo defined contribution plan, like the Plan, and will readily respond to a request for proposal. These recordkeepers primarily differentiate themselves based on price, and vigorously compete for business by offering their best price to plan sponsors in response to competitive bidding. The cost of recordkeeping services depends on the number of participants (or participant accounts), not on the amount of assets in the participant's account.[12] Thus, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account. Plans with large numbers of participants can take advantage of economies of scale: a plan with 100,000 participants can negotiate a much lower per participant fee for recordkeeping services than a plan with 1,000 participants. Much lower administrative expenses are readily available for plans with a large number of participants, such as the Plan.

104.     An illustrative example of this decreasing per capita cost in providing

---

[12] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan." There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets." *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees, Hewitt Assoc.,* October 2008.

recordkeeping services was described in 1998 in the "Study of 401(k) Plan Fees and Expenses" ("Study") available on the Department of Labor website.[13] Per the Study, the below expenses were based on quotations "of major 401(k) service providers."

| Number of Participants | Service Provider Cost Per Participant |
|---|---|
| 200 | $42 |
| 500 | $37 |
| 1,000 | $34[14] |

105.     Because recordkeeping costs are not affected by account size, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees on the basis of a fixed dollar amount per participant in the plan rather than as a percentage of plan assets. Otherwise, as plan assets increase, such as through participant contributions or investment gains, the recordkeeping compensation increases without any change in the recordkeeping and administrative services, leading to unreasonable fees.

106.     For example, if a plan has 20,000 participants, a fiduciary could negotiate a plan-level contract to pay the recordkeeper $700,000 per year, based on a flat annual fee of $35 or less per participant account serviced. That rate could then be assessed either by charging the same $35 to every participant in the plan, or *pro rata* as a percentage of assets. If the plan's assets increase during the contract while the number of participants stays constant, the recordkeeper's compensation does not change, because the services provided have not changed.

---

[13] Available at https://www.dol.gov/sites/default/files/ebsa/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf.

[14] "Study of 401(k) Plan Fees and Expenses" at § 4.2.2 ("Recordkeeping and Administration Expenses").

107.     Although paying for recordkeeping with asset-based revenue sharing is not *per se* violation of ERISA, it can lead to excessive fees if not monitored and capped. If a fiduciary allows the plan recordkeeper to be compensated with revenue sharing from plan mutual funds—which is based on a percentage of assets charged to fund investors—then the payments can become excessive based on an increase in plan assets alone, such as from the over 25% increase in the S&P 500 in the stock market in 2019, while the services have not changed. The opposite is generally not true. If plan assets decline, participants will not receive a sustained benefit of paying lower fees, because the recordkeeper will demand that the plan make up the shortfall through additional direct payments.

108.     Thus, if a fiduciary decides to use revenue sharing to pay for recordkeeping, it is critical to (1) determine and monitor the amount of the revenue sharing and any other sources of compensation that the provider has received, (2) compare that amount to the price that would be available on a flat per-participant basis, and (3) control the amount of fees paid through recordkeeping by obtaining rebates of any revenue sharing amounts that exceed the reasonable level of fees.

109.     To ensure that plan administrative and recordkeeping expenses are and remain reasonable for the services provided, prudent fiduciaries of large defined contribution plans put the plan's recordkeeping and administrative services out for competitive bidding at regular intervals of approximately three years, and monitor recordkeeping costs regularly within that period.

110.    Cerulli Associates stated in early 2013 that more than half of the plan sponsors asked indicated that they "are likely to conduct a search for recordkeeper with the next two years." These RFPs were conducted even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[15]

111.    The Department of Labor supports the use of an RFP to assess the reasonableness of the service provider's fees every three to five years.[16]

112.    In November 2017, it was reported that Nike, Inc. changed its 401(k) plan recordkeeper from Alight (formerly part of Aon Hewitt) to Fidelity.[17] As noted below, the Nike 401(k) plan is a large plan. A further review of public documents reveals that this large plan paid, with the following participant counts, paid the following fees for recordkeeping and administrative services.

| Nike, Inc. 401(k) Plan | 2016* | 2012** | 2010*** |
|---|---|---|---|
| Per participant for recordkeeping services | **$21** | **$21** | **$30** |

*Nike, Inc. Form 5500 with 26,568 participants with an account balance and compensation to recordkeeper, Hewitt. No additional source of compensation to Hewitt is identified or discernable.

---

[15] "Recordkeeper Search Activity Expected to Increase Within Next Two Years," *Cerulli Assoc.*, January 8, 2013,
http://www.401khelpcenter.com/press_2013/pr_cerulli_010813.html#.Wt5hIS7wY3E.

[16] "Meeting Your Fiduciary Responsibilities," *U.S. Dept. of Labor*, 2012, at pages 5−6.

[17] Pensions&Investments, "Nike taps Fidelity as record keeper for 401(k) plan, Nov. 17, 2017, http://www.pionline.com/article/20171117/ONLINE/171119854/nike-taps-fidelity-as-record-keeper-for-401k-plan.

**Nike, Inc. Form 5500 with 19,362 participants with an account balance and compensation to recordkeeper, Hewitt. No additional source of compensation to Hewitt is identified or discernable.

***Nike, Inc. Form 5500 with 15,428 participants with an account balance and compensation to recordkeeper, Hewitt. No additional source of compensation to Hewitt is identified or discernable.

