## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| CHARLES HARMON, BRIAN COBLE, ASUR VALLEJOS, DAVID LAWRENCE, individually and as representatives of a class of participants and beneficiaries of the Shell Provident Fund 401(k) Plan, | : : : : : : : : | |
| *Plaintiffs*, | : : | |
| v. | : : | |
| SHELL OIL COMPANY, TRUSTEES OF THE SHELL PROVIDENT FUND, CYNTHIA A.P. DEERE, SCOTT G. BALLARD, PAUL GOODFELLOW, RHOMAN J. HARDY, EILEEN M. PERILLO, CHRISTOPHER B. RICE, SUSAN M. WARD, GLENN T. WRIGHT, FIDELITY INVESTMENTS INSTITUTIONAL OPERATIONS COMPANY, INC., FMR LLC, FIDELITY BROKERAGE SERVICES LLC, FIDELITY PERSONAL AND WORKPLACE ADVISORS LLC, FIDELITY INVESTMENTS LIFE INSURANCE COMPANY, FIDELITY PERSONAL TRUST COMPANY, FSB, AND ALL OTHER UNKNOWN PLAN ADMINISTRATORS AND TRUSTEES OF THE SHELL PROVIDENT FUND FROM 2014 TO THE PRESENT, | : : : : : : : : : : : : : : : : : : : : : | Civil Action No. 3:20-cv-00021  **Oral Argument Requested** |
| *Defendants*. | : : | |

## FIDELITY DEFENDANTS' MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................1

BACKGROUND ...............................................................................................................3

ARGUMENT .....................................................................................................................6

    I.     THE CLAIMS AGAINST FIDELITY SHOULD BE DISMISSED
          BECAUSE PLAINTIFFS LACK CONSTITUTIONAL STANDING. ................6

    II.    THE CLAIMS AGAINST FIDELITY SHOULD BE DISMISSED
          BECAUSE PARTICIPANT DATA IS NOT A "PLAN ASSET." ......................11

          A.    ERISA's Text and Structure Show that Participant Data Is Not a
                "Plan Asset." ............................................................................................12

          B.    Plaintiffs' Theory Has Been Consistently Rejected by Courts and
                Undercut by the DOL. ..............................................................................16

          C.    Plaintiffs' Theory Has Troubling Implications for the Treatment of
                 Personal Information Generally and Would Significantly Expand
                ERISA's Scope Beyond What Congress Could Have Intended. ...............20

    III.   PLAINTIFFS FAIL TO PLEAD THE ELEMENTS NECESSARY TO
          STATE A PROHIBITED-TRANSACTION CLAIM. ........................................26

          A.    None of the Fidelity Affiliates Alleged To Have Solicited Plaintiffs
                Is a Party In Interest. ...............................................................................26

          B.    The Amended Complaint Fails To Allege that Shell Subjectively
                Intended To Benefit Fidelity. ...................................................................28

           C.    The Amended Complaint Fails To Allege That Fidelity Knew That
                 Transferring Participant Data to Other Fidelity Entities Violated
                 ERISA. ......................................................................................................29

CONCLUSION.................................................................................................................30

## **TABLE OF AUTHORITIES**

**CASES**.................................................................................................................... **PAGE(S)**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...........................................................................................11

*Caldwell v. Dretke*,
    429 F.3d 521 (5th Cir. 2005) ...........................................................................15

*David v. Alphin*,
    704 F.3d 327 (4th Cir. 2013) .............................................................................7

*Divane v. Northwestern University*,
    No. 16 C 8157, 2018 WL 2388118 (N.D. Ill. May 25, 2018),
    *aff'd*, 953 F.3d 980 (7th Cir. 2020)..................................................................16

*Divane v. Northwestern University*,
    953 F.3d 980 (7th Cir. 2020) ...........................................................................29

*Dupree v. Prudential Insurance Co. of America*,
    No. 99-8337-Civ., 2007 WL 2263892 (S.D. Fla. Aug. 7, 2007) ......................28

*Edmonson v. Lincoln National Life Insurance Co.*,
    725 F.3d 406 (3d Cir. 2013)..............................................................................18

*Faber v. Metropolitan Life Insurance Co.*,
    648 F.3d 98 (2d Cir. 2011).................................................................................18

*In re Fidelity ERISA Float Litigation*,
    829 F.3d 55 (1st Cir. 2016)...............................................................................11

*Fifth Third Bancorp v. Dudenhoeffer*,
    573 U.S. 409 (2014)............................................................................................2

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995)...........................................................................................15

*Harris Trust & Savings Bank v. Salomon Smith Barney, Inc.*,
    530 U.S. 238 (2000)...........................................................................................29

*In re iPhone Application Litigation*,
    844 F. Supp. 2d 1040 (N.D. Cal. 2012) ............................................................19

*Jordan v. Michigan Conference of Teamsters Welfare Fund*,
    207 F.3d 854 (6th Cir. 2000) ...........................................................................28

*Kalda v. Sioux Valley Physician Partners, Inc,*
    481 F.3d 639 (8th Cir. 2007) ......................................18

*Kitty Hawk Aircargo, Inc. v. Chao,*
    418 F.3d 453 (5th Cir. 2005) .......................................9

*Lee v. Verizon Communications, Inc.,*
    837 F.3d 523 (5th Cir. 2016) .......................................7

*Low v. LinkedIn Corp.,*
    900 F. Supp. 2d 1010 (N.D. Cal. 2012) ......................19

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) .....................................................8

*In re Luna,*
    406 F.3d 1192 (10th Cir. 2005) .................................18

*Martone v. Robb,*
    902 F.3d 519 (5th Cir. 2018) .....................................11

*Merrimon v. Unum Life Insurance Co. of America,*
    758 F.3d 46 (1st Cir. 2014) ........................................18

*Patient Advocates, LLC v. Prysunka,*
    316 F. Supp. 2d 46 (D. Me. 2004) .......................16, 24

*Pension Benefit Guaranty Corp. ex rel. St. Vincent Catholic Medical Centers Retirement*
    *Plan v. Morgan Stanley Investment Management Inc.,*
    712 F.3d 705 (2d Cir. 2013) ........................................2

*Reich v. Compton,*
    57 F.3d 270 (3d Cir. 1995) .........................................28

*Renfro v. Unisys Corp.,*
    671 F.3d 314 (3d Cir. 2011) .......................................11

*Rozo v. Principal Life Insurance Co.,*
    344 F. Supp. 3d 1025 (S.D. Iowa 2018),
    *rev'd on other grounds,* 949 F.3d 1071 (8th Cir. 2020) ....................29

*Salcedo v. Hanna,*
    936 F.3d 1162 (11th Cir. 2019) ...............................2, 7

*Sexton v. Runyon,*
    No. 1:03-CV-291-TS, 2005 WL 2030865 (N.D. Ind. Aug. 23, 2005) ............19

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ....................................................................................6

*Teets v. Great-West. Life & Annuity Insurance Co.*,
    286 F. Supp. 3d 1192 (D. Colo. 2017),
    *aff'd on other grounds*, 921 F.3d 1200 (10th Cir. 2019) ..................................29

*Teets v. Great-West Life & Annuity Insurance Co.*,
    921 F.3d 1200 (10th Cir. 2019),
    *cert.denied*, 140 S. Ct. 554 (2019) ................................................................11

*Tracey v. Massachusetts Institute of Technology*,
    No. 16-11620-NMG, 2017 WL 4478239 (D. Mass. 2017) ..............................28

*United States v. American Trucking Associations, Inc.*,
    310 U.S. 534 (1940) ......................................................................................20

*Waggoner v. Gonzales*,
    488 F.3d 632 (5th Cir. 2007) ........................................................................20

*Walsh v. Principal Life Insurance Co.*,
    266 F.R.D. 232 (S.D. Iowa 2010) ..................................................................16

