# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **CHARLES HARMON, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| vs. | § | **CIVIL ACTION NO. 3:20-cv-00021** |
| | § | |
| **SHELL OIL COMPANY, et al.,** | § | |
| | § | **ORAL ARGUMENT REQUESTED** |
| **Defendants.** | § | |
| | § | |

## SHELL DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

Of Counsel:

Nancy G. Ross (*pro hac vice*)
Richard E. Nowak (*pro hac vice*)
Abigail M. Bartine (*pro hac vice*)
71 S. Wacker Dr.
Chicago, Illinois 60606-4637
Telephone: (312) 782-0600
Facsimile: (312) 701-7711

Brian D. Netter (*pro hac vice*)
1999 K Street, NW
Washington, D.C. 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-5236

Andrew C. Elkhoury
State Bar No. 24097648
Southern District No. 2914732
700 Louisiana Street, Suite 3400
Houston, Texas 77002-2730
Telephone: (713) 238-2841
Facsimile: (713) 238-4888

*Attorneys for Shell Defendants*

Attorney-In-Charge:

Michael P. Lennon, Jr.
State Bar No. 00787895
Southern District No. 19866
700 Louisiana Street, Suite 3400
Houston, Texas 77002-2730
Telephone: (713) 238-2667
Facsimile: (713) 238-4613

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 2

    A.    The Plan's Recordkeeper ........................................................................ 3

    B.    The Plan's Investment Options .............................................................. 3

    C.    The Plan's Managed Account Services .................................................. 4

    D.    Shell's Internal Administrative Costs ................................................... 5

ARGUMENT ...................................................................................................................... 5

I.     Plaintiffs Lack Article III Standing as to the Investment Option and
      Participant Data Claims .................................................................................. 5

II.    Plaintiffs Fail to State a Claim ...................................................................... 7

    A.    The Plan's recordkeeping payments to Fidelity do not give rise to a
         fiduciary breach claim [Count I] ......................................................... 9

         1.    Plaintiffs fail to plead a breach of the duty of loyalty ...................... 9

         2.    Plaintiffs fail to plead a breach of the duty of prudence ................ 10

    B.    Plaintiffs' challenge to individual funds within the Plan's Fund
         Window fails because the Fund Window's component funds are not
         designated investment alternatives [Count II] ................................... 16

    C.    The Plan's managed account arrangement with Financial Engines
         does not support a claim for fiduciary breach [Count III] .................. 19

    D.    Plaintiffs fail to state a claim with their allegations that participant
         data was used to cross-sell non-Plan products [Counts V and VI] ........... 20

         1.    Plaintiffs do not allege a plausible fiduciary breach claim with
             respect to participant data [Count V] ............................................ 21

         2.    Plaintiffs similarly fail to plausibly allege a prohibited
             transaction with respect to participant data [Count VI] ................. 23

    E.    The Plan's reimbursements of Shell's direct expenses do not
         constitute prohibited transactions [Count VIII] ................................. 25

    F.    Plaintiffs fail to plausibly allege a derivative claim for injunctive
         relief against the Shell Defendants [Count IX] .................................. 27

## TABLE OF CONTENTS
(continued)

**Page**

G.   Plaintiffs have not satisfied their burden to plead that Shell or the Individual Shell Defendants acted in a fiduciary capacity with respect to the allegations of the complaint [Counts I-III, V-VI, and VIII] ........................................................................................................ 28

III.   Conclusion .......................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alas v. AT&T Inc.*,
2019 WL 1744847 (C.D. Cal. Feb. 25, 2019) ............................................................ 29

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................. 7, 8

*Bannistor v. Ullman*,
287 F.3d 394 (5th Cir. 2002) ...................................................................................... 28

*Barchock v. CVS Health Corp.*,
886 F.3d 43 (1st Cir. 2018) ......................................................................................... 18

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................ 8, 9, 12

*Bussian v. RJR Nabisco, Inc.*,
223 F.3d 286 (5th Cir. 2000) ......................................................................................... 9

*Cotton v. Mass. Mut. Life Co.*,
402 F.3d 1267 (11th Cir. 2005) .................................................................................... 28

*Cunningham v. Cornell Univ.*,
2017 WL 4358769 (S.D.N.Y. Sept. 29, 2017) ............................................................ 18

*Cuvillier v. Sullivan*,
503 F.3d 397 (5th Cir. 2007) ......................................................................................... 8

*Davis v. FEC*,
554 U.S. 724 (2008) ...................................................................................................... 6

*Divane v. Nw. Univ.*,
2018 WL 2388118 (N.D. Ill. May 25, 2018) ..................................................... *passim*

*Divane v. Nw. Univ.*,
953 F.3d 980 (7th Cir. 2020) ................................................................. 13, 14, 15, 27

*Donovan v. Bierwirth*,
680 F.2d 263 (2d Cir. 1982) .......................................................................................... 9

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Donovan v. Mercer*,
   747 F.2d 304 (5th Cir. 1984) ..................................................................... 28

*Duff v. Hilliard Martinez Gonzalez, LLP*,
   2018 WL 2046953 (S.D. Tex. May 2, 2018) ................................................. 3

*In re Dynegy, Inc. ERISA Litig.*,
   309 F. Supp.2d 861 (S.D. Tex. 2004) ......................................................... 23

*Ferguson v. Ruane Cunniff & Goldfarb Inc.*,
   2019 WL 4466714 (S.D.N.Y. Sept. 18, 2019)............................................. 14

*Fifth Third Bancorp v. Dudenhoeffer*,
   573 U.S. 409 (2014) ...................................................................... 11, 15, 19

*Frank v. Prudential Health Care Plan, Inc.*,
   164 F.Supp.2d 865 (W.D. Tex. 2001)........................................................... 3

*George v. Kraft Foods Global, Inc.*,
   641 F.3d 786 (7th Cir. 2011) ...................................................................... 14

*Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*,
   530 U.S. 238 (2000) .................................................................. 26, 27, 28, 29

*Hecker v. Deere & Co.*,
   556 F.3d 575 (7th Cir. 2009) ................................................................ 12, 16

*Jenkins v. Yager*,
   444 F.3d 916 (7th Cir. 2006) ...................................................................... 19

*Jordan v. Mich. Conf. of Teamsters Welfare Fund*,
   207 F.3d 854 (6th Cir. 2000) ...................................................................... 25

*Kanawi v. Bechtel Corp.*,
   590 F. Supp. 2d 1213 (N.D. Cal. 2008) ....................................................... 25

*Kopp v. Klein*,
   894 F.3d 214 (5th Cir. 2018) ........................................................ 10, 11, 29

*Laborers Nat'l Pension Fund v. N. Tr. Quantitative Advisors, Inc.*,
   173 F.3d 313 (5th Cir. 1999) ...................................................................... 10

iv

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Larson v. Allina Health Sys.*,
  350 F. Supp. 3d 780 (D. Minn. 2018) ........................................................ 16

*Lee v. Verizon Commc'ns, Inc.*,
  837 F.3d 523 (5th Cir. 2016) ................................................................. 6, 7

*Lockheed Corp. v. Spink*,
  517 U.S. 882 (1996) ............................................................................ 24

*Loomis v. Exelon Corp.*,
  658 F.3d 667 (7th Cir. 2011) ................................................................. 15

*Marks v. Trader Joe's Co.*,
  2020 WL 2504333 (C.D. Cal. Apr. 24, 2020) ......................................... 11, 12, 13, 14

*Marshall v. Northrop Grumman Corp.*,
  2019 WL 4058583 (C.D. Cal. Aug. 14, 2019) ........................................ 14, 15

*Meiners v. Wells Fargo*,
  898 F.3d 820 (8th Cir. 2018) ................................................................. 19

*Metzler v. Graham*,
  112 F.3d 207 (5th Cir. 1997) ................................................................. 18

*O'Shea v. Littleton*,
  414 U.S. 488 (1974) ............................................................................. 6

*Patelco Credit Union v. Sahni*,
  262 F.3d 897 (9th Cir. 2001) ................................................................. 26

*Patterson v. Stanley*,
  2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019) ............................................. 10

*Pegram v. Herdrich*,
  530 U.S. 211 (2000) .......................................................................... 9, 28

*Powell v. Dallas Morning News LP*,
  610 F.Supp.2d 569 (N.D. Tex. 2009) ..................................................... 29

*Rosen v. Prudential Ret. Ins. & Ann. Co.*,
  2016 WL 7494320 (D. Conn. Dec. 30, 2016) ........................................... 20

