**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | |
|---|---|
| CHARLES HARMON, ET AL., | |
| *Plaintiffs*, | |
| v. | Civil Action No. 3:20-cv-00021 |
| SHELL OIL COMPANY, ET AL., | Oral Argument Requested |
| *Defendants*. | |

**PLAINTIFFS' OPPOSITION TO
FIDELITY DEFENDANTS' MOTION TO DISMISS [Doc. 91]**

**Table of Contents**

INTRODUCTION ........................................................................................................ 1

ARGUMENT .............................................................................................................. 3

    I.   The Plan and Plaintiffs have standing. ................................................... 3

        A.  Plaintiffs have standing based on cognizable injuries to the Plan. ................. 3

        B.  Plaintiffs have standing based on individual injury. ..................................... 5

    II.  The data set of Plan participants' financial and personal information is a "plan asset." ............................................................................................. 7

    III.  Fidelity's authorities are inapposite or support Plaintiffs' arguments. ................ 19

    IV.  Count VII of the First Amended Complaint sufficiently pleads a prohibited transaction claim. ......................................................................... 25

        A.  Fidelity affiliates are parties-in-interest. ......................................................... 26

        B.  Count VII is premised on FIIOC committing a prohibited transaction, not Shell. ........................................................................................... 28

        C.  FIIOC "knew" or "should have known" that the data set was a plan asset... 29

CONCLUSION ........................................................................................................ 29

## Table of Authorities

**Cases**

*AMGRO, Inc. v. Johnson*,
  71 Ill.App.3d 485 (Ill. Ct. App. 1979) .......................................................................... 10

*Arrant v. Georgia Cas. Co.*,
  102 So. 447 (Ala. 1924) ................................................................................................. 9

*Bertulli v. Independent Ass'n of Continental Pilots*,
  242 F.3d 290 (5th Cir. 2001) ......................................................................................... 7

*Blume v. Curson*,
  447 S.W.2d 727 (Tex. Ct. App. 1969) ........................................................................... 9

*Braden v. Wal-Mart Stores, Inc.*,
  588 F.3d 585 (8th Cir. 2009) ....................................................................................... 27

*Brewer v. Suzuki Motor of Am., Inc.*,
  No. 15-197-MH, 2015 WL 4433046  (S.D. Tex. July 17, 2015) .................................. 27

*Brocade Comm. Sys., Inc. v. A10 Networks, Inc.*,
  873 F.Supp.2d 1192 (N.D. Cal. 2012) ......................................................................... 22

*Bussian v. RJR Nabisco*,
  223 F.3d 286 (5th Cir. 2000) ......................................................................................... 4

*Chao v. Hall Holding Co.*,
  285 F.3d 415 (6th Cir. 2002) ....................................................................................... 29

*Clark-Lami, Inc. v. Cord*,
  440 S.W.2d 737 (Mo. 1969) ........................................................................................... 9

*Costanzo v. Nationwide Mut. Ins. Co.*,
  832 N.E.2d 71 (Ohio Ct. App. 2005) .......................................................................... 10

*Divane v. Northwestern University*,
  No. 16-8157, 2018 WL 2388118 (N.D. Ill. May 25, 2018) ......................................... 19

*Donovan v. Cunningham*,
  716 F.2d 1455 (5th Cir. 1983) ..................................................................................... 29

*Edmonson v. Lincoln Nat. Life Ins. Co.*,
  899 F.Supp.2d 310 (E.D. Penn. 2012) ........................................................................... 7

*F.B. Miller Agency v. Home Ins. Co.*,
  276 Ill.App. 418 (Ill. Ct. App. 1934) ............................................................................. 9

*Fidelity Brokerage Services LLC v. Hudson*,
  No. 14-3229-NFA (S.D. Tex. Nov. 10, 2014) ............................................................. 11

*Fidelity Brokerage Services LLC v. Pacholek*,
  No. 07-333 (N.D. Tex. Nov. 26, 2007) ........................................................................ 11

ii

*Fidelity Brokerage Services v. Johnson,*
    No. 04-662 (W.D. Tex. 2004) ............................................................................... 11

*Fidelity Brokerage Services, Inc. v. Murray,*
    No. 99-3039 (Mass. Super. July 13, 1999) ........................................................ 11

*Fidelity Brokerage Svcs. LLC v. Corcoran,*
    No. 18-674-DH (S.D. Tex. Mar. 2, 2018) ............................................. 2, 11, 25

*Financial Engines, Inc. v. Hedman,*
    No. 16SL-CC02948 (21st Judicial Cir., Mo., Aug. 16, 2016) ...................... 14

*Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.,*
    530 U.S. 238 (2000) ...................................................................................... 4, 28

*Husband C. v. Wife C.,*
    391 A.2d 745 (Del. 1978) ...................................................................................... 17

*In re Arnay's Estate,*
    187 N.Y.S.2d 782 (Surrogate's Ct. N.Y. Co. 1959) ........................................ 9

*In re Enron Corp. Sec., Derivative & ERISA Litig.,*
    258 F.Supp.2d 576 (S.D. Tex. 2003) .............................................................. 14

*In re iPhone Application Litig.,*
    844 F.Supp.2d 1040 (N.D. Cal. 2012) ............................................................ 22

*In re Regions Morgan Keegan ERISA Litig.,*
    692 F.Supp.2d 944 (W.D. Tenn. 2010) ............................................................ 28

*Kalda v. Sioux Valley Physician Partners, Inc.,*
    481 F.3d 639 (8th Cir. 2007) .............................................................................. 20

*KVUE, Inc. v. Moore,*
    709 F.2d 922 (5th Cir. 1983) ................................................................................ 7

*L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cnty., Inc.,*
    710 F.3d 57 (2d Cir. 2013) .................................................................................... 3

*LaRue v. DeWolff, Boberg & Assocs.,*
    552 U.S. 248 (2008) ............................................................................................... 3

*Lee v. Verizon Communications, Inc.,*
    837 F.3d 523 (5th Cir. 2016) ............................................................................... 5

*Low v. LinkedIn Corp.,*
    900 F.Supp.2d 1010 (N.D. Cal. 2012) ............................................................ 22

*Mass. Mutual Life Ins. Co. v. Russell,*
    473 U.S. 1344 (1985) ............................................................................................. 3

*Meissel v. Finley,*
   95 S.E.2d 186 (Va. 1956) ................................................................... 9

*Mertens v. Hewitt Assocs.,*
   508 U.S. 248 (2000) ......................................................................... 19

*Nationwide Mut. Ins. Co. v. Darden,*
   503 U.S. 318 (1992) ............................................................... 8, 19, 24

*Neder v. U.S.,*
   527 U.S. 1 (1999) .............................................................................. 24

*NLRB v. Amax Coal Co.,*
   453 U.S. 322 (1981) ......................................................................... 24

*Oliver v. Oliver,*
   45 S.E. 232 (Ga. 1903) ..................................................................... 17

*Patient Advocates v. Prysunka,*
   316 F.Supp.2d 46 (D. Me. 2004) ...................................................... 20

*Perez v. Bruister,*
   823 F.3d 250 (5th Cir. 2016) .............................................................. 3

*Plant Indus., Inc. v. Coleman,*
   287 F.Supp. 636 (C.D. Cal. 1968) .................................................... 17

*Rankin v. Rots,*
   278 F.Supp.2d. 853 (E.D. Mich. 2007) ............................................ 28

*Ruiz v. Brennan,*
   851 F.3d 464 (5th Cir. 2017) ............................................................ 14

*Sec'y of Labor v. Doyle,*
   657 Fed.Appx. 117 (3d Cir. 2016) .................................................... 13

*Shaw v. Delta Air Lines, Inc.,*
   463 U.S. 85 (1983) ........................................................................... 19

*Swindol v. Aurora Flight Scis. Corp.,*
   805 F.3d 516 (5th Cir. 2015), *certified question answered,* 194 So.3d 847 (Miss.
   2016) ................................................................................................. 27

*Thole v. U.S. Bank N.A.,*
   140 S.Ct. 1615 (2020) ........................................................................ 5

*Tibble v. Edison Int'l,*
   135 S.Ct. 1823 (2015) ..................................................................... 5, 9

*Trice v. Comstock,*
   121 F. 620 (8th Cir. 1903) ............................................................... 17

*U.S. Chamber of Commerce v. U.S. Dep't of Labor,*
    885 F.3d 360 (5th Cir. 2018) ........................................................................ 9, 10, 15, 19

*V.L. Phillips & Co. v. Pa. Threshermen & Farmers' Mut. Ins. Co.,*
    1999 F.2d 244 (4th Cir. 1952) ....................................................................................... 9

*Varity Corp. v. Howe,*
    516 U.S. 489 (1996) ......................................................................................................... 8

*Walsh v. Principal Life Insurance Company,*
    266 F.R.D. 232 (D. Iowa 2010) ................................................................................... 20

**Statutes**

15 U.S.C. §6802(a) ................................................................................................................. 23

29 U.S.C. §1002(14)(B) ....................................................................................................... 26

29 U.S.C. §1002(14)(H) ....................................................................................................... 26

29 U.S.C. §1002(18) ...................................................................................................... 15, 16

29 U.S.C. §1002(20) ............................................................................................................. 15

29 U.S.C. §1002(21) ............................................................................................................. 15

29 U.S.C. §1002(21)(A) ....................................................................................................... 25

29 U.S.C. §1002(21)(A)(i) ................................................................................................... 15

29 U.S.C. §1002(23) ............................................................................................................. 15

29 U.S.C. §1002(26) ............................................................................................................. 16

29 U.S.C. §1002(34) ............................................................................................................. 15

29 U.S.C. §1002(38) ............................................................................................................. 15

29 U.S.C. §1002(42) ...................................................................................................... 8, 17

29 U.S.C. §1103 ..................................................................................................................... 17

29 U.S.C. §1104 ....................................................................................................................... 3

29 U.S.C. §1106 ....................................................................................................................... 3

29 U.S.C. §1106(a) ........................................................................................................ 20, 25

29 U.S.C. §1106(a)(1)(D) ................................................................................................... 28

29 U.S.C. §1108(b)(14) ....................................................................................................... 20

29 U.S.C. §1108(b)(14)(A) ................................................................................................. 20

29 U.S.C. §1132(a)(2) ........................................................................................................... 3

29 U.S.C. §1344 ..................................................................................................................... 17

**Regulations**

29 C.F.R. §2550.408g-1 .............................................................................. 20

29 C.F.R. §2550.408g-1(b)(3)(C) ............................................................... 21

29 C.F.R. §2550.408g-2 .............................................................................. 20

Final Regulation Relating to the Definition of Plan Assets,
    51 Fed.Reg. 41262 (Nov. 13, 1986) ................................................... 16

Investment Advice—Participants and Beneficiaries,
    74 Fed. Reg. 3822 (Jan. 21, 2009) ..................................................... 20

Regulation Relating to Definition of "Plan Assets"—Participant Contributions,
    61 Fed.Reg. 41220 (Aug. 7, 1996) ..................................................... 17

**Other Authorities**

Department of Labor,
    Advisory Op. No. 93-14A, 1993 WL 188473 (May 5, 1993) ................. 7, 8, 17

Hughes, Exchange Act Release No. 4048,
    1948 WL 29537 (Feb. 18, 1948), *aff'd sub nom.*, *Hughes v. S.E.C.*, 174 F.2d 969
    (D.C. Cir. 1949) ................................................................................ 10

Mason, Moran & Co., Exchange Act Release No. 4832,
    1953 WL 44092 (Apr. 23, 1953) ......................................................... 10

Statement of Financial Accounting Standards Board (FASB) No. 141 (revised 2007) .... 12

## INTRODUCTION

Plaintiffs' theory is not novel. Before ERISA was enacted, courts routinely recognized the same types of data sets that Fidelity Investment Institutional Operations Company, Inc. ("FIIOC") misappropriated from the Plan are assets. The common law concerns are the same here—the combination of information linking each customer to their most highly confidential information such as investment history, identity of their investments, account balances, investment contribution amounts, investment goals, social security numbers, age, income, marital status, and call center notes combined with knowledge of triggering events such as retirement, changes in employment status, marital status or beneficiary status. It is this combination of elements that makes the data set highly valuable to the Plan and financial services firms. Congress incorporated the common law understanding that such data sets are asset into ERISA.

In fact, Fidelity[1] agrees with this position. This can be seen by the forcefulness with which Fidelity asserts the importance and value of such data sets as *its* asset and seeks to protect the asset from misappropriation by competitors. Fidelity succinctly argued in *this District* as to why the data set at issue is an asset:

> The list would enable competitors – just as Merrill Lynch has done here - to market to a pre-selected elite group of customers and target their financial products, services and efforts without the need to spend any time, money or resources to identify and develop such customers. Moreover, Fidelity's trade secret is not simply a list of names. It includes far more information, including contact information and financial information such as customer

---

[1] Fidelity refers to Fidelity Investments Institutional Operations Company, Inc., FMR LLC, Fidelity Brokerage Services LLC, Fidelity Personal and Workplace Advisors LLC, Fidelity Investments Life Insurance Company, and Fidelity Personal Trust Company FSB.

1

statements, investment goals and history, assets, income, and net worth, all
of which would be very valuable to a competitor in the financial industry,
such as Merrill Lynch.

*Fidelity Brokerage Svcs. LLC v. Corcoran*, No. 18-674-DH, Doc. 2-1 at p. 22 (S.D. Tex.
Mar. 2, 2018) (attached as Exhibit 1). As discussed below, this is not an isolated
statement by Fidelity. For at least three decades, Fidelity has made similar representations
to courts throughout the country.

Like Fidelity's competitor in *Corcoran*, FIIOC did not develop the Plan's highly
valuable data set at its own expense—instead it charged Plan participants an excessive
recordkeeping fee. FIIOC then provided the industry's most valuable asset to Fidelity
without compensating the Plan. FIIOC crossed the line from the Plan's service provider,
to that of a fiduciary, when it exercised control over this asset so its affiliates could
market to a pre-selected elite group of customers—Plan participants with a demonstrated
savings and investing propensity—and engage in targeted marketing efforts based on
non-public information. Fidelity removed this asset from the Plan without the need to
spend any time, money or resources to identify and cultivate relationships with
customers. Now, Fidelity asserts that its previous three-decades of judicial
representations are false, asking this Court to provide a new interpretation of the term
"asset" that conflicts with a century of contrary authority and the plain language of
ERISA. Fidelity simply ignores these authorities and its own three decade's long
representations.

Moreover, Fidelity stepped into the role of fiduciary by cultivating an intimate
relationship with participants by leveraging FIIOC's position as recordkeeper to learn

2

participants' personal and intimate financial details and then seeking to prevent participants from receiving competitive quotes for products and services. Further, as explained below, even if no Fidelity affiliate was a fiduciary or party-in-interest, Fidelity would remain in this case as a recipient of ill-gotten gains from Plan assets.

## ARGUMENT

### I.   The Plan and Plaintiffs have standing.

#### A.   Plaintiffs have standing based on cognizable injuries to the Plan.

The relevant inquiry for standing is injury to the *Plan*. *Perez v. Bruister*, 823 F.3d 250, 257–58 (5th Cir. 2016); *see also L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cnty., Inc.,* 710 F.3d 57, 65–6 (2d Cir. 2013) ("[Plaintiffs] asserted these claims on the Plan's behalf, and prayed for relief inuring to the Plan. This relief, of course, surely would have benefitted the Plan. It is of no moment that recovery inuring to the Plan may ultimately benefit particular participants.") (citations and quotations omitted). "The Supreme Court has held that claims for [§1132(a)(2)] must inure to the benefit of the *plan* as a whole, not *individual beneficiaries*." *Bruister*, 823 F.3d at 257–58 (emphasis added) citing *Mass. Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 139–44 (1985); *see also LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 254 (2008) (plan is "the victim of any fiduciary breach"); *Mass. Mutual Life Ins. Co.*, 473 U.S. at 142 n.9 (§1132(a)(2) "is indicative of Congress' intent that actions … be brought in a representative capacity on behalf of the plan as a whole"). Plaintiffs seek Plan-wide relief pursuant to §1132(a)(2) for breaches of fiduciary duties under §1104 and prohibited transactions under §1106. *Bruister*, 823 F.3d at 258.

3

"Consequently, the losses suffered by the participants in the Plan are coterminous with those of the Plan." *Id*. (citations and quotations omitted).

FIIOC misappropriated a Plan asset to derive substantial additional income and continues to do so while receiving excessive recordkeeping fees for managing that asset. Doc. 84 ¶¶118, 136, 139, 148–49, 152–54, 156–57, 160–66, 168–77, 181-90, 229–33. The breach is ongoing, and the remedy is disgorgement of gains and injunctive relief. *Id*. ¶¶251–59, 265–68; 29 U.S.C. §1132(a)(3); *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 250–51 (2000) (transferee may be held liable for disgorgement of ill-gotten plan assets). These ill-gotten gains revert to the *Plan*.

As a conflicted fiduciary, FIIOC also breached its fiduciary duties by appropriating this asset at the Plan's expense without defraying reasonable Plan expenses by reducing the fees FIIOC charged or providing larger revenue credits to account for its use of a Plan asset. Doc. 84 ¶¶3–5, 12, 27, 35, 48–51, 118–19, 136, 137, 148, 153–57, 161, 177, 181–84, 189–90; *see also Bussian v. RJR Nabisco*, 223 F.3d 286, 300 (5th Cir. 2000) ("A fiduciary must consider any potential conflict of interest[.]"). The appropriate amount of compensation to the Plan for Fidelity's misappropriation will be provided to the Plan and allocated to each participant's account pro rata. That means each participant has an interest in bringing this action on behalf of the Plan to obtain that compensation. Doc. 84 at p. 96 (requesting this Court adjudge Fidelity "make good to the Plan all losses" and "order Defendants to provide all accounting necessary to determine the amounts Defendants must make good to the Plan").

*Lee v. Verizon Communications, Incorporated* is inapposite because it concerns the standing of a participant of a defined benefit plan that has sufficient assets to pay all participant benefits claims. 837 F.3d 523, 530 (5th Cir. 2016).[2] Unlike in a defined contribution plan such as Shell's, in a defined benefit plan a participant gets only a specified amount of monthly payments as his benefit. *Thole v. U.S. Bank N.A.*, 140 S.Ct. 1615, 1618 (2020). He does not share in any increase in plan assets from a recovery of damages or profits from a fiduciary breach. *Id.* In contrast, defined contribution plan participants have a pro rata share of all plan assets, and any recovery for the plan increases their retirement accounts pro rata. *Id.*; *Tibble v. Edison Int'l*, 135 S.Ct. 1823, 1825 (2015). Thus, participants suffer from the Plan's loss and gain from the Plan's recovery. *Lee*, 837 F.3d at 545 ("[a] defined-contribution plan presents a starkly different circumstance than a defined-benefit plan" and breaches of fiduciary duty in a defined-contribution plan "present a more direct impact on a participant's interest[.]").

### B. Plaintiffs have standing based on individual injury.

Plaintiffs also have individual standing. Mr. Harmon suffered a direct injury—financial loss from reduced returns on his investment and restricted investment opportunity after Fidelity utilized his intimate personal and financial details to convince him to move Plan assets into a Fidelity IRA. Now, Mr. Harmon has retirement funds sitting in a Fidelity IRA and can never put those funds back into the Plan's lower-cost

---

[2] The portion of *David* on which Fidelity relies also concerns a defined benefit plan.

5

LifePath Retirement Fund Class F commingled pool that is only available to the Plan, which is where his funds were invested prior to his partial rollover. Doc. 84 ¶¶61, 175.

Mr. Harmon experienced a "triggering event" in 2017: he retired from his job. Doc. 84 ¶166. FIIOC and its affiliates were aware that, among other things, Mr. Harmon was retiring, his age, reason for retiring, marital status, and dependent status because of its acquisition of his intimate financial and personal information from the Plan. *Id.* at 163–66. Upon this "triggering event," FIIOC informed local Fidelity sales representatives. *Id.* ¶163. Mr. Harmon's information was also contained in Fidelity's Salesforce database. *Id.* ¶162. Fidelity's sales representatives capitalize on this data to make targeted sales of non-Plan products. *Id.* ¶165.

Mr. Harmon met with one of these sales representative in Fidelity's Houston branch. *Id.* ¶166. The salesperson had access to "the most proprietary information you can imagine about [Harmon]" including his investment preferences, retirement status, Plan account balance, and beneficiary status as well as information about every interaction he had with FIIOC. *Id.* ¶162, 164. Utilizing this extensive knowledge, Fidelity's salesperson convinced Mr. Harmon to roll a portion of his assets out of the Plan. *Id.* ¶163, 166. There was no prudent reason for Mr. Harmon to complete this partial rollover.[3] Mr. Harmon can

---

[3] Fidelity cites facts not contained within the First Amended Complaint. Discovery will show that Mr. Harmon's retirement was based on an event that would have likely made him eligible to withdraw Plan assets without penalty pursuant to 26 U.S.C. §72(t)(2)(A)(iii) and that Mr. Harmon rolled over approximately *13 times* the amount he needed to pay for the dependent's schooling. These are fact-specific issues that cannot be decided at the pleading stage. *General Elec. Capital Corp. v. Posey*, 415 F.3d 391, 398 (5th Cir. 2005).

no longer access his Plan investment. *Id.* ¶175. Instead, if he wants to remain invested in the same asset-class that he chose in the Plan he can only invest in a higher cost fund available to retail consumers. *Id.* ¶180. Mr. Harmon suffers an injury and has standing. *KVUE, Inc. v. Moore*, 709 F.2d 922, 930 (5th Cir. 1983); *Bertulli v. Independent Ass'n of Continental Pilots*, 242 F.3d 290, 295 (5th Cir. 2001). The same is true for Mr. Coble. Doc. 84 ¶¶15, 166.

Mr. Vallejos and Mr. Lawrence also have standing for injunctive relief because they receive targeted solicitations and are at risk of additional targeted solicitations during triggering events based on FIIOC's misappropriation of a Plan asset. *Id.* ¶¶166, 174. All Plaintiffs are also subject to efforts by Fidelity to prevent Fidelity's competitors from offering them competitive quotes for financial services and products. *Id.* at ¶181.

## II.  The data set of Plan participants' financial and personal information is a "plan asset."

Whether any particular property, tangible or intangible, is a plan asset "is largely dependent on the specific facts of a given case" and should not be determined on a motion to dismiss. *See*, *e.g.*, *Edmonson v. Lincoln Nat. Life Ins. Co.*, 899 F.Supp.2d 310, 329 (E.D. Penn. 2012) (citations omitted); *see also* Department of Labor ("DOL"), Advisory Op. No. 93-14A, 1993 WL 188473 at *4 (May 5, 1993) (whether a particular asset is a "plan asset" requires a factual inquiry into the parties' representations and understandings). However, it is well settled under the common law as it existed at the time ERISA was enacted, and has been confirmed repeatedly by Fidelity in its many

lawsuits and affidavits in various courts, that the data set of retirement plan participants' financial information is an asset, and that it is the Plan's asset.

The data set at issue in this case—the personal and intimate details of the financial affairs and life events of Plan participants—is a "plan asset" by the term's plain meaning. ERISA does not define "plan assets." It only authorizes the Secretary of Labor to define the term by regulation. 29 U.S.C. §1002(42). That means "plan assets" has the meaning of the term at common law at the time ERISA was enacted, unless the statute (or, in this case, the Secretary of Labor) dictates otherwise. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322–23 (1992) (applying principle to the term "employee" under ERISA); *Varity Corp. v. Howe*, 516 U.S. 489, 502 (1996) (applying principle to the terms "fiduciary" and "administration" under ERISA). DOL's 1993 statement that "assets of a plan generally are to be identified on the basis of ordinary notions of property rights under non-ERISA law" only reinforces reliance on the common law understanding of what is an asset. *Cf.* DOL Advisory Op. No. 93-14A, 1993 WL 188473 at *4 (May 5, 1993).[4] It certainly did not change the definition in place since 1974. The common law

---

[4] The DOL's guidance states:

> [O]utside the scope of the plan assets-plan investments regulation (29 C.F.R. 2510.3-101), the assets of a plan generally are to be identified on the basis of ordinary notions of property rights under non-ERISA law. In general, the assets of a welfare plan would include any property, tangible *or intangible*, in which the plan has a beneficial ownership interest. The identification of plan assets would therefore include consideration of any contract or other legal instrument involving the plan, as well as *the actions and representations of the parties involved*.

DOL Advisory Op. No. 93-14A, 1993 WL 188473 at *4 (emphasis added).

meaning "presumption is particularly salient in analyses of ERISA, which has its roots in the common law." *U.S. Chamber of Commerce v. U.S. Dep't of Labor*, 885 F.3d 360, 381 (5th Cir. 2018) (citing *Tibble*, 135 S. Ct. at 1828).

For more than 50 years prior to the enactment of ERISA, courts at common law throughout the country understood that data sets are assets:

> Property rights exist in information, and one who spends time, money, labor, and thought in codifying and tabulating information is the owner of it. Such owner may communicate such information to another without thereby destroying his property rights in it, and one who acquires such information by virtue of a confidential relationship with the owner, or for a contractually limited purpose, cannot use it for other purposes to the prejudice of the owner, without his consent.

*Arrant v. Georgia Cas. Co.*, 102 So. 447, 449 (Ala. 1924) (emphasis added); *see also, e.g.*, *In re Arnay's Estate*, 187 N.Y.S.2d 782, 786–787 (Surrogate's Ct. N.Y. Co. 1959) (customer list belongs to decedent's estate and administrator had no right to use for own profit); *F.B. Miller Agency v. Home Ins. Co.*, 276 Ill.App. 418, 428–29 (Ill. Ct. App. 1934) (the entity that pays for and acquires information that can be used to solicit business is the information's owner); *V.L. Phillips & Co. v. Pa. Threshermen & Farmers' Mut. Ins. Co.*, 1999 F.2d 244, 246 (4th Cir. 1952) ("It has been determined that this information is of vital assistance to the agency in carrying on the insurance business and it has become, in the insurance field, recognized as a valuable asset in the nature of good will."); *Meissel v. Finley*, 95 S.E.2d 186, 190–91 (Va. 1956) (similar); *Blume v. Curson*, 447 S.W.2d 727, 729 (Tex. Ct. App. 1969) (similar); *Clark-Lami, Inc. v. Cord*, 440 S.W.2d 737, 740–41 (Mo. 1969) ("Confidential information … is a species of property to which the corporation has the exclusive right and benefit."). This recognition has

9

continued since the enactment of ERISA. *See, e.g.*, *AMGRO, Inc. v. Johnson*, 71

Ill.App.3d 485, 487 (Ill. Ct. App. 1979) (intimate financial information is a "valuable

asset" and an "intangible property right); *Costanzo v. Nationwide Mut. Ins. Co.*, 832

N.E.2d 71, 75 (Ohio Ct. App. 2005) ("'an agent is subject to a duty to the principal not to

use or to communicate information confidentially given him … [or to use it to injure] the

principal.'") (quoting Restatement of the Law 2d, Agency (1959)).

Prior to ERISA, the SEC also recognized that such data was extremely valuable by

repeatedly holding "that 'learning the personal and intimate details of the financial affairs

of clients and making recommendations as to purchases and sales of securities—

cultivates a confidential and intimate relationship'—rendering a broker-dealer who does

so 'a fiduciary.'" *U.S. Chamber*, 885 F.3d at 374 (quoting Hughes, Exchange Act Release

No. 4048, 1948 WL 29537 at *4, *7 (Feb. 18, 1948), *aff'd sub nom.*, *Hughes v. S.E.C.*,

174 F.2d 969 (D.C. Cir. 1949), and citing Mason, Moran & Co., Exchange Act Release

No. 4832, 1953 WL 44092 at *4 (Apr. 23, 1953)). Moreover, the advice that Fidelity

provides to participants such as Mr. Harmon is not merely incidental to the equivalent of

broker-dealer-like activities. Instead, it is providing advice based upon the learning of

personal intimate details of the financial affairs of the participants so as to cultivate a

confidential and intimate relationship—which unquestionably makes Fidelity a fiduciary.

*Id.* Thus, even if the participant data set was not a plan asset, Fidelity is a fiduciary

because of the confidential and intimate relationship it cultivates using the intimate

financial details that the data set provides.

10

Fidelity agrees that this data set is an asset under the common law understanding because that is what it has repeatedly told the courts for years. *E.g.*, *Fidelity Brokerage Services LLC v. Corcoran*, No. 18-674-DH (S.D. Tex. Mar. 2, 2018), Doc. 2-1 (Fidelity memorandum referencing client information as property), Doc. 2-2 ¶¶10-19, 25 (Declaration of Fidelity Houston Branch Manager describing the data set at issue as an asset and referencing the importance of knowing 401(k) triggering dates) (all documents submitted herewith as Exhibit 1); *Fidelity Brokerage Services LLC v. Hudson*, No. 14-3229-NFA (S.D. Tex. Nov. 10, 2014), Doc. 3-2 ¶¶3, 5, 7–9, 11 (Declaration of Fidelity Senior Vice President describing the data set at issue as an asset and the particular importance of knowing dates of 401(k) participants' triggering events) (submitted herewith as Exhibit 2); *see also* Exhibit 3 (similar sworn Fidelity declarations filed in courts throughout the country and Fidelity demand letters stating customer data is Fidelity's property). Fidelity has repeatedly made these representations for at least three-decades.[5] *See generally Fidelity Brokerage Services LLC v. Pacholek*, No. 07-333, Doc. 28-2, Doc. 28-6 (N.D. Tex. Nov. 26, 2007) (similar representations that the data set is an asset) (excerpts submitted herewith as Exhibit 4); Doc. 84 ¶¶162–65; 168–70; 172 (additional relevant documents cited in First Amended Complaint submitted herewith as Exhibit 5). Thus, as a matter of Fidelity's own admissions, the data set is a plan asset.

---

[5] *E.g.*, *Fidelity Brokerage Services, Inc. v. Murray*, No. 99-3039 (Mass. Super. July 13, 1999); *Fidelity Brokerage Services v. Johnson*, No. 04-662 (W.D. Tex. 2004) (15 similar complaints and orders through 2012 attached as Exhibit 6).

Defendants' actions and representations further support a finding that the data set is a plan asset. Before a Fidelity employee views Plan participant data on Fidelity's intranet they must agree that "[i]nformation is an asset of tremendous value in the financial services industry." Doc. 84 ¶172. Fidelity states that the Plan's data set is "the most proprietary information you can imagine about a customer[.]" *Id*. ¶165. "[C]ustomer lists for businesses like Fidelity are just important; just as important as the formula of Coke to Coca-Cola. That is their bread and butter. That is it. It is the most valuable asset they have." *Id*. ¶170; *see also* Ex. 4 at 506:1–18. Around 60% of Fidelity Brokerage's business comes from the Plan participant data set provided by FIIOC. Doc. 84 ¶¶163–66, 173–74, 176, 178; *see also* Ex. 4 at 48:21–49:3; 153:5–12; 170:20–171:8. Fidelity pays nothing for this tremendously valuable asset; instead, the Plan pays FIIOC excessive recordkeeping fees to maintain the data set asset. *See* Doc. 84 ¶¶118, 148, 157, 161–62, and 177-82. FIIOC uploads this Plan asset into a customer interaction software program known as Salesforce. *Id*. ¶162.[6]

Fidelity routinely represents that this data set is its property and exercises control over this data set by bringing temporary restraining orders against its former employees. *Id*. ¶171. Fidelity places a dollar value on the data set by seeking damages from the departing broker and the broker's new employer. *Id*. Fidelity actively prevents other firms from

---

[6] "A customer list also may be in the form of a database that includes other information about the customers, such as their order histories and demographic information." Statement of Financial Accounting Standards Board (FASB) No. 141 (revised 2007) at A37, available at https://www.fasb.org/pdf/fas141r.pdf. "[C]ustomer lists are frequently leased or exchanged." *Id*. FASB categorizes customer lists as an intangible asset. *Id*. at A36.

providing competitive quotes to Plan participants, attempting to leverage its position as Plan recordkeeper to become the sole provider of all financial services to Plan participants. *Id*. ¶¶157, 162–63, 171–72, 179, 181, 183–84, and 188–89.

Shell's binding policy regarding the data set also demonstrates that the data set at issue is a Plan asset. Shell informs Plan participants that it utilizes Employee Privacy Rules to protect personal information. *Id*. ¶158. Under these rules, personal information may only be used for defined legitimate business purposes. *Id*. The sale of non-Plan products by FIIOC is not a defined legitimate business purpose. *Id*. Shell states that "[e]ach Shell Company shall seek to contractually protect the data protection interests of its Employees if it engages with a Third Party Controller." *Id*. Shell informs participants that "[p]ersonal data must be protected from misuse, accidental, unlawful or unauthorized access, disclosure, corruption, destruction, loss, unavailability or acquisition[.]" *Id*. ¶159. Thus, Plan participants reasonably expect that the Plan's data set will be protected and not misappropriated by FIIOC. *Id*. ¶160.[7] Defendants' consistent and clear representations demonstrate that they treat the data set as an extremely valuable asset and that Plan participants have a reasonable expectation that it will be protected.

Other financial services firms, including another Plan service provider (Financial Engines) also recognize that this data set is a valuable asset that is transferrable and

---

[7] Plan asset considerations under the DOL test include "the reasonable beliefs of plan participants … based on the representations attributable to [the Plan sponsor]." *Sec'y of Labor v. Doyle*, 657 Fed.Appx. 117, 124 (3d Cir. 2016).

protected as property.[8] *See Financial Engines, Inc. v. Hedman*, Mo. 16SL-CC02948 (21st Judicial Cir., Mo., Aug. 16, 2016),  Complaint ¶¶14, 17, 19, 24, 29, 31, 36–7, 44, 46, 49–50 (submitted herewith as Exhibit 7). SEC audits of broker-dealers include such data sets as "intangible asset." SEC Audit of Broker-Dealer at pp. 10, 14–16, and 20 (submitted herewith as Exhibit 8).[9] Indeed, SEC audits demonstrate that broker-dealers purchase such data sets. SEC Audit of Broker-Dealer at p. 8 ("The Company has purchased customer lists from other broker/dealers … for $100,000[.]") (submitted herewith at Exhibit 9).[10] Thus, courts, regulators, Fidelity, and industry participants have long recognized that the data set FIIOC misappropriated from the Plan—special knowledge of investor's intimate financial details including triggering events—constitutes an asset.

In short, when Congress enacted ERISA the data set in this case was clearly categorized as an asset. Under the common law meaning at the time of ERISA's enactment, a data set of intimate knowledge of financial and personal information combined with insider knowledge of exploitable triggering events, such as years to

---

[8] Other financial services providers and Plan sponsors recognize this extremely valuable data set as an asset. Doc. 84 ¶¶171-72, 181.

[9] Available at https://www.sec.gov/Archives/edgar/vprr/1003/10035788.pdf. The Court may take judicial notice of the document. *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F.Supp.2d 576, 641–42 (S.D. Tex. 2003); *Ruiz v. Brennan*, 851 F.3d 464, 468 (5th Cir. 2017) ("[W]e may take judicial notice of matters of public record."). Additional SEC audits including customer lists as the broker-dealer's asset are available at https://www.sec.gov/Archives/edgar/vprr/1404/14049076.pdf at 9, 12, 16 (Lara, May & Associates audit valuing data set at $4.8 million and indicating $50,000 purchase of data set); https://www.sec.gov/Archives/edgar/vprr/1201/12010417.pdf at 4, 6 (Telemus Investment Brokers 2011 audit); https://www.sec.gov/Archives/edgar/vprr/0905/09055877.pdf at 6, 11 (Triangle Securities audit).

[10] Available at https://www.sec.gov/Archives/edgar/vprr/1301/13013755.pdf.

retirement, marital status and beneficiary status, was clearly an "asset." Doc. 84 ¶¶157,

162–65, 170–74, 181, 188–90. And because this information is collected by the Plan for

the exclusive purpose of administering the Plan and providing benefits to participants, it

is a *Plan* asset, not property of the Plan's recordkeeper or custodian of that information,

such as FIIOC. Congress did not reject or limit the common law's recognition that such a

data set is an asset when it passed ERISA.

The actual words that Congress used and omitted in ERISA are important because

"[h]ornbook canons of statutory construction require that every word in a statue be

interpreted to have meaning, and Congress's use and withholding of terms within a

statute is taken to be intentional." *U.S. Chamber*, 885 F.3d at 381. Further proof that

Congress intended "plan assets" to have the same broad meaning as was understood in

common law is shown by the fact that in particular situations ERISA limits "plan assets"

to specific subsets of assets. 29 U.S.C. §1002(18), (20), (21), (23), (34), (38) (using the

terms "money," "a security," "securities," "balance of the individual's account,"

"income," "amount contributed," "gains," "forfeitures of accounts," and "investment" as

qualifiers in other definitions but not for the term "plan assets."). Section 1002(21) is

especially instructive. There Congress used the term "asset" broadly in subsection (A)(i)

to refer to all assets of a plan. 29 U.S.C. §1002(21)(A)(i). In subsection (A)(ii) Congress

used the term "money or other property" to refer to a subset of "assets" with respect to

which investment advice is given, and in subsection (B) referred to "securities issued by

an investment company (mutual fund)," "money," and investable "property" as other

subsets of "assets" for the purposes of limiting the circumstances under which a mutual

fund and related entities become fiduciaries. Had Congress intended to limit "plan assets" to things such as investments, securities, money, contributions, and income it would have done so by using those qualifiers in the "plan assets" definition. ERISA's text contradicts Fidelity's position that "plan assets" is limited to a subset of "assets" like investments and monetary contributions.

Additional definitions contradict Fidelity's narrow interpretation of "plan assets." ERISA defines "current value" to mean "fair market value *where available and otherwise the fair value as determined in good faith by a trustee or a named fiduciary*[.]" 29 U.S.C. §1002(26) (emphasis added). ERISA also defines "adequate consideration" to mean "in the case of an *asset other than a security* for which there is a generally recognized market, the fair market value of the asset *as determined in good faith by the trustee or named fiduciary* [.]" 29 U.S.C. §1002(18).[11] These definitions recognize that plan assets include intangible assets, mass assets or goodwill. Fidelity's position that an asset must be "easily labeled with a 'current value'" would render the italicized words as surplusage and would fundamentally change these definitions. Doc. 91 at 21–22 (Mot. 14–5).

The fact that the Secretary did not exercise its statutory authority to define by regulation "plan assets" for 12 years further demonstrates that "plan assets" had and has the same meaning as under the common law. *See* Final Regulation Relating to the Definition of Plan Assets, 51 Fed.Reg. 41262 (Nov. 13, 1986). And the Secretary did not limit the scope of "plan assets" in all circumstances, much less the circumstances in this

---

[11] As Plaintiffs alleged, there is a market in the financial services industry for the Plan's data set. Doc. 84 ¶¶171–72; *see also* Ex. 9.

case, but only in specific circumstances. By allowing "plan assets" to be defined by DOL regulation (29 U.S.C. §1002(42)), Congress intended the term to have its common law meaning. The 1986 regulation only clarifies whether assets of an entity in which a plan invests will be considered to include "plan assets" so that the manager of the entity would be a fiduciary. *Id.* at 41262–63. It does not purport to provide a comprehensive definition of "plan assets" or limit the common law definition. *Id*; *see also* DOL Advisory Op. No. 93-14A, 1993 WL 188473 at *4 (plan asset test applies to all assets outside the scope of 29 C.F.R. §2510.3-101). DOL's other "plan asset" regulation, promulgated in 1996, also is limited to a specific context—contributions to a plan. Regulation Relating to Definition of "Plan Assets"—Participant Contributions, 61 Fed.Reg. 41220-01 (Aug. 7, 1996). It also does not limit the common law definition in other contexts.

Fidelity's reliance on §1103 and §1344 does not alter the common law understanding of the term plan "asset." Fidelity baldly asserts that information cannot be held in trust. This is incorrect and contrary to century-long common law. *E.g., Oliver v. Oliver*, 45 S.E. 232, 233 (Ga. 1903) (executive "holds the information in trust for the benefit of those who placed him where this knowledge was obtained, in the well-founded expectation that the same should be used … for those who were the real owners of the company."); *Trice v. Comstock*, 121 F. 620, 625 (8th Cir. 1903) (citation omitted) (employee holds information "in trust for his former master"); *Plant Indus., Inc. v. Coleman*, 287 F.Supp. 636, 642 (C.D. Cal. 1968) (there is "an implied obligation … not to disclose … confidential information received … in trust"); *Husband C. v. Wife C.*, 391 A.2d 745, 746 (Del. 1978) ("A trust, by definition, grants to nonparties ownership rights and control

17

over property, while cutting off control by the grantor."). Here, Plan participants provide the Plan with intimate financial data with the understanding the data set will be used solely in their interest and to administer the Plan. Once they provide this information to the Plan, the Plan's fiduciaries control the data set asset.

Fidelity also asserts, without support, that the trustee cannot have "exclusive authority and discretion to manage and control" the data set. Fidelity's own position, and Shell's binding corporate policies, demonstrate this is false. Fidelity admits that "Plan sponsors have the ability through contract to ensure that recordkeepers and other third-party administrators do not use participant data in ways that exceed their authority." Doc. 91 at 31 (Mot. 24). Shell's binding corporate policies state that "[e]ach Shell Company shall seek to contractually protect the data protection interests of its Employees if it engages with a Third Party Controller[,]" and "[w]hen [Shell] engage[s] third parties to process personal data, Shell is responsible for ensuring that the personal data is safeguarded and adequately protected." Doc. 84 ¶¶158–59. Thus, Plan fiduciaries have exclusive authority and discretion over the asset. Treating the data set at issue as the Plan's asset also means it will be held "for the exclusive purpose of providing benefits to participants in the plan" and not for improper purposes of targeting vulnerable participants for exploitation during triggering events or otherwise.

Finally, Fidelity's citation to the Form 5500 is not persuasive, nor does it provide any insight into the meaning of "plan assets." Fidelity cites no authority for the argument that a reporting form created by a federal agency is evidence of the meaning of a statutory term. This asset is not assigned a dollar value for valuing participant retirement accounts

18

because it is not supposed to be sold for money (although it clearly could be sold to a financial services firm). It is supposed to be used exclusively for administering participants' retirement accounts and returned to participants (or destroyed to prevent further use) once the account has been distributed or the plan terminated.

## III. Fidelity's authorities are inapposite or support Plaintiffs' arguments.

In *Divane v. Northwestern University* the court did not engage in any recognized statutory interpretation. No. 16-8157, 2018 WL 2388118 (N.D. Ill. May 25, 2018). Instead, the court held that it would not find that the particular data in that case was an asset because "[t]his Court will not be the first, particularly in light of Congress's hope that litigation would not discourage employers from offering plans and in light of the principle that breach of fiduciary duty remedies inure to the plans." *Id*. at *12. Reference to ERISA's competing purposes as a method of statutory interpretation is improper. *U.S. Chamber*, 885 F.3d at 378 (citing *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 261 (2000) and *Darden*, 503 U.S. at 324–25). Moreover, ERISA's purpose is to "promote the interest of employees and their beneficiaries in employee benefits plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983). The *Divane* court also stated "[i]t does not appear that courts have recognized a property right in such information." *Divane*, 2018 WL 2388118 at *12. That is clearly incorrect based on the cases cited *supra*, Fidelity's more than twenty-years of judicial admissions, and acknowledgement by regulators and other financial services actors that the data set is a tremendously valuable asset. Thus, this

19

Court should reject *Divane's* impermissible legal framework and failure to evaluate extensive precedent.

*Patient Advocates v. Prysunka*, 316 F.Supp.2d 46 (D. Me. 2004), was decided on summary judgment and the plaintiff in that case failed to provide evidence that the health plan's claims data had any financial value or that the plan sponsors or service provider treated the information as a plan asset. *Id*. at 48. That is in stark contrast to the evidence Plaintiffs present here and in their First Amended Complaint, and this is just the pleading stage. Although "claims information typically is not acquired for its value" (*id.* at 49), plan participant financial information most certainly is, as shown *supra*. The court expressly rejected Fidelity's interpretation of its decision by noting that it was not "deciding whether information or data could ever constitute 'plan assets' under ERISA." *Id*.[12]

Fidelity's reliance on the DOL's publication of its regulation on plan investment advice (29 C.F.R. §2550.408g-1 and §2550.408g-2) is misplaced. *Cf.* Investment Advice—Participants and Beneficiaries, 74 Fed. Reg. 3822 (Jan. 21, 2009). That regulation, which implements 29 U.S.C. §1108(b)(14), applies only to investment advice given to participants for the investment of their accounts. 29 U.S.C. §1108(b)(14)(A).[13]

---

[12] *Walsh v. Principal Life Insurance Company* is similarly unpersuasive. 266 F.R.D. 232 (D. Iowa 2010). Fidelity expressly acknowledges that the decision does not address whether data sets are plan assets. Doc. 91 at 24 n.15 (Mot. 17). Thus, the *Walsh* court did not engage in any statutory interpretation or the fact-intensive inquiry required by the Eighth Circuit under the DOL's plan asset test. *Kalda v. Sioux Valley Physician Partners, Inc.*, 481 F.3d 639, 647 (8th Cir. 2007) (adopting the DOL's plan asset test).

[13] Section 1108 provides exemptions from the prohibited transactions provisions of 29 U.S.C. §1106(a).

20

The exemption applies only to advice that takes into account personal financial information of the participant that is "furnished by a plan, participant or beneficiary" after the fiduciary adviser has requested that information. 29 C.F.R. §2550.408g-1(b)(3)(C); 72 Fed.Reg. 3847. That confirms this information is a Plan asset (or the participant's asset held in trust by the fiduciaries for the participant's benefit). If plan service providers such as FIIOC had free rein to use this information as they wished, they would not need to "request such information" from a plan or participants.

The "cross-selling" that DOL refers to in its preamble (72 Fed.Reg. 3832) is limited to marketing "additional services or products" to plan participants. DOL does not in any way state or suggest that the cross-selling it refers to is based upon a participant's personal financial information that a service provider has taken from the plan without the participant's consent.

Within the context of the regulation, the cross-selling to which DOL refers is limited to the circumstance in which *the participant* has provided the adviser the participant's personal financial information at the adviser's request, for the purpose of receiving advice on investment of her retirement account in the plan. 29 C.F.R. §2550.408g-1(b)(3)(C). It would undermine the regulation entirely to allow a service provider (who does not even claim to qualify as a "fiduciary adviser") to sell participants non-plan services based on financial information that the service provider took from the plan without even first requesting it from the participant, much less getting it from the participant in the context of providing advice as to the investment of her retirement

21

account, when that is specifically what the regulation requires of fiduciary advisers in order to be exempt from a prohibited transaction.

Fidelity's position that it has the unfettered right to use the highly confidential information it receives for its own purposes, wholly unrelated to recordkeeping for the Plan conflicts with the DOL's guidance. If Fidelity's position were adopted, recordkeepers could use insider knowledge of participants' investment choices, asset balances, triggering dates, social security numbers, and other information for their own financial benefit, rather than solely for the limited purpose for which they have been entrusted with the information and without taking on the duties of a fiduciary adviser. Participants have never granted permission for such use of this sensitive data for Fidelity's financial benefit.

*Low v. LinkedIn Corporation* and *In re iPhone Application Litigation* are also inapposite. The information at issue *Low* and *iPhone Application* was "limited information"—not the data set at issue here. *Low v. LinkedIn Corp.*, 900 F.Supp.2d 1010, 1030 (N.D. Cal. 2012); *In re iPhone Application Litig.*, 844 F.Supp.2d 1040, 1050 (N.D. Cal. 2012). The same judge held that the type of data set at issue here—"confidential customer-related information including customer lists and contact information, pricing guidelines, historical purchasing information, and customers' business needs/preferences" is routinely protected. *Brocade Comm. Sys., Inc. v. A10 Networks, Inc.,* 873 F.Supp.2d 1192, 1213 (N.D. Cal. 2012). The important distinction between *Low* and *iPhone* and the data set in *Brocade* was the combination of "information linking each customer to other confidential information such as the customer's buying patterns, product needs, and

preferences." *Id*. at 1215. "It is this combination of elements that makes the information valuable and not generally known to the public." *Id*. This supports Plaintiffs' position and is consistent with the common law definition of a data set as an asset. *See also* Doc. 84 ¶¶157, 162–65, 170-72, 174, 181, 184, and 188–90.

Fidelity's invocation of the Gramm-Leach-Bliley Act (GLB) is not applicable to this action. GLB applies to an *individual* retail customer who chooses to have a *direct* relationship with a particular financial institution—a relationship that does not involve prior insider knowledge of intimate financial details and expiration trigger dates. GLB contemplates consumers voluntarily providing details to a firm they chose. That is not true for a participant in the Plan. The relationship in a retirement plan is between FIIOC and the plan sponsor; the participant has nothing to do with that relationship. Doc. 84 at ¶165; *see also* Ex. 4 at 43:5–44:3; 48:21–50:2.

Although GLB does not apply, it would support a finding that the nonpublic data set at issue in this case is an asset that should not be disclosed outside of the Plan. GLB states that "a financial institution may not, directly or through any affiliate, disclose to a nonaffiliated third party any nonpublic personal information, unless such financial institution provides or has provided to the consumer a notice that complies with section 6803 of this title." 15 U.S.C. §6802(a). GLB thus would prohibit the disclosure of the data set by plan fiduciaries (assuming they are a financial institution) to FIIOC. FIIOC, as a nonaffiliated third party, would be prohibited from sharing the data with affiliates. *Id*. §6802(c). Shell's policies supports this application. 15 U.S.C. §6803 (policy requirement); Doc. 84 at ¶¶158–59.

23

The presumption of common law incorporation is strong: to overcome it, Fidelity must show that ERISA "dictates" a departure from the common law, *Darden*, 503 U.S. at 322, because some aspect of the statute is "incompatible with" the common-law meaning, *Neder v. U.S.*, 527 U.S. 1, 25 (1999), or reflects an "unequivocal[l] … intent" to abandon it, *NLRB v. Amax Coal Co.*, 453 U.S. 322, 330 (1981). Fidelity posits hypotheticals attempting to assert that absurd results would "turn the world upside down[.]" Doc. 91 at 8 (Mot. 1). These hypotheticals are specious. They are quickly refuted by a century of common law and Fidelity's repeated contention that it owns the same data set. Based on Fidelity's voluminous declarations, Fidelity knows that the asset is not a single piece of information standing alone, such as a single social security number, but the combination of information linking each customer to other confidential information, here investment histories, identity of their investments, account balances, investment contribution amounts, age, income, marital status, call center notes, and triggering dates including retirement, changes in employment status, changes in marital status or beneficiary status.

Properly applied to the asset at issue—the *data set*—Fidelity's hypotheticals fall apart. Fidelity has *never* given such a data set to entities like AON Hewitt, Deloitte, the Investment Company Institute, or anyone else. As Fidelity has stated:

> [Plan participant customer] information is only known to a limited number of Fidelity employees. Fidelity maintains its trade secret customer data in confidence to preserve Fidelity's competitive advantage … The identities of the customer assigned to Corcoran at Fidelity are closely guarded and not known to Fidelity's competitors … This is because the list gives Fidelity a competitive advantage over its competitors who cannot target its list of customers.

*E.g.*, *Fidelity Brokerage Services LLC v. Corcoran*, 18-cv-00674-DH, Doc. 2-1 at pp. 3, 22 (S.D. Tex. 2018) (Ex. 1). Fidelity sues departing brokers and competitors who obtain the same data set, but not individual customers who cannot take the data set. Likewise, Plan participants do not control or exercise discretion over the data set, thereby making themselves fiduciaries. As long as the Plan and vendors do not use this asset to benefit themselves, but solely to administer the Plan, provide benefits, and defray reasonable expenses as required by §1103(c)(1) and §1104(a)(1), there are no issues.

The data set at issue is a plan asset according to a century of precedent and the representations of Defendants. FIIOC's exercise of control and authority over this asset by forwarding the data set to its affiliates makes FIIOC a fiduciary. 29 U.S.C. §1002(21)(A). Fidelity's motion to dismiss should be denied.

## IV. Count VII of the First Amended Complaint sufficiently pleads a prohibited transaction claim.

Fidelity challenges Count VII, which alleges that they violated ERISA §1106(a). Section 1106(a) states that:

> "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect … sale or exchange, or leasing, of any property between the plan and a party in interest [or] … transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]"

29 U.S.C. §1106(a). Fidelity does not challenge Count IV, except to the extent they argue that the data set is not a plan asset.

25

**A. Fidelity affiliates are parties-in-interest.**

FIIOC and the other Fidelity affiliates are engaged in a joint venture in which FIIOC shares the data set that it takes from the Plan with the other Fidelity affiliates for their use in soliciting business in their respective areas of the Fidelity enterprise (FMR LLC).

It is undisputed that FIIOC is a party-in-interest under 29 U.S.C. §1002(14)(B) because it provides plan services. Because the data set is a Plan asset over which it exercised control, FIIOC also is a fiduciary and party-in-interest under §1002(14)(A). FMR LLC is a party-in-interest because it owns all the shares of FIIOC. Doc. 84 ¶253; 29 U.S.C. §1002(14)(H).

The other Fidelity affiliates are parties in interest under 29 U.S.C. §1002(14)(H) or (I). Subsection (H) and (I) provide that party-in-interest means "(H) ... a 10 percent or more shareholder directly or indirectly, of a person described in subparagraph (B) [plan service provider]" and "(I) a 10 percent or more (directly or indirectly in capital or profits) partner or joint venture of a person described in (B)."

The data set that FIIOC takes from the Plan is capital, which it shares with the Fidelity affiliates on a common computer platform called Salesforce—another piece of common capital used to conduct the joint venture. *Id*. ¶¶163, 170, 173–74, 190; *see also* Ex. 8 (customer list accounted for 35% of broker-dealer's assets). Fidelity Brokerage Services LLC generates 60% of its business using this capital alone. *Id*. ¶¶165, 174, *see also* Ex. 4 at 48:21–49:3; 153:5–12; 170:20–171:8. In additional, FMR LLC, Fidelity Brokerage Services LLC, and FIIOC share the same principal office—another piece of common capital used to by the joint venture. (Massachusetts Secretary of State Filings

26

attached herewith at Exhibit 10).[14] Fidelity Brokerage Services LLC and FIIOC also share a common executive, Kevin M. Barry. *Id*. Based on these overlapping ties it is evident that FIIOC and the five Fidelity affiliates are engaged in a joint venture with each other for the purposes of using Plan participant data sets to solicit new business in their respective areas, to which they are at least equal (20%) contributors. This is supported by Fidelity's many affidavits referencing its business model and referring to the entire enterprise as working for the same purpose and sharing common resources. *See* Ex. 1, Doc. 2-2 ¶¶1–2, 6, 8–10 & Ex. 2 ¶¶1–2, 5–7, 9; *see also, e.g.* Ex. 3 at 3–5, 19–24, 26, 28, 46–48, 51–53, 61, 66–67, 74, 81, 83–84, 87–88, 108–110. The Fidelity affiliates and FIIOC share 10% or more capital (customer lists, computer systems, office space, employees) and are parties-in-interest.

It is apparent from the relationship among these entities that they are 10% or more joint venturers. However, because Fidelity is privately owned, the underlying specific information of how it operates among affiliates is a black box unavailable to anyone outside of Fidelity. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("No matter how clever or diligent, ERISA plaintiffs generally lack the insider information necessary to make out their claims in detail unless and until discovery

---

[14] The Court may take judicial notice of documents contained in Exhibit 10 from the website of the Massachusetts Secretary of State. *Swindol v. Aurora Flight Scis. Corp.*, 805 F.3d 516, 519 (5th Cir. 2015), *certified question answered*, 194 So.3d 847 (Miss. 2016); *Brewer v. Suzuki Motor of Am., Inc.*, No. 15-197-MH, 2015 WL 4433046 at *2 (S.D. Tex. July 17, 2015).

commences."). Thus, the fact-intensive inquiry into whether Fidelity affiliates are parties-in-interest under §1102(14)(H) or (I) cannot be resolved on a motion to dismiss. *See In re Regions Morgan Keegan ERISA Litig.*, 692 F.Supp.2d 944, 964 (W.D. Tenn. 2010) (quoting *Rankin v. Rots*, 278 F.Supp.2d. 853, 879 (E.D. Mich. 2007)) ("[T]he manner in which each defendant ... operated is for now something of a black box. To expect a plaintiff to be able to turn on the light and point to particular individuals who exercised decision making authority is simply too much to require at this stage of the case.").[15]

### B. Count VII is premised on FIIOC committing a prohibited transaction, not Shell.

Count VII alleges that FIIOC, not Shell, is a fiduciary because it exercised control over the data set, which is a plan asset, and committed a prohibited transaction by causing the Plan to transfer the data set to itself and/or to its affiliates, parties-in-interest, in violation of §1106(a)(1)(D). Doc. 84 ¶¶252–254, 259. The allegations also demonstrate that FIIOC knew, or reasonably should have known, that providing the data set to its parent and subsidiaries constituted a direct or indirect provision of plan assets to or for the use or benefit of parties in interest. Shell's intent regarding this transaction is irrelevant. *Cf.* Count VI, *id*. ¶¶241–50; Doc. 91 at 35–36 (Mot. 28–9).

Although section 1106(a) does not include a requirement of subjective intent, Plaintiffs have alleged FIIOC's subjective intent to benefit the other Fidelity affiliates.

---

[15] Even if the Fidelity affiliates are not parties-in-interest they remain liable under §1132(a)(3), as alleged in Count VII, as knowing recipients of ill-gotten plan assets, since they are not purchasers for value and are alleged to have known or should have known that the transfer of this data was a violation of fiduciary duties owed to the plan and its participants. *See*, *e.g.*, *Harris Tr.*, 530 U.S. at 250–51.

*See Chao v. Hall Holding Co.*, 285 F.3d 415, 442 n.12 (6th Cir. 2002) (discussing the problems with reading a subjective intent requirement into §1106); Doc. 84 ¶¶49–50, 156–57, 161–66, 168–79, 184, 189–90.[16]

**C.  FIIOC "knew" or "should have known" that the data set was a plan asset**.

Plaintiffs allege extensive facts showing that FIIOC knew the data set was a plan asset. Doc. 84 ¶¶157, 161, 164–65, 170-74, 177–78, 181, 185, 189–90. In addition to a century of common law putting Fidelity on notice, Fidelity itself has admitted that this data set is an asset—albeit claiming it is *Fidelity's* asset—in *decades* of representations to courts, including *this District*.[17]

Even if the Court could somehow conclude that FIIOC did not know this data was a plan asset for purposes of §1106(a)(1)(D) that would make only more compelling the issuance of an injunction as requested in Count IX against FIIOC's further misuse of that plan asset. *Cf.* Doc. 91 at 37 n.22 (Mot. 30).

## CONCLUSION

For all the reasoned provided above, the Court should deny Fidelity's Motion to Dismiss.

---

[16] This Circuit has not directly addressed the question of whether §1106 requires subjective intent, but, like *Chao* has observed that "the object of Section [1106] was to make illegal per se the types of transactions that experience had shown to entail a high potential for abuse." *Donovan v. Cunningham*, 716 F.2d 1455, 1464–65 (5th Cir. 1983).

[17] Fidelity's reference to 29 U.S.C. §1132(*l*)(1)(B) is erroneous because this is not an action by the Secretary of Labor.

July 6, 2020                              By: */s/ Jerome J. Schlichter*       

*Jerome J. Schlichter, Esq., Attorney-in-Charge
(Missouri Bar #32225)
*Scott T. Apking, Esq., of counsel
(Missouri Bar #66868)
SCHLICHTER, BOGARD & DENTON, LLP
100 South Fourth Street, Suite 1200
St. Louis, Missouri 63102
Telephone: (314) 621-6115
Facsimile: (314) 621-5934
jschlichter@uselaws.com
tdoles@uselaws.com
hlea@uselaws.com
ssoyars@uselaws.com
sapking@uselaws.com
*Admitted Pro Hac Vice*
*Attorneys for Plaintiffs*

Robert M. Tramuto, of counsel
Texas Bar #20186300
S.D. Texas Bar #6863
Jones Granger
10000 Memorial Drive
Suite 888
P.O. Box 4340
Houston, TX 77210
Telephone: (713) 668-0230
Facsimile: (713) 956-7139
btra@jonesgranger.com
*Local Counsel for Plaintiffs*

30

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2020, I electronically filed the foregoing using the court's CM/ECF system, which will send notification of such filing at all counsel of record.

*/s/ Jerome J. Schlichter*
Jerome J. Schlichter
Attorney-in-Charge for Plaintiffs
