## THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | |
|---|---|
| CHARLES HARMON, BRIAN COBLE, ASUR VALLEJOS, DAVID LAWRENCE, individually and as representatives of a class of participants and beneficiaries of the Shell Provident Fund 401(k) Plan,<br><br>*Plaintiffs*,<br><br>v.<br><br>SHELL OIL COMPANY, TRUSTEES OF THE SHELL PROVIDENT FUND, CYNTHIA A.P. DEERE, SCOTT G. BALLARD, PAUL GOODFELLOW, RHOMAN J. HARDY, EILEEN M. PERILLO, CHRISTOPHER B. RICE, SUSAN M. WARD, GLENN T. WRIGHT, FIDELITY INVESTMENTS INSTITUTIONAL OPERATIONS COMPANY, INC., FMR LLC, FIDELITY BROKERAGE SERVICES LLC, FIDELITY PERSONAL AND WORKPLACE ADVISORS LLC, FIDELITY INVESTMENTS LIFE INSURANCE COMPANY, FIDELITY PERSONAL TRUST COMPANY, FSB, AND ALL OTHER UNKNOWN PLAN ADMINISTRATORS AND TRUSTEES OF THE SHELL PROVIDENT FUND FROM 2014 TO THE PRESENT,<br><br>*Defendants*. | Civil Action No. 3:20-cv-00021<br><br>**Oral Argument Requested** |

## FIDELITY DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

ARGUMENT ................................................................................................................3

    I.    PLAINTIFFS DO NOT HAVE ARTICLE III STANDING. ...................................3

    II.    PARTICIPANT DATA IS NOT A "PLAN ASSET." ............................................6

        A.    Participant Data Is Not Trust Property Under Common Law ....................6

        B.    Participant Data Is Not The Plan's Trade Secret. ........................................9

        C.    Plaintiffs' Theory Is Contradicted By ERISA's Text And
            Structure, DOL Guidance, And Every ERISA Case To Address It ..........12

    III.    THE PROHIBITED-TRANSACTION CLAIM FAILS. .....................................14

CONCLUSION .........................................................................................................15

## TABLE OF AUTHORITIES

**CASES**                                                         **PAGE(S)**

*Amgro Inc. v. Johnson*,
   389 N.E.2d 688 (Ill. App. Ct. 1979) ........................................................................7

*In re Arnay's Estate*,
   187 N.Y.S.2d 782 (Sur. Ct. N.Y. Co. 1959) ....................................................7, 8, 9

*Bertulli v. Ind. Ass'n of Continental Pilots*,
   242 F.3d 290 (5th Cir. 2001) ....................................................................................6

*Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*,
   873 F. Supp. 2d 1192 (N.D. Cal. 2012) .................................................................11

*Chamber of Commerce of U.S. v. U.S. Dep't of Labor*,
   885 F.3d 360 (5th Cir. 2018) ....................................................................................7

*Daugherty v. Univ. of Chicago*,
   2017 WL 4227942 (N.D. Ill. Sept. 22, 2017) ..........................................................4

*David v. Alphin*,
   704 F.3d 327 (4th Cir. 2013) ....................................................................................4

*Divane v. Nw. Univ.*,
   2018 WL 2388118 (N.D. Ill. 2018) .......................................................................13

*In re Fidelity ERISA Float Litig.*,
   829 F.3d 55 (1st Cir. 2016) .......................................................................................6

*Husband C. v. Wife C.*,
   391 A.2d 745 (Del. 1978) .........................................................................................9

*In re iPhone Application Litig.*,
   844 F. Supp. 2d 1040 (N.D. Cal. 2012) .................................................................11

*KVUE, Inc. v. Moore*,
   709 F.2d 922 (5th Cir. 1983) ....................................................................................6

*Lee v. Verizon Commc'ns, Inc.*,
   837 F.3d 523 (5th Cir. 2016) ....................................................................................4

*Low v. LinkedIn Corp.*,
   900 F. Supp. 2d 1010 (N.D. Cal. 2012) .................................................................11

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ..................................................................................................5

*Oliver v. Oliver*,
45 S.E. 232 (Ga. 1903).................................................................................8

*Patient Advocates v. Prysunka*,
316 F. Supp. 2d 46 (D. Me. 2004) ............................................................13

*Perez v. Bruister*,
823 F.3d 250 (5th Cir. 2016) ......................................................................3

*Plant Industries, Inc. v. Coleman*,
287 F. Supp. 636 (C.D. Cal. 1968) ............................................................8

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984)...................................................................................10

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009).....................................................................................6

*Thole v. U.S. Bank N.A.*,
140 S. Ct. 1615 (2020).................................................................................3

*Trice v. Comstock*,
121 F. 620 (8th Cir. 1903) ...........................................................................8

*Triple Tee Golf, Inc. v. Nike, Inc.*,
485 F.3d 253 (5th Cir. 2007) ....................................................................10

*Ultraflo Corp. v. Pelican Tank Parts, Inc.*,
926 F. Supp. 2d 935 (S.D. Tex. 2013) ......................................................11

*Varity Corp. v. Howe*,
516 U.S. 489 (1992)................................................................................7, 12

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*,
529 U.S. 765 (2000).....................................................................................4

## STATUTES AND REGULATIONS

18 U.S.C. § 1839(3) ...........................................................................................10

29 U.S.C. § 1002(14)(I) ......................................................................................15

29 U.S.C. § 1106(a)(1)(D) ..................................................................................15

29 U.S.C. § 1132(a)(2)..........................................................................................3

29 C.F.R. § 2550.408g-1(b)(3)(i)(C) .................................................................14

**OTHER AUTHORITIES**

Black's Law Dictionary, "Capital" (11th ed. 2019) ........................................................15

Bogert's Trusts and Trustees § 16 (updated June 2020) ...............................................8

Bogert's Trusts and Trustees § 543 (updated June 2020)..............................................9

Restatement (First) of Torts § 757, cmt. b (1939) .........................................................10

Restatement (Second) of Trusts § 74, cmt. a (1959)......................................................9

Restatement (Second) of Trusts § 170, cmt. s (1959)....................................................9

To state a claim, Plaintiffs need to convince the Court that ever since 1974, ERISA has made participant data an asset of every ERISA-governed retirement plan—even though Plaintiffs identify not a single court, agency, or ERISA plan that has ever treated participant data that way.  In other words, for Plaintiffs' claims against Fidelity to stand, this Court would have to find that, for nearly half a century, everyone got it wrong.

If Plaintiffs' theory had any basis, it would have to be rooted in the statute.  But instead of focusing on the text and structure of ERISA or even on ERISA caselaw, Plaintiffs devote much of their brief to 20 years of cases that have nothing to do with ERISA or 401(k) plans.  The cases on which Plaintiffs focus were brought by Fidelity's retail brokerage affiliate, FBS, against its former employees, who took Fidelity's customer information with them to other brokerage firms that compete with FBS for business.  FBS sought to enforce contractual non-solicitation clauses and trade-secret rights, in order to protect FBS's retail brokerage business from competitive harm.  Although these cases have nothing to do with ERISA, Plaintiffs nonetheless suggest that, if customer information that Fidelity compiled is a trade secret belonging to Fidelity—as Fidelity claimed in those cases—then participant data must be an asset belonging to the Plan.  This comparison, which forms the crux of Plaintiffs' argument, is inapt.   Trade-secret law protects compilations of information as property only where that information is kept secret and the secrecy provides an economic business advantage—because the holder's *competitors* do not have it.  That is certainly true for the brokerage customer information at issue in Fidelity's misappropriation cases:  FBS is a market-leading retail broker that competes for its customers, and its customer list would be extremely valuable to its competitor brokerage

firms.  In contrast, the Shell Plan is not a commercial enterprise, does not compete with anyone for business (or even engage in business), derives no independent economic value from participant data, and (according to Plaintiffs) does not even keep participant data secret.  There is no comparison to be had.

Plaintiffs also argue that information akin to participant data has been treated as an asset under "common law."  But, to the extent courts look to the common law when interpreting ERISA, they look to the common law of trusts—not the common law of insurance, which is almost exclusively what Plaintiffs cite.  Unsurprisingly, none of Plaintiffs' insurance cases sheds any light on the meaning of the term "plan asset"; they address the entirely unrelated question of who owns an insurance policy "expiration"—the insurance company or its agents.  Plaintiffs do cite one trust law case, but that case stands for the uneventful proposition that information—in that case, a business's customer list—can be a trust asset where the business is *placed in trust* for the financial benefit of the trusts' beneficiaries; it does not hold that any information *about* the trust or its beneficiaries is a trust asset, which is what Plaintiffs urge the Court to hold here.

Finally, as the Supreme Court has made clear, even the common law of trusts has no role to play where, as here, the proposed reading of ERISA is inconsistent with the statute's own text and structure.  Fidelity's opening brief explains at length the many ways in which Plaintiffs' proposed interpretation of the term "plan asset" is inconsistent with the statute, and Plaintiffs barely even attempt to rebut these arguments.  When read as a whole, ERISA makes clear that "plan assets" include only assets *placed in* trust, for the trustees to manage in the participants' financial interest and make available for distribution to

participants at the appropriate time.  Participant data is not placed in trust, it is not managed by the trustee in the participants' financial interests, and it cannot be made available for distribution.  So it is not a plan asset under ERISA.

In short, both on the merits and on Fidelity's standing argument (discussed below), Plaintiffs rest on sleight-of-hand and misdirection.  Instead of focusing on applicable Article III standing doctrine or the actual text of ERISA, they divert the Court's attention to other, unrelated areas of the law, hoping that the Court will let the case move forward simply because participant data is allegedly very valuable to Fidelity.  But, because Plaintiffs allege no harm and no violation of ERISA, the claims should be dismissed.

## **ARGUMENT**

## I.    **PLAINTIFFS DO NOT HAVE ARTICLE III STANDING.**

*Injury to the Plan:*  Plaintiffs principally rely on the notion that they need not show individualized injury-in-fact at all—just "injury to the Plan."  Opp. 3.  But "there is no ERISA exception to Article III."  *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1622 (2020).  Plaintiffs' cases (Opp. 3-4) stand for the uncontroversial proposition that ERISA provides a *cause of action*, in 29 U.S.C. § 1132(a)(2), for a participant to sue in a representational capacity, with relief inuring to the plan.[1]  "But the cause of action does not affect the Article III standing analysis."  *Thole*, 140 S. Ct. at 1620.

---

[1] Where those cases use the word "standing," that term refers to statutory standing—*i.e.*, whether and to what extent the plaintiff has a cause of action under ERISA—not constitutional standing.  *E.g.*, *Perez v. Bruister*, 823 F.3d 250, 257 (5th Cir. 2016) (addressing the "authoriz[ation]" to sue provided by 29 U.S.C. § 1132(a)(2)).

Second, Plaintiffs argue that, had Fidelity compensated the Plan for the use of participant data, they could have benefited from lower fees or more revenue credits. Opp. 4. But Plaintiffs do not allege that the Plan would have or should have negotiated lower fees or more revenue credits in exchange for participant data. In fact, they argue that participant data "is not supposed to be sold for money." Opp. 19.

Third, Plaintiffs suggest that, even if they have suffered no loss, they have something to gain—that ordering disgorgement would mean a financial windfall for the Plan and, thus, each participant. Opp. 4-5. But just because a plaintiff will be wealthier if he wins a recovery does not mean he has suffered an injury-in-fact. *See Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000) (a "bounty" awarded to successful plaintiffs does not confer standing because "an interest that is merely a 'byproduct' of the suit itself cannot give rise to a cognizable injury in fact"). If Plaintiffs were correct, a suit for disgorgement or statutory penalties could never be dismissed for lack of standing. As Fidelity established in its Motion (at 6-7), that is not the law.[2]

*Individual Injury:* Plaintiffs also argue that Fidelity's alleged use of participant data injured them individually. But they barely address three of the named Plaintiffs, and for the fourth, Mr. Harmon, they rest on factual assertions with no basis in the Amended Complaint—even though this is the third time Fidelity has challenged Plaintiffs' standing

---

[2] Plaintiffs try to distinguish *Lee v. Verizon Commc'ns, Inc.*, 837 F.3d 523 (5th Cir. 2016), and *David v. Alphin*, 704 F.3d 327 (4th Cir. 2013), as cases specific to the defined-benefit context. Opp. 5. But those cases' reasoning comes from Article III and the Supreme Court's non-ERISA standing decisions such as *Spokeo*. *See id.* at 336-38; *Lee*, 837 F.3d at 529-30. That reasoning applies fully to defined-contribution cases. *E.g.*, *Daugherty v. Univ. of Chicago*, 2017 WL 4227942, *6 (N.D. Ill. Sept. 22, 2017).

(starting with the pre-motion letter), and Plaintiffs have already had a chance to amend.[3]

Plaintiffs argue in one sentence that Messrs. Vallejos and Lawrence have standing because they received "targeted solicitations."  Opp. 7.  But, as Fidelity explained, solicitations alone do not injure anyone.  Mot. 7.  Plaintiffs make no contrary argument and cite no contrary authority.  Fidelity also pointed out that Plaintiffs do not allege that Mr. Coble executed his rollover (never mentioned in the original Complaint) *before filing suit*, as is required.  Mot. 8-9.  Plaintiffs do not even respond to this argument.  Opp. 7.

That leaves only Mr. Harmon.  But Plaintiffs do not address the key deficiency in their pleading:  the Amended Complaint does not assert that Mr. Harmon (or Mr. Coble) rolled over his funds as a result of Fidelity's alleged solicitation—as opposed to voluntarily approaching Fidelity for expert financial advice, as many participants do.  *See* Mot. 9. Plaintiffs thus fail to establish any injury "fairly traceable" *to the alleged ERISA violation*. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Indeed, Plaintiffs fail to establish any injury *at all*.  They argue that Mr. Harmon suffered "reduced returns on his investment and restricted investment opportunity" in his IRA.  Opp. 5.  But the Amended Complaint does not allege that he actually invested the rolled-over funds in a poorer-performing IRA fund than his Plan investments—or even that

---

[3] Indeed, *throughout* their brief Plaintiffs make factual assertions that are not in the Amended Complaint.  *E.g.*, Opp. 10 (asserting, without citation, that Fidelity "cultivate[s] a confidential and intimate relationship" with plan participants).   This would be inappropriate on any motion to dismiss, but it is particularly inappropriate here, because Plaintiffs had—indeed, insisted on—a chance to amend *after* seeing Fidelity's first (substantially identical) motion to dismiss.  ECF No. 70.  Plaintiffs cannot use their brief as the equivalent of a further, unauthorized amendment.

he rolled over his funds to invest them rather than to withdraw them. *See* Mot. 9-10 & n.10. As for the supposed "restricted investment opportunity," Plaintiffs contend that "*if*" Mr. Harmon wants to "invest[] in the same asset-class that he chose in the Plan," the specific fund he chose in the Plan is not available in his IRA. Opp. 7 (emphasis added). That carefully hedged "if" argument alleges only hypothetical harm, not injury-in-fact.[4]

## II.   PARTICIPANT DATA IS NOT A "PLAN ASSET."

Plaintiffs do not meaningfully dispute that their claims against Fidelity fail unless participant data is a plan asset within the meaning of ERISA.[5] As a matter of law, participant data is not a plan asset, and the claims against Fidelity should be dismissed.[6]

### A.   Participant Data Is Not Trust Property Under Common Law.

Plaintiffs do little to explain how their interpretation of the statutory term "plan

---

[4] *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the actual or imminent injury that our cases require"). Neither case Plaintiffs cite holds otherwise. *See Bertulli v. Ind. Ass'n of Continental Pilots*, 242 F.3d 290, 295 (5th Cir. 2001) (deprivation of seniority status is injury); *KVUE, Inc. v. Moore*, 709 F.2d 922, 930 (5th Cir. 1983) (lost revenue is injury).

[5] *See* Mot. 11-12. Plaintiffs suggest in passing that Fidelity could be held liable even if participant data is not a plan asset, because Fidelity acts as a fiduciary by making "recommendations as to purchases and sales of securities" using participant data. Opp. 10. But the Amended Complaint alleges no such thing. Instead, it acknowledges that Fidelity "provides no investment advice" to the Plan. FAC ¶ 140. Plaintiffs also suggest that they could somehow get injunctive relief even if they failed to plead any claim against Fidelity. Opp. 29. They offer no support for that meritless assertion.

[6] Plaintiffs argue (at 7), that this issue should not be decided on a motion to dismiss. But the statutory-interpretation issue presented here—whether participant data is capable of being a plan asset within the meaning of the statute—is a legal question, not a factual one. Moreover, courts regularly analyze plan-asset questions on motions to dismiss. *See, e.g.*, *In re Fidelity ERISA Float Litig.*, 829 F.3d 55, 59 (1st Cir. 2016).

asset" is consistent with ERISA's text and structure. (As explained in Fidelity's Motion, at 12-15, and reiterated *infra*, at 12-14, it is not.) Instead, they argue that the term "plan asset" had an established "common law" meaning in 1974 that ERISA implicitly incorporated, and that the established meaning swept in participant data. Opp. 7-10.

This argument is built on sand. Almost all Plaintiffs' cases are *insurance* cases—no valid guide to the meaning of ERISA. The Supreme Court has looked to the common law *of trusts* to interpret ERISA, but it has not substituted the "common law" *generally* for textual analysis. *See, e.g.*, *Varity Corp. v. Howe*, 516 U.S. 489, 496 (1992) ("we recognize that . . . fiduciary duties [in ERISA] draw much of their content from the common law *of trusts*, the law that governed most benefit plans before ERISA's enactment") (emphasis added); *accord Chamber of Commerce of U.S. v. U.S. Dep't of Labor*, 885 F.3d 360, 370 (5th Cir. 2018). And it certainly has not looked to the common law of insurance. Plaintiffs' cases (Opp. 9-10) examine whether an insurance agent's list of the policies it has issued to customers, "known in insurance circles as 'expirations'," which contain information about the insured party and the terms of the insurance, "constitute a valuable asset of [the] insurance agency" (akin to trade secrets) because they "are more than simply a list of customers"; they carry with them "the exclusive right to use those records to solicit renewals." *Amgro Inc. v. Johnson*, 389 N.E.2d 688, 691 (Ill. App. Ct. 1979). They say nothing about the meaning of the term "plan asset" in ERISA. Indeed, they offer no insight about what assets a trust could even hold at common law.

Plaintiffs cite only one trust case, *In re Arnay's Estate*, 187 N.Y.S.2d 782 (Sur. Ct. N.Y. Co. 1959), and that case does not support their argument. Indeed, the case does not

involve information about trust beneficiaries at all; it involves a business that was *placed in* a trust.  A partner in the business died; his executor sought to sell the partnership stake for the estate's benefit, but to sell the business's customer list (and her own promise not to compete) for her own benefit.  *Id.* at 784-85.  The court held that the "list of customers belonged to the decedent as incidental to his interest in the business," and the executor was "obliged to include [the list] in the sale of the decedent's interest in the business" and "had no right to use the . . . list for her own personal profit."  *Id.* at 788.  The case, then, stands for two uncontroversial propositions:  first, that a customer list has commercial value *to a business*, *see infra*, pp. 9-12 (discussing trade secrets, and distinguishing participant data), and second, that a fiduciary violates her duty of loyalty if she "enter[s] into competition in business with the estate which [s]he represents," or trades upon her position for personal financial gain.  *Id.* at 787-88.  It does not hold that confidential information about a trust's beneficiaries (in that case, the decedent's relatives; here, Plan participants) is a trust asset, and there is no support in trust law for that proposition.

Plaintiffs also argue more generally that, under "century-long" common law, information is capable of being held in trust.  Opp. 17-18.  But, their century-old cases establish no such thing.  *Oliver v. Oliver*, 45 S.E. 232 (Ga. 1903), for example, concerns a director acting as "quasi trustee" for a stockholder, and is cited by a leading trust treatise as an example of a court using "the words 'trust' and 'trustees' in a non-technical sense," Bogert's Trusts and Trustees § 16 (updated June 2020).  *See also Trice v. Comstock*, 121 F. 620 (8th Cir. 1903) (ordering property, not information, be held in equitable trust); *Plant Industries, Inc. v. Coleman*, 287 F. Supp. 636, 642 (C.D. Cal. 1968) (using the phrase "in

trust" in the colloquial sense, i.e., "in confidence"); *Husband C. v. Wife C.*, 391 A.2d 745, 746 (Del. 1978) (no mention of information whatsoever).

That is Plaintiffs' sole attempt to consider trust law; Plaintiffs do not point to a single trust-law source that embraces the supposedly "century-long" established meaning of "plan assets" they advance.  Opp. 17; *see also* Opp. 9.  And it makes perfect sense that Plaintiffs cannot find any:  the point of a trust, under the common law, is to "dispos[e] of" trust assets—*i.e.*, to acquire assets and manage them in a way that maximizes their value, with the financial benefits going to trust beneficiaries.  Restatement (Second) of Trusts § 74, cmt. a (1959).  Plaintiffs' theory is irreconcilable with this foundational concept.  According to Plaintiffs, participant data "is not supposed to be sold for money" and instead should be tucked away until it is returned or destroyed.  Opp. 19.  But a trust is not a safe-deposit box—it is a "method of disposing of property."  Restatement (Second) of Trusts § 74, cmt. a.  Nothing in trust law supports Plaintiffs' novel theory.[7]

## B.    Participant Data Is Not The Plan's Trade Secret.

Without any real support in the common law, Plaintiffs attempt to divert the Court's attention by pointing throughout their brief to cases in which Fidelity has sued former employees of its retail brokerage affiliate, Fidelity Brokerage Services LLC (FBS), for

---

[7] In the Restatement of Trusts and the oft-cited Bogert's Trusts and Trustees, the only references to the use of confidential information indicate that when someone *is already a fiduciary*, the duty of loyalty prevents him from using confidential information he learned in that role to the detriment of beneficiaries.  Restatement (Second) of Trusts § 170, cmt. s; Bogert's Trusts and Trustees § 543 (updated June 2020).  That rule—applied in *Arnay's Estate*—does not support the different proposition that information concerning trust beneficiaries is an asset of the trust.

sharing information about FBS's customers with directly competing brokerage firms, in violation of non-solicitation clauses in the employees' contracts and in violation of statutory and common-law protections for trade secrets.  Opp. 1-2, 11-14, 24-25.

If anything, these cases show why participant data is *not* a plan asset.  As plaintiffs acknowledge, the misappropriated customer information in these cases constituted Fidelity's trade secrets:[8]  Fidelity compiles information about its customer relationships in a database and develops it with call-center notes, FAC ¶ 162; Fidelity preserves the confidentiality of this database, including through litigation against former employees who misappropriate this information, *id.* ¶ 171; and the information has economic value to Fidelity, because it gives Fidelity an advantage over other retail brokerage firms, *id.* ¶ 172. This is the very definition of a trade secret:  information that derives economic value from not being known to competitors and that is subject to reasonable efforts to be kept secret. 18 U.S.C. § 1839(3); Restatement (First) of Torts § 757, cmt. b (1939).

The same is clearly not true of participant data vis-à-vis the Plan.  Plaintiffs do not allege in the Amended Complaint that participant data has any independent economic value to the Plan from being kept secret.  *See Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 266 (5th Cir. 2007) (information is a trade secret only if it is "valuable to [plaintiff's] business").[9]  They do not allege that the Plan could sell the information or use it to make

---

[8] To be clear, the trade-secret cases do not concern Fidelity's retirement plan business or ERISA; rather, Fidelity sought to enjoin former employees of its retail brokerage business from bringing customer information to Fidelity's retail brokerage competitors.  *See, e.g.*, Ex. 1, 2-1; *id*, 2-2 ¶¶ 1-10.

[9] Nor do Plaintiffs allege that data was subject to reasonable efforts to be kept secret; in fact, they allege the opposite, *see* FAC ¶¶ 182, 193, 236.  *See also Ruckelshaus v. Monsanto*

money, or that the information somehow gives the Plan "an advantage over competitors." *Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 926 F. Supp. 2d 935, 948 (S.D. Tex. 2013) (competitive advantage is an element of trade-secret protection). Indeed, a plan is not a commercial enterprise and does not compete with other plans for business.[10]

Thus, while some commercial enterprises may have a property right in customer information,[11] no court has ever treated plans or trusts as holding a property right in their participants' or beneficiaries' personal information. Plans are not competing with other plans to acquire new participants. So the information plans have about their participants does not have any economic value to them. Indeed, Plaintiffs admit as much. *See* Opp. 19 (alleging that participant data "is not supposed to be sold for money").

Of course, the fact that participant data is not a "trade secret"—and is therefore not an asset—does not mean that those who possess it lack any obligation to keep it confidential or limit the ways in which it may be used. As discussed in Fidelity's opening brief, both contracts and privacy laws, along with policies like the Shell Employee Privacy Rules that Plaintiffs cite, are sufficient to ensure that this kind of information is treated

---

*Co.*, 467 U.S. 986, 1002 (1984) (information not a trade secret when it is disclosed "to others who are under no obligation to protect [its] confidentiality").

[10] Plaintiffs rely on *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 873 F. Supp. 2d 1192 (N.D. Cal. 2012), which they claim (at 22) was about a "combination" of information. But they omit why Brocade's "confidential customer-related information" was protected: it had "potential or actual value from not being generally known to the public," and Brocade took "reasonable steps to maintain [its] secrecy." *Id.* at 1213-14.

[11] Outside the trade secret context, courts have held that this kind of information is not property. *See, e.g.*, *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1030 (N.D. Cal. 2012); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1074-75 (N.D. Cal. 2012).

confidentially.  Mot. 24-25.[12]

### C.    Plaintiffs' Theory Is Contradicted by ERISA's Text and Structure, DOL Guidance, and Every ERISA Case To Address It.

Even if Plaintiffs could identify a definition of "asset" in pre-ERISA trust law that supported their argument, ERISA's text and structure would still show that Congress did not adopt that definition in ERISA.  Mot. 12-15; *Varity Corp.*, 516 U.S. at 497.

1.  Plaintiffs do not dispute that ERISA requires all plan assets to be held in trust by a trustee who has exclusive authority to manage and control them (§ 1103(a)) for the exclusive purposes of providing benefits and defraying expenses (§ 1103(c)(1)).  And it requires that those assets be valued and reported to DOL annually.  Mot. 14.  Plaintiffs do not meaningfully dispute that participant data cannot meet these criteria.  Instead, they criticize Fidelity's reliance on the Form 5500, which is filed annually with DOL by all ERISA plans.  Opp. 18-19.  But the language in the Form—and the fact that Plaintiffs identify not a single Form 5500 in which any ERISA plan has ever listed participant data as an asset of the plan—indicates that neither the DOL nor anyone in the industry has ever considered participant data to be a plan asset under ERISA.[13]  If Plaintiffs are right, then both the DOL and millions of ERISA plans have been wrong for decades.

---

[12] Plaintiffs cite Shell's Employee Privacy Rules (at 13), arguing that, because Shell takes steps to keep employee information confidential, participant data is a trade secret belonging to the Plan.  Not only does this argument wrongly equate Shell with the Plan and employee information with Plan information, it also wrongly conflates privacy interests with property rights.

[13] The DOL's Form 5500 is certainly more relevant to the ERISA plan-asset issue than broker-dealer financial statements filed with the SEC.  Opp. 14.

Plaintiffs also argue that, because specific provisions of ERISA (regulating investments) apply to "money or other property," the more general term "plan asset" must be broader—enough to encompass participant data.  Opp. 15-16.[14]  That does not follow. That ERISA refers in places to specific types of traditional assets does not mean that "plan asset" includes anything more than the collection of those traditional assets—in fact, the opposite inference follows.  Similarly, while ERISA recognizes that some plan assets may not have a readily determinable market value, Opp. 16, Fidelity already explained (citing DOL guidance) that this category includes items like collectibles or partnership shares, which can be valued without an active market and are available for distribution to participants.  Mot. 14 n.13.  Participant data does not meet these criteria.

2.  Plaintiffs' plan-asset theory has been consistently rejected by courts and undercut by the DOL. Mot. 16-20.  Plaintiffs' arguments to the contrary are meritless.

First, Plaintiffs attempt to distinguish *Patient Advocates v. Prysunka*, 316 F. Supp. 2d 46 (D. Me. 2004), by noting that it was decided at summary judgment; they suggest that Plaintiffs can overcome it by alleging that participant data is "acquired [by the Plan] for its [financial] value" and is treated "as a plan asset."  Opp. 20.  That is doubly wrong: whether Plaintiffs have pleaded a plan asset is a question of law, not fact, *see* note 6, *supra*, and they have pleaded *no such allegations* anyway.  As for *Divane v. Nw. Univ.*, 2018 WL 2388118 (N.D. Ill. 2018), Plaintiffs argue only that it was wrongly decided.  Opp. 19-20. But they do not identify a single ERISA case supporting their theory.

---

[14] It is far from clear that the term "plan asset" is, in fact, broader than the term "money *or other property*."  To the contrary, these two phrases seem synonymous.

Second, Plaintiffs argue that Fidelity's reliance on DOL guidance regarding "cross-selling," Mot. 17, is "misplaced" because "[w]ithin the context of the regulation, the cross-selling to which DOL refers is limited to the circumstance in which *the participant* has provided the adviser the participant's personal financial information at the adviser's request." Opp. 21. The regulation says no such thing. To the contrary, it states that an adviser is not precluded from "taking into account additional information that a *plan . . . may provide*." 29 C.F.R. § 2550.408g-1(b)(3)(i)(C) (emphasis added).

3. Plaintiffs' theory would lead to a host of practical problems that Congress could not have intended when enacting ERISA: it would turn service providers into fiduciaries when they use participant data to defend lawsuits like this one, and it would preclude plan fiduciaries from sharing participant data with consultants and state governments—sharing that benefits everyone. Mot. 20-25. Plaintiffs have not meaningfully addressed these consequences of their theory, much less resolved them.[15]

## III.   THE PROHIBITED-TRANSACTION CLAIM FAILS.

Plaintiffs abandon any argument that *Shell* is the relevant fiduciary for Count VII; they argue only that FIIOC engaged in a prohibited transaction when it transferred participant data to the Fidelity Retail Entities. Opp. 28. This argument still fails.

---

[15] Plaintiffs also take issue with Fidelity's reference to the Gramm-Leach Bliley Act, arguing that it is "not applicable to this action." Opp. 23. To be sure, the text and structure of ERISA are sufficient to reject Plaintiffs' theory. But Plaintiffs ignore Fidelity's point: in considering whether Congress implicitly designated financial data as property when it passed ERISA, it is certainly relevant that another federal statute treats comparable consumer financial data as something entitled to privacy protections—but not property rights—and that it allows firms to share this customer data with their affiliates for marketing purposes, as Fidelity is alleged to have done here. Mot. 20.

First, to establish that the Fidelity Retail Entities are parties in interest under 29 U.S.C. § 1002(14)(I), Plaintiffs argue that they are "joint venturers" that "share 10% or more capital" with FIIOC. Opp. 26-27. But the Amended Complaint contains no such allegation; it alleges only that the Retail Entities "share 10 percent or more *in profits* with *FMR LLC*, and *therefore indirectly* with FIIOC." FAC ¶ 254 (emphasis added). And Plaintiffs make no effort to defend the proposition that having a common parent amounts to sharing profits, thereby satisfying § 1002(14)(I).[16]

Second, to establish § 1106's "knowledge" requirement, Plaintiffs argue that the litany of trade secret cases Fidelity has filed demonstrates Fidelity's knowledge that participant data was a plan asset. Opp. 29. But those cases are irrelevant to Fidelity's knowledge on the plan asset issue; as discussed earlier, they do not involve ERISA or plan assets. And every court to have considered the plan-asset question has held that participant data is *not* a plan asset under ERISA. Mot. 16-17, 30. Plaintiffs' suggestion that Fidelity somehow knew these courts were wrong is absurd.

## **CONCLUSION**

The Court should dismiss the claims against Fidelity.

---

[16] Plaintiffs fail in yet another attempt to amend-by-briefing (*see* note 3, *supra*) to establish sharing of capital. Opp. 26-27. Information, employees, and office space are not "capital." *See* Black's Law Dictionary, "Capital" (11th ed. 2019) ("Money or assets invested, or available for investment, in a business."). Plaintiffs are also wrong that the Retail Entities may be held liable under Count VII as "knowing recipients of ill-gotten plan assets," even if they are not parties in interest. *See* Opp. 28 n.15. Count VII is not asserted against the Retail Entities. Also, if the Retail Entities are not parties in interest, then there is no prohibited transaction transferring plan assets to "a party in interest," 29 U.S.C. § 1106(a)(1)(D), and no "ill-gotten plan assets" for which they may be held liable.

DATED:  July 13, 2020

Respectfully submitted,

/s/ Noelle M. Reed

Noelle M. Reed
Attorney-In-Charge
Federal Bar No. 27139
State Bar No. 24044211
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1000 Louisiana Street, Suite 6800
Houston, Texas 77002
Tel.: (713) 655-5122
Fax.: (713) 483-9122
Email:  noelle.reed@skadden.com

*Of Counsel:*

James R. Carroll (*pro hac vice*)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
Tel.: (617) 573-4800
Fax.: (617) 573-4822
Email: james.carroll@skadden.com

*Attorney-In-Charge for Defendants
Fidelity Investments Institutional Operations
Company, Inc., FMR LLC, Fidelity
Brokerage Services LLC, Fidelity Personal
and Workplace Advisors LLC, Fidelity
Investments Life Insurance Company, and
Fidelity Personal Trust Company, FSB*

Alison V. Douglass (*pro hac vice*)
Edwina B. Clarke (*pro hac vice*)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, Massachusetts 02210
Tel.: (617) 570-1000
Fax.: (617) 523-1231
Email: adouglass@goodwinlaw.com
Email: eclarke@goodwinlaw.com

William M. Jay (*pro hac vice*)
Jaime A. Santos (*pro hac vice*)
GOODWIN PROCTER LLP
1900 N Street NW
Washington, District of Columbia 20036
Tel.: (202) 346-4000
Fax.: (202) 346-4444
Email: wjay@goodwinlaw.com
Email: jsantos@goodwinlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing reply brief was filed electronically with the United States District Court for the Southern District of Texas through the Court's ECF System on this date.  The Notice of Electronic Filing constitutes service on all parties under Local Rule 5.1.

Dated: July 13, 2020                            <u>*/s/ Noelle M. Reed*</u>
                                                 Noelle M. Reed