IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| CHARLES HARMON et al., | |
| *Plaintiffs*, | |
| v. | Civil Action No. 3:20-cv-00021 |
| SHELL OIL COMPANY et al., | |
| *Defendants*. | ORAL ARGUMENT REQUESTED |

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT**

\*Jerome J. Schlichter, Esq., Attorney-in-Charge
(Missouri Bar #32225)
\*Michael A. Wolff, Esq., of counsel
(Missouri Bar #38207)
\*Sean E. Soyars, Esq., of counsel
(Missouri Bar #57317)
\*Joel D. Rohlf, Esq., of counsel
(Missouri Bar #67540)
SCHLICHTER BOGARD & DENTON, LLP
100 South Fourth Street, Suite 1200
St. Louis, Missouri 63102
Telephone: (314) 621-6115
Facsimile: (314) 621-5934
jschlichter@uselaws.com
mwolff@uselaws.com
ssoyars@uselaws.com
jrohlf@uselaws.com
*\*Admitted Pro Hac Vice
Attorneys for Plaintiffs*

Robert M. Tramuto, of counsel
Texas Bar #20186300
S.D. Texas Bar #6863
Jones Granger
10000 Memorial Drive
Suite 888
P.O. Box 4340
Houston, TX 77210
Telephone: (713) 668-0230
Facsimile: (713) 956-7139
btra@jonesgranger.com
*Local Counsel for Plaintiffs*

## TABLE OF CONTENTS

ARGUMENT .................................................................................................................... 1

    1.   The "prudence" of Shell's belief that it had no duty to monitor is irrelevant to the issue presented, and it was not even prudent. .................................................... 2

    2.   Proving other fiduciaries monitored Tier III investments is not required to determine that Shell owed a duty to monitor. ......................................................... 5

    3.   The Tier III investments were designated investment alternatives. ........................ 9

    4.   Shell did not prudently decide to keep Tier III in the Plan. ................................. 12

    5.   The Plan suffered losses from Tier III. ................................................................ 14

CONCLUSION ............................................................................................................... 15

## Table of Authorities

**Cases**

*Clark v. Feder Semo & Bard, P.C.*,
  739 F.3d 28 (D.C. Cir. 2014) ............................................................................... 4

*DiFelice v. U.S. Airways, Inc.*,
  497 F.3d 410 (4th Cir. 2007) ............................................................................... 4

*Donovan v. Cunningham*,
  716 F.2d 1455 (5th Cir. 1983) ............................................................................. 3

*George v. Kraft Foods Global, Inc.*,
  641 F.3d 786 (7th Cir. 2011) ............................................................................. 13

*Hecker v. Deere & Co.*,
  569 F.3d 708 (7th Cir. 2009) ............................................................................. 13

*Kopp v. Klein*,
  894 F.3d 214 (5th Cir. 2018) ............................................................................. 12

*Moitoso v. FMR LLC*,
  451 F. Supp. 3d 189 (D. Mass. 2020) ............................................................... 12

*Sweda v. Univ. of Pa.*,
  923 F.3d 320 (3d Cir. 2019) ............................................................................... 3

**Statutes**

29 U.S.C. §1110(a) ............................................................................................... 12

**Regulations**

29 C.F.R. §2550.404a-1 (2021) ........................................................................ 9, 14

**Other Authorities**

Field Assistance Bulletin 2012-02 (May 7, 2012) (superseded), available at
  https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2012-02 ............................................................................. 10

Field Assistance Bulletin 2012-02R (July 30, 2012), available at
  https://www.dol.gov/sites/dolgov/files/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2012-02r.pdf ................................... 10, 11

Financial Factors in Selecting Plan Investments, 85 Fed. Reg. 72846 (November 13, 2020) ................................................................................................................. 9

## ARGUMENT

Shell does not dispute that it controlled what investments were included in Tier III.[1] Shell also does not dispute that its disclaimers are ineffective to avoid liability if Shell had a duty to monitor the prudence of each Tier III investment.[2]

Shell contends that it is not liable for failing to monitor the Tier III investments because it "prudently" determined that it had no such duty.[3] That misapplies the law. ERISA does not exonerate fiduciaries who fail to perform their duty because they acted in good faith. It also is factually baseless because Shell does not show that the Plan fiduciaries actually relied on the 2004 V&E letter in and after 2014 or obtained an updated opinion letter based on the current facts and law that had changed significantly since 2004.

Shell next contends that it cannot be liable for failing to monitor the Tier III investments without proof that other fiduciaries monitored their Tier III investments.[4] That argument also misapplies the law. Consideration of prevailing standards among prudent fiduciaries in *discharging* their duty to monitor for prudence does not apply to the legal issue whether the fiduciaries *had* a duty to monitor. The argument also is based on two erroneous factual premises—that there were thousands of plans with Tier IIIs and that Tier III was the same as a brokerage window. In fact, Tier III was rare and obsolete. It was not like a brokerage window because Shell controlled what funds were included in

---

[1] Pla. Motion For Partial Summary Judgment (Doc. 202) ("Mot.") at 9–10 (Argument 1). All brief page references are to the brief footer page number.
[2] *Id*. at 28–30 (Argument 4).
[3] Def. Opposition (Doc. 212) ("Opp'n") at 3–9 (Argument I).
[4] *Id*. at 9–12 (Argument II).

1

Tier III and Shell specifically identified and described for participants the investment options included in Tier III. Moreover, Fidelity told Shell it had to monitor the Tier III options.

In arguing it had no duty to monitor the prudence of each investment option in Tier III, Shell erroneously contends that the options were not designated investment alternatives because Shell said so, entirely ignoring the effect of its selecting and specifically identifying the options—designating them—for participants.[5] Shell's argument that it engaged in a prudent process in deciding whether to keep Tier III as a whole in the Plan is contrary to the facts, as well as irrelevant to the issue presented. Shell's argument that the Plan suffered no loss from the inclusion of Tier III is contrary to the facts and based on an invalid theory of damages.[6]

The Court should grant Plaintiffs summary judgment as to liability on Count II.

**1.      The "prudence" of Shell's belief that it had no duty to monitor is irrelevant to the issue presented, and it was not even prudent.**

Whether fiduciaries engaged in a prudent process is a question of *how* the fiduciaries discharged their duties, not *whether* they had a duty, which is the issue presented here.[7] Whether Shell "honestly" believed it had no duty or even "came to a reasoned decision" that it had no duty is not relevant because Shell's state of mind is not relevant. "The law expects more than good intentions." *Sweda v. Univ. of Pa.*, 923 F.3d 320, 329 (3d Cir.

---

[5] *Id.* at 12–24 (Argument III.A–B).
[6] *Id.* at 24–27 (Arguments III.C and IV)
[7] 29 U.S.C. §1104(a)(1)(B) ("a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and... with the care, skill, prudence, and diligence...") (emphasis added).

2

2019). A "pure heart and an empty head are not enough." *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983).

Shell also provides no evidence that the Plan Trustees relied on the 2004 V&E letter in continuing not to monitor the Tier III investment options. Only Shell's lawyers provided conclusory assertions of *their* opinions that the investment options in Tier III did not require fiduciary monitoring or due diligence.[8] Shell erroneously claims that Jim Smith, not a Trustee, "revisited" the letter in 2016 and that Shell's counsel "reviewed" the letter in 2018, but its exhibits show no such revisiting or review. They show only that Eric Perry emailed the letter to Smith in 2016 and that Perry sent the letter to Shell's Senior Counsel in 2018.[9] Neither of those recipients presented the letter to or discussed it with the Trustees and neither of them have testified they actually reviewed or relied on that letter. Shell's counsel did not rely on the letter for the advice he gave to the Trustees in or after 2014, because he did not even have the letter.[10]

The fact that the 2004 V&E letter was never presented to the Trustees in or after 2014 shows the Trustees never relied on it. That alone distinguishes the two cases Shell cites in support of its contention that the letter excuses their breach of duty.[11] In those

---

[8] Mot. at 7 n.34; Exhibit 31 (Doc. 204-20). Shell's deposition testimony does not prove otherwise. Trustee Susan Ward could not recall who provided this advice or the substance of that advice and referred instead to the minutes of the Trustee and Investment Committee meetings, which do not show any advice from V&E. Exhibit 34, 94:15–96:7. Mr. Perry, who was not a Trustee, relied on his own reading of the regulations and Shell's counsel. Ex. B (Doc. 212-3).

[9] Exs. C & D (Docs. 212-4, 212-5); *cf.* Opp'n at 6.

[10] Ex. D at 2 ("Could you send me a copy of the old law firm memo on Tier III? I am having trouble locating it."). Smith apparently did not have the letter either. Ex. C. Exhibit page references are to the ECF header page number.

[11] *Cf.* Opp'n at 6–7.

3

cases, the fiduciaries actually relied on the advice of their attorneys in deciding how much a participant should receive from a terminated retirement plan, *Clark v. Feder Semo & Bard, P.C.*, 739 F.3d 28, 32 (D.C. Cir. 2014), and in deciding to retain publicly traded employer stock as a plan investment option despite its collapsing price, *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 421 (4th Cir. 2007). Those cases concerned legal opinions obtained *contemporaneously* with the fiduciary decision based on the facts and law as they existed *at that time*. The 2004 V&E letter was based on facts and law that existed ten years before the fiduciary decision in question here, which were far different from the facts and law in 2014. Moreover, those opinions were definite. V&E's opinion was conditional.[12]

Those cases also concerned legal opinions about the application of the law to the facts confronting the fiduciaries in *discharging* their fiduciary duties, not legal opinions about whether the fiduciaries *had* any duty. Shell cites no case in which a fiduciary was excused from a breach of a duty under ERISA because the fiduciary had obtained a legal opinion that it had no such duty, particularly when that legal opinion concerned a different set of facts and law.[13]

Shell cannot claim it "prudently" or in good faith believed it owed no duty because it did not even get an updated opinion letter from V&E in light of all the factual and legal

---

[12] Mot. at 26, Ex. 33 at 5 (Doc. 204-22) ("a cogent argument can be made").

[13] *See* Mot. at 25–28 (noting difference in facts and law from 2004 to 2014). Shell could have sought an opinion from DOL on its duty to monitor the Tier III investments. *See* ERISA Procedure 76-1, https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/advisory-opinions/filing-requests-for-erisa-aos. But Shell did not.

4

changes that had occurred from 2004 to 2014. One fact on which V&E based its opinion was that the Plan did not have a brokerage window and that the precursor to Tier III that V&E examined was the only administratively feasible means to provide expanded investment options.[14] That clearly was not so once the Tier IV brokerage window was added after 2004.

Another fact that V&E did not address was Fidelity's repeated warning that the Tier III funds *were* designated investment alternatives and had to be monitored.[15] Shell disparages that as coming from "outside consultants" and "non-lawyer service providers" unsuited to interpret the law.[16] Fidelity was not merely the Plan's recordkeeper, *it was the provider* of the Tier III investment options.[17] Certainly, Fidelity based that warning on its own legal research. Any diligent fiduciary would have reconsidered whether V&E's opinion from ten years ago was still valid and at least asked V&E to issue a new opinion letter addressing Fidelity's advice, as well as all of the changes in the Plan and the law over the past decade. That Shell did not undermines its claim of good faith or prudent conduct.

2. **Proving other fiduciaries monitored Tier III investments is not required to determine that Shell owed a duty to monitor.**

As stated above, the prevailing standards applied among prudent fiduciaries in

---

[14] Mot. at 26–27. V&E also assumed Fidelity controlled what investments were in Tier III. *Id.* at 27–28. Shell, in fact, controlled what investments were included. Mot. at 9–10.

[15] *Id.* at 8.

[16] Opp'n at 8–9.

[17] Ex. 1 at 38 (§8.1(a)) (Doc. 202-2); Ex. 5 at 60. The other "outside consultant" was Russell Investments, who Shell hired *specifically* to advise it on the Plan's investment structure, including what to do with Tier III. Mot. at 8; Ex. 26 (Doc. 204-15); Shell Motion for Summary Judgment at 8 (Doc. 207) ("Shell Mot.").

*discharging* their duties is irrelevant to the legal determination of whether fiduciaries *owe* a duty. Even if proof that prudent fiduciaries did monitor investment options like Tier III were required, that is proven by Fidelity's repeated alerts to Shell that it had to monitor the prudence of the funds in Tier III, as well as the warning from Russell Investments.[18] Since Fidelity was the provider of the Tier III investments, its warning that Shell had to monitor the investments is ample evidence of the industry standard (as well as a correct interpretation of the law).

While Shell claims "thousands of fiduciaries" offered mutual fund windows on Fidelity's recordkeeping platform, its exhibit does not show that.[19] Instead, it shows that only **22** out of 30,424 Fidelity plans (0.1%) had over 300 funds (presuming that indicates plans with a mutual fund window like Tier III). And that number steadily declined over time. Not only is that not "thousands," it shows Tier III was not an "industry standard." Moreover, that exhibit does not indicate any of those 22 plans did not monitor the investments, which Fidelity told Shell (and likely all its clients) that it had to do.

Shell recognized that its Tier III was unusual and rare. One consultant told Shell that the Plan's mutual fund window was "unique and not offered to new clients."[20] Shell admitted that "very few plans use a Mutual Fund window" like Tier III.[21] Shell also recognized in 2011 that the Plan was "unusual" in having both Tier III and Tier IV and

---

[18] Mot. at 8.
[19] Shell Ex. 39 at 2, Doc. 206-17; *cf.* Opp'n at 10.
[20] Shell Ex. 24 (Doc. 207-25) at 8.
[21] Ex. 35 at 1.

6

that only 8% of Fidelity's clients even used a mutual fund window.[22]

Contrary to Shell's assertion, DOL did *not* recognize that it is common practice among plan fiduciaries not to "engage in a deliberative process to affirmatively review and select each of the investment options available through brokerage windows." *Cf.* Mot. 10. What DOL *in fact* stated is:

> Other articles, however, counter that brokerage windows may present undue risks for many retirement plan participants, because plan fiduciaries do not engage in a deliberative process to affirmatively review and select each of the investment options available through brokerage windows.[23]

DOL did not define "brokerage windows" to include "limited mutual fund windows or 'supermarkets'" of less than all of the mutual funds in the market. DOL said only that "*may be* encompassed by the terms 'brokerage window,' 'self-directed brokerage account,' and similar arrangements."[24] DOL requested information on how to define "brokerage window" and how ERISA's fiduciary standards should apply to, and whether they should vary as to, different types of brokerage windows.[25] DOL even asked whether, in light of its revision of FAB 2012-02, there was a need to clarify the extent of a fiduciary's duties of prudence and loyalty regarding the investments available in a brokerage window.[26] DOL did not recognize that structures like Tier III are similar to brokerage windows or that it was common practice for fiduciaries not to monitor the

---

[22] Shell Ex. 44 at 16 (Doc. 206-21). *See also* Ex. B, 58:7–15 (Tier III was a "legacy of Fidelity's old architecture").
[23] Request for Information Regarding Standards for Brokerage Windows in Participant-Directed Individual Account Plans, 79 Fed. Reg. 49469, 49471 (Aug. 21, 2014); Ex. E at 4 (first column) (Doc. 212-6). *Cf.* Opp'n at 10.
[24] 79 Fed. Reg. at 49471; Ex. E at 4 (second column) (emphasis added).
[25] *Id.*, Questions 1–3.
[26] *Id.* at 49473; Ex. E at 6, Question 37.

7

prudence of investments in structures like Tier III. At best, DOL raised questions about that. Shell does not identify any response to DOL's request that supports Shell's contentions.[27] Furthermore, Shell selected the funds that were included in Tier III (including non-mutual fund collective investment trusts) and specifically identified the funds for participants.[28] Since that makes the Tier III funds designated investment alternatives, a structure like Tier III is not what DOL is referring to (a brokerage window, even limited to mutual funds, where the fiduciaries do not identify the investments in the window).

Shell's reliance on the opinion of Pete Swisher is misplaced because he admitted that he does not personally know of any plan that used a structure like Tier III.[29] The "mutual fund window" Mr. Swisher refers to in his report is a brokerage window limited to mutual funds.[30] He is not referring to a structure like Tier III in which the investments are designated and categorized for participants. The distinction between brokerage windows (even if limited to mutual funds) and designated investments like Tier III is important. Brokerage windows, like Tier IV, require the opening of separate brokerage accounts and have additional fees and limitations on fund transfers.[31] The investment options available in brokerage windows are not identified or classified for participants

---

[27] DOL has issued no guidance or regulation in response to this Request.
[28] Mot. at 3–7, 16–17. Perry's opinion that *Fidelity* selected the funds (Opp'n at 17) is not based on personal knowledge and directly contradicts the undisputed evidence, including the Plan's Recordkeeping Agreement with Fidelity. Mot. at 3–4, 7.
[29] Exhibit 36 at 2 (90:4–13).
[30] Exhibit 38 at 8–11.
[31] Mot. at 5–6.

8

and the plan fiduciaries do not select what is included in the brokerage window. The investments in Tier III were so designated and Shell selected the funds included in Tier III.[32] Mr. Swisher's opinions about brokerage windows limited to mutual funds (his "mutual fund window") where the investments are not identified for and described to participants, has nothing to do with the Plan's Tier III.[33]

3.  **The Tier III investments were designated investment alternatives.**

Shell bases its contention that DOL limits the duty to monitor to designated investment alternatives on a misapplication of 29 C.F.R. §2550.404a-1 (2021) . That regulation was not promulgated until November 13, 2020 and addresses only "investments made and investment courses of action taken after January 12, 2021."[34] Shell removed Tier III at the end of September 2020. The 2021 regulation does not apply to Shell's conduct. The regulation also focuses on the use of non-pecuniary goals (particularly ESG) in selecting or retaining plan investment options,[35] which is not at issue here. Moreover, DOL's definition of "designated investment alternative" is the same as it always has been, that which is "specifically identified as available under the plan."[36] So even if the new regulation had limited the duty of prudent monitoring to designated investment alternatives in 2014, the Tier III investments were designated

---

[32] *Id*. at 5–7, 17–19.
[33] *See* Exhibit 38 at 8–11 (explaining Swisher confusion of terms). Mr. Stone has far more experience with defined contribution plans than Mr. Swisher. Ex. 37 at 5–9. *See also* Ex. 40 at 6–10.
[34] Financial Factors in Selecting Plan Investments, 85 Fed. Reg. 72846, 72885 (November 13, 2020); 29 C.F.R. §2500.404a-1(c) (2021).
[35] 85 Fed. Reg. at 72846, 72847–49.
[36] *Id.* at 72866.

9

because Shell selected them and specifically identified them for participants.

Shell's attempt to equate Tier III with a brokerage window (which was Tier IV) fails for not addressing this key feature that makes an investment option a *designated* investment alternative—being specifically identified to participants as an investment alternative. Brokerage window investment options (or similar arrangements) are not specifically identified to plan participants. The Tier III investment options were.

Shell incorrectly argues that the revision of FAB 2012-02 had an effect on a fiduciary's duty to "oversee" or "monitor" plan investment options.[37] Both bulletins state that they concern only "participant-level disclosure regulation" in 29 C.F.R. §2550.404a-5.[38] The text of the bulletins also does not refer to oversight or monitoring. However, as to what constitutes a "designated investment alternative" for which the participant-level disclosures must be made, the bulletins consistently state that they are investment options specifically identified as available in the plan.[39] The bulletins make no distinction as to whether the designated investment alternatives are in a brokerage window or not. Shell does not address the actual text of the bulletins (or the similar text in the DOL regulations) that focus on *specifically identifying* as being what constitutes designating.[40]

Shell attempts to diminish the effect of its specific identification of the Tier III

---

[37] Opp'n at 14–16.
[38] FAB 2012-02 at 1, FAB 2012-02R at 1 ("Background").
[39] Mot. at 20–23.
[40] Mr. Swisher's contrary interpretation contradicts the bulletins themselves and is not based on personal knowledge. He did not participate in any discussions with DOL about this and could not recall details that would indicate he has any foundation for this opinion. Ex. 36 at 3–9 (162:13–165:1, 165:24–168:1). Mr. Swisher's opinion about whether Shell had a duty to monitor the investments in Tier III should carry little weight because he did not even know Fidelity told Shell it had to monitor them. *Id.* at 10–11 (193:18–194:1).

investments by contending that was only in "certain Plan documents."[41] Those "certain Plan documents" were "Your Guide To The Shell Provident Fund" and the Disclosures required under the 404a-5 participant-level disclosure regulation (Exs. 5–9). These are the very documents by which Shell informed participants what investments were in the Plan.

Shell refers instead to its 2019 Summary Plan Description (SPD), but that document provides only a cursory description of Plan investments and does not even describe all of the investment options in the Plan.[42] For Tier II, which had twenty investment options, the SPD identifies only two.[43] In terms of identifying Plan investment options for the participants, the Guides and Disclosures are the relevant documents, not the SPD.[44]

Shell essentially contends that what constitutes a designated investment alternative is merely a matter of labeling. That interpretation has no support in the regulations and other DOL guidance, which repeatedly state that designating is a matter of deeds—specifically identifying investment options for participants—not words. Allowing a fiduciary to avoid responsibility for designated investment options merely because a fiduciary labels them "non-DIA investment options" is contrary to ERISA (29 U.S.C.

---

[41] Opp'n at 22.
[42] Shell Ex. 1, Doc. 207-2; Opp'n at 23.
[43] Shell Ex. 1 at 17; *cf.* Ex. 5 at 35–58, Ex. 8 at 8–10 (detailed descriptions of the Tier II funds).
[44] *See* Mot. at 18–19 (noting how Disclosures identify the Tier III investment options "in the Plan" and Tier IV providing access to investments "beyond those offered by the Plan"). Shell's reference to Q-28 of FAB 2012-02R is misplaced because that Question concerns "model portfolios"—different combinations of designated investment options—which is not the issue here. *Cf.* Opp'n at 24. As the Answer notes, if the model portfolio includes investment not designated in the plan, then the model portfolios *are* designated investment alternatives because they are specifically identified for the participants.

11

§1110(a), Mot. at 28–30) and undermines ERISA's primary purpose of protecting plan participants (*Kopp v. Klein*, 894 F.3d 214, 219 (5th Cir. 2018)).

The differences Shell notes between this case and *Moitoso* are outweighed by the more substantive similarities.[45] While the court expressed concern about allowing Fidelity to avoid responsibility over its proprietary mutual funds, that was not the driving factor of the court's decision. The court noted there were, apart from that, "already ample indicia that the offering of proprietary funds was not 'similar' to a self-directed brokerage window" that supported its conclusion that the funds were designated investment alternatives. *Moitoso v. FMR LLC*, 451 F. Supp. 3d 189, 210 (D. Mass. 2020).

### 4.     Shell did not prudently decide to keep Tier III in the Plan.

Whether Shell engaged in a prudent process to monitor Tier III as a whole has no bearing on its liability for failing to monitor the prudence of each investment option in Tier III.[46] Moreover, Shell did not act prudently even as to Tier III as a whole.

The Plan Trustees were informed by the asset managers of Shell's $11 billion dollar pension plan (Shell Asset Management (SAM)) that numerous studies had consistently shown that actively managed funds fail to outperform index funds, which Shell Asset Management confirmed from its own experience in the pension plan.[47] Consequently, Shell Asset Management recommended, and the Trustees agreed, to use only passive index investments in the pension plan. A diligent fiduciary would have applied that same

---

[45] Opp'n at 18–19; *cf.* Mot. at 23–25.
[46] *Cf.* Opp'n at 24–25.
[47] Exhibit 41 at 50–60. Ex. 42 at 52–60.

experience to the Plan, since it would be exceedingly unlikely any Plan participant, much less a significant number of Plan participants, would be more successful in finding outperforming actively managed mutual funds than Shell's own manager of its $11 billion pension plan.[48] Yet, the Trustees never addressed that issue, much less came to a reasoned decision considering the relevant factors for continuing to offer actively managed mutual funds through Tier III. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 796 (7th Cir. 2011) ("balance the relevant factors and make a reasoned decision as to the preferred course of action").

The Trustees never determined how the excess of funds in Tier III provided any benefit under prevailing standards for plan investment menus when Tiers I and II already covered the range of risks and returns for any participant to build a prudent portfolio to fit any unique need.[49] The Trustees did not address why it was prudent to pay plan administrative expenses through revenue sharing from certain mutual funds in Tier III (including paying Shell itself) without disclosing to participants which funds paid the revenue sharing.[50] The Trustees provided no good reason for rejecting Russell Investments' advice—the same advice given all three times Russell was asked—to remove Tier III because it was duplicative, added no value, and was confusing.[51] The Trustees provided no reasons why they retained Tier III investment options that even

---

[48] Leaving it to the participants to find the prudent investments in a mass of options is an obvious and reckless breach in any case. *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009).
[49] Exhibit 43 at 18–23; Exhibit 44 at 3–6; Ex. 37 at 15–47.
[50] Ex. 37 at 45–47.
[51] Exhibit 45 SHELL0002512 at 1–2.

13

their Tier-as-a-whole analysis revealed were more expensive or worse performing than the bottom half of their categories.[52] The Trustees provided no reasons why they retained index funds in Tier III that already existed in Tier II, but were more expensive and worse performing.[53] The only explanation Shell provided was that is "the fallout of how the mutual fund window was constructed and managed[.]"[54]

The Court cannot conclude Shell prudently monitored Tier III as a whole.

### 5. The Plan suffered losses from Tier III.

Shell's contention that the Plan suffered no loss from Tier III is based on a comparison of the performance of each Tier III fund to the median return of all other funds in each fund's peer group.[55] Shell does not explain why that is an appropriate measurement of Plan losses. It assumes that every single investment option in Tier III would have been retained in the Plan without explaining how that could be prudent.[56]

Shell's theory of damages does not fit with its liability. The facts show: (1) providing such an excess of investment options was unnecessary for providing participants a sufficient range of options to build prudent investment portfolios, was contrary to prevailing standards of plan investment menu construction, and was harmful to participants; (2) Tier III included funds that were duplicative but worse than funds that

---

[52] *See, e.g.*, Ex. 68 at 4–6 (funds above 50% line, Ex. 69 (funds below 50% line); Exhibit 46 at 2 (85:4–12) (50% line important).
[53] Ex. 46 at 3 (104:12–24); Ex. 37 at 29–36.
[54] Ex. 46 at 3 (104:17–19).
[55] Shell Ex. 57 at 5 (¶98) (Doc. 206-24).
[56] *Cf.* 29 C.F.R. §2550.404a-1(b) (2014) (requiring consideration of risk and return as part of the entire portfolio); Ex. 43, Ex. 44 at 3–6 (explaining that Tier III funds provided no beneficial risk and return characteristics to Tiers I and II); Ex. 38 at 8 (explaining error of Shell's damages theory).

14

already were in Tiers I and II, had insufficient performance histories, and were not suitable for defined contribution plans; (3) it would have been impossible for a prudent fiduciary applying prevailing investment standards to monitor the prudence of each fund in Tier III, just as it would have been impossible for participants to determine which of those funds were appropriate for their own investment portfolios; and (4) the prudent alternatives to the Tier III funds for calculating Plan losses from Shell's breach are their counterparts in Tiers I and II of the same characteristics.[57] The passive investments in Tiers I and II are the prudent alternatives to Tier III also because Shell's own investment expert—Shell Asset Management—informed the Trustees that actively managed funds are imprudent and should be replaced by passive investments.[58] Just as Shell stopped using actively managed funds in its pension plan, so should it have removed Tier III, which was mostly actively managed funds. Participants then would have allocated their retirement savings among the Tier I and II funds with the same characteristics (but better performance). Failing to do so cost the Plan $684,042,902 in losses.[59] That shows a prima facie case of loss to the Plan.

## CONCLUSION

Shell has not shown why it did not owe a duty to monitor the prudence of each Tier III investment option or why it is not liable under Count II for failing to do so. Therefore, the Court should grant Plaintiffs' motion.

---

[57] Ex. 37 at 15–49; Ex. 43; Ex. 39 at 8–28.
[58] Ex. 37 at 39–43; Ex. 43 at 15–18; Ex. 41 at 50–60; Ex. 42 at 52–60.
[59] Exhibit 47 at 8, ¶21.

Respectfully submitted,

September 13, 2022

By: */s/ Jerome J. Schlichter*
\*Jerome J. Schlichter, Esq., Attorney-in-Charge
(Missouri Bar #32225)
\*Michael A. Wolff, Esq., of counsel
(Missouri Bar #38207)
\*Sean E. Soyars, Esq., of counsel
(Missouri Bar #57317)
\*Joel D. Rohlf, Esq., of counsel
(Missouri Bar #67540)
SCHLICHTER BOGARD & DENTON, LLP
100 South Fourth Street, Suite 1200
St. Louis, Missouri 63102
Telephone: (314) 621-6115
Facsimile: (314) 621-5934
jschlichter@uselaws.com
mwolff@uselaws.com
ssoyars@uselaws.com
jrohlf@uselaws.com
*\*Admitted Pro Hac Vice*
*Attorneys for Plaintiffs*

Robert M. Tramuto, of counsel
Texas Bar #20186300
S.D. Texas Bar #6863
Jones Granger
10000 Memorial Drive
Suite 888
P.O. Box 4340
Houston, TX 77210
Telephone: (713) 668-0230
Facsimile: (713) 956-7139
btra@jonesgranger.com
*Local Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I certify that on September 13, 2022, I electronically filed the foregoing using the court's CM/ECF system, which will send notification of such filing at all counsel of record.

>   */s/ Jerome J. Schlichter*
>   Jerome J. Schlichter
>   Attorney-in-Charge for Plaintiffs