113.     Another large plan, the New Albertson's Inc. 401(k) plan is noted as leaving its then recordkeeper, Fidelity, for Vanguard in 2016. This is another recent example of a large plan, in terms of participant size, changing recordkeepers. Based on public documents, this plan charges a fixed annual fee of $31 per participant for recordkeeping and administrative services.[18] The Form 5500 in 2016 confirms that the New Albertsons's 401(k) Plan, with approximately 31,000 participant paid approximately $31−$32 per participant for recordkeeping and administrative services.[19]

114.     Similarly, a previously related company to New Albertson's Inc., Albertson's LLC 401(k) Plan, with approximately 17,200 plan participants also left Fidelity for Vanguard in 2016 and paid approximately $29 per participant for recordkeeping and administrative services.[20]

115.      In order to make an informed assessment as to whether a recordkeeper is receiving no more than reasonable compensation for the services provided to a plan, the responsible fiduciary must identify *all* fees, including

---

[18] New Albertson's Inc. 401(k) Plan Fee Disclosure,
  https://retirementplans.vanguard.com/ekit/workshops/albertsons_nai/convert/pdfs/New_Albertsons
  _FeeDisclosure.pdf.
[19] See Form 5500 for 2016 for New Albertson's Inc. 401(k) Plan and Master Trust Form 5500.
[20] See Form 5500 for 2016 for Albertson's LLC 401(k) Plan and Master Trust Form 5500.

recordkeeping fees and other sources of compensation, paid to the service provider.

**A. Shell Defendants failed to monitor recordkeeping fees, resulting in the Plan paying excessive fees.**

116.     Upon information and belief, since January 1, 2014, Shell Defendants failed to analyze whether the direct and indirect compensation paid to FIIOC, including revenue sharing FIIOC received from Plan mutual funds and Financial Enginges, was reasonable compared to market rates for the same services, and also failed to retain an independent third party to appropriately benchmark FIIOC's compensation.

117.     Upon information and belief, Shell Defendants also failed to conduct a competitive bidding process for the Plan's recordkeeping services since 2014 or prior. A competitive bidding process for the Plan's recordkeeping services would have produced a reasonable recordkeeping fee for the Plan. That is particularly so because recordkeeping fees for enormous plans such as the Plan have been declining since 2014 and since Shell Defendants hired FIIOC as the Plan's recordkeeper (before 2009). By failing to engage in a competitive bidding process for Plan recordkeeping fees, Defendants caused the Plan to pay excessive recordkeeping fees.

118.     Instead of obtaining a flat per-participant rate or sufficient rebates of excessive revenue sharing for the Plan, Defendants allowed FIIOC to collect excessive asset-based revenue sharing as payment for administrative services.

119.     FIIOC also received additional indirect compensation from another Plan service provider—Financial Engines. Financial Engines provides managed account services to Plan participants—investment advice—to assist them in

selecting options in which to invest their retirement assets. Financial Engines receives a fee based on the percentage of assets in the participant's 401(k) account. Financial Engines then shares over 25% of that asset-based advice fee with FIIOC, even though FIIOC provides no investment advice. FIIOC provides no service to Financial Engines or the Plan participant to justify this payment from participants' Plan assets.

120.    FIIOC actively conceals the nature of the payment it receives from Financial Engines. FIIOC refers to payments from Financial Engines by a misnomer it misleadingly calls "Data Connectivity" charges. FIIOC, via Financial Engines, charged this "Data Connectivity" charge to Plan participants since at least 2009. The payments to FIIOC have grown exponentially since that time, ranging from $825,759 in 2009 to over $3.8 million by 2016—over 450% increase. These escalating charges bear no relationship to the true cost that a recordkeeper like FIIOC incurs to provide a data feed to a managed account service provider like Financial Engines.

121.    The 2014 GAO Study reports that to set up data connectivity, a recordkeeper incurs a maximum one-time cost of roughly $400,000. Some managed account providers have developed a process to transfer information to recordkeepers that does not require integration with the recordkeeping system, which allows the necessary data to be transferred even without any additional cost. *Id*. Once this data connectivity feed is established, there is near zero cost to the recordkeeper to allow electronic data connectivity to the managed account provider on an ongoing

44

basis.

122.     Indeed, Financial Engines' 2016 Form 10-K, filed with the United

States Securities and Exchange Commission makes clear that data connectivity is a

one-time charge, not a recurring one. Financial Enginges states that "[f]ollwing

contract signing [with a recordkeeper], technical teams from Financial Engines and

the plan provider initiate a data connection project that typically takes between

four months and one year to complete. Once we have incurred this *one-time*, up-

front cost to establish a relationship and connection with a plan provider, we are

able to roll out our services for any plan sponsor of that provider." Financial

Engines Form 2016 SEC Form 10-K at 13 (emphasis added).

123.     Thus, labeling the charge collected by FIIOC "Data Connectivity" is a

pretense. The charge was nearly total profit to FIIOC.

124.     The "Data Connectivity" charge collected by FIIOC is not actually a

data connectivity charge, but a charge designed to further FIIOC's undisclosed

business relationship with Financial Engines. Based on publicly available Form

5500s for the Plan, this business relationship appears to be based on an asset-based

revenue sharing agreement that is unrelated to data connectivity, but instead

represents virtually pure additional profit to FIIOC with no additional services

provided to the Plan. Upon information and belief, the undisclosed business

relationship also includes direct fees that Financial Engines pays to FIIOC.

125.     Even though ERISA fiduciaries are obligated to monitor service

providers' compensation from all sources, Shell Defendants never investigated the

explosive growth in these payments from Financial Engines to FIIOC.

126.     Instead of discharging their fiduciary duties to act prudently and in the exclusive interest of participants, Shell Defendants served Fidelity Defendants' financial interests. Defendants failed to obtain competitive bids to determine whether the amounts paid to FIIOC were reasonable compared to market rates, and to determine whether participants would benefit from hiring a different recordkeeper with lower fees. Shell Defendants also failed to prudently assess whether each of the funds that paid revenue sharing to Fidelity Defendants was a prudent choice for the Plan compared to non-proprietary alternatives that did not pay such revenue sharing. Shell Defendants also failed to prudently assess whether the fee that FIIOC obtained from Financial Engines was a prudent choice for the Plan compared to other managed account services that did not pay such disguised charges to FIIOC Instead, Defendants included funds in the Plan not based on their merits, but because FIIOC requested the funds' inclusion and included Financial Engines as the Plan's managed account service provider not based on its merit, but because FIIOC requested that Financial Engines provide managed account services because of the pre-existing undisclosed business relationship with Financial Engines, by which FIIOC would benefit itself by benefitting Financial Engines at the expense of Plan participants. This benefited FIIOC because it allowed them to collect revenue sharing, disguised fees from managed account services, and investment management fees from their proprietary investment funds, but did not benefit participants.

46

127.     Shell Defendants permitted the Plan to pay an unreasonable asset-based recordkeeping fees to FIIOC, resulting in excessive recordkeeping fees. Although the Plan received rebates from FIIOC, those rebates did not bring the Plan's recordkeeping fees in line with reasonable market rates.

128.     Defendants were also required under ERISA to determine and monitor all sources of FIIOC's compensation, and to ensure that the compensation was limited to a reasonable amount for the services provided. Had Defendants discharged those duties, they would not have selected and retained as Plan investment options proprietary funds of the Plan's recordkeepers while failing to consider non-proprietary alternatives of other investment managers, and would not have allowed the Plan to pay excessive sums for recordkeeping. Defendants' failure to properly monitor and cap the recordkeepers' compensation caused the Plan to pay excessive recordkeeping fees, as follows.

129.     Experts in the recordkeeping industry with vast experience in requests for proposals and information for similar plans have determined the market rate that the Plan likely would have been able to obtain had the fiduciaries put the Plan's recordkeeping services out for competitive bidding. Based on the Plan's features, the nature and type of administrative services provided by FIIOC the Plans' combined participant level (roughly 33,000–38,000), and the recordkeeping market, the maximum outside limit of a reasonable recordkeeping fee for the Plan would have been $1,155,000 to $1,333,500 per year (an average of $35 per participant with an account balance).

130.     Based on schedules regarding service provider compensation shown on the Plan's publicly available Form 5500s filed with the Department of Labor, including details on revenue credits FIIOC provided to the Plan, and upon information regarding the rate of internal revenue share allocated to the Plan's recordkeeper, the Plan paid between $2.4 million and $6.3 million (or approximately $65 to $190 per participant) per year from 2014 to 2018, *over 5 times* higher than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year.

131.     To discharge their fiduciary duties, Defendants were required to obtain sufficient information regarding all sources of compensation received by the Plan's recordkeeper, including the amount of any revenue sharing payments and other outside payments, to make an informed assessment as to whether the amount of compensation was no more than reasonable for the services provided. Had Defendants accounted for and monitored those payments, it would have been apparent that FIIOC was receiving excessive fees and that participants were losing retirement savings as a result.

132.     Aside from the failures to monitor the amount of revenue sharing payments and to solicit competitive bids, Defendants also failed to assess the adequacy of rebates of excessive fee payments from FIIOC. Had Defendants obtained sufficient rebates to ensure the fees were reasonable, the Plan's recordkeeping fees would have been reduced to a level below $35 per participant, as other large plans have obtained, avoiding additional losses of retirement savings

133.    Shell Defendants' failure to ensure that participants were charged only reasonable fees for recordkeeping services caused the Plan to lose over $31.7 million due to unreasonable recordkeeping fees and lost investment opportunity.

## IV.    Confidential Plan Participant Data and its Value to Recordkeepers with an Affiliated Brokerage.

134.    Some defined contribution plan recordkeepers have affiliated businesses that sell other financial products and services. FIIOC has several such affiliates, the Fidelity Defendants, which sell nonplan retail financial products and services.

135.    As the Plan's recordkeeper, FIIOC receives not only the names and contact information of the Plan's participants, but also social security numbers, financial information and other non-public highly confidential and sensitive information relating to those participants, such as home and cellular phone numbers, work and personal email addresses, investment history, identity of their investments, account balances, investment contribution amounts, age, income, marital status, call center notes, and access to knowledge of "triggering events" such as when a Plan participant is nearing retirement, among other valuable information (hereinafter "Confidential Plan Participant Data"). The Confidential Plan Participant Data is current, as Plan participants tend to keep their contact and other details updated with their employers and benefits providers who hold their retirement assets. Unlike a typical broker who has to make cold calls to find clients who desire to invest, FIIOC's access to Confidential Plan Participant Data

allows it to easily identify individuals who participate in the Plan and have demonstrated that they desire to invest their income.

136.     Plan participants have an expectation that their Confidential Plan Participant Data will be protected by the Plan sponsor and not disclosed outside of the Plan for nonplan purposes, such as allowing the Plan's recordkeeper to proactively solicit participants to invest in retail financial products and services.

137.     After FIIOC receives Confidential Plan Participant Data, it shares that data with salespeople at its affiliated companies, including, but not limited to, Fidelity Brokerage Services, LLC and Fidelity Personal and Workplace Advisors, LLC.

138.     Upon information and belief, once FIIOC receives Confidential Plan Participant Data, it uploads Plan participant data to a customer interaction software program known as "Salesforce." Each time a Fidelity representative has an interaction with a customer, he or she is required to enter information concerning that interaction (*i.e.*, the substance of the discussion) in the "Comments" or "Notes" section of Salesforce, at or around the time that the interaction occurs. *See Fidelity Brokerage Services, LLC v. Brett Rocine, et al.*, No. 17-04993, Doc. 15 (N.D.Cal., Aug. 30, 2017) (Declaration of Fidelity Employee Peter Van Bemmel). The data collected in Salesforce is shared across all Fidelity affiliates, including all Fidelity Defendants, and is used by Fidelity Defendants to solicit the purchase of nonplan retail financial products and services.

50

139.     Fidelity Defendants are unique in their sales practices in that Fidelity does not have its sales representatives make cold calls to persons who have no relationship with Fidelity, or who were not referred to Fidelity. This is unlike other financial services firms that build their business through cold calls and door-to-door solicitations, without access to Confidential Plan Participant Data from retirement plans. Fidelity forwards Confidential Plan Participant Data to its local sales representatives when those participants experience triggering events, such as 401(k) distributable events and other events that Fidelity learns of in its role as the Plan's recordkeeper (*e.g.*, adding a new beneficiary or changing marital status). *See Fidelity Brokerage Services, LLC v. John Nordstrom, et al.*, No. 17-00594, Doc. 5-4 (N.D.Cal, Mar. 21, 2017)(Declaration of Robert Heisler, Fidelity's Senior Vice President, Market Manager for Fidelity Brokerage Services LLC)(hereinafter "Heisler Decl."). Fidelity Defendants utilize this practice on Plan participants. For example, Laurie Ovesen, a Fidelity salesperson based in Seattle, Washington, repeatedly called Plaintiff Brian Coble, who lives in Seattle, Washington, using his Confidential Plan Participant Data in an attempt to solicit the purchase of non-Plan products.

140.     The Confidential Plan Participant Data that Fidelity receives from the Plan is among Fidelity's most important and valuable assets. *See, e.g.*, Heisler Decl. at ¶7.

141.     The financial services industry is highly competitive and it is generally known in the financial services industry, and by investment professionals and Plan

51

fiduciaries, that such Confidential Plan Participant Data is an extremely valuable asset. *See*, *e.g.*, *Fidelity Brokerage Serv. LLC v. Michael Miller*, No. 13-02390, Doc. 1-2 (M.D.Fla, Sep. 16, 2013)(Fidelity policy stating that "*Information is an asset of tremendous value in the financial services industry.*"). Indeed, Fidelity Defendants refer to the Confidential Plan Participant Data they receive as a trade secret. Financial Engines has stated that the wealth management industry is highly competitive, and a company's competitive advantage is substantially dependent upon its ability to obtain, maintain and protect client goodwill and relationships and confidential, competitively-valuable and trade secret information pertaining to clients, prospective clients, and referral sources. MassMutual recently required its financial salespersons to cross-sell non-plan products to retirement plan participants in order to "build a stream of business in the future." MassMutual@WORK, Why Sell retirement plans? For Financial Professional Use Only. Not For Use With The Public, 2019.[21] MassMutual advises that "Advisors who sell and manage retirement plans tend to have significantly more assets under management. They also are in a position to capture downstream retail sales opportunities through IRA rollovers and other ancillary sales. Consider the personal assets of CEOs, CFOs, senior executives and other plan participants." *Id.*

142.    A significant portion of Fidelity Defendants' business is derived from selling non-Plan retail financial products and services to Plan participants using Confidential Plan Participant Data.

---

[21] Available at https://wwwrs.massmutual.com/retire/pdffolder/rs3264.pdf.

143.     Fidelity uses the valuable Plan asset of Confidential Plan Participant Data to derive substantial revenue from the sale of individual retirement accounts ("IRA"), high interest credit cards, life insurance, banking products, advisory accounts, individual brokerage accounts with tools such as Fidelity's Active Trader Pro that encourages market timing and active trading (and therefore increases Fidelity's fees and Plan participants' risk), options trading accounts (where investors' losses are potentially limitless), 529 accounts, and other retail products and services. Fidelity solicited Plan participants to purchase these products, including soliciting the named Plaintiffs through multiple platforms, including phone calls, in-person meetings and sending emails, using their Confidential Plan Participant Data.

144.     The revenue generated by these sales is significant and often represents multiples of the recordkeeping fees received by the service provider. The illustration below is used by professionals in the retirement plan industry to demonstrate the effect of nonplan product sales by recordkeepers with affiliated businesses on total recordkeeper compensation:



145.     Here, a large driver of revenue to Fidelity Defendants is Plan

participants' "roll over" of their Plan assets into IRAs provided by Fidelity

Defendants. The revenue from selling nonplan products—138,000 (in blue)—from

an opaque provider (such as FIIOC) alone exceeds the entire recordkeeping fee for a

transparent provider. Fidelity Defendants earn additional investment advisory fees,

higher expense ratios or even commissions on retail investment and insurance

products sold within an IRA.

146.     Moving Plan participants' assets out of the 401(k) into an IRA is often

contrary to Plan participants' best interest. In fact, Financial Engines, who, as a

discretionary managed account service provider, is a fiduciary with respect to the

investment advice it provides to Plan participants, states in its Form ADV disclosures that it does not solicit rollovers from 401(k) Plan participants as a conflict of interest may exist because it has an economic incentive to recommend rollovers to clients. Financial Engines' disclosure states that it makes certain exceptions to this policy, including when a 401(k) plan contains high fees, but that strict safeguards are in place (including internal management approval) to ensure a rollover is always in the participant's best interests. Fidelity Defendants have no such protections or policies to avoid the conflict of interest. Shell Defendants do not monitor Fidelity Defendants' rollover activities or solicitations using Confidential Plan Participant Data to determine if they are in the best interest of Plan participants.

147.    The damage to Plan participants here is significant. It is common knowledge in the retirement plan industry, and among investment professionals, that generally "IRA owners pay higher fees in the range of 25 bps to 30 bps and, in some cases, as high as 65 bps, which can be two to three times higher than fees paid by plan participants for in-plan investments." United States Government Accountability Office, Report to Congressional Requesters, 401(K) PLANS, Improved Regulation Could Better Protect Participants from Conflict of Interest, January 2011, at 40, available at https://www.gao.gov/assets/320/315363.pdf (hereinafter "2011 GAO Study"). In 2012, Jeffrey Maggioncalda, Financial Engines' CEO, stated on an earnings call that:

> [I]f you go out there and look at typical pricing in the industry, the
> difference between asset management fees associated with folks in

401(k) plans, and the asset management fees for folks in an IRA program, which is retailing outside of the 401(k), we find that typically, the expense ratios and the funds are higher, you also find, typically, that the management fee, if it's a managed account, are also higher. We do not expect these prices to be -- I shouldn't say, we do not expect. The prices are not the same, between 401(k) and IRA. They are more reflective of higher prices associated wave a broader set of offerings that is more traditionally seen in the retail market.

148.     Because Confidential Plan Participant Data is such a valuable asset, financial services companies, including Fidelity Defendants and Financial Engines, engage in extraordinary efforts to prevent losing the asset, including routinely taking legal action to protect the asset, and actively preventing their competitors from offering competitive financial services and products to Plan participants.

149.     Shell Defendants took no action to preclude Fidelity Defendants from cross-selling nonplan retail products and services despite long-standing industry knowledge that such practices were not in retirement plan participants' best interests. In January 2011, a Government Accountability Office Report stated that:

> **Cross-selling products outside of a plan to participants can substantially increase a service provider's compensation, which creates an incentive for the service provider to steer participants toward the purchase of these products even though such purchases may not serve the participants best interest.** For example, products offered outside a plan may not be well suited to participants' needs or participants may be able to secure lower fees by choosing investment funds within their plans comparable with products offered outside their plan. **Industry professionals we spoke with said that cross-selling IRA rollovers to participants, in particular, is an important source of income for service providers. For example, according to an industry professional, a service provider could earn $6,000 to $9,000 in fees from a participant's purchase of an IRA, compared with $50 to $100 in fees if the same participant were to invest in a fund within a plan. Plan sponsors can take steps to preclude service providers**

**from cross-selling nonplan products and services to plan participants.**

2011 GAO Study at 36 (emphasis added).

150.     By March 2013, another GAO study found that "service providers' call center representatives encouraged rolling 401(k) plan savings into an IRA even with only minimal knowledge of a caller's financial situations. Participants may also interpret information about their plans' service providers' retail investment products contained in their plans' educational materials as suggestions to choose those products." United States Government Accountability Office, Report to Congressional Requesters, 401(K) PLANS, Labor and IRS Could Improve the Rollover Process for Participants, March, 2013, available at https://www.gao.gov/assets/660/652881.pdf (hereinafter "2013 GAO Study").

151.     Fidelity's role as recordkeeper also give its sales agents access to other sales opportunities to pitch IRAs and other products and services, such as employee meetings, benefit-enrollment fairs, and professional conferences.

152.     As early as 2010, other defined contribution plan fiduciaries, recognizing the value of Confidential Plan Participant Data, prohibited cross-selling by their plans' recordkeepers. For example, in 2010, Jefferson County Public Schools in Colorado required in its Request for Proposal that the recordkeeper contractually agree not to have the recordkeeping representative cross-sell products. Recently, in August 2019, fiduciaries on the Oregon Savings Growth Plan advisory committee discussed the importance that its recordkeeper not cross-sell

57

any products and confirmed that the language existed in the current recordkeeping

contract.

153.     A 2017 PriceMetrix report suggests that $200 million in assets under

management would translate to approximately $1.2 million in additional revenue to

Fidelity Defendants *per year*.[22] That assumes no prior or future rollovers. Upon

information and belief, based on the size of the Plan and the amount of rollovers of

assets reported on the publicly available Form 5500, over $200 million in Plan

participants' assets transfer to Fidelity Defendants' IRAs per year, so Fidelity

Defendants' expected additional revenue solely from rollovers since 2014 is well

over $26.4 million as estimated in the chart below.[23]

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|
| **Expected assets under management from Plan participant rollovers to Fidelity Defendants from solicitations** | $200 million | $400 million | $600 million | $800 million | $1 billion | $1.2 billion |
| **Fidelity Defendants' expected revenue per year from IRA rollovers (conservative estimate)** | $1.2 million | $2.4 million | $3.6 million | $4.8 million | $6 million | $8.4 million |

154.     Shell Defendants did not prohibit or monitor such cross-selling by

Fidelity Defendants.

---

[22] The State of Retail Wealth Management, PriceMetrix, p. 4, 2017, *available at*
https://www.mckinsey.com/~/media/mckinsey/industries/financial%20services/our%20insights/the%2
0state%20of%20retail%20wealth%20management%20in%20north%20america/the-state-of-retail-
wealth-management.ashx
[23] See id.

155.     Fidelity's role as the 401(k) plan's provider serves as an implicit endorsement of its products by Shell to Plan participants. The implicit endorsement of a service provider is significant, because, as the 2011 GAO study observed, "participants may mistakenly assume that service providers are required to act in the participant's best interest." 2011 GAO Study at 39-40. This is commonly known by plan fiduciaries and investment professionals. In 2012, Jeffrey Maggioncalda, Financial Engines' CEO, stated on an earnings call that "about 30% of all participants consider their plan provider to be a primary source for retirement advice."

156.     In addition to the revenue received by the recordkeeper from the use of Confidential Plan Participant Data, allowing the recordkeeper access to Confidential Plan Participant Data creates additional harm to the Plan because it allows the Plan's recordkeeper to maintain Confidential Plan Participant Data after termination of the recordkeeping contract, enabling the targeting and solicitation of plan assets on an ongoing basis with no fiduciary protections, which contributes to participants moving their assets out of the plan and into less favorable retail investment, insurance, and banking products.

157.     By cross-selling nonplan retail products and services, Fidelity Defendants exercised control over the management and disposition of Confidential Plan Participant Data—a valuable Plan asset—and made enormous profits through the use of assets of the Plan. Documents and data regarding the amount of such profits are solely in the possession of Fidelity Defendants.

**E. Shell Defendants Paid Shell Employees with Plan Assets**

158.     The Plan's Regulations and Trust Agreement provide that the Plan Administrator shall serve without compensation from the Plan.

159.     Despite this, Shell Defendants obtained money from Plan participants' retirement assets for administering the Plan. Shell Defendants used Plan assets to pay four employees $2,124,886 from 2014 to 2018, including paying one employee $201,032 in 2015. Shell Defendants also used Plan assets to pay United Airlines $7,404 in 2014 for airline tickets.

160.     Upon information and belief, Shell Defendants did not enter into any contract or formal arrangement, much less a reasonable contract or arrangement, for reimbursement of proper Plan expenses, but instead just paid itself from Plan assets under this scheme when it had a clear conflict of interest with the Plan and Plan participants.

161.     Upon information and belief, Shell Defendants did not hire an independent fiduciary to determine whether it was in the interest of the participants to engage in this scheme or whether the services that Shell employees performed were necessary for the operation of the Plan, whether the amounts charged for those services were reasonable, and whether Shell was being reimbursed only its direct expenses incurred in providing necessary services to the Plan.

## CLASS ACTION ALLEGATIONS

162.      29 USC §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

163.       In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following classes:

> All participants and beneficiaries of the Shell Provident Fund 401(K) Plan from January 21, 2014 through the date of judgment, excluding the Defendants.

> And the following subclass:

> All participants and beneficiaries of the Shell Provident Fund 401(K) Plan who utilized the Plan's managed account services from January 21, 2014 through the date of judgment, excluding the Defendants.

> This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.      The Class includes over 35,000 members and is so large that joinder of all its members is impracticable.

b.      There are questions of law and fact common to this Class because the Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. Thus, common

questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breach of duty.

c.      Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

d.      Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.      Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and

beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

## COUNT I

## Breach of Fiduciary Duties (29 U.S.C. §1104(a)(1))

## against Shell Defendants related to Unreasonable Recordkeeping Fees

164.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

165.    Shell Defendants were required to discharge their duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA.

166.    If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. *See George v. Kraft Foods Global, Inc*., 641 F.3d 786, 798–99 (7th Cir. 2011). Similarly, failing to "monitor and control recordkeeping fees" and "paying excessive revenue sharing" as a result of failures to "calculate the amount the Plan was paying … through revenue sharing," to "determine whether [the recordkeeper's] pricing was competitive," and to "leverage the Plan's size to reduce fees," while allowing the "revenue sharing to benefit" a

third-party recordkeeper "at the Plan's expense" is a breach of fiduciary duties. *Tussey,* 746 F.3d at 336.

167.    Shell Defendants' process for monitoring and controlling the Plan's recordkeeping fees was a fiduciary breach in that Shell Defendants failed to: monitor the amount of the revenue sharing received by the Plan's recordkeeper, determine if those amounts were competitive or reasonable for the services provided to the Plan, use the Plan's size to reduce fees, or obtain sufficient rebates to the Plan for the excessive fees paid by participants. Moreover, Shell Defendants failed to solicit bids from competing providers on a flat per-participant fee basis. Over time, as the Plan's assets grew, the asset-based revenue sharing payments to the Plan's recordkeeper grew, even though the services provided by the recordkeeper remained the same. This caused the recordkeeping compensation paid to the recordkeeper to exceed a reasonable fee for the services provided. This conduct was a breach of fiduciary duties.

168.    By allowing Fidelity Defendants to put virtually all of their proprietary investments in the Plan without scrutinizing Fidelity Defendants' financial interest in using funds that provided them a steady stream of revenue sharing payments, Shell Defendants failed to act in the exclusive interest of participants.

169.    Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

170.    Each Shell Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of

fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

171.     Each Shell Defendant knowingly participated in the breach of the other Shell Defendants, knowing that such acts were a breach, enabled the other Shell Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Shell Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Shell Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

**COUNT II**

**Breach of Fiduciary Duties (29 U.S.C. §1104(a)(1))**

**against Shell Defendants related to Plan Investments**

172.     Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

173.     This Count alleges breach of fiduciary duties against Shell Defendants.

174.     The scope of the fiduciary duties and responsibilities of these Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries and acting with the care, skill, diligence, and prudence required by ERISA. These Shell Defendants are directly responsible for selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent designated investment alternatives, and taking all necessary steps to ensure that the Plan's assets are invested prudently.

65

175.     As the Supreme Court recently confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1829.

176.     Shell Defendants completely failed to monitor and evaluate the Plans' investments that were internally designated as fund window investments in the Plan. Shell Defendants also retained for years Plan investment options with unreasonably poor performance relative to other investment options in the same or similar assets classes that were readily available to the Plan.

177.     By retaining the entire fund window, Shell Defendants retained an investment structure that was contrary to prudent investment practices and the actions and practices of other knowledgeable and diligent fiduciaries of similar defined contribution plans.

178.     Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

179.     Each Shell Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

180.     Each Shell Defendant knowingly participated in the breach of the other Shell Defendants, knowing that such acts were a breach, enabled the other Shell Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Shell Defendants and failed to

make any reasonable effort under the circumstances to remedy the breach. Thus, each Shell Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

**COUNT III**

**Breach of Fiduciary Duties (29 U.S.C. §1104(a)(1))**

**against Shell Defendants related to Unreasonable Managed Account Fees**

181. Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

182. Shell Defendants were required to discharge their duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA.

183. Shell Defendants' process for monitoring and controlling the Plan's managed account fees was a fiduciary breach in that Shell Defendants failed to engage in a reasoned decision making process that compared Financial Engines services and fees to other providers. Shell Defendants also failed to monitor the amount of revenue received by the Plan's managed account service provider, determine if those amounts were competitive or reasonable for the services provided to the Plan, or use the Plan's size to reduce fees. Moreover, Shell Defendants failed to solicit bids from competing providers. This caused the managed account compensation paid to Financial Engines to exceed a reasonable fee for the services provided. Moreover, the undisclosed scheme Financial Engines has with FIIOC

which benefited FIIOC was one in which FIIOC benefitted itself since the that
participants paid Financial Engines the more FIIOC received in kickbacks from
that amount. This conduct was a breach of fiduciary duties.

184.     Shell Defendants were obligated to monitor all sources of compensation
for each of the Plan's service providers, including FIIOC. Shell Defendants failed to
monitor the so called "Data Connectivity" payments from Financial Engines to
FIIOC to determine with the payments were legitimate compensation for bona fide
services, or merely a quid pro quo to further the hidden business relationship
between Financial Engines and FIIOC. Shell Defendants' failure to monitor and
control these payments caused the Plan to pay inflated managed account fees to
Financial Engines and caused FIIOC's already-excessive compensation to become
even more unreasonable. Had Shell Defendants monitored and controlled these
payments, it could have recovered the excess for the benefit of the Plan.

185.     Total Plan losses will be determined at trial after complete discovery in
this case and are continuing.

186.     Each Shell Defendant is personally liable under 29 U.S.C. §1109(a) to
make good to the Plan any losses to the Plan resulting from the breaches of
fiduciary duties alleged in this Count and is subject to other equitable or remedial
relief as appropriate.

187.     Each Shell Defendant knowingly participated in the breach of the
other Shell Defendants, knowing that such acts were a breach, enabled the other
Shell Defendants to commit a breach by failing to lawfully discharge its own

fiduciary duties, knew of the breach by the other Shell Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Shell Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT IV

### Breach of Fiduciary Duties (29 U.S.C. §1104(a)(1)) against Fidelity Investments Institutional Operations Company, Inc.— Misappropriation of Confidential Plan Participant Data

188.   Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

189.   FIIOC is a fiduciary because it exercise authority and control respecting management and disposition of Confidential Plan Participant Data.

190.   FIIOC was required to discharge its duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA. That included restricting its use of Confidential Plan Participant Data solely to carrying out its Plan recordkeeping role, not using the data for nonplan purposes.

191.   FIIOC's disclosure of Plan participant data to Fidelity Defendants for the purpose of soliciting the purchase of nonplan products was a fiduciary breach in that the disclosure was for the purpose of providing benefit to Fidelity Defendants

69

and not for the exclusive purpose of providing benefits to Plan participants and beneficiaries.

192.     Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

193.     FIIOC is liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## COUNT V

## Breach of Fiduciary Duties (29 U.S.C. §1104(a)(1))

## against Shell Defendants—Failure to Safeguard Confidential Plan

## Participant Data

194.     Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

195.     Shell Defendants were required to discharge their duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA.

196.     Shell Defendants disclosure of Plan participant data to FIIOC, without any restrictions as to the use of Plan participant data, was a fiduciary breach in that sensitive, highly confidential personal financial data was disclosed and used for purposes of soliciting nonplan retail products from Plan participants.

70

197.     By allowing Fidelity Defendants to use Confidential Plan Participant Data to solicit the purchase of retail nonplan products, Shell Defendants failed to act in the exclusive interest of participants.

198.     Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

199.     Each Shell Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

200.     Each Shell Defendant knowingly participated in the breach of the other Shell Defendants, knowing that such acts were a breach, enabled the other Shell Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Shell Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Shell Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT VI

## 29 U.S.C. §1106(a)—Prohibited Transactions Between the Plan and a Party in Interest against Shell Defendants

201.     Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

202.     This Count alleges prohibited transactions against Shell Defendants.

203.     Shell Defendants were involved in causing the Plan to use FIIOC as the Plan's recordkeeper.

204.     As recordkeeper, FIIOC is a party in interest. Because FIIOC is a wholly-owned subsidiary of FMR LLC, FMR LLC is also a party in interest.

205.     Fidelity Defendants are parties in interest because Fidelity Defendants are wholly owned subsidiaries of FMR LLC and, upon information and belief, Fidelity Defendants share 10 percent or more in profits with FMR LLC.

206.     Shell Defendants knew or should have known that in its role as recordkeeper, FIIOC received and had unfettered access to a valuable asset of the Plan, Confidential Plan Participant Data.

207.     Shell Defendants knew or should have known that by retaining FIIOC as the Plan's recordkeeper year after year and allowing FIIOC to receive unfettered access to Confidential Plan Participant Data which its affiliates used to market Fidelity Defendants' non-plan products to Plan participants, Shell Defendants caused the Plan to engage in transactions that constituted a direct or indirect transfer to, or use by or for the benefit of a party in interest, a valuable asset of the Plan, Confidential Plan Participant Data, in violation of 29 U.S.C. §1106(a)(1)(D).

208.     Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

209.     Each Shell Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of

fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

210.     Each Shell Defendant knowingly participated in the breach of the other Shell Defendants, knowing that such acts were a breach, enabled the other Shell Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Shell Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Shell Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT VII

## 29 U.S.C. §1106(a) and §1132(a)(3)—Prohibited Transaction Between the Plan and a Party in Interest against FIIOC

211.     Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

212.     As alleged above, FIIOC is an ERISA fiduciary and subject to liability for losses and equitable remedies under 29 U.S.C. §1132(a)(2) and §1109(a). Alternatively, 29 U.S.C. §1132(a)(3) provides a cause of action against a party in interest, such as FIIOC, for knowing participation in prohibited transactions or a breach of duty by a fiduciary.

213.     FMR LLC is a party in interest because FIIOC is a wholly owned subsidiary of FMR LLC. 29 USC §1002(14)(E).

214.     Fidelity Defendants are parties in interest because Fidelity Defendants are wholly owned subsidiaries of FMR LLC and, upon information and belief, Fidelity Defendants share 10 percent or more in profits with FMR LLC. 29 USC §1002(14)(E) &(I).

215.     As set forth in the preceding counts, Shell Defendants knew or should have known that retaining FIIOC year after year caused the Plan to engage in prohibited transactions with a party in interest in violation of 29 U.S.C. §1106(a)(1)(D).

216.      As recordkeeper and party in interest, FIIOC knowingly received access to highly sensitive Confidential Plan Participant Data, a valuable asset of the Plan, and knowingly used such Confidential Plan Participant Data for its own benefit and the benefit of its affiliates that marketed Fidelity Defendants' non-plan products to Plan participants to generate substantial corporate profits for the Fidelity Defendants. Those corporate profits are the product of FIIOC and the Fidelity Defendants' wrongful use of the Plan's assets and subject to disgorgement.

217.     The amount of such profits can only be determined after complete discovery, as the documents and data regarding the amount of such profits are solely in the possession of Fidelity Defendants.

218.     Fidelity Defendants are also subject to other equitable relief as appropriate.

219.     FIIOC, in transmitting Confidential Plan Participant Data to Fidelity Defendants and using Confidential Plan Participant Data to market Fidelity

Defendants' non-plan products to Plan participants, caused the Plan to transfer to, or allow use by or for the benefit of Fidelity Defendants, a valuable asset of the Plan, Confidential Plan Participant Data, in violation of 29 U.S.C. §1106(a)(1)(D).

## COUNT VIII

### 29 U.S.C. §1106(a) and (b)—Prohibited Transactions Between the Plan and Shell

220.     Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

221.     Shell Defendants dealt with the assets of the Plan in their own interest and for their own account by diverting rebates to the Plan for reimbursement of employee salaries and fringe benefits and other expenses instead of recovering that revenue sharing for the Plan and Plan participants. 29 U.S.C. §1106(b)(1).

222.     By establishing expense reimbursement accounts and revenue credit programs that delivered revenue sharing to Shell Defendants in the form of reimbursement of employee salaries and other expenses instead of delivering revenue sharing to the Plan and by paying itself from those accounts, Shell Defendants acted on behalf of a party whose interests were adverse to the interests of the Plan or the interests of its participants or beneficiaries (namely, itself). 29 U.S.C. §1106(b)(2).

223.     The payments to itself described above constitute prohibited transactions by Shell Defendants as fiduciaries to the Plan and Shell Defendants are obligated to disgorge to the Plan all amounts it received and must make good to

the Plan all losses the Plan suffered from being deprived of those assets, namely, the gains the Plan would have earned had those amounts been restored to the Plan. 29 U.S.C. §1109(a).

224.    To the extent that the arrangement and payments described above are determined not to constitute prohibited transactions under §1106(b), they are prohibited transactions under §1106(a) because Shell Defendants, acting through its officers, employees, and agents, caused the Plan to engage in transactions—payment of excess revenue sharing to Shell Defendants and allowing Shell Defendants employees to provide services to the Plan—that it knew or should have known constituted a direct or indirect furnishing of services between the Plan and a party in interest (Shell Defendants) or the transfer to, or use by or for the benefit of a party in interest (Shell Defendants), of Plan assets in the form of revenue sharing. 29 U.S.C. §1106(a)(1)(C)–(D).

## COUNT IX

### Injunctive Relief against all Defendants

225.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

226.    Under 29 U.S.C. §1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA. A defendant may be liable under that section regardless of whether it is a fiduciary. A nonfiduciary transferee of proceeds from a breach of a fiduciary duty or prohibited transaction is subject to equitable relief if it had actual or constructive knowledge of the circumstances that rendered the transaction or payment unlawful.

76

227.    In doing the acts described herein, Shell Defendants and FIIOC, and those in concert with them, including Fidelity Defendants have harmed Plan participants by, among other things, improperly garnering, retaining, disclosing and utilizing Confidential Plan Participant Data to solicit Plan participants to purchase nonplan retail financial products and services, providing financial and investment advice that is not in participants' best interest, and actively benefitting over competitors offering nonplan products and services because of the imprimatur of Shell Defendants' approval by reason of FIIOC's role as recordkeeper.

228.    Unless Defendants are temporarily or preliminarily enjoined from the foregoing conduct, Plan participants will be irreparably harmed by:

a.  Improper use of confidential, highly sensitive financial information that is solely the property of Plan participants;

b.  Improper use of a plan asset, which is confidential, highly sensitive financial information that is solely the property of the Plan participants;

c.  Loss of confidentiality of Plan participants' records and financial dealings;

d.  Continued solicitation of Plan participants, using their Confidential Plan Participant Data, under the auspices of being the chosen Plan service provider to purchase nonplan retail financial products and services; and

e.  Present economic loss, which is incalculable at this time because all

documents necessary to calculate such damages are in the sole possession of

Fidelity Defendants, and future economic loss which is unascertainable at this time.

## JURY TRIAL DEMANDED

229.  Pursuant to Fed.R.Civ.P. 38 and the Constitution of the United States,

Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated

Plan participants and beneficiaries, respectfully request that the Court:

- find and declare that Defendants have breached their fiduciary

  duties as described above;

- find and declare that Defendants committed prohibited transactions;

- find and adjudge that Defendants are personally liable to make good

  to the Plan all losses to the Plan resulting from each breach of

  fiduciary duty, and to otherwise restore the Plan to the position it

  would have occupied but for the breaches of fiduciary duty;

- determine the method by which Plan losses under 29 U.S.C. §1109(a)

  should be calculated;

- order Defendants to provide all accountings necessary to determine

  the amounts Defendants must make good to the Plan under §1109(a);

- remove the fiduciaries who have breached their fiduciary duties and

  enjoin them from future ERISA violations;

- surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- reform the Plan to include only prudent investments;

- reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

- reform the Plan to obtain bids for managed account services and to pay only reasonable managed account service fees;

- certify the Classes, appoint each of the Plaintiffs as a class representative, and appoint Schlichter, Bogard & Denton LLP as Class Counsel;

- award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- order the payment of interest to the extent it is allowed by law; and

- grant other equitable or remedial relief as the Court deems appropriate.

Additionally, Plaintiffs request that the Court enter a preliminary injunction in favor of Plaintiffs and against Defendants, and all those acting in concert with them, to enjoin Defendants, pending further Order of this Court, from committing the following acts:

(a) soliciting any business from Plan participants whose name became known to Fidelity Defendants by way of FIIOC's position as the Plan's recordkeeper;

(b) using, disclosing, transmitting, and continuing to possess, for the purpose of solicitation of Plan participants, the information contained in the records of the Plan, including, but not limited to, the names, addresses, and confidential financial information of the customers Fidelity Defendants learned through FIIOC's position as the Plan's recordkeeper.

January 24, 2020                    By: /s/ Robert M. Tramuto
                                    Robert M. Tramuto, attorney-in-charge
                                    Texas Bar #20186300
                                    S.D. Texas Bar #6863
                                    Jones Granger
                                    10000 Memorial Drive
                                    Suite 888
                                    P.O. Box 4340
                                    Houston, TX 77210
                                    Telephone: (713) 668-0230
                                    Facsimile: (713) 956-7139
                                    btra@jonesgranger.com
                                    *Local Counsel for Plaintiffs*


                                    *Jerome J. Schlichter, Esq., of counsel
                                    (Missouri Bar #32225)
                                    *Scott T. Apking, Esq., of counsel
                                    (Missouri Bar #66868)
                                    SCHLICHTER, BOGARD & DENTON, LLP
                                    100 South Fourth Street, Suite 1200
                                    St. Louis, Missouri 63102
                                    Telephone: (314) 621-6115
                                    Facsimile: (314) 621-5934
                                    jschlichter@uselaws.com
                                    sapking@uselaws.com
                                    *Pro Hac Vice Admission Forthcoming*

                                    *Attorneys for Plaintiffs*

81