**STATUTES** ...................................................................................... **PAGE(S)**

15 U.S.C. §§ 6802-6803 ...................................................................................20

26 U.S.C. § 72(t)(1), (2) .....................................................................................9

26 U.S.C. § 72(t)(2)(D), (E), (F) ........................................................................9

29 U.S.C. § 1002(14)(I) ...................................................................................27

29 U.S.C. § 1002(21)(A)(i) ...................................................................11, 22, 25

29 U.S.C. § 1002(38)(A) ..................................................................................13

29 U.S.C. § 1002(42) .......................................................................................12

29 U.S.C. § 1103(a) .........................................................................................13

29 U.S.C. § 1103(c)(1) .....................................................................................13

29 U.S.C. § 1104(a)(1) ...................................................................................5, 22

29 U.S.C. § 1106(a)(1)(D) ..............................................................6, 12, 26, 28, 29

29 U.S.C. § 1132(*l*)(1)(B) ...............................................................................29

29 U.S.C. § 1344(d)(3)(A) ..................................................................................15

**REGULATIONS** ......................................................................... **PAGE(S)**

29 C.F.R. §§ 2510.3-101 ....................................................................................12

29 C.F.R. §§ 2510.3-102 ....................................................................................13

**OTHER AUTHORITIES** ............................................................. **PAGE(S)**

73 CJS Property § 5 ............................................................................................19

Aon Hewitt, *Specialty Services: Recordkeeper Search*, https://aon.io/3czegcG ..........................23

Marthin De Beer, *Financial Wellness: The New Must-Have Employee Benefit*, Forbes
    (Feb. 6, 2020), https://bit.ly/2Koax5N ....................................................................25

Deloitte & Investment Company Institute, *Defined Contribution/401(k) Fee Study*
    (June 2009), https://bit.ly/3cIOva9 ........................................................................24

Fidelity, *Retirement and IRA Rollover*, https://www.fidelity.com/retirement-ira/overview .........10

Nellie S. Huang, *The Best Online Brokers, 2018*, Kiplinger (Aug. 29, 2018),
    https://bit.ly/2yycwBM ........................................................................................3

Internal Revenue Service, *Retirement Topics – Exceptions To Tax on Early Distributions*,
    https://www.irs.gov/retirement-plans/plan-participant-employee/retirement-
    topics-tax-on-early-distributions ...........................................................................9

Instructions for Schedule H (Form 5500) ...........................................................14, 15

*Investment Advice—Participants and Beneficiaries*,
    74 Fed. Reg. 3822 (Jan. 21, 2009) .......................................................................17

Cameron F. Kerry & John B. Morris, *Why data ownership is the wrong approach to
    protecting privac*y, Brookings (June 26, 2019), https://brook.gs/2KpqatS .....................21

Maryalene LaPonsie, *Best IRA Accounts*, US News & World Report (Jan. 27, 2020),
    https://bit.ly/2RXaNNr .......................................................................................10

Mark MacCarthy & Washington Bytes, *Privacy Is Not A Property Right In Personal
    Information*, Forbes (Nov. 2, 2018), https://bit.ly/2x0XO60 .............................................21

Press Release, Fidelity, *Fidelity Mutual Funds Win 21 Lipper Awards*, Business Wire
    (Mar. 8, 2019), https://bit.ly/3cy0KG8 .....................................................................3

Press Release, Fidelity, *Fidelity's New Financial Wellness Platform Provides 20 Million
    Workers with a Solution Targeted to Their Top Financial Needs*, Business Wire
    (Oct. 25, 2018), https://bwnews.pr/3cG7iCX .................................................................25

v

Blain Reinkensmeyer, *Best Online Brokers 2020*, Stockbrokers.com (Apr. 1, 2020),
https://www.stockbrokers.com/guides/online-stock-brokers ...............................................3

Schedule H (Form 5500) (2019) .................................................................................14

*United States Department of Labor, Advisory Op. No. 93-14A*,
1993 WL 188473 (May 5, 1993) ...........................................................................17, 18

*United States Department of Labor, Advisory Op. No. 2011-06A*,
2011 WL 585774 (Feb. 4, 2011) ...................................................................................28

United States Government Accountability Office, *Retirement Security: Most Households
Approaching Retirement Have Low Savings, an Update* (Mar. 26, 2019),
https://bit.ly/2XQaSpQ ...............................................................................................25

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs' claims against Fidelity[1] are based entirely on the allegation that Fidelity violated the Employee Retirement Income Security Act ("ERISA") by contacting them to offer them financial products and services.  The viability of these claims depends on an unprecedented legal theory:  that once an employee enrolls in his company's 401(k) plan, his personal information, including his name, age, phone number, and address, becomes an "asset" of the 401(k) plan.  Therefore, Plaintiffs contend, ERISA requires recordkeepers like Fidelity to manage employee information under the same fiduciary standards as the plan's actual assets—its cash or investments.  This theory is plainly wrong.  ERISA itself, and every case to consider the question, make clear that personal data of this kind is not an asset of a 401(k) plan—not under ERISA, and not under ordinary notions of property rights.  Treating *employees'* information as the *plan's* asset would turn the world upside down:  only the "plan," and not the employee, the employer, or anyone else, would be able to control how an employee's personal information is used and to whom it is disseminated.  To avoid this illogical result, this Court should reject Plaintiffs' novel legal theory and dismiss the claims against Fidelity.

Additionally, this Court must dismiss the claims against Fidelity because none of the four Plaintiffs has constitutional standing to bring them.  Plaintiffs essentially complain about receiving marketing communications.  But receiving a marketing communication is

---

[1]  "Fidelity" refers to defendant FMR LLC and its subsidiaries, including defendants Fidelity Investments Institutional Operations Company, Inc. ("FIIOC"), Fidelity Brokerage Services LLC, Fidelity Personal and Workplace Advisors LLC, Fidelity Investments Life Insurance Company, and Fidelity Personal Trust Company, FSB.

1

an unremarkable event in 2020; it does not entail the sort of "objectively serious and universally condemnable" invasion of privacy that gives rise to a constitutionally adequate injury-in-fact. *E.g.*, *Salcedo v. Hanna*, 936 F.3d 1162, 1171 (11th Cir. 2019). The Amended Complaint does not allege any harm beyond these communications. Two named Plaintiffs are not even alleged to have signed up for any Fidelity retail products or services. And while the other two Plaintiffs allege that they moved money out of their 401(k) Plan accounts and into a Fidelity individual retirement account ("IRA"), the Amended Complaint contains no facts to establish a causal connection between Fidelity's alleged marketing communications and the Plaintiffs' rollovers, or to demonstrate that either Plaintiff was harmed by his decision to roll money out of the Plan.

The Supreme Court has recognized that motions to dismiss are a particularly "important mechanism for weeding out meritless [ERISA] claims." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). This is especially true where, as here, a plaintiff alleges fiduciary breach, as such a claim exposes the defendant to asymmetrical, "ominous" discovery that "elevates the possibility that 'a plaintiff with a largely groundless claim [will] simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the discovery process will reveal relevant evidence.'" *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719 (2d Cir. 2013) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). In order "to prevent [such] settlement extortion," courts presiding over ERISA cases like this one are especially careful to require that plaintiffs plead a plausible

claim for relief.  *Id.* (quotation marks omitted).  In this case, for multiple reasons, Plaintiffs have not pleaded any plausible claim for relief against Fidelity; therefore, Fidelity should be dismissed.

## BACKGROUND[2]

Fidelity is one of the nation's leading financial-services firms, offering thousands of financial products and services used by tens of millions of Americans.[3]  Among Fidelity's many offerings is its Workplace Investing service, through which Fidelity provides recordkeeping and other administrative services to 401(k) plans and other employer-sponsored benefit plans.

One of the retirement plans that Fidelity services is the Shell Provident Fund 401(k) Plan (the "Plan"), a retirement plan for eligible employees of Shell Oil Company.  *See* Dkt. No. 84, First Amended Complaint ("FAC") ¶ 10.  The Plan is a defined-contribution plan in which each participant has her own retirement account, and the amount credited to that account reflects the contributions by the participant, any matching or profit-sharing contributions by the employer, and the performance of the Plan's investment options selected by the participant net of fees and expenses.  *Id.* ¶¶ 8, 12.  As of the end of 2014,

---

[2] Fidelity takes the factual allegations in the Amended Complaint as true for the purposes of this motion.

[3] *See, e.g.*, Blain Reinkensmeyer, *Best Online Brokers 2020*, Stockbrokers.com (Apr. 1, 2020), https://www.stockbrokers.com/guides/online-stock-brokers; Nellie S. Huang, *The Best Online Brokers, 2018*, Kiplinger (Aug. 29, 2018), https://bit.ly/2yycwBM; Press Release, Fidelity, *Fidelity Mutual Funds Win 21 Lipper Awards*, Business Wire (Mar. 8, 2019), https://bit.ly/3cy0KG8.

the Plan had $10.5 billion in assets and 36,898 participants with account balances. *Id.* ¶ 13.

Plaintiffs' allegations, as amended after reviewing the motions to dismiss,[4] primarily challenge Shell's management of the Plan. A subset of the claims, however, are asserted against various Fidelity entities. Defendant Fidelity Investments Institutional Operations Company, Inc. ("FIIOC") is alleged to be the Plan's recordkeeper. *Id.* ¶ 27. The other Fidelity defendants are FMR LLC, FIIOC's parent, and four other companies alleged to be FMR LLC subsidiaries. *Id.* ¶ 33.

According to the Amended Complaint, in order to perform its role as recordkeeper, FIIOC receives certain information about participants, including their names, mailing addresses, phone numbers, email addresses, social security numbers, age, income, marital status, financial information, investment history, account balances, and investment contribution amounts (collectively, "participant data"). *Id.* ¶ 157. The Amended Complaint alleges that FIIOC uploads this participant data into a customer-interaction software program that is shared with various Fidelity affiliates, including the other FMR LLC subsidiaries named as defendants, who then use the participant data "to solicit the purchase of nonPlan retail financial products and services," such as IRAs, credit cards, and managed accounts. *Id.* ¶¶ 161-163, 174.[5]

---

[4] Fidelity and Shell each moved to dismiss the initial Complaint on April 30, 2020. *See* Dkt. Nos. 81-82. Plaintiffs filed the First Amended Complaint on May 21. Dkt. No. 84.

[5] Most of the Amended Complaint's allegations about the purported use of participant data to market non-Plan (or "retail") products and services describe practices of the "wealth management industry," the "retirement plan industry," and the "financial services industry"—rather than specifically describing Fidelity's practices. *See, e.g.*, FAC ¶¶ 172,

The Amended Complaint contains no concrete allegations about how Fidelity used any of the Plaintiffs' participant data to solicit them to purchase retail products and services. Indeed, for two of the named Plaintiffs—Asur Vallejos and David Lawrence— there are no specific allegations that they were solicited by Fidelity based on their participant data or that, as a result of such solicitations, they purchased any Fidelity retail products or services. As to the other two Plaintiffs—Brian Coble and Charles Harmon— while the Amended Complaint conclusorily alleges that each rolled funds out of the Plan and into a Fidelity IRA, the details surrounding these alleged transactions are similarly lacking. *See* Argument Section I, pp. 6-10, *infra*.

The Amended Complaint alleges violations of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"), individually and on behalf of a putative class of all Plan participants and beneficiaries since January 21, 2014. FAC ¶ 203. It includes nine counts, only three of which include claims against FIIOC and the other Fidelity defendants.

Count IV alleges that FIIOC is a Plan fiduciary because of its control over participant data, and that FIIOC breached its fiduciary duties in violation of 29 U.S.C. § 1104(a)(1) by sharing participant data with affiliates "for the purpose of providing benefit to Fidelity Defendants and not for the exclusive purpose of providing benefits to Plan

_____

177, 180, 182, 183, 185, 188. The only specific allegations about Fidelity's practices are based on mischaracterizations of testimony offered *thirteen years ago* in an arbitration initiated by Fidelity against a former employee for breach of his employment contract. *See id.* ¶¶ 164-165, 168-170 (citing *Fidelity Brokerage Servs. LLC v. Pacholek*, No. 07-333 (N.D. Tex. Nov. 26, 2007)). Plaintiffs assert, without any support, that "there is no reason to believe [Fidelity's] sales practices have changed" in the past thirteen years. FAC ¶ 169.

participants and beneficiaries."  FAC ¶¶ 229-231.  Plaintiffs seek to restore to the Plan any losses resulting from this alleged fiduciary breach.  *Id.* ¶ 233.

Count VII alleges that Shell transferred a plan asset—participant data—to Fidelity, that Fidelity used that data to market retail products and services, and that together this conduct constitutes a prohibited transaction under 29 U.S.C. § 1106(a)(1)(D).  FAC ¶¶ 251-259.  The Amended Complaint appears to assert two theories of prohibited-transaction liability:   first, that the Fidelity defendants are liable as parties in interest to Shell's prohibited transaction, *see id.* ¶¶ 252-256, and, second, that FIIOC is directly liable as a Plan fiduciary, *see id.* ¶¶ 252, 259.  Count VII asserts that Plaintiffs are entitled to disgorge any corporate profits earned by Fidelity in connection with its alleged use of participant data to market Fidelity's retail products to Shell Plan participants.  *Id.* ¶ 256.

In Count IX, Plaintiffs seek to enjoin Fidelity from using participant data to market retail products to Plan participants, based on the purported violations asserted in Counts IV and VII.  *Id.* ¶¶ 266-268.

As discussed below, for Plaintiffs to prevail on any of their three claims against the Fidelity defendants, "participant data" would have to be a "plan asset" under ERISA.

## ARGUMENT

## I.   THE CLAIMS AGAINST FIDELITY SHOULD BE DISMISSED BECAUSE PLAINTIFFS LACK CONSTITUTIONAL STANDING.

As a threshold matter, this Court should dismiss the claims against Fidelity for lack of subject matter jurisdiction, because Plaintiffs do not have standing to sue.  A plaintiff does not "automatically satisf[y] the injury-in-fact requirement" of standing just by

pleading a statutory cause of action; "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016). Thus, in an ERISA case, a plaintiff cannot just assert "invasion of [a] statutory right[] to proper [p]lan management"; rather, "the deprivation of a right created by [ERISA]," the Fifth Circuit has held, "must be accompanied by some concrete interest that is affected by the deprivation." *Lee v. Verizon Commc'ns, Inc.*, 837 F.3d 523, 529 (5th Cir. 2016) (internal quotation marks omitted); *accord David v. Alphin*, 704 F.3d 327, 338 (4th Cir. 2013).

Plaintiffs have not alleged any cognizable injury-in-fact. The Amended Complaint generally alleges that Fidelity solicits participants to purchase retail products and services, including soliciting them to move their money from their 401(k) plans to an IRA (which Plaintiffs contend have higher costs). *E.g.*, FAC ¶¶ 174-175. But only one Plaintiff alleges that he personally was solicited by Fidelity, and all he alleges is that a Fidelity representative called him more than once. *Id.* ¶ 166. Receiving a couple of phone calls does not approach the sort of "objectively serious and universally condemnable" invasion of privacy that could give rise to a cognizable injury. *Salcedo v. Hanna*, 936 F.3d 1162, 1171 (11th Cir. 2019) (noting that at common law, there was "no liability for one, two, or three phone calls").[6]

---

[6] This is true even where those emails or phone calls are unwanted—a fact not alleged here. *See, e.g.*, *Salcedo*, 936 F.3d at 1172-73 (holding that receipt of an unwanted text message is insufficient for standing).

The original complaint did not allege that any Plaintiff took action in response to Fidelity's solicitations—not a single one of the four was alleged to have purchased any Fidelity retail products or signed up for any Fidelity retail services.  After Fidelity moved to dismiss the original complaint for lack of standing, however, two of the four Plaintiffs (Messrs. Coble and Harmon) now claim to have rolled over some or all of their assets from the Shell Plan into a Fidelity IRA.  *See* FAC ¶ 166.  These Plaintiffs still lack standing, though, because they do not allege that their rollovers were undertaken in response to Fidelity marketing communications (let alone marketing communications based on Plan participant data), nor do they claim to have been harmed by rolling over.

As to Mr. Coble, the Amended Complaint alleges that he received phone calls at some unspecified time from a named Fidelity representative with access to his participant data who works at a nearby retail investor center.  *Id.* The Amended Complaint then alleges that Mr. Coble met with an unnamed Fidelity representative "earlier this year," and that, based on that unnamed representative's recommendation, "Mr. Coble has now rolled all of his assets from the Shell Plan into a Fidelity IRA."  *Id.*; *see also id.* ¶ 15 ("earlier this year, Mr. Coble rolled his assets from the Plan into a Fidelity individual retirement account").  The Amended Complaint in no way links the earlier phone calls—purportedly based on Mr. Coble's participant data—to Mr. Coble's recent decision to rollover his Plan assets into an IRA.  Moreover, the Amended Complaint does not allege, and could not allege consistent with Rule 11, that Mr. Coble executed his rollover before filing this lawsuit on January 24, 2020—the relevant date for purposes of assessing standing.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 570 n.5 (1992) (Article III standing "is to be determined as of the

commencement of suit"); *see also Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 459-60 & nn.20-21 (5th Cir. 2005) ("The party invoking the jurisdiction of the court cannot rely on events that unfolded after the filing of the complaint.").[7]

With respect to Mr. Harmon, the Amended Complaint once again alleges a rollover, but no connection to any solicitation by Fidelity and no resulting harm. Mr. Harmon allegedly met with a Fidelity representative who, "[a]rmed with Mr. Harmon's [unspecified participant data] . . . suggested, and convinced Mr. Harmon, to roll a portion of his assets out of the Shell Plan and into a higher-cost proprietary Fidelity IRA." FAC ¶¶ 166, 175. The Amended Complaint does not allege that this meeting, which occurred at a Fidelity branch office in Houston, was the result of any solicitation by Fidelity, as opposed to a meeting *sought by Mr. Harmon*, nor that the representative somehow lacked Mr. Harmon's permission to review and rely on his Plan account information during the meeting. Nor does the Amended Complaint allege facts establishing that Mr. Harmon was harmed by his rollover. While Plaintiffs baldly assert that there "would be no prudent reason to roll-over only a portion of Mr. Harmon's assets," *id.* ¶ 166, that assertion is baseless: Withdrawals from 401(k) plans for higher-education expenses, first-time home purchases, and certain health insurance premiums are subject to a tax penalty, but withdrawals from IRAs for those same purposes are not.[8] Accordingly, participants can save money by taking partial

---

[7] In fact, Mr. Coble did not roll over his assets from the Plan into a Fidelity IRA until three days *after* he filed his Complaint in this case.

[8] *See* 26 U.S.C. § 72(t)(1), (2) (10% penalty generally applies to early distributions from retirement plans); *id.* § 72(t)(2)(D), (E), (F) (exceptions for withdrawals from IRAs for certain health insurance premiums, higher-education expenses, and first-time home purchases); *see also* IRS, Retirement Topics – Exceptions To Tax on Early Distributions,

rollovers when they need to draw on their retirement savings for such purposes.[9]  And, where a rollover is undertaken for purposes of effectuating a withdrawal—rather than for purposes of continuing to invest—the relative cost of investment options available in the Plan as compared to those available in the IRA is of no moment.  *See id.* ¶¶ 166, 175.[10]

In sum, because the Amended Complaint identifies no cognizable injury that Fidelity has caused any of the four named Plaintiffs, the claims against Fidelity must be dismissed for lack of subject-matter jurisdiction.

---

https://www.irs.gov/retirement-plans/plan-participant-employee/retirement-topics-tax-on-early-distributions (comparing treatment of early withdrawals from 401(k)s to early withdrawals from IRAs).

[9] While not necessary to rule on this motion, discovery would show that these are precisely the facts surrounding Mr. Harmon's rollover:  Fidelity records confirm that Mr. Harmon went to the Fidelity branch office to withdraw funds from the Plan to pay for his son's college tuition, and by following the Fidelity representative's suggestion to roll over the necessary funds before withdrawing them, Mr. Harmon was able to avoid thousands of dollars in tax penalties.

[10] While the Amended Complaint alleges that the investment option that Mr. Harmon selected in his Plan account was only available to Fidelity IRA accountholders in a "higher-cost" share class, *see* FAC ¶¶ 166, 175, notably absent from the Amended Complaint is any allegation that Mr. Harmon ever invested in this higher cost fund.  Nor do Plaintiffs provide any factual support for their conclusory assertion that Fidelity IRAs are inherently "higher cost" than the Plan.  *Id.* ¶ 166.  To the contrary, Plaintiffs themselves assert that the investment options in the Plan were excessively expensive, *id.* ¶¶ 110-117, 137-155, and Plaintiffs ignore publicly available information that Fidelity IRAs have no account fees, charge no commissions on most trades, and offer thousands of low-cost investment options, including zero-fee mutual funds and ETFs, *see* Fidelity, Retirement and IRA Rollover, https://www.fidelity.com/retirement-ira/overview; Maryalene LaPonsie, *Best IRA Accounts*, US News & World Report (Jan. 27, 2020), https://bit.ly/2RXaNNr.

## II.   THE CLAIMS AGAINST FIDELITY SHOULD BE DISMISSED BECAUSE PARTICIPANT DATA IS NOT A "PLAN ASSET."

Even if Plaintiffs had standing, their claims against Fidelity would still fail because they rest on the faulty premise that participant data is a "plan asset" within the meaning of ERISA.  That premise is a "legal conclusion, not a factual assertion," and so it cannot be credited even at the pleading stage.  *In re Fidelity ERISA Float Litig.*, 829 F.3d 55, 59 (1st Cir. 2016); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 680-81 (2009).  Under Rule 12(b)(6), therefore, Plaintiffs have failed to "state a claim to relief that is plausible on its face.'"  *Martone v. Robb*, 902 F.3d 519, 523 (5th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678).

Count IV seeks to hold FIIOC liable for fiduciary breach.  But to be held liable for a fiduciary breach, one must, in fact, be a fiduciary, and caselaw makes clear that recordkeeping is not an inherently fiduciary function.[11]  Count IV therefore asserts that FIIOC is a fiduciary because it exercises "authority and control" over the disposition of participant data—a novel theory of fiduciary status that works only if that data is a "plan asset."  FAC ¶ 229; *see also* 29 U.S.C. § 1002(21)(A)(i) (defining "fiduciary" to include any person who exercises "authority or control respecting management or disposition of *[plan] assets*") (emphasis added).  Count VII alleges that Fidelity engaged in a prohibited transaction under ERISA because, in handling participant data, Fidelity transferred or used "assets of the plan" "for the benefit of a party in interest"—a claim that, again, can only

---

[11] *See, e.g.*, *Teets v. Great-W. Life & Annuity Ins. Co.*, 921 F.3d 1200, 1213 (10th Cir. 2019), *cert. denied*, 140 S. Ct. 554 (2019); *Renfro v. Unisys Corp.*, 671 F.3d 314, 324 (3d Cir. 2011).

succeed if participant data is a "plan asset."  FAC ¶¶ 252-259; *see also* 29 U.S.C.
§ 1106(a)(1)(D) (prohibiting fiduciaries from knowingly causing a transaction that
involves the "transfer to, or use by or for the benefit of a party in interest, of any *assets of
the plan*") (emphasis added).  And Count IX—seeking injunctive relief—depends on
Plaintiffs' proving at least one underlying violation alleged in Counts IV and VII.  FAC ¶¶
266-268.  Plaintiffs' claims against Fidelity therefore all require, as an essential element,
that participant data is a "plan asset," and they all fail if participant data is not a "plan
asset."

There is not a single case holding that participant data is a "plan asset."  And rightly
so:  the text and structure of ERISA make clear that Congress did not intend personal and
account information to be considered a "plan asset."  Consistent with ERISA's text, several
courts have rejected Plaintiffs' theory, and the DOL has suggested that it, too, does not
consider participant data to be a plan asset.  Instead, how service providers use participant
data is regulated first by contract, and second by privacy law—not by ERISA.  This Court
should therefore hold that participant data is not a plan asset and dismiss all claims against
Fidelity.

### A.   ERISA's Text and Structure Show that Participant Data Is Not a "Plan Asset."

ERISA states that "the term 'plan assets' means plan assets as defined by such
regulations as the Secretary [of Labor] may prescribe."  29 U.S.C. § 1002(42).  The
Secretary has prescribed two such regulations.  Both define plan assets by reference to
investments and monetary contributions; neither defines plan assets to include anything

remotely close to the participant data at issue here. *See* 29 C.F.R. §§ 2510.3-101 (plan assets sometimes include the underlying assets of entities in which a plan has invested), 2510.3-102 (plan assets include "amounts" contributed to the plan by plan participants and beneficiaries through their employer).

This is not surprising, because ERISA uses the term "plan asset" in a particular way that clearly does not encompass the participant data at issue in this case. Myriad provisions in ERISA make abundantly clear what Congress understood the concept "plan assets" to mean—namely, money, investment holdings, or similar assets that are capable of being held in trust to ensure that participants receive the retirement benefits to which they are entitled. These provisions would not make sense if the term "plan asset" encompassed participant data.

For example, ERISA states that "*all assets* of an employee benefit plan *shall be held in trust* by one or more trustees." 29 U.S.C. § 1103(a) (emphases added). It provides that the trustees "shall have *exclusive authority* and discretion to manage and control the assets of the plan," except that a portion of that exclusive authority may be "delegated to one or more investment managers." *Id.* (emphasis added).[12] It further states that "the assets of a plan . . . shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." *Id.* § 1103(c)(1). This framework makes sense as applied to money and investments, but

---

[12] The term "investment manager" is defined in ERISA as someone "who has the power to manage, acquire, or dispose of any asset of a plan." 29 U.S.C. § 1002(38)(A). In other words, the statute expressly links "assets" with "investments"; anyone with the power to "manage" a plan asset is an *investment* manager. *Id*.

it would not make sense as applied to a participant's phone number, e-mail address, or investment history, which are not held "in trust" by a trustee who has "exclusive authority" to "manage" the information, and are not held for the "exclusive purposes" of "providing benefits" and "defraying reasonable expenses." To the contrary, people use their own data in their daily lives regularly and freely, not just to further their interests in their 401(k) plans.

Other provisions of ERISA similarly would not make sense if "plan asset" included participant data. Section 1023(b)(3)(A) requires an employer-sponsored benefit plan to provide annually "a statement of the assets and liabilities of the plans aggregated by categories and valued at their current value." Stocks and bonds are easily labeled with a "current value"; a participant's social security number is not. Indeed, Fidelity is not aware of a single plan that reports the value of participant data on its publicly filed annual report (known as the "Form 5500"), nor is it aware of any instructions from the Department of the Treasury, the IRS, or the DOL suggesting that such disclosure is required, much less explaining how plans are to go about valuing participant data.[13] Similarly, Section 1344

---

[13] The form itself, which is issued by the Department of the Treasury, the IRS, and the DOL, asks for the "value" of certain financial instruments, such as cash, government securities, and stocks, as well as other traditional assets, such as real estate. *See* Schedule H (Form 5500) (2019). While the Form includes a line for assets "whose current value was neither readily determinable on an established market nor set by an independent third party appraiser," *id.* at 4, DOL guidance indicates that even those assets are far afield from the data at issue here: "[e]xamples of assets that may not have a readily determinable value on an established market (e.g., NYSE, AMEX, over the counter, etc.) include real estate, nonpublicly traded securities, shares in a limited partnership, and collectibles." Instructions for Schedule H (Form 5500), at 39 (2019).

Also telling, the "Form 5500-SF," a simplified annual reporting form, is available to certain small benefit plans that hold only "eligible plan assets," which are assets that

provides for "allocation of the assets" of the plan in the event of its termination, and states that the assets shall be used to pay the participants' benefits, and that any remaining assets shall be "equitably distributed to the participants who made such contributions or their beneficiaries." 29 U.S.C. § 1344(d)(3)(A). On Plaintiffs' theory, a terminating plan could be obliged to sell participant data to raise money to pay benefits (and then somehow to figure out how to "equitably distribute" those proceeds to those who "contributed" the data at issue—even though, of course, the provision of data for purposes of administering a plan is not a "contribution" under ERISA).

In short, ERISA gives the term "plan assets" a particular meaning, and ERISA's many provisions that concern "plan assets" make clear that the term does not encompass participants' personal information or investment history. Because courts "construe statutes, not isolated provisions," *Gustafson v. Alloyd Co.*, 513 U.S. 561, 568 (1995), "[i]t is an elementary canon of statutory construction" that, where possible, courts should "give a term consistent meaning throughout an act," *Caldwell v. Dretke*, 429 F.3d 521, 527 (5th Cir. 2005) (citing *Gustafson)*. Plaintiffs' unprecedented interpretation would make that impossible.[14]

---

"have a regularly determinable fair market value" and "are held or issued by" a "regulated financial institution[]." Instructions for Form 5500-SF, at 12 (2019). Participant data does not have a regularly determinable fair market value, nor is it held or issued by a regulated financial institution, and therefore it is not an "eligible plan asset." Thus, if Plaintiffs are correct that participant data is a plan asset, then no plan could ever file a Form 5500-SF, because all plans would have at least one asset—participant data—that is not an "eligible plan asset."

[14] The Amended Complaint alleges that participant data is "important" and "valuable" to Fidelity, and that Fidelity seeks temporary restraining orders against former employees who try to take customer information (not limited to participant data) with them when they

### B.     Plaintiffs' Theory Has Been Consistently Rejected by Courts and Undercut by the DOL.

Consistent with ERISA's text and structure, three federal courts have rejected Plaintiffs' theory, and no court has accepted it.  In *Divane v. Northwestern University*, the court rejected claims almost identical to those in this case—that the plan sponsor violated ERISA by permitting the recordkeeper to market products using participant data—because "plan participants' confidential information" is not a "plan asset" under ERISA.  No. 16 C 8157, 2018 WL 2388118, at *12 (N.D. Ill. May 25, 2018), *aff'd*, 953 F.3d 980 (7th Cir. 2020).  The court observed that "[i]t does not appear that courts have recognized a property right in such information," as opposed to a privacy right, and expressly declined "to be the first."  *Id.*  In *Patient Advocates, LLC v. Prysunka*, 316 F. Supp. 2d 46 (D. Me. 2004), the court considered a state statute requiring third-party plan administrators to disclose participant demographic, health, and payment information, and held that because such information was not a "plan asset" governed by ERISA, the statute was not preempted by ERISA.  *Id.* at 47-49.  In reaching that conclusion, the court found persuasive that participant information is not held in trust, is not acquired for its value or held as an investment, and is not otherwise treated as a traditional "hard" asset, such as a stock, bond, cash, or investment contract.  *Id.* at 48-49.  Finally, in *Walsh v. Principal Life Insurance Co.*, 266 F.R.D. 232 (S.D. Iowa 2010), the court held that plan service providers were not fiduciaries when using plan data to market retail products.  The providers "had access to

---

leave.  *See, e.g.*, FAC ¶¶ 170-171.  But being "important" and "valuable" does not make something a plan asset under ERISA.

and used plan confidential information" to send letters to plan participants soliciting the purchase of retail products, but they did not have "actual control over . . . plan assets," *i.e.*, the money held within the "employer's 401(k) plan." *Id.* at 235-36, 248-50.[15]

Similarly, the DOL has indicated, in adopting regulations under ERISA, that using information about plan participants does not constitute the "use of plan assets." *Investment Advice—Participants and Beneficiaries*, 74 Fed. Reg. 3822 (Jan. 21, 2009).  The DOL explained that, "[w]ith regard to the practice of 'cross-selling,' i.e., using existing clients, plan participants and beneficiaries in this case, to market additional services or products," one would not be exercising any fiduciary function unless the person "is already acting in a fiduciary capacity with respect to the plan." *Id.* at 3832.  And even then, the DOL indicated that the fiduciary would be dealing with plan assets only if the cross-sale involved money or investments already held in the plan.  *See id.*  Plaintiffs' theory is inconsistent with this explanation; were Plaintiffs correct, the DOL would have advised that the act of "market[ing] additional services or products," to "plan participants and beneficiaries," *id.*, *always* involves the use of a plan asset—and therefore always amounts to a fiduciary function—because it necessarily involves using those participants' and beneficiaries' personal information.

Several courts have looked to a different DOL advisory opinion issued on May 5, 1993, in determining whether something is a "plan asset" under ERISA.  *See* U.S. Dep't of

---

[15] Although the court in *Walsh* did not directly address the question whether participant data *itself* is a "plan asset" under ERISA, its analysis is inconsistent with that theory:  there would have been no need to look at "control over" plan monies if control over participant data sufficed.

Labor, Advisory Op. No. 93-14A, 1993 WL 188473 (May 5, 1993); *see also, e.g.*, *In re Luna*, 406 F.3d 1192, 1199 (10th Cir. 2005). Plaintiffs may therefore seek to invoke that guidance in this case. But the DOL guidance did not purport to expand the meaning of "plan asset" in the statute, nor could it. The guidance dealt with traditional investments and examined whether they should be treated as the plan's—specifically, whether certain funds held in trust for the purposes of paying plan participants' medical expenses were a plan asset. U.S. Dep't of Labor, Advisory Op. No. 93-14A, at *4. In answering that question, the DOL advised that "the assets of a plan generally are to be identified on the basis of ordinary notions of property rights under non-ERISA law"; under that standard, the funds, which were held in trust for the plan, were plan assets. *Id.* In rendering that opinion, the DOL was not confronted with the question whether "participant data" could be a plan asset under the statute, nor has the DOL since encouraged the application of its "ordinary notions of property rights" standard to data or information. Similarly, the vast majority of the court decisions that have cited the 1993 DOL opinion and others like it focused on the question whether money, funds, contributions, and similar investment holdings belonged to the plan or to someone else, and did not address whether plan participants' personal or investment information could ever qualify as a "plan asset" under ERISA.[16] The few decisions that cite DOL guidance in the context of participant data are

---

[16] *See, e.g.*, *Merrimon v. Unum Life Ins. Co. of Am.*, 758 F.3d 46, 56 (1st Cir. 2014); *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 427 (3d Cir. 2013); *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 105-106 (2d Cir. 2011); *Kalda v. Sioux Valley Physician Partners, Inc*, 481 F.3d 639, 647 (8th Cir. 2007); *In re Luna*, 406 F.3d at 1199.

discussed above, *supra* at pp. 16-17, and those decisions all hold that participant data is *not* a plan asset.

Even if ERISA's text and structure did not foreclose Plaintiffs' theory, Plaintiffs' claim that participant data is a plan asset under ERISA would still fail under ordinary notions of property rights.  Individual plan participants' personal identifying information—phone numbers, email addresses, and investment information, for example—is not "property" because, among other things, it is not capable of exclusive possession or control. *See, e.g.*, *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1030 (N.D. Cal. 2012) (dismissing claim that defendant unlawfully converted plaintiffs' browsing history and contact information by disclosing the information to third-party marketing companies, in part because "the weight of authority holds that a plaintiff's 'personal information' does not constitute property"); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1074-75 (N.D. Cal. 2012) (dismissing claim that defendant unlawfully converted iPhone user's location, ZIP code, device identifier, and other data by allowing third-party applications to collect and use the information for business purposes, because such "personal information" is not property); *see also* 73 CJS Property § 5 ("for a property right to exist in something . . . it must be capable of exclusive possession or control"); *cf. Sexton v. Runyon*, No. 1:03-CV-291-TS, 2005 WL 2030865, at *8 (N.D. Ind. Aug. 23, 2005) (claim that social security number and address were property would "extend the meaning of 'property' to an extent unrecognized by the law" because "[t]hough the law has considered various privacy interests in personal information, . . . the law does not frame these protections as property rights").

19

Moreover, treating participant data as property would be incompatible with federal privacy law applicable to *identical* consumer financial information in the hands of banks, insurance companies, and securities firms.  Under the Gramm-Leach-Bliley Act, enacted in 1999 (long after the DOL's guidance), with appropriate notice a financial services firm may share its customers' information with its corporate affiliates (but not others) for marketing or other purposes, and consumers do not have a right to opt out of such communications.  *See* 15 U.S.C. §§ 6802-6803.  The law thus treats data as data— information the financial institutions need to provide services—and imposes rules to protect the consumers' privacy, but it does not establish any property rights.

### C.  Plaintiffs' Theory Has Troubling Implications for the Treatment of Personal Information Generally and Would Significantly Expand ERISA's Scope Beyond What Congress Could Have Intended.

Plaintiffs' theory that participant data is a "plan asset" under ERISA raises two sets of practical problems:  the same problems that efforts to commoditize information always create, plus problems specific to ERISA.  Plaintiffs' theory would drastically expand ERISA's scope and lead to absurd results that cannot be what Congress intended.  *See United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 543-44 (1940) (absurd results are to be avoided if alternative interpretations of statute consistent with its purpose are available); *Waggoner v. Gonzales*, 488 F.3d 632, 638 (5th Cir. 2007) (recognizing "the common mandate of statutory construction to avoid absurd results").

First, any attempt to force information into a legal framework designed for different types of property threatens to raise practical problems.  As commentators have noted, a significant amount of data sharing serves important public interests and values.  Moreover,

treating information as a commodity that cannot be passed freely from one person to another is impractical because information is often about more than one person, raising the question of who has the right to disseminate it.  *See generally* Mark MacCarthy & Washington Bytes, *Privacy Is Not A Property Right In Personal Information*, Forbes (Nov. 2, 2018), https://bit.ly/2x0XO60; Cameron F. Kerry & John B. Morris, *Why data ownership is the wrong approach to protecting privacy*, Brookings (June 26, 2019), https://brook.gs/2KpqatS.

The problems with an information-as-property regime are apparent when considered in the context of ERISA.  Participants regularly use their personal information, when, for example, they share their phone numbers with friends, apply for a loan, fill out tax returns, or discuss their investment portfolio with financial advisors.  Their ability to do these things is incompatible with the notion that the information they use to do them is subject to the plan fiduciaries' exclusive control.  *See* p. 13, *supra*.[17]  The same is true for plan sponsors, which use information about participant accounts in structuring, amending, and managing ERISA plans, and for employers and their third-party vendors, which also regularly use employees' contact information for administering payroll and other employee benefits.

---

[17] In some places, the Amended Complaint appears to try to plead around this problem by advancing a theory that it is improper for a recordkeeper like Fidelity to use participant data to market retail products to participants *unless the recordkeeper already has a separate* "*relationship with [the] participant outside of the Plan.*"  FAC ¶ 157 (emphasis added).  But if data actually is plan property, then the presence of a separate relationship between the participant and Fidelity should not have any impact on the analysis.  Moreover, Plaintiffs do not actually plead facts that support liability under this theory, nor could they have done so because, in fact, each of the four named Plaintiffs has had a separate "relationship" with Fidelity—each has had a Fidelity brokerage account—since before the class period.

These uses, too, are incompatible with Plaintiffs' theory that the plan fiduciaries control this information exclusively.

Second, and related, Plaintiffs' theory has no limiting principle and leads straight to absurd results—such as making even plan participants themselves fiduciaries.  If participant data were a plan asset, it would follow that anyone who receives, maintains, and uses *any* information about a plan or its participants would exercise "control respecting management" of a plan asset, and therefore would be subject to the myriad of fiduciary rules in ERISA.  *See* 29 U.S.C. § 1002(21)(A)(i).  But plan participants themselves handle their own data.  On Plaintiffs' theory, then, plan participants become ERISA fiduciaries when they use that data, and they, too, are subject to claims of fiduciary breach if they use that data for their own benefit, or in any way that is not for the exclusive purpose of benefiting the plan.  *See* 29 U.S.C. § 1104(a)(1).  Consider, for example, a 401(k) plan participant who brings her plan investment information to a financial advisor, or a health plan participant who gives her doctor information about the dates of prior treatments.  Under Plaintiffs' theory, those participants may be liable for breaching a fiduciary duty to the plan, simply by seeking personal investment or medical advice.  This cannot be what Congress intended.

Just as absurd, Plaintiffs' theory would turn a nonfiduciary service provider, like FIIOC, into a fiduciary when it defends itself in court against allegations of fiduciary breach.  Consider this very case.  If Plaintiffs' theory were correct, then should this case proceed through discovery, Fidelity would breach its fiduciary duties by producing, citing, and relying on Shell Plan data to support its defense.  It could not produce or rely on data

about whether and to what degree it has contacted participants to discuss retail products and services, data about the extent to which participants have or have not signed up for retail products and services, and even basic data showing which participants had active accounts during the class period. Under Plaintiffs' theory, Fidelity could not even provide the data to its expert witnesses for their analysis without breaching a fiduciary duty under ERISA.[18] This, too, cannot be what Congress intended.

Third, Plaintiffs' proliferating theory of fiduciary responsibility—and liability—would create a host of practical problems for plans and their participants by preventing them from receiving the benefit of market data. For example, consider a consultant to plan sponsors that aggregates data on recordkeeping fees from across its many plan clients, and provides that aggregate data to plan sponsors in order to help them choose a recordkeeper and negotiate fees. *See, e.g.*, Aon Hewitt, Specialty Services: Recordkeeper Search, https://aon.io/3czegcG. Under Plaintiffs' theory, that consultant would be vulnerable to a claim that it is a fiduciary and breached its duties by using the aggregated data from each of its plan clients for purposes unrelated to the services it provides to each particular plan—*i.e.*, to benefit a separate plan client who purchases the data.

Similarly, consider an organization like the Investment Company Institute, which, in partnership with consultants like Deloitte, regularly surveys plan sponsors regarding their plans' characteristics, anonymizes the information, and publishes the findings in

---

[18] The same problem would exist for more routine claims brought by plan participants against plan sponsors and service providers, including claims involving disputes regarding the proper beneficiary of an account, how to apply a qualified domestic relations order to a participant's account, and the like.

publicly available reports.  *See, e.g.*, Deloitte & Investment Company Institute, *Defined Contribution/401(k) Fee Study* (June 2009), https://bit.ly/3cIOva9 (report based on survey of 130 plans).  Under Plaintiffs' theory, those organizations and consultants would also be vulnerable to a claim of fiduciary breach for using plan assets (the surveyed information) for non-plan purposes (general public knowledge).  Indeed, if using participant data were a violation of ERISA, some of the very sources Plaintiffs cite in support of their claims would cease to exist.  *See* FAC ¶ 72 (citing T. Rowe Price and Callan Investments Institute survey).

Consider, also, a state government official who collects health care claims data for the state health database from administrators of health plans governed by ERISA—data such as provider information, payment information, diagnoses, and demographic information.  This scenario is not a hypothetical; it comes from a real case.  *See Prysunka*, 316 F. Supp. 2d at 47.  Under Plaintiffs' theory, the official and the third-party administrator are both fiduciaries, because they are transferring and using participant data, and both could be liable for fiduciary breach simply for using that data to improve the health of state citizens, because doing so benefits government and the public, not the health benefit plan exclusively.

There is no reason to adopt Plaintiffs' reading, and accept the host of problems it would create.  Treating participant data as a plan asset and subjecting it to ERISA is not necessary to ensure that it will be adequately protected.  Plan sponsors have the ability through *contract* to ensure that recordkeepers and other third-party administrators do not use participant data in ways that exceed their authority.  Privacy laws, like the Gramm-

24

Leach-Bliley Act, discussed *supra*, at p. 20, can provide another layer of protection. These tools—contract and privacy laws—not only avoid the absurd results discussed above, but also allow plan sponsors to employ trusted service providers like Fidelity to engage participants in a holistic approach to financial planning, an approach that requires taking into account the particular attributes and investments of each participant.[19] This holistic approach is widely viewed as a good thing, as it becomes more apparent that Americans are struggling to save for retirement and other major life events. *See, e.g.*, Marthin De Beer, *Financial Wellness: The New Must-Have Employee Benefit*, Forbes (Feb. 6, 2020), https://bit.ly/2Koax5N; U.S. Gov't Accountability Office, *Retirement Security: Most Households Approaching Retirement Have Low Savings, an Update* (Mar. 26, 2019), https://bit.ly/2XQaSpQ.

In sum, the text and structure of ERISA, case law, DOL guidance, and common sense all make clear that participant data is not a "plan asset" under ERISA. Fidelity's alleged receipt and use of that data therefore does not make it a fiduciary under 29 U.S.C. § 1002(21)(A)(i), as Plaintiffs allege in Count IV, nor does it constitute a prohibited

---

[19] As part of the suite of services it makes available to retirement-plan sponsors, Fidelity offers "financial wellness" tools and education, which are designed to help employees identify the financial challenges most significant to them, such as saving for a home and paying student debt, and to provide personalized information that will help them prepare to meet those challenges. Plan sponsors have discretion about whether or not to make these types of financial wellness offerings available to their employees. *See* Press Release, Fidelity, *Fidelity's New Financial Wellness Platform Provides 20 Million Workers with a Solution Targeted to Their Top Financial Needs*, Business Wire (Oct. 25, 2018), https://bwnews.pr/3cG7iCX.

transaction under § 1106(a)(1)(D), as Plaintiffs allege in Count VII.  Plaintiffs' novel theory of ERISA liability fails, and all the claims against Fidelity must be dismissed.

## III.   PLAINTIFFS FAIL TO PLEAD THE ELEMENTS NECESSARY TO STATE A PROHIBITED-TRANSACTION CLAIM.

Count VII is based on Plaintiffs' allegation that FIIOC shared Plan participant data with Fidelity affiliates.  FAC ¶ 259.  But even if participant data *were* a plan asset, this Court should still dismiss this Count because Plaintiffs have failed to plead three necessary elements of their prohibited-transaction claim—that the affiliates were "parties in interest"; that Shell shared participant data with the intent to benefit such a "party in interest"; and that any Fidelity affiliate knew that Shell violated ERISA by allowing Fidelity to use participant data.

### A.   None of the Fidelity Affiliates Alleged To Have Solicited Plaintiffs Is a Party In Interest.

Plaintiffs' prohibited-transaction claim relies on the premise that each of the four Fidelity affiliates that allegedly received and used participant data to market retail products and services—Fidelity Brokerage Services LLC, Fidelity Personal and Workplace Advisors LLC, Fidelity Investments Life Insurance Company, and Fidelity Personal Trust Company, FSB (collectively "Fidelity Retail Entities")—is a "party in interest" under ERISA.  FAC ¶¶ 161-163, 168.  Plaintiffs argue that, because those entities are parties in interest, the transfer of participant data to them by the alleged Plan fiduciaries (Shell and FIIOC) constituted a prohibited transaction under § 1106(a)(1)(D), and they should be enjoined from using the data and ordered to return to the Plan any profits they earned as a result of the alleged fiduciary breach.  *See* FAC ¶¶ 256, 259, 266-267, Prayer for Relief at

96.  But Plaintiffs have failed to plead facts sufficient to establish that any of the Fidelity Retail Entities is a "party in interest."[20]

The Amended Complaint alleges that the Fidelity Retail Entities are parties in interest because they "are wholly owned subsidiaries of FMR LLC and, upon information and belief, [they] share 10 percent or more in profits with FMR LLC and therefore indirectly with FIIOC." *Id.* ¶ 254.  Plaintiffs cite a provision defining "party in interest" to include:

> A 10 percent or more (directly or indirectly in capital or profits) partner or joint venturer of a person described in subparagraph (B), (C), (D), (E), or (G).

29 U.S.C. § 1002(14)(I).  Plaintiffs do not specify which subparagraph they rely on, but the only potentially applicable paragraph is (B), which refers to "a person providing services to the Plan"—*i.e.*, FIIOC.  But Plaintiffs' allegations do not establish that the Fidelity Retail Entities are 10 percent or more partners with FIIOC, directly or indirectly. Plaintiffs have merely alleged that the Fidelity Retail Entities are wholly owned by (and 10 percent or more partners with) FMR LLC, and that FIIOC is *also* wholly owned by FMR LLC.  FAC ¶¶ 253-254.  Two entities do not share profits with each other simply because they are owned by the same holding company.  Indeed, the DOL has already rejected Plaintiffs' interpretation: in a 2011 advisory opinion, the DOL explained that the definition of "party in interest" in § 1002(14) does not include entities that happen to be owned by

---

[20] The Amended Complaint also alleges that FMR LLC is a "party in interest."  FAC ¶ 253. But, as the Amended Complaint acknowledges, FMR LLC is only a holding company, *see id.* ¶¶ 33, 253-254, and therefore it is not plausible that FMR LLC receives participant data from Shell and FIIOC and engages in the solicitation practices that are the subject of the prohibited-transaction claim.

the same holding company that owns the plan's service provider. *See* U.S. Dept. of Labor, Advisory Op. No. 2011-06A, 2011 WL 585774, *3 (Feb. 4, 2011).

In sum, because the Amended Complaint fails to allege that the Fidelity Retail Entities are parties in interest, even if participant data were a plan asset (and it is not), the transfer of data to and use of data by those entities could not constitute a prohibited transaction under § 1106(a)(1)(D).

### B.   The Amended Complaint Fails To Allege that Shell Subjectively Intended To Benefit Fidelity.

To the extent Count VII is premised on *Shell* committing a prohibited transaction, the claim also fails. Plaintiffs allege that Shell violated 29 U.S.C. § 1106(a)(1)(D), which prohibits plan fiduciaries from engaging in a transaction if they know or should know that it "constitutes a direct or indirect . . . transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." To establish a § 1106(a)(1)(D) violation, a plaintiff must show that the transaction was conducted with the *subjective intent* to benefit a party in interest. *Jordan v. Mich. Conference of Teamsters Welfare Fund*, 207 F.3d 854, 860-61 (6th Cir. 2000); *accord Tracey v. Mass. Inst. of Tech.*, No. 16-11620-NMG, 2017 WL 4478239, at *3 (D. Mass. 2017).[21] Here, the Amended Complaint alleges only that Shell "knew" that FIIOC, as recordkeeper, would have access to participant data, and that Shell did not "prohibit or monitor" FIIOC's use of that data. FAC ¶¶ 187, 246. The Amended

---

[21] *See also Reich v. Compton*, 57 F.3d 270, 279-80 (3d Cir. 1995) (reaching the same conclusion for the "use" prong of § 1106(a)(1)(D)); *Dupree v. Prudential Ins. Co. of Am.*, No. 99-8337-Civ., 2007 WL 2263892, *39 (S.D. Fla. Aug. 7, 2007) ("a 'transfer' or 'use' is prohibited as being 'for the benefit' of a party in interest only if the purpose of such transfer or use is to benefit the party in interest").

Complaint does not plead any facts plausibly indicating that Shell hired FIIOC as recordkeeper *with the subjective intent* to allow FIIOC and its affiliates to profit from access to participant data.  Nor would such an inference make sense:  Shell hired FIIOC because the Plan needed a recordkeeper.  Any incidental benefit FIIOC and its affiliates allegedly obtained from FIIOC's access to participant data is not enough to support a § 1106(a)(1)(D) violation by Shell, much less a claim against Fidelity for participating in Shell's violation.

### C. The Amended Complaint Fails To Allege That Fidelity Knew That Transferring Participant Data to Other Fidelity Entities Violated ERISA.

A claim against Fidelity based on Shell's alleged commission of a prohibited transaction fails for a separate reason as well:  as a non-fiduciary, Fidelity can be liable only if it "knowing[ly] participat[ed]" in Shell's violation.  *See* 29 U.S.C. § 1132(*l*)(1)(B). This requires Plaintiffs to allege that Fidelity "had actual or constructive knowledge of the circumstances that rendered the transaction unlawful," *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 251 (2000), which includes both the facts constituting the prohibited transaction, and also that Shell's conduct violated ERISA.  *See Divane v. Northwestern Univ.*, 953 F.3d 980, 992 (7th Cir. 2020) (plaintiffs failed to plausibly allege the "basic element[]" of prohibited-transaction claim that "any defendant knew or should have known that collecting routine fees may violate ERISA"); *Teets v. Great-W. Life & Annuity Ins. Co.*, 286 F. Supp. 3d 1192, 1208-09 (D. Colo. 2017) (same), *aff'd on other grounds*, 921 F.3d 1200 (10th Cir. 2019); *Rozo v. Principal Life Ins. Co.*, 344 F. Supp. 3d

1025, 1038 (S.D. Iowa 2018) (same), *rev'd on other grounds*, 949 F.3d 1071 (8th Cir. 2020).

But nowhere does the Amended Complaint allege that FIIOC (or any of the Fidelity Retail Entities) understood that the participant data FIIOC received in conjunction with its role as recordkeeper for the Plan was a "plan asset" within the meaning of ERISA and that Fidelity's use of that data would constitute a prohibited transaction.  Nor would such an allegation be plausible given the authorities cited above rejecting such an interpretation of ERISA.  *See* pp. 11-25, *supra*.  Similarly, nowhere does the Amended Complaint allege that FIIOC understood that any of the Fidelity Retail Entities was a "party in interest," such that the transaction was prohibited under ERISA.  And, once again, for the reasons explained above, at pp. 26-28, if FIIOC had considered this question, the only reasonable conclusion it could have reached under the statute is that none of the Fidelity Retail Entities is a "party in interest."  Therefore, the prohibited-transaction claim in Count VII should be dismissed.[22]

## CONCLUSION

For all of the reasons provided above, the Court should dismiss the claims against Fidelity under Rule 12(b)(1) and/or Rule 12(b)(6).

## REQUEST FOR ORAL ARGUMENT

Under Local Rule 7.5.A, Fidelity respectfully requests a hearing on this Motion.

---

[22] Count IX seeks injunctive relief as a remedy for the violations alleged in Counts IV and VII, and therefore should be dismissed as well, as against Fidelity.  FAC ¶¶ 266-268.

DATED:  June 15, 2020

Respectfully submitted,

*/s/ Noelle M. Reed*

Noelle M. Reed
Attorney-In-Charge
Federal Bar No. 27139
State Bar No. 24044211
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1000 Louisiana Street, Suite 6800
Houston, Texas 77002
Tel.: (713) 655-5122
Fax.: (713) 483-9122
Email:  noelle.reed@skadden.com

*Of Counsel:*

James R. Carroll (*pro hac vice*)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
Tel.: (617) 573-4800
Fax.: (617) 573-4822
Email: james.carroll@skadden.com

*Attorney-In-Charge for Defendants
Fidelity Investments Institutional Operations
Company, Inc., FMR LLC, Fidelity
Brokerage Services LLC, Fidelity Personal
and Workplace Advisors LLC, Fidelity
Investments Life Insurance Company, and
Fidelity Personal Trust Company, FSB*

Alison V. Douglass (*pro hac vice*)
Edwina B. Clarke (*pro hac vice*)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, Massachusetts 02210
Tel.: (617) 570-1000
Fax.: (617) 523-1231
Email: adouglass@goodwinlaw.com
Email: eclarke@goodwinlaw.com

William M. Jay (*pro hac vice*)
Jaime A. Santos (*pro hac vice*)
GOODWIN PROCTER LLP
1900 N Street NW
Washington, District of Columbia 20036
Tel.: (202) 346-4000
Fax.: (202) 346-4444
Email: wjay@goodwinlaw.com
Email: jsantos@goodwinlaw.com

## <u>GALVESTON DISTRICT COURT RULE 6 CERTIFICATION</u>

On March 20, 2020, after conferring with counsel for Plaintiffs, Fidelity filed a pre-motion letter request with the Court seeking permission to file a Motion to Dismiss the initial complaint in accordance with the local rules in effect at that time. Dkt. No. 60. The Court referred Fidelity's request to Magistrate Judge Edison. Dkt. No. 61. On March 26, 2020, the parties appeared before Judge Edison for a pre-motion conference concerning Fidelity's letter request. On March 31, 2020, Judge Edison entered an order granting Fidelity permission to file a Motion to Dismiss and, if Plaintiffs filed an amended complaint, to file a Motion to Dismiss the amended complaint within six weeks thereafter. Dkt. No. 70. On May 21, 2020, Plaintiffs exercised their right to file an amended complaint. Dkt. 84. In accordance with Judge Edison's order, Fidelity now timely submits the Fidelity Defendants' Motion to Dismiss.

June 15, 2020                                             */s/ Noelle M. Reed*
                                                          Noelle M. Reed

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing motion was filed electronically with the United States District Court for the Southern District of Texas through the Court's ECF System on this date.  The Notice of Electronic Filing constitutes service on all parties under Local Rule 5.1.

Dated: June 15, 2020                                   _/s/ Noelle M. Reed_____
                                                       Noelle M. Reed