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Sacerdote v. New York Univ.*,
2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017) .................................................. 9, 10, 27

*Scott v. Aon Hewitt Financial Advisors, LLC*,
2018 WL 1384300 (N.D. Ill. Mar. 19, 2018) ............................................................. 15

*Singh v. RadioShack Corp.*,
882 F.3d 137 (5th Cir. 2018) ...................................................................................... 5

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctr. Ret. Plan
v. Morgan Stanley Investment Mgmt.*,
712 F.3d 705 (2d Cir. 2013) ..................................................................................... 13

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) .................................................................................................... 6

*Sweda v. University of Pennsylvania*,
923 F.3d 320 (3d Cir. 2019) ................................................................................ 24, 25

*Thole v. U. S. Bank N.A.*,
140 S. Ct. 1615 (2020) ................................................................................................ 6

*Tracey v. Mass. Inst. of Tech.*,
2017 WL 4478239 (D. Mass. Oct. 4, 2017) .............................................................. 25

*Tussey v. ABB, Inc.*,
746 F.3d 327 (8th Cir. 2014) ..................................................................................... 15

*White v. Chevron Corp.*,
2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ............................................... 14, 15, 19

*Wilcox v. Georgetown Univ.*,
2019 WL 132281 (D.D.C. Jan. 8, 2019) .................................................................... 13

*Wolcott v. Sebelius*,
635 F.3d 757 (5th Cir. 2011) ...................................................................................... 2

**Statutes**

29 U.S.C. § 406(a) ............................................................................................ 23, 24, 25

29 U.S.C. § 1002(14) ................................................................................................... 27

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

29 U.S.C. § 1002(42) ............................................................................ 24

29 U.S.C. § 1101 ...................................................................................... 2

29 U.S.C. § 1105(a) ............................................................................. 30

29 U.S.C. § 1106(a) .......................................................... 24, 25, 26, 29

29 U.S.C. § 1108(b) ............................................................................ 27

29 U.S.C. § 1109(a) ............................................................................ 29

## Other Authorities

29 C.F.R. Part 510 .............................................................................. 24

29 C.F.R. § 2510.3 ............................................................................. 24

29 C.F.R. § 2550.404a .................................................................. 17, 18

29 C.F.R. § 2550.404c ....................................................................... 17

29 C.F.R. § 2550.408b ....................................................................... 26

U.S. Dep't of Labor, Field Assistance Bulletin No. 2012-02 (May 7, 2012),
    Available at https://www.dol.gov/agencies/ebsa/employers-and-
    advisers/guidance/field-assistance-bulletins/2012-02 ................................ 17

U.S. Dep't of Labor, Field Assistance Bulletin No. 2012-02R (July 30,
    2012), Available at https://www.dol.gov/agencies/ebsa/employers-and-
    advisers/guidance/field-assistance-bulletins/2012-02r ................................ 17

## INTRODUCTION

The Shell Defendants[1] moved to dismiss Plaintiffs' prolix Complaint because it did not state a claim that would entitle them to relief. In response, Plaintiffs filed an Amended Complaint that makes superficial changes. None of the changes cure the fundamental flaws of Plaintiffs' case. In their zeal to criticize virtually every aspect of the administration of the Shell Provident Fund 401(k) plan ("Plan"), Plaintiffs have delivered a complaint that is long on form but short on substance. Plaintiffs' Amended Complaint only proves that they cannot state a valid claim, so their case should be dismissed.  Given that Plaintiffs have now had two opportunities to try to sufficiently state a claim, dismissal should be with prejudice.

For starters, Plaintiffs assert claims for which they allege no personal injury. Plaintiffs seek, for example, to challenge certain of the investment options offered to Plan participants as imprudent underperformers. However, none of the Plan participants were *required* to invest in those options—and none of the Plaintiffs *elected* to invest in the options that Plaintiffs identify as deficient. Plaintiffs could not have been injured by the availability of funds they never chose, and, as confirmed by the U.S. Supreme Court last month in *Thole v. U.S. Bank N.A.*, lack Article III standing. Plaintiffs likewise attempt the novel theory that the Shell Defendants violated federal law because Fidelity allegedly used

---

[1] The "Shell Defendants" consist of Shell Oil Company ("Shell"), the Plan Trustees ("Trustees"), and current and former Shell employees Cynthia A.P. Deere, Scott G. Ballard, Paul Goodfellow, Rhoman J. Hardy, Eileen M. Perillo, Christopher B. Rice, Susan M. Ward, and Glenn T. Wright ("Individual Shell Defendants").

Plan participant data to market non-Plan products. Again, Plaintiffs fail at the outset because they do not plausibly allege that they suffered a cognizable injury-in-fact.

Standing aside, Plaintiffs' Amended Complaint does not state a claim for relief. Plaintiffs' causes of action all purport to arise under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1101 *et seq*. But, as the Supreme Court has emphasized, ERISA fiduciary breach claims must be articulated against individuals making fiduciary decisions. Plaintiffs have failed at the threshold to allege fiduciary behavior by each particular Shell Defendant.

Moreover, rather than allege facts that plausibly detail a violation of law, Plaintiffs rely on lengthy discussions of ERISA's general standards. Plaintiffs' verbosity should not be mistaken for sufficiency; when the time comes for Plaintiffs to make allegations about ***what the Shell Defendants did in particular***, Plaintiffs' Amended Complaint is strikingly conclusory. Without allegations of fact that specify conduct that violates the law, Plaintiffs are not entitled to proceed.

## BACKGROUND[2]

Shell sponsors the Plan to help its employees plan and save for retirement. Am. Compl. ¶¶ 10, 18. As with all 401(k) plans, the Plan's participants maintain individual accounts. *Id.* ¶ 45. As of year-end 2014, the Plan had more than 36,000 participants with more than $10 billion in net assets. *Id.* ¶ 13. The Plan is governed by a written document

---

[2] This background information is based on the factual allegations of the Amended Complaint, which are presumed true solely for purposes of this motion. *Wolcott v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011).

that designates the Plan's administrator and Trustees and authorizes them to retain vendors to perform the Plan's essential functions. *Id.* ¶¶ 9, 11, 21; *see* Ross Decl. ¶ 2, Ex. 1 at 2, 53.

### A.    The Plan's Recordkeeper

The most prominent third-party service provider to a 401(k) plan is the recordkeeper, which serves as the hub for participant documentation and information. Among other services, a recordkeeper commonly tracks each participant's investments, provides account statements, and maintains a website and/or call center through which participants can obtain information about and make changes to their accounts. Am. Compl. ¶ 118.

The Plan's recordkeeper is alleged to be Fidelity Investments Institutional Operations Company, Inc. ("Fidelity"). [3] *Id.* ¶ 27. Fidelity is compensated for recordkeeping services through a revenue-sharing arrangement. *Id.* ¶ 139. Under that arrangement, Fidelity keeps a portion of expenses related to the Plan's investments. According to the Amended Complaint, Fidelity keeps the negotiated amount and rebates the excess to the Plan. *Id.* ¶ 148.

### B.    The Plan's Investment Options

Plan participants decide how to invest their assets among the options on the Plan's investment menu. Different participants have different retirement horizons, different personal financial circumstances, and different risk tolerances, so the Plan has made available a wide range of investment options. Those investment options are organized into

---

[3] Plaintiffs also raise claims against a host of companies affiliated with Fidelity. In the collective, they are referred to herein as the "Fidelity Defendants."

four tiers. *Id.* ¶ 53; Ross Decl. ¶ 3, Ex. 2 at 12 (2019 summary plan description ("SPD")).[4]

Tier I consists of target date funds, which are aimed at investors looking for a simple,

single-fund approach to investing. *Id.* The Tier I funds automatically reallocate assets over

time, adopting an increasingly conservative posture as the fund's target retirement date

approaches. Tier II (Core Funds) generally contains passively managed index mutual funds

that focus on particular segments of the market. Am. Compl. ¶ 53; Ex. 2 at 13. This tier

targets investors seeking to invest in a custom balance of market segments.[5]

The SPD explains that, with the exception of the Royal Dutch Shell Stock Fund,

Tiers I and II comprise the Plan's "Designated Investment Alternatives" within the

meaning of Department of Labor regulations.  Ex. 2 at 12 n.13. Those funds are the ones

for which the Plan conducts ordinary due diligence. Tier III (the "Fund Window"), which

provides access to a much longer list of funds, is "intended for the investor who is willing

to do more research before investing." *Id.* at 13. Finally, Tier IV (BrokerageLink) provides

access to an even broader array of investment products, including individual equities,

options, and bonds. *Id.* at 13-14.

### C.    The Plan's Managed Account Services

---

[4] The Court may consider the SPD without converting the motion into one for summary judgment because it shows the at-issue plan and goes to the heart of Plaintiffs' claims. *See Duff v. Hilliard Martinez Gonzalez, LLP*, 2018 WL 2046953, at *5 (S.D. Tex. May 2, 2018); *Frank v. Prudential Health Care Plan, Inc.*, 164 F.Supp.2d 865, 871-72 (W.D. Tex. 2001). The SPD was specifically referred to in the original Complaint – and attached to the Shell Defendants' previous motion to dismiss (Dkt. No. 81-3) – but, presumably, Plaintiffs removed that reference in the Amended Complaint after it became clear that the SPD directly refuted their allegations regarding the Fund Window and designated investment alternatives.

[5] Tier II also contains an investment option that permits Plan participants to invest in Royal Dutch Shell plc stock.

To provide additional resources to Plan participants to help them plan and save for retirement, the Plan's Trustees have contracted with Financial Engines to provide managed account services. *Id.* ¶¶ 93, 97. For participants opting into these services, Financial Engines helps participants make investment decisions by allocating their Plan account balances across a mix of alternative investment options available under the Plan. *Id.* ¶¶ 92-95. As compensation for its services, Financial Engines is paid a fee from the account balances of participants who have opted in. *Id.* ¶ 110.

Because Financial Engines requires access to the Plan's records in order to make recommendations to Plan participants and to make changes to their investment elections, Financial Engines has entered into a contract for data connectivity services with Fidelity. *Id.* ¶¶ 140-41. Neither the Plan nor the Shell Defendants is a party to the arrangement between Financial Engines and Fidelity, and the consideration paid under their agreement comes from Financial Engines' assets, not the Plan's assets.

### D.    Shell's Internal Administrative Costs

Administering a large retirement plan with tens of thousands of participants naturally requires a substantial amount of resources. As is common with large plans, Shell provides certain services to the Plan that cannot be outsourced efficiently. *Id.* ¶ 199. The Plan reimburses Shell for certain direct expenses that it incurs in servicing the Plan. *Id.*

### ARGUMENT

## I.    PLAINTIFFS LACK ARTICLE III STANDING AS TO THE INVESTMENT OPTION AND PARTICIPANT DATA CLAIMS

This Court lacks subject matter jurisdiction over Counts II, V, VI, and IX of Plaintiffs' complaint. No Plaintiff has alleged an injury-in-fact with respect to those claims.

The doctrine of standing requires Plaintiffs to "prov[e] that they . . . are 'entitled to have the court decide the merits of the dispute or of particular issues.'" *Singh v. RadioShack Corp.*, 882 F.3d 137, 150-51 (5th Cir. 2018) (citation omitted). In an ERISA case, as in all other federal cases, a plaintiff must allege that she has an "injury [that is] 'concrete and particularized,' and 'actual or imminent, not conjectural or hypothetical.'" *Lee v. Verizon Commc'ns, Inc.*, 837 F.3d 523, 544 (5th Cir. 2016) (citations omitted).

Plaintiffs must demonstrate standing for "'each claim'" and "'for each form of relief that is sought.'" *Davis v. FEC*, 554 U.S. 724, 734 (2008). In a class action, the named plaintiffs must demonstrate that they have Article III standing (a "personal stake in the outcome of the controversy") for every claim alleged. *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted). "There is no ERISA exception to Article III." *Thole v. U. S. Bank N.A.*, 140 S. Ct. 1615, 1622 (2020). Participants cannot satisfy Article III by "assert[ing] standing as representatives of the plan," seeking to invoke injuries sustained only by other participants; they must be able to assert their own individualized stake in each claim. *Id.* at 1620. Thus, a "[b]are allegation of incursion on the purported statutory right to 'proper plan management' under ERISA is insufficient to meet the injury-in-fact prong of Article III standing." *Lee*, 837 F.3d at 529, 547.

Four of Plaintiffs' claims against the Shell Defendants fail to satisfy Article III. In Count II, Plaintiffs challenge as imprudent specific investments available through the Plan's fund window (Tier III). Am. Compl. ¶¶ 77-91. But no Plaintiff alleges that he invested in any of the particular options that they challenge. *Id.* ¶¶ 14-17. "[C]onstitutional

standing requires allegations to support injury against an individual's benefit payments."

*Lee*, 837 F.3d at 545. Plaintiffs' challenge to investment options that they never personally

elected falls far short of what is required.[6]

Plaintiffs' claims against the Shell Defendants in Counts V, VI, and IX, concerning

Fidelity's alleged use of participant data to market non-Plan products, fail for the same

reason. The Amended Complaint does not plausibly allege that the alleged data usage

caused them to suffer a cognizable injury. Although they wax indignant about the risks that

participants will buy inferior products after a marketing pitch, they do not actually allege

that any Plaintiff succumbed to allegedly improper marketing tactics before filing the

Complaint. The Fidelity Defendants have amply detailed Plaintiffs' inability to satisfy

Article III with respect to the cross-selling allegations, *see* Dkt. 91 at 6-10, and those same

arguments require the dismissal of Counts V, VI, and IX as against the Shell Defendants.

## II.   PLAINTIFFS FAIL TO STATE A CLAIM

To the extent this Court has jurisdiction to entertain the merits, Plaintiffs' operative

complaint still fails to state any claim against the Shell Defendants upon which relief may

be granted. To survive a motion to dismiss, "a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009). While a court analyzing a motion to dismiss must accept

---

[6] Plaintiffs further allege that there were too many funds in Tier III. Am. Compl. ¶¶ 64-76. They have likewise failed to identify any personal injury stemming from the abundance of choice. Plaintiffs' too-much-choice allegation is particularly peculiar given the existence of Tiers I and II. Participants who want one-stop shopping or a limited subset of options have shorter menus to consider. Tiers III and IV are for more sophisticated investors who want more choice; how that could be injurious is a mystery.

as true all well-pleaded factual allegations in the complaint, "a court is not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (internal quotation omitted). Although a complaint need not contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, such that it is "plausible on its face." *Id.*; *see also Cuvillier v. Sullivan*, 503 F.3d 397, 401 (5th Cir. 2007).

Plaintiffs' Amended Complaint targets five aspects of the Shell Defendants' administration of the Plan. *First*, they contend that the Shell Defendants paid excessive fees to Fidelity, the Plan's recordkeeper. Am. Compl. ¶¶ 118-55, 204-11. *Second*, Plaintiffs assert that the Shell Defendants inadequately managed the investment options provided to Plan participants. *Id.* ¶¶ 52-91, 212-20. *Third*, Plaintiffs challenge as excessive the fees paid to Financial Engines for managed account services. *Id.* ¶¶ 92-117, 221-27. *Fourth*, Plaintiffs challenge the Shell Defendants' alleged failure to prohibit the Fidelity Defendants from allegedly using Plan participant data to sell unrelated financial products to Plan participants. *Id.* ¶¶ 156-97, 234-50, 265-68. *Fifth*, Plaintiffs allege that Shell improperly accepted reimbursements for administrative services that its employees provided to the Plan. *Id.* ¶¶ 198-201, 260-64. For each alleged course of conduct, Plaintiffs claim that the Shell Defendants breached ERISA's fiduciary duties of loyalty and prudence and, with respect to the reimbursements to Shell and Fidelity's alleged use of Plan

8

participant data, that this conduct violates ERISA's prohibited transaction rules. As discussed below, Plaintiffs have failed to satisfy their pleading burden as to any claim.

### A. The Plan's recordkeeping payments to Fidelity do not give rise to a fiduciary breach claim [Count I]

Plaintiffs contend that the Shell Defendants breached the duties of loyalty and prudence through the retention and payment of allegedly excessive fees to Fidelity as the Plan's recordkeeper. Plaintiffs are wrong on both counts and fail to state a claim.

#### 1. Plaintiffs fail to plead a breach of the duty of loyalty

ERISA "charges fiduciaries with a duty of loyalty to guarantee beneficiaries' interests" by invoking a common law trustee's duty to "'administer the trust solely in the interest of the beneficiaries.'" *Pegram v. Herdrich*, 530 U.S. 211, 224 (2000) (citation omitted). A fiduciary acts disloyally when he acts to advance his own interests, or the interests of a third party, instead of acting "'with an eye single to the interests of the participants and beneficiaries of the plan.'" *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 296 (5th Cir. 2000) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982)).

Disloyalty is not the same as imprudence, so "a plaintiff must do more than simply recast purported breaches of the duty of prudence as disloyal acts." *Sacerdote v. New York Univ.*, 2017 WL 3701482, at *5 (S.D.N.Y. Aug. 25, 2017). "[T]he proper inquiry has as its central concern the extent to which the fiduciary's conduct reflects a subordination of beneficiaries' and participants' interests to those of a third party." *Bussian*, 223 F.3d at 298. Moreover, under *Twombly*, Plaintiffs cannot survive a motion to dismiss merely by identifying conduct that *might* have resulted from either loyal or disloyal decision making; they must allege facts that tend to exclude the possibility of proper fiduciary conduct.

In Count I, as elsewhere in the Amended Complaint, Plaintiffs try to fashion a cause of action out of factual allegations that do nothing to exclude the possibility of proper fiduciary conduct. For example, Plaintiffs allege that the Shell Defendants disloyally favored Fidelity when they agreed to a supposedly expensive vendor contract. *See*, *e.g.*, Am. Compl. ¶¶ 147-49. But "the potential for a conflict, without more, is not synonymous with a plausible claim of fiduciary disloyalty." *Kopp v. Klein*, 894 F.3d 214, 222 (5th Cir. 2018). Plaintiffs offer nothing more than speculation that the Shell Defendants were striving to benefit somebody other than the Plan participants. Other courts have dismissed conclusory duty of loyalty claims just like this.[7] As there, Plaintiffs' conclusory allegation of disloyalty based on a routine business arrangement is far from sufficient to state an actionable disloyalty claim.

### 2.    Plaintiffs fail to plead a breach of the duty of prudence

Plaintiffs have not plausibly alleged any fiduciary imprudence with respect to the Plan's Fidelity contract. ERISA's duty of prudence calls on courts to "objectively assess whether the fiduciary, at the time of the transaction, utilized proper methods." *Laborers Nat'l Pension Fund v. N. Tr. Quantitative Advisors, Inc.*, 173 F.3d 313, 317 (5th Cir. 1999).

Motions to dismiss duty-of-prudence claims are a crucial "mechanism for weeding out meritless [ERISA] claims," requiring "careful judicial consideration of whether the

---

[7] *See Patterson v. Stanley*, 2019 WL 4934834, at *14 (S.D.N.Y. Oct. 7, 2019) (dismissing disloyalty claim based on conclusory allegation that a fiduciary retained investments due to a "desire to foster a business relationship" with an investment company without alleging facts to suggest that the business relationship was contingent on the offering the investments); *Sacerdote*, 2017 WL 3701482, at *5-6 (dismissing disloyalty claim concerning retention of recordkeeper because the allegations did not "support purposeful action" by the defendant to "benefit another (let alone itself)").

complaint states a claim that the defendant has acted imprudently." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). Such a claim can proceed only if the plaintiffs "allege facts to support the conclusion that the Defendants would have acted differently had they engaged in proper monitoring—and that an alternative course of action could have prevented the Plan's losses." *Kopp*, 894 F.3d at 221. Plaintiffs' theory fails at every turn. They do not plausibly allege how much the Plan paid, what services were covered by those fees, or how the Plan could have attained the same service levels on more favorable terms.

To start, Plaintiffs lack plausible allegations as to how much the Plan was paying Fidelity for recordkeeping services. They allege that Fidelity was paid somewhere between $1.8 million and $5.3 million per year. Am. Compl. ¶ 151. Such a wide range illustrates that Plaintiffs are guessing at how much Fidelity was paid—or guessing what compensation was for recordkeeping, given that Fidelity provides multiple services to the Plan.[8] Plaintiffs cannot state a fiduciary-breach claim for excessive recordkeeping fees if they "do not actually know how much the recordkeeping fees are." *Marks v. Trader Joe's Co.*, 2020 WL 2504333, at *6 (C.D. Cal. Apr. 24, 2020). Plaintiffs claim that their fee information comes from the Plan's annual Form 5500 disclosures to the Department of Labor. Am. Compl. ¶ 151. But the Plan's Forms 5500 actually disclose far lower fees. *See* Ross Decl. ¶¶ 4-8, Exs. 3-7, Schedule C. For example, for 2015, the disclosure shows that Fidelity retained just over $1.2 million for "RECORDKEEPING FEES" (*id.* Schedule C, at 4-1), which works out to *less* than the $35 per participant that Plaintiffs say was required.

---

[8] The Form 5500s show that Fidelity provided myriad services to the Plan, as reflected by the various service codes attributed to the payments Fidelity received. *See*, *e.g.*, Ross Decl. ¶ 4, Ex. 3, Schedule C at 3-2.

Ross Decl. ¶ 5, Ex. 4; Am. Compl. ¶¶ 122, 150, 154. As in *Marks*, where the judicially noticeable pricing information showed that the plaintiffs' guess was well off-base, Plaintiffs' inability to allege what Shell's Plan was paying compels dismissal. *See* 2020 WL 2504333, at *5-6.

In any event, without any supporting factual allegations, Plaintiffs pull out of thin air the claim that a reasonable fee would have been $35 per participant. Am. Compl. ¶¶ 122, 150, 154. Plaintiffs proceed from the apparent premise that cheaper is always better, and that fiduciaries must be intent on cutting costs (regardless of the corners that must be cut in the process). But the law does not support Plaintiffs' race-to-the-bottom mentality. Rather, "nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund" or service provider regardless of other considerations. *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009).

Therein lies the fundamental problem with Plaintiffs' claim. When different plans have different pricing, there are numerous possible explanations—one plan might be more complex, it might provide additional services, or it might provide higher service levels.[9] Again, under *Twombly*, Plaintiffs can state a claim only by alleging facts that are suggestive of fiduciary misconduct—not facts that have both lawful and unlawful explanations. *See*

---

[9] Among other plan comparisons, Plaintiffs allege that Fidelity recently stipulated in separate litigation that the value of its recordkeeping service for its *own* 401(k) plan was no more than $21 per participant between 2014-2017. Am. Compl. ¶ 130. Plaintiffs' implication—that the Shell Defendants' failure to pay Fidelity similar compensation for its work on the Plan is a breach of fiduciary duty—is not grounded in any allegations demonstrating that the two plans are comparable, thereby justifying comparable fees.

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctr. Ret. Plan v. Morgan Stanley Investment Mgmt.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

Plaintiffs are attempting to assert a claim for breach-of-fiduciary duty because the Plan's recordkeeping fees allegedly exceeded an unsupported benchmark. Other courts have rejected similar attempts to peg retirement plans to the same $35 per participant benchmark that Plaintiffs advance here.[10]

In sum, Plaintiffs are making an (erroneous) guess about the Plan's fees, without any understanding of its service offerings, and comparing that supposed fee to an arbitrary benchmark. That level of pleading cannot be sufficient; if it were, there would be no way for fiduciaries to avoid a costly suit. A participant in a plan paying $100 per participant could simply allege that $80 was attainable, or a participant in a plan paying $35 per participant could allege that $25 would have been better. With respect to any retirement plan, there will be opportunities to cut corners—to provide the bare minimum of services to reduce fees. But fiduciaries are supposed to be acting in the interests of plan participants to ensure that they have access to the resources that will help them to facilitate their retirement savings. *See Divane*, 953 F.3d at 988 ("When claiming an ERISA violation, the plaintiff must plausibly allege action that was objectively unreasonable."). Plaintiffs' numbers game delves so superficially into the drivers of the Plan's expenses that it creates

---

[10] *See, e.g.*, *Divane v. Nw. Univ.*, 953 F.3d 980, 990–91 (7th Cir. 2020) ("Northwestern was not required to search for a recordkeeper willing to take $35 per year per participant as plaintiffs would have liked. . . . And plaintiffs have failed to explain how a hypothetical lower-cost recordkeeper would perform at the level necessary to serve the best interests of the plans' participants."); *Wilcox v. Georgetown Univ.*, 2019 WL 132281, at *13 (D.D.C. Jan. 8, 2019).

no inference of wrongdoing at all—certainly not an inference that warrants the intense burdens of discovery even for faultless fiduciaries.[11]

In addition to their pricing allegations, Plaintiffs make allegations about fiduciary process, mostly based on information and belief, because Plaintiffs do not purport to actually know anything about the Plan's decisional processes.[12] But those theories have all been rejected as a matter of law elsewhere and should be rejected as a matter of law here.

*First*, Plaintiffs contend that plan pricing can be determined only through formal bidding processes. But "the allegation that the Plan fiduciaries were required to solicit competitive bids on a regular basis has no legal foundation." *White v. Chevron Corp.*, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016).[13] Competitive bidding may provide evidence of prudence, but an information-and-belief allegation that there was no bidding does not plausibly establish a fiduciary breach. *Cf. George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 798-99 (7th Cir. 2011).

---

[11] *Compare, e.g., Divane*, 953 F.3d 980 (affirming dismissal of fiduciary breach lawsuit), *with Divane v. Nw. Univ.*, 2018 WL 2388118 (N.D. Ill. May 25, 2018), ECF No. 154 (No. 1:16-cv-08157) (describing the pre-dismissal discovery burden, which "caused [Northwestern] to incur nearly $3 million in attorneys' fees and more than $1 million in expenses").

[12] Plaintiffs admit that they lack any concrete basis for their allegations against the Shell Defendants. *See* Am. Compl. ¶ 25. And Plaintiffs allegations do not dispute that Shell provided all documents they were entitled to under § 1024(b)(4). Notably, Plaintiffs have not asserted a claim based on Shell's purported violation of § 1024(b)(4) or otherwise challenged its response to Plaintiffs' documents demands, formally or informally.

[13] S*ee also Ferguson v. Ruane Cunniff & Goldfarb Inc.*, 2019 WL 4466714, at *8 (S.D.N.Y. Sept. 18, 2019) ("ERISA does not require plan fiduciaries to obtain competitive bids from plan service providers."); *Marshall v. Northrop Grumman Corp.*, 2019 WL 4058583, at *10 (C.D. Cal. Aug. 14, 2019) ("[N]othing in ERISA compels periodic competitive bidding.") (quoting *White*, 2016 WL 4502808, at *14); *Marks*, 2020 WL 2504333, at *6-7.

14

*Second*, Plaintiffs challenge the use of revenue sharing to pay recordkeeping fees. Because revenue sharing is a "common and 'acceptable' investment industry practice[] that frequently inure[s] to the benefit of ERISA plans" (*Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014)), courts have rejected the theory that revenue sharing is imprudent.[14]

*Third*, Plaintiffs contend that the Shell Defendants should have recouped money that Fidelity received from Financial Engines, the Plan's managed-account provider. Plaintiffs speculate that Financial Engines' payment was "unnecessary" and was actually a "kickback." Am. Compl. ¶ 116. However, Plaintiffs are asking the wrong question. Basic economics says that a client seeking services pays the price that the market will bear. The question for the Plan is not how its vendors spend their money; it is whether the vendors' contracts with the Plan reflect market-reasonable rates. Another group of ERISA plaintiffs attempted a similar claim involving payments from Financial Engines to a recordkeeper, but those claims were rejected as a matter of law: "[d]ata connectivity fees . . . are not subject to fiduciary control, the fees are not paid out of plan assets, and are for services [the recordkeeper] provides to Financial Engines out of an independent business arrangement."[15] *Marshall*, 2019 WL 4058583, at *11.[16] Plaintiffs' challenges to Fidelity's

---

[14] *E.g.*, *Divane*, 953 F.3d at 989 ("[P]laintiffs fail to support their claim that a flat-fee structure is required by ERISA or would even benefit plan participants.") (citation omitted); *Loomis v. Exelon Corp.*, 658 F.3d 667 (7th Cir. 2011) ("flat payments per participant may help some participants but hurt others, depending on the size of each participant's account"); *White*, 2016 WL 4502808, at *14.

[15] Plaintiffs' new allegation that the data connectivity fees paid from Financial Engines to Fidelity are made "via Plan payments" (¶ 145) makes no sense. *See Marshall*, 2019 WL 4058583, at *11 (noting that the payment of these fees was not under fiduciary control).

[16] *See also Scott v. Aon Hewitt Financial Advisors, LLC*, 2018 WL 1384300, at *10 (N.D. Ill. Mar. 19, 2018) (fees paid from Financial Engines to the recordkeeper are not plan assets).

compensation—whether considered individually or as a collective—fail to plausibly demonstrate a breach of fiduciary duty that can survive a motion to dismiss.

**B.    Plaintiffs' challenge to individual funds within the Plan's Fund Window fails because the Fund Window's component funds are not designated investment alternatives [Count II]**

In Count II, Plaintiffs allege that the Shell Defendants breached ERISA's duty of prudence by failing "to regularly monitor and review each of the Plan's designated investment options in Tier III on an ongoing basis." Am. Compl. ¶ 77. In particular, Plaintiffs challenge the Tier III Fund Window, contending that fund windows are "obsolete" and that the funds within it performed poorly. *Id.* ¶¶ 64-77.

As described above (*see supra* Background Sec. B), the Plan offers investment options in four tiers. Tiers I and II contain all of the Plan's "designated investment alternatives." Tiers III and IV expand the choices available to more sophisticated investors. Courts have deemed choice to be a *good* thing in ERISA plans, not a *bad* thing.  Even when plans offer hundreds of mutual funds without segregating them into tiers, courts have dismissed similar allegations of excessive choice. *See, e.g., Larson v. Allina Health Sys.*, 350 F. Supp. 3d 780, 801-02 (D. Minn. 2018) (collecting cases). Indeed, "courts have 'bristled' at 'paternalistic' theories that suggest ERISA does not 'allow participants to make their own choices.'" *Id.* at 801 (citation omitted); *see also Hecker*, 556 F.3d at 586 (relying on existence of 2,500-fund mutual fund window as indication of a plan's prudence).

Plaintiffs have further failed to state a claim with respect to the particular Tier III offerings that they claim to have been imprudent. Plaintiffs' theory is dependent on characterizing "each investment in Tier III [as] a designated investment alternative." Am.

16

Compl. ¶ 68; *accord id.* ¶¶ 57, 58, 64, 77 (describing Tier III funds as designated investment options). With good reason: under ERISA, fiduciaries have a duty to "monitor . . . *designated investment alternatives* offered under the plan." 29 C.F.R. § 2550.404a-5(f) (emphasis added); *see also* 29 C.F.R. § 2550.404c-1(d)(2)(iv) (acknowledging a fiduciary's responsibility to "prudently select and monitor any service provider or *designated investment alternative* offered under the plan") (emphasis added). But as the summary plan description makes clear, the individual investment options within Tiers III and IV are not "designated investment alternatives." *See* Ex. 2 at 12 n.13.[17]

The U.S. Department of Labor ("DOL") has specifically considered how to address individual funds within a fund window. In 2012, the DOL issued a Field Assistance Bulletin positing that fiduciaries would oversee individual funds within "a brokerage window or similar arrangement" if they were "selected by significant numbers of participants and beneficiaries." U.S. Dep't of Labor, Field Assistance Bulletin No. 2012-02 (May 7, 2012). But that guidance, which prompted an outcry, was short-lived. Two months later, the DOL withdrew the suggestion that plan fiduciaries might need to monitor funds within fund windows. *See* U.S. Dep't of Labor, Field Assistance Bulletin No. 2012-02R (July 30, 2012) (withdrawing the previous guidance and specifying instead that "nothing in this Bulletin prohibits the use of a platform or a brokerage window, self-directed brokerage account, or similar plan arrangement in an individual account plan"). The DOL subsequently defined "designated investment alternative" to *exclude* " 'brokerage

---

[17] Plaintiffs' assertion (¶ 58) that Tier III funds are listed on the Form 5500 is immaterial to their claims. The Form 5000 provides a schedule of assets; it does not distinguish between designated investment alternatives and non-designated investment alternatives.

windows,' 'self-directed brokerage accounts,' or similar plan arrangements that enable participants and beneficiaries to select investments beyond those designated by the plan." 29 C.F.R. § 2550.404a-5(h)(4).

Plaintiffs' insistence that individual funds within the Tier III window constitute "designated investment alternatives" is wrong as a matter of law.[18] This Court need not accept as true allegations that contain legal errors. Therefore, because "Plaintiffs have not provided the Court with any principled reason to believe that reviewing a subset of core investment options would not satisfy" ERISA, their investment claims fail. *Cunningham v. Cornell Univ.*, 2017 WL 4358769, at *8 (S.D.N.Y. Sept. 29, 2017).

Plaintiffs' substantive theory of imprudence is to provide a frozen-in-time snapshot comparison between the performance of certain funds and their prospectus benchmarks. Am. Compl. ¶ 82. But those comparisons are not suggestive of fiduciary imprudence. "[T]he test of prudence . . . is one of *conduct*, and not a test of the result of performance of the investment"; it is "evaluated at the time of the investment without the benefit of hindsight." *Barchock v. CVS Health Corp.*, 886 F.3d 43, 44 (1st Cir. 2018) (emphasis in original); *Metzler v. Graham*, 112 F.3d 207, 209 (5th Cir. 1997). Plaintiffs' table of underperformance shows why. They say, for example, that the Fidelity Select Gold Fund underperformed the S&P 500. But people who invest in gold are not expecting that gold will always outperform the equities market; it serves different functions, such as hedging

---

[18] Plaintiffs rely on Fidelity's alleged assertion that "investments within internally designated tiers, such as those in the Plan's Tier III, are designated investment alternatives." Am. Compl. ¶ 71. As with Plaintiffs' position that the Tier III investment options were "designated investment alternatives," Fidelity's alleged statement, if made, was contrary to the law.

against inflation. The Supreme Court has rejected the notion that fiduciaries have an obligation to outguess the market; because the U.S. stock market is presumed to be efficient, differences in performance reflect differences in risk. *See Dudenhoeffer*, 573 U.S. at 426-27.[19]

Moreover, a "fiduciary may – and often does – retain investments through a period of underperformance as a long-range investment strategy." *White*, 2016 WL 4502808, at *17.[20] Plaintiffs' simplistic critique of a small subset of the Fund Window's offerings does not make out a claim for fiduciary breach.

### C.   The Plan's managed account arrangement with Financial Engines does not support a claim for fiduciary breach [Count III]

Plaintiffs' challenge to the Plan Trustees' retention of Financial Engines fails for much the same reason as its challenge to the Fidelity relationship. Financial Engines provides managed account services—a financial wellness offering that helps individual investors tailor their investment strategy to their personal financial situation. The full-service Financial Engines offering is *optional* for Plan participants. Nothing precludes them from using an outside financial advisor (or a different robo-advisor tool) should they so desire. As with Fidelity, Plaintiffs' tactic here is to suggest that cheaper alternatives exist. Am. Compl. ¶ 112. Plaintiffs do not allege that the Shell Defendants could have obtained

---

[19] *See also Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018) ("The fact that one fund with a different investment strategy ultimately performed better [than another fund] does not establish anything about whether [that was] an imprudent choice at the outset.")

[20] *See also Jenkins v. Yager*, 444 F.3d 916, 926 (7th Cir. 2006) (holding that a fiduciary could prudently select "funds with long-term growth potential and . . . stay with those . . . funds even during years of lower performance").

the services of Financial Engines for less; they allege that *different vendors* could have been retained to provide a different set of services for less. *Id.* It takes a trivial amount of investigation—the sort of investigation that is supposed to precede the filing of a massive class-action lawsuit—to confirm that different vendors promote different features to differentiate themselves in the market.[21] Financial Engines dominates the market; no part of ERISA required the Shell Defendants to take a chance on an upstart or a competitor seeking market share just in order to appear to be saving money. After all, those savings would vanish in a heartbeat with an inferior product.

### D.  Plaintiffs fail to state a claim with their allegations that participant data was used to cross-sell non-Plan products [Counts V and VI]

Plaintiffs allege that the Shell Defendants breached their fiduciary duties and engaged in prohibited transactions by allowing the Fidelity Defendants to use Plan participant data to market non-Plan products to participants. As Shell Defendants established in their initial motion, there is no statutory, regulatory, or judicial support for these claims. To the contrary, the Seventh Circuit recently affirmed the dismissal of practically identical claims in *Divane*, finding: (i) plaintiffs failed to plausibly allege any cognizable breach of fiduciary duty, and (ii) they failed to state a prohibited transaction under the plain language of § 1106(a)(1)(D). 2018 WL 2388118, at *12, *aff'd*, 953 F.3d 980 (7th Cir. 2020).

Plaintiffs are attempting to establish new industry standards through litigation. ERISA does not permit such tactics. *See Rosen v. Prudential Ret. Ins. & Ann. Co.*, 2016

---

[21] *See, e.g.*, https://www.fi360.com/uploads/media/Events/2019_Conference_Slides/FI360_Managed_Account_Presentation_2019_Final.pdf

WL 7494320, at *17 (D. Conn. Dec. 30, 2016) (ERISA cases cannot be used to "move the

'entire industry'"), *aff'd*, 718 F. App'x 3 (2d Cir. 2017).  The Fidelity Defendants identify

in their renewed motion many of the fatal defects with Plaintiffs' amended participant data

claims. Those defects apply equally to and are incorporated herein by the Shell Defendants.

Dkt. 91, at 11-29.

### 1. Plaintiffs do not allege a plausible fiduciary breach claim with respect to participant data [Count V]

Plaintiffs contend that the Shell Defendants breached their fiduciary duties by

failing to prohibit the Fidelity Defendants from using Plan participant data to market non-

Plan products. *See, e.g.*, Am. Compl. ¶¶ 236-37. In addition to the lack of any plausible

allegation that the Shell Defendants acted as fiduciaries as to this conduct, this claim fails

for multiple other reasons. *First*, there is no basis for this claim in ERISA or its regulations,

and the Shell Defendants are not aware of *any* court decision or DOL guidance concluding

that the failure to prohibit a recordkeeper from using participant data is a breach of

fiduciary duty.[22] As the district court emphasized in *Divane* and the Seventh Circuit

---

[22] In their initial Complaint, Plaintiffs sourced the supposed duty to prohibit cross-selling to the Government Accountability Office ("GAO"), which they quote selectively, and two non-ERISA plan sponsors. Dkt. 1, ¶¶ 147, 149-50, 152. But Plaintiffs can allege a fiduciary breach only by demonstrating that no reasonable fiduciary would have followed the Shell Defendants' course, and neither the GAO nor the non-ERISA plans come near approaching that standard (particularly since the DOL, not GAO, is responsible for interpreting and administering ERISA). In the Amended Complaint, Plaintiffs stand firm on their original allegations and add a new source—Shell's internal Employee Privacy Rules and Ethics and Compliance Manual. *See* Am. Compl. ¶¶ 158-59. They seemingly overlook that Shell's policies specifically permit the use of personal data in connection with employee "benefits." Ross Decl. ¶ 9, Ex. 8, § 2.1(i) at 3; ¶ 10, Ex. 9 § 2.1 at 34. In any event, Plaintiffs do not explain how or why internal Shell policies would create ERISA-enforced obligations for the Plan's fiduciaries.

affirmed on appeal: "Plaintiff has not . . . cited a single case in which a court has held that releasing confidential information or allowing someone to use confidential information constitutes a breach of fiduciary duty under ERISA. This Court will not be the first[.]" 2018 WL 2388118, at *12, *aff'd*, 953 F.3d at 993. This Court should not be the first either.

Even if there were a cognizable fiduciary duty relating to participant data, Plaintiffs plead no facts supporting their conclusions that the Shell Defendants "took no action" to stop the use of the participant data (Am. Compl. ¶ 182) or "allow[ed]" the Fidelity Defendants to use it. *Id.* ¶ 160. Nor do Plaintiffs plausibly allege that the Fidelity Defendants actually used Shell participant data to market non-Plan products. Although the Amended Complaint makes broad, self-serving generalizations about practices in the retirement plan industry, it lacks well-pleaded factual allegations regarding the Fidelity Defendants' use of Plan participant data. All Plaintiffs are able to muster are conclusory allegations (Am. Compl. ¶ 166) that: (i) a Fidelity representative allegedly called Plaintiff Coble on some unspecified date "using his [unspecified] Data in an attempt to solicit the purchase of [unspecified] non-Plan products"; (ii) Coble separately rolled over his Plan assets into an IRA *after* filing this lawsuit based on some amorphous "recommendation" from a different unidentified Fidelity representative; and (iii) Plaintiff Harmon, also based on an unspecified suggestion from an unidentified Fidelity representative, rolled over a portion of his Plan assets into an IRA.[23] These allegations – which are long on conclusions

---

[23] While Plaintiffs allege in self-serving fashion that there "would be no prudent reason" to perform a partial rollover (¶ 166)," the GAO report that Plaintiffs repeatedly cite explicitly notes that "the choice to roll over 401(k) plan savings into an IRA may . . . be in the best interests of participants depending on their individual circumstances." *See* 2013 GAO Study at 1, https://www.gao.gov/assets/660/652881.pdf. For example, unlike a 401(k)

but short on facts – are plainly insufficient, particularly since the Complaint does not allege that Coble or Harmon were actually harmed by their rollover decisions.

Plaintiffs' fiduciary duty claim also fails for the same reason that they lack standing to assert it (*see supra* at Section I): they fail to allege that any Plaintiff (or any other participant) actually purchased any non-Plan product (or rolled over their Plan assets into an IRA) because of the Fidelity Defendants' alleged marketing tactics. In fact, despite Plaintiffs' attempts at artful pleading (¶ 166), they tellingly do not allege that any Fidelity representative's use of his Plan data caused Coble or Harmon to roll over his Plan assets. In addition to having to show their own injury, under Fifth Circuit law, "[t]o establish a claimed breach of fiduciary duty, an ERISA plaintiff must prove a breach of fiduciary duty and a prima facie case of loss to the plan." *In re Dynegy, Inc. ERISA Litig.*, 309 F. Supp. 2d 861, 872 (S.D. Tex. 2004) (quotation omitted). With no allegation that any Shell participant purchased a non-Plan product as a result of the alleged conduct, let alone was harmed by the decision, there is no prima facie case of loss to the Plan.[24]

### 2. Plaintiffs similarly fail to plausibly allege a prohibited transaction with respect to participant data [Count VI]

Plaintiffs' prohibited transaction claim also fails for the same reasons set forth in Shell's initial motion and Fidelity's renewed motion. ERISA § 406(a)(1)(D) prohibits a "transfer to, or use by or for the benefit of a party in interest, of any *assets of the plan*."

---

plan, an IRA distribution is exempt from the 10 percent early distribution tax for higher education expenses and first-time home purchases. *Id.* at 41 n.80.

[24] Because the decision to roll over to an IRA must be evaluated on an individual basis, Plaintiffs' focus on certain generalized risks associated with such rollovers – while deliberately ignoring the beneficial reasons for doing so – is plainly insufficient to establish any tangible loss to the Plan. *See, e.g.*, Am. Compl. ¶¶ 175-76, 178-80.

29 U.S.C. § 1106(a)(1)(D) (emphasis added). Fatal to Plaintiffs' claim, a participant's personal data is not an "asset[] of the plan." 29 U.S.C. § 1106(a)(1)(D). ERISA defines "plan assets" by reference to its regulations, *see* 29 U.S.C. § 1002(42), which logically state that "plan assets" refers *only* to money and investments. *See* 29 C.F.R. § 2510.3-101 ("Definition of 'plan assets' – plan investments"); 29 C.F.R. § 2510.3-102 ("Definition of 'plan assets' – participant contributions").[25] Neither definition includes any reference to participant data. *Id.* Nor has any court held that participant data is a "plan asset." *See Divane*, 2018 WL 2388118, at *12.[26]

As the Supreme Court explained in rejecting a hyper-literal reading of ERISA § 406(a)(1)(D), Section 406(a)(1) was intended to prevent "commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length." *Lockheed Corp. v. Spink*, 517 U.S. 882, 893 (1996). There is no such risk here. Nor is there any statutory, regulatory, or judicial support for Plaintiffs' attempt to base a ERISA § 406(a)(1)(D) claim on the use of participant data.

Plaintiffs' prohibited transaction claim also fails because they do not allege that the Shell Defendants had any subjective intent to benefit the Fidelity Defendants. As the Third Circuit recently emphasized in *Sweda v. University of Pennsylvania*, a plan fiduciary (allegedly, here, the Shell Defendants) does not engage in a prohibited transaction under

---

[25] The definitions in 29 C.F.R. Part 510 apply to subchapters C, D, E, F, G, and L, which include the subchapters governing "fiduciary responsibility" (F) and "administration and enforcement" (G) under ERISA.

[26] The court further held that, even setting aside ERISA's statutory and regulatory text, participant data was not a plan asset "under ordinary notions of property rights" and no court had recognized it to be. *Divane*, 2018 WL 2388118, at *12 (citing cases). The same is true here.

Section 406(a)(1)(D) unless it specifically intends to benefit the alleged party in interest (Fidelity Defendants) by engaging in the challenged actions (not prohibiting Fidelity from using participant data to market non-plan products). 923 F.3d 320, 337-38 (3d Cir. 2019).[27] Indeed, the purpose of Section 406(a)(1) is "to rout out transactions that benefit such parties at the expense of participants"; it is "not meant to impede necessary service transactions." *Sweda*, 923 F.3d at 338. To hold otherwise "would produce unreasonable consequences" given the purpose and context of ERISA's statutory scheme. *Id.* at 337-38 (citation omitted). The lack of well-pleaded facts demonstrating the Shell Defendants' subjective intent to benefit the Fidelity Defendants is fatal to Plaintiffs' claim.

Finally, Plaintiffs' prohibited transaction claim fails because it is derivative of, and based on the same flawed allegations, as their fiduciary breach claim. *Compare* ¶¶ 236-37 *with* ¶¶ 246-47. Plaintiffs plead no independent facts that plausibly establish the basic elements of a prohibited transaction. *See Divane*, 953 F.3d at 922 (affirming dismissal of a "repackage[d]" prohibited transaction claim).[28] Accordingly, it should also be dismissed.

### E.    The Plan's reimbursements of Shell's direct expenses do not constitute prohibited transactions [Count VIII]

To supplement the general duty of loyalty, ERISA "broadly define[s] certain transactions that are prohibited," *Kanawi v. Bechtel Corp.*, 590 F. Supp. 2d 1213, 1223 (N.D. Cal. 2008). In their Amended Complaint, Plaintiffs continue to allege incorrectly that reimbursements to Shell for administrative services to the Plan are prohibited.

---

[27] *See also Jordan v. Mich. Conf. of Teamsters Welfare Fund*, 207 F.3d 854, 860-61 (6th Cir. 2000); *Tracey v. Mass. Inst. of Tech.*, 2017 WL 4478239, at *3 (D. Mass. Oct. 4, 2017).

[28] *See also Sweda*, 923 F.3d at 327 ("a fiduciary who breaches the duties under § 1104(a) does not necessarily violate § 1106(a)").

First, Plaintiffs allege that the Shell Defendants engaged in impermissible self-dealing. Am. Compl. ¶¶ 261-262. But Plaintiffs do not allege any respect in which Shell directed the reimbursements or otherwise controlled this alleged disposition of Plan assets, as required for fiduciary status, and if Shell was not acting as a fiduciary, it cannot be liable under this theory. *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 245 (2000). Plaintiffs also have not alleged that any of the Individual Shell Defendants or the Trustees as a group, even if fiduciaries, received any compensation through this arrangement. So, Plaintiffs also have not plausibly alleged *self*-dealing. *Patelco Credit Union v. Sahni*, 262 F.3d 897, 911 (9th Cir. 2001). Plaintiffs' self-dealing theory boils down to the assertion that self-dealing can be inferred from the mere fact of a plan's reimbursement to the plan sponsor for services rendered. But the DOL's regulations, which interpret § 1108(b)(2), prove otherwise. When a fiduciary provides services to a plan, there is no prohibited transaction for self-dealing when the fiduciary receives "reimbursement of direct expenses properly and actually incurred in the performance of such services." 29 C.F.R. § 2550.408b-2(e)(3). A long list of DOL advisory opinions further belie Plaintiffs' overbroad theory of liability.[29]

Plaintiffs' alternative theory is even broader. They assert that any reimbursements by the Plan to Shell constitute transactions prohibited by § 1106(a), insofar as they represent "a direct or indirect furnishing of services between the Plan and a party in interest (Shell Defendants) or the transfer to, or use by or for the benefit of a party in interest (Shell

---

[29] *E.g.*, DOL Adv. Op. 1993-06A; DOL Adv. Op. 1997-19A; DOL Adv. Op. 2001-10A; DOL Field Assistance Bulletin 2006-01.

Defendants), of Plan assets in the form of revenue sharing." Am. Compl. ¶ 264. Because any vendor providing services to a plan may be a "party in interest" under ERISA (29 U.S.C. § 1002(14)), Plaintiffs' alternative theory is that they can survive a motion to dismiss a prohibited transaction claim merely by alleging that the Plan paid one of its vendors. Such a theory "would transform § [11]06—a statutory provision meant to 'categorically bar[] certain transactions deemed 'likely to injure the pension plan'—into a statutory provision that proscribes retirement pension plan's most basic operations." *Sacerdote*, 2017 WL 3701482, at *14 (quoting *Harris Tr. & Sav. Bank*, 530 U.S. at 241)); *see also id.* ("Depending on the circumstances, overpayment of fees may be an issue under other provisions of ERISA, but a payment for services rendered cannot be a 'prohibited transaction.'").

Again, here, "plaintiffs failed to plausibly allege the basic elements of their claim; namely, that [the individual responsible for a payment personally] benefited from the collected fees, that the fees were assets of the plan[], or that any defendant knew or should have known that collecting routine fees may violate ERISA." *Divane*, 953 F.3d at 992. None of the alleged facts show the Shell Defendants benefited, that Shell was reimbursed after funds became Plan assets, or that any of the Shell Defendants had the requisite knowledge of a transaction prohibited by ERISA—particularly given that 29 U.S.C. § 1108(b)(2) specifically authorizes transactions in which "no more than reasonable compensation is paid therefor." Accordingly, this claim must also be dismissed.

**F.    Plaintiffs fail to plausibly allege a derivative claim for injunctive relief against the Shell Defendants [Count IX]**

Finally, Plaintiffs attempt a last-ditch claim against the Shell Defendants based on Fidelity's allegedly improper use of participant data. This claim is as baseless as the others. *First*, their claim that the Shell Defendants are "nonfiduciary transferee[s] of proceeds from a breach of a fiduciary duty or prohibited transaction" involving the Fidelity Defendants' alleged use of participant data is unsupported by Plaintiffs' barren paragraphs in Count IX. Am. Compl. ¶¶ 266-67. *Second*, Plaintiffs do not plead any facts that plausibly support a claim that the Shell Defendants "knowingly participated" in the alleged use of participant data or that it had "actual or constructive knowledge" thereof. *Harris Tr. & Sav. Bank*, 530 U.S. at 247, 251. Accordingly, Count IX against the Shell Defendants should be dismissed.

### G. Plaintiffs have not satisfied their burden to plead that Shell or the Individual Shell Defendants acted in a fiduciary capacity with respect to the allegations of the complaint [Counts I-III, V-VI, and VIII]

"In every case charging breach of fiduciary duty . . . the threshold question is . . . whether the person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). Plaintiffs' allegations do not meet this basic pleading requirement.

Under ERISA, an individual can become a fiduciary either through an express designation in the Plan's written instrument or by undertaking discretionary acts with respect to Plan assets or Plan administration. *Donovan v. Mercer*, 747 F.2d 304, 308 (5th Cir. 1984). In any case, whether formally designated or not, fiduciary status is not an "all-or-nothing concept" (*Cotton v. Mass. Mut. Life Co.*, 402 F.3d 1267, 1277 (11th Cir. 2005)); "a person is a fiduciary only with respect to those aspects of the plan over which he exercises authority or control" (*Bannistor v. Ullman*, 287 F.3d 394, 401 (5th Cir. 2002)).

To claim that a fiduciary breached a duty or engaged in a prohibited transaction[30] in violation of ERISA, a plaintiff must suitably allege that each defendant had fiduciary authority over the challenged action or omission.[31] That showing is particularly important because individual fiduciaries are "personally liable" for "any losses to the plan resulting from each such breach." *Kopp*, 894 F.3d at 219 (quoting 29 U.S.C. § 1109(a)).

Yet, Plaintiffs allege in nothing more than a conclusory fashion that Shell and each of the Individual Shell Defendants are fiduciaries of the Plan, *see* Am. Compl. ¶¶ 20-23, and, in that capacity, should be held generally liable for fiduciary breaches under ERISA. Acknowledging that Plaintiffs have no basis for alleging specific actions taken by any of these parties (*id.* ¶ 26), the remainder of the complaint relies entirely on group pleading to allege that the "Shell Defendants" collectively breached their fiduciary duties. *See*, *e.g.*, *id.* ¶ 207 ("Shell Defendants' process for monitoring and controlling the Plan's recordkeeping fees was a fiduciary breach . . .").[32] The complaint *does* acknowledge that Shell and the Individual Shell Defendants played different roles—Shell as the Plan sponsor; Cynthia Deere as the Plan Administrator; and the other individual Shell Defendants as Plan

---

[30] *Harris Tr. & Sav. Bank*, 530 U.S. at 245 ("§ [11]06(a) imposes a duty only on the fiduciary that causes the plan to engage in the transaction").

[31] *See Powell v. Dallas Morning News LP*, 610 F.Supp.2d 569, 580-81 (N.D. Tex. 2009) (adopting report and recommendation for dismissal of claims against defendants where the plaintiff did not "allege[ ] any facts that would show the fiduciary status" of the defendants in connection with the specific duty allegedly breached); *Alas v. AT&T Inc.*, 2019 WL 1744847, at *4 (C.D. Cal. Feb. 25, 2019) (dismissing individual defendants where the complaint did not "allege any facts demonstrating any plausible liability for individual Defendants, as it must in order to bring an ERISA claim against a fiduciary in their individual capacity").

[32] Given the need to plead facts establishing each Shell Defendant's fiduciary status, Plaintiffs' attempt to include "all other unknown plan administrators and trustee [sic]" of the Plan (Am. Compl. ¶ 1) in the universe of Shell Defendants does not work.

Trustees—but that only makes it more implausible that each of these Shell Defendants is equally responsible for all aspects of the Plan. Indeed, the written Plan document confirms that the mere appointment of an individual as a Trustee does not confer authority to execute fiduciary acts alone. *See*, *e.g.*, Ross Decl. ¶ 2, Ex. 1 at 93 ("The Trustees may act by a majority of their number . . .").[33] Accordingly, Counts I-III, V-VI, and VIII must be dismissed for failure to plausibly allege that Shell or the Individual Shell Defendants acted in a fiduciary capacity as to Plaintiffs' claims.

Relatedly, Plaintiffs assert conclusively in Counts I (¶ 211), II (¶ 220), III (¶ 227), V (¶ 240), and VI (¶ 250) that all of the Shell Defendants are liable for co-fiduciary liability. But, as with their insufficient pleadings of personal fiduciary capacity, Plaintiffs have neglected to include any factual allegations that establish a basis for co-fiduciary liability under 29 U.S.C. § 1105(a) against Shell or the Individual Shell Defendants. These claims must therefore be dismissed as to those Shell Defendants.

## III.   CONCLUSION

For the foregoing reasons, the Shell Defendants move the Court to dismiss with prejudice all claims asserted against them in the Amended Complaint.

Dated: July 1, 2020                         MAYER BROWN LLP

                                            By: */s/ Michael P. Lennon, Jr.*
                                                Michael P. Lennon, Jr.

                                                Attorney-in-Charge for Shell
                                                Defendants

---

[33] For this reason, the Shell Defendants acknowledge that the Trustees as a group is the only Shell Defendant for whom fiduciary claims could be alleged plausibly, although Plaintiffs fail to do so in the Amended Complaint as discussed in the preceding sections.

## CERTIFICATE OF CONFERENCE

On March 20, 2020, after conferring with counsel for Plaintiffs, the Shell Defendants filed a pre-motion letter request with the Court seeking permission to file a Motion to Dismiss the original Complaint in accordance with the local rules in effect at that time. Dkt. No. 59. The Court referred the Shell Defendants' request to Judge Edison on March 24, 2020. Dkt. No. 61. On March 26, 2020, the parties appeared before Judge Edison for a pre-motion conference concerning the Shell Defendants' letter request. On March 31, 2020, Judge Edison entered an order granting the Shell Defendants permission to file a Motion to Dismiss, and if Plaintiffs filed an amended complaint, to file a Motion to Dismiss the amended complaint within six weeks thereafter. Dkt. No. 70. On May 21, 2020, Plaintiffs exercised their right to file an amended complaint. Dkt. No. 84. Through Judge Edison's March 31 Order, Plaintiffs were notified of their right to file an amended complaint and the Shell Defendants now timely submit their Motion to Dismiss the Amended Complaint.

Date: July 1, 2020

*/s/ Michael P. Lennon, Jr.*
Michael P. Lennon, Jr.
Attorney-in-Charge for Shell Defendants

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 1, 2020, I electronically filed the foregoing using the

court's CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Michael P. Lennon, Jr.*
Michael P. Lennon, Jr.
Attorney-in-Charge for Shell Defendants