## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | |
|---|---|
| CHARLES HARMON et al., | |
| *Plaintiffs*, | |
| v. | Civil Action No. 3:20-cv-00021 |
| SHELL OIL COMPANY et al., | |
| *Defendants*. | ORAL ARGUMENT REQUESTED |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

*Jerome J. Schlichter, Esq., Attorney-in-Charge
(Missouri Bar #32225)
*Michael A. Wolff, Esq., of counsel
(Missouri Bar #38207)
*Sean E. Soyars, Esq., of counsel
(Missouri Bar #57317)
*Joel D. Rohlf, Esq., of counsel
(Missouri Bar #67540)
SCHLICHTER BOGARD & DENTON, LLP
100 South Fourth Street, Suite 1200
St. Louis, Missouri 63102
Telephone: (314) 621-6115
Facsimile: (314) 621-5934
jschlichter@uselaws.com
mwolff@uselaws.com
ssoyars@uselaws.com
jrohlf@uselaws.com
*Admitted Pro Hac Vice
Attorneys for Plaintiffs*

Robert M. Tramuto, of counsel
Texas Bar #20186300
S.D. Texas Bar #6863
Jones Granger
10000 Memorial Drive
Suite 888
P.O. Box 4340
Houston, TX 77210
Telephone: (713) 668-0230
Facsimile: (713) 956-7139
btra@jonesgranger.com
*Local Counsel for Plaintiffs*

Table of Contents

I.    Legal Principles ..................................................................................... 1

II.   Shell's imprudence caused the plan to pay excessive recordkeeping Fees ............... 3

    A.   The Plan paid more than $30 per-participant for recordkeeping ...................... 3

    B.   Shell breached its fiduciary duties by failing to adequately control
         recordkeeping expenses .......................................................... 6

        1.   Industry-accepted practices for monitoring recordkeeping fees .............. 7

        2.   Shell failed to follow prudent practices in monitoring the Plan's
             recordkeeping fees ......................................................... 8

            a.   Shell never conducted a request for proposal (RFP) ..................... 8

            b.   Shell failed to consider revenue sharing ......................... 10

            c.   The Plan's excessive recordkeeping fees caused loss.................. 11

III.  Shell's imprudence caused excessive managed account fees.................................. 13

IV.   Shell imprudently retained Tier III in the Plan......................................... 15

    A.   Shell did not engage in a prudent process in deciding to retain Tier III.......... 15

    B.   Plaintiffs show losses to the Plan................................................... 25

    C.   Shell had a duty to monitor each investment option in Tier III....................... 26

    D.   Shell has not met its burden of proving a prudent fiduciary would have
         retained Tier III or specific funds in Tier III ................................ 26

V.    Shell's self-dealing constitutes prohibited transactions ........................................ 28

Table of Authorities

**Cases**

*Alas v. AT&T Servs.*,
2021 WL 4893372 (C.D. Cal. Sept. 28, 2021) ................................................ 4

*Allen v. GreatBanc Trust Co.*,
835 F.3d 670 (7th Cir. 2016) ............................................................... 2, 28

*Barboza v. Cal. Ass'n of Prof. Firefighters*,
799 F.3d 1257 (9th Cir. 2015) ............................................................. 2, 31

*Bowen v. Univ. of Tex. Med. Branch*,
2022 U.S. Dist. LEXIS 52042 (S.D. Tex. Feb. 14, 2022) .............................. 1

*Bussian v. RJR Nabisco, Inc.*,
223 F.3d 286 (5th Cir. 2000) ................................................................... 27

*Cates v. Trs. of Columbia Univ.*,
No. 16-6524, 2019 U.S. Dist. LEXIS 186573 (S.D.N.Y. Oct. 25, 2019),
*adopted*, 2020 U.S. Dist. LEXIS 55409 (S.D.N.Y. Mar. 30, 2020) ......................... 9, 12

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................................................ 1

*DiFelice v. U.S. Airways, Inc.*,
497 F.3d 410 (4th Cir. 2007) ............................................................. 15, 16

*Donovan v. Bierwirth*,
754 F.2d 1049 (2d Cir. 1985) ............................................................... 6, 12

*Donovan v. Cunningham*,
716 F.2d 1455 (5th Cir. 1983) .............................................. 1, 2, 10, 28

*Forman v. TriHealth, Inc.*,
40 F.4th 443 (6th Cir. 2022) ................................................................... 25

*George v. Kraft Foods Global, Inc.*,
641 F.3d 786 (7th Cir. 2011) ............................................. 6, 7, 9, 15, 26

*Hecker v. Deere & Co.*,
569 F.3d 708 (7th Cir. 2009) ................................................................... 25

*Herster v. Bd. of Supervisors of La. State Univ.*,
887 F.3d 177 (5th Cir. 2018) ................................................................... 1

*Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich.*,
751 F.3d 740 (6th Cir. 2014) ............................................................. 2, 31

*Hughes v. Nw. Univ.*,
142 S. Ct. 737 (2022) ....................................................................... 15, 25

*Langbecker v. Elec. Data Sys. Corp.*,
   476 F.3d 299 (5th Cir. 2007) ................................................................. 15, 16

*Marshall v. Northrop Grumman Corp.*,
   2019 WL 4058583 (C.D. Cal. Aug. 14, 2019) ............................................ 4

*McDonald v. Provident Indem. Life Ins. Co.*,
   60 F.3d 234 (5th Cir. 1995) ................................................................. 2, 27

*Mersch v. City of Dallas*,
   207 F.3d 732 (5th Cir. 2000) ..................................................... 1, 19, 22, 33

*New York v. Julius Nasso Concrete Corp.*,
   202 F.3d 82 (2d Cir. 2000) ....................................................................... 12

*Perez v. Bruister*,
   823 F.3d 250 (5th Cir. 2016) ..................................................................... 2

*Ramos v. Banner Health*,
   461 F. Supp.3d 1067 (D. Colo. 2020) ...................................................... 26

*Reich v. Compton*,
   57 F.3d 270 (3d Cir. 1995) .................................................................. 2, 31

*Sacerdote v. N.Y. Univ.*,
   328 F. Supp. 3d 273 (S.D.N.Y 2018), *rev'd in part* 9 F.4th 95 (2d Cir. 2021)......... 9, 11

*Schweitzer v. Inv. Comm. Of the Phillips 66 Sav. Plan*,
   960 F.3d 190 (5th Cir. 2020) .......................................................... 2, 15, 25

Smith v. CommonSpirit Health,
   37 F.4th 1160 (6th Cir. 2022) ................................................................. 25

*Spano v. Boeing Co.*,
   125 F. Supp. 3d 848 (S.D. Ill. 2014) ........................................................ 9

*Sweda v. Univ. of Pa.*,
   923 F.3d 320 (3d Cir. 2019) .............................................................. 3, 8, 12

*Tatum v. RJR Pension Inv. Comm.*,
   761 F.3d 346 (4th Cir. 2014) ..................................................... 1, 2, 15, 27

*Tibble v. Edison Int'l*,
   575 U.S. 523 (2015) ........................................................................... 2, 15

*Tibble v. Edison Int'l*,
   843 F.3d 1187 (9th Cir. 2016) ................................................................... 7

*Trs. of Upstate NY, Eng'rs Pension Fund v. Ivy Asset Mgmt.*,
   843 F.3d 561 (2d Cir. 2016) ..................................................................... 12

*Tussey v. ABB, Inc.*,
   746 F.3d 327 (8th Cir. 2014) ..................................................... 3, 4, 7, 9, 11

*Webster v. Offshore Food Serv., Inc.*,
   434 F.2d 1191 (5th Cir. 1970) ................................................................. 6, 26

*Weinhoffer v. David Shoring, Inc.*,
   23 F.4th 579 (5th Cir. 2022) ................................................................. 17, 19

**Statutes**

29 U.S.C. §1002(14)(C) ................................................................................ 30

29 U.S.C. §1002(14)(H) ................................................................................ 30

29 U.S.C. §1002(21) ...................................................................................... 31

29 U.S.C. §1103(c)(1) ................................................................................... 30

29 U.S.C. §1104(a)(1) ................................................................................. 1, 8

29 U.S.C. §1106 ............................................................................................. 2

29 U.S.C. §1108(b)(2) .................................................................................. 28

29 U.S.C. §1109(a) ........................................................................................ 2

29 U.S.C. §1113 ........................................................................................... 20

**Rules**

Fed. R. Evid. 802 .................................................................................. 19, 22, 33

Fed. R. Evid. 901(a) ................................................................................. 17, 19

**Regulations**

29 C.F.R. §2550.404a-1(b)(2)(i) (2014) ....................................................... 16

29 C.F.R. §2550.408b-2 (2014) .................................................................... 28

29 C.F.R. §2550.408b-2(a) ........................................................................... 30

29 C.F.R. §2550.408b-2(a)(1) ................................................................. 29, 31

29 C.F.R. §2550.408b-2(a)(2) ...................................................................... 29

29 C.F.R. §2550.408b-2(b) ........................................................................... 29

29 C.F.R. §2550.408b-2(c) ........................................................................... 33

29 C.F.R. §2550.408b-2(e) ........................................................................... 31

29 C.F.R. §2550.408b-2(e) (2014) ............................................................... 30

29 C.F.R. §2550.408b-2(f) ...................................................................... 30, 31

29 C.F.R. §2550.408c-2(a)(1) (2014) ........................................................... 33

29 C.F.R. §2550.408c-2(b)(2) ...................................................................... 34

29 C.F.R. §2550.408c-2(b)(3) ...................................................................... 34

**Other Authorities**

DOL Adv. Op. 2013-03A, 2013 ERISA LEXIS 3 (July 3, 2013) ...................................... 3

DOL Adv. Op. 97-03A, 1997 ERISA LEXIS 3 (Jan. 23, 1997) ................................ 30, 35

DOL Adv. Op. 97-15A, 1997 ERISA LEXIS 18 (May 22, 1997) ................................ 3, 4

DOL Adv. Op. 97-16A, 1997 ERISA LEXOS 17 (May 22, 1997) .................................. 5

DOL Adv. Op. 97-19A, 1997 ERISA LEXIS 34 (Aug. 28, 1997) .................................. 5

Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure,
   75 FR 41600 (July 16, 2010) ........................................................................................ 7

## ARGUMENT

Overwhelming evidence demonstrates that Shell Oil Company and its co-fiduciaries (collectively, Shell) caused participants in the Shell Provident Fund (the Plan) to suffer significant losses of retirement savings due to Shell's failure to prudently monitor the Plan's fees and hundreds of investments in what it called "Tier III." The evidence also shows that Shell's payments to itself from the Plan are prohibited transactions. Because the material facts are genuinely disputed and Shell is not entitled to judgment as a matter of law, the Court should deny Shell's motion for summary judgment.

## I.   Legal Principles

Shell does not show that there is no genuine issue as to all the material facts or that it is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists whenever "the evidence would allow a reasonable jury to return a verdict for the nonmovant." *Bowen v. Univ. of Tex. Med. Branch*, 2022 U.S. Dist. LEXIS 52042 (S.D. Tex. Feb. 14, 2022). In ruling on a summary judgment motion, the Court can consider only admissible evidence. *Mersch v. City of Dallas*, 207 F.3d 732, 734-35 (5th Cir. 2000). The Court "must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences" in its favor. *Herster v. Bd. of Supervisors of La. State Univ.*, 887 F.3d 177, 184 (5th Cir. 2018).

The fiduciary duties impose by 29 U.S.C. §1104(a)(1)  are the "highest known to the law." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014); *Donovan v. Cunningham*, 716 F.2d 1455, 1464 (5th Cir. 1983).  To prove their claims, Plaintiffs need only prove "a breach of fiduciary duty and a prima facie case of loss to the plan."

*McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234, 237 (5th Cir. 1995). Then "the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by the breach of duty." *Id.* (citations omitted).

A fiduciary must "engage in a reasoned decision-making process for investigating the merits of each investment option and ensure that each one 'remains in the best interest of plan participants.'" *Schweitzer v. Inv. Comm. Of the Phillips 66 Sav. Plan*, 960 F.3d 190, 196 (5th Cir. 2020) (quoting *Tatum*, 761 F.3d at 358). Prudence requires that fiduciaries continually monitor plan investment options for prudence. *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015). Fiduciaries also are prohibited from engaging in transactions with the plan, such as diverting plan assets to the employer. 29 U.S.C. §1106; *Cunningham*, 716 F.2d at 1464. Shell has the burden of proving it meets an exemption from prohibited transactions under 29 U.S.C. §1108 (which do not appy to §1106(b) transactions). *Allen v. GreatBanc Trust Co.*, 835 F.3d 670, 676 (7th Cir. 2016) (citing *Cunningham*, 716 F.2d at 1467-68). *Reich v. Compton*, 57 F.3d 270, 287 (3d Cir. 1995); 29 C.F.R. §2550.408b-2(a)(1); *Barboza v. Cal. Ass'n of Prof. Firefighters*, 799 F.3d 1257, 1269 (9th Cir. 2015); *Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich.*, 751 F.3d 740, 750 (6th Cir. 2014).

A fiduciary in breach is "personally liable to make good to such plan any losses to the plan resulting from each such breach[.]" 29 U.S.C. §1109(a)); *Perez v. Bruister*, 823 F.3d 250, 257 (5th Cir. 2016). Shell has stipulated to liability to any fiduciary action by its employees and cannot disclaim responsibility for any transaction. Doc. 153.

## II. Shell's imprudence caused the plan to pay excessive recordkeeping Fees

Shell's flawed process for monitoring recordkeeping fees caused participants to pay millions of dollars in excess fees. Shell has not conducted a request for proposal in over a decade. Shell allowed Fidelity to receive unrestrained revenue sharing from Financial Engines for recordkeeping functions other vendors provided for free. As a result, participants lost over $28,699,797 in retirement savings.[1]

### A. The Plan paid more than $30 per participant for recordkeeping

Plan fiduciaries must "understand and monitor plan expenses." *Sweda v. Univ. of Pa.*, 923 F.3d 320, 328 (3d Cir. 2019). To determine whether a service provider's "compensation for services is no more than reasonable," plan fiduciaries must "obtain sufficient information regarding all fees and other compensation" received by the provider.[2] This includes "calculat[ing] the amount the Plan was paying Fidelity for recordkeeping through revenue sharing." *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).[3]

Recordkeeping services, for which Fidelity received base compensation include "plan record maintenance, tracking account balances and investments, processing transactions, call centers, website maintenance and services, communications to participants, educational services to participants, ERISA administrative services, and custodial services."[4] Additional services for which Fidelity receive compensation include "[d]ata

---

[1] Pla. Ex. 38 at 56, 78 (Expert Donald Stone Rebuttal Report Doc. 213-6).
[2] DOL Adv. Op. 2013-03A, 2013 ERISA LEXIS 3, at *10 (July 3, 2013).
[3] *See also* DOL Adv. Op. 97-15A, 1997 ERISA LEXIS 18, at *12–13 (May 22, 1997).
[4] Pla. Ex. 37 at 50 (Expert Donald Stone Report, Doc. 213-5).

3

[f]eeds" to send data to third parties, "[t]ransaction [m]anagement" for "[t]ransfers and [e]xchanges" within the Plan, and "[p]articipant [c]ommunications[.]".[5] Shell's claim that the Plan paid only $30 per participant is wrong for three reasons.

*First*, Fidelity received millions of dollars in revenue sharing from Financial Engines—considerably more than its base recordkeeping compensation.[6] Revenue sharing is the practice of a plan provider sharing a portion of its fee with the recordkeeper for recordkeeping services.[7] Prudent fiduciaries, including Shell's own expert, consider revenue sharing when evaluating recordkeeper compensation.[8]

Shell incorrectly argues that it was not required to monitor and control the revenue sharing from Financial Engines to Fidelity because it stems from an independent agreement.[9] Shell's argument is barred by the law of the case. Shell made the very same argument, relying on the same authority, in its motion to dismiss, which the Court denied.[10] *Alas* and *Marshall* are also inconsistent with years of DOL and judicial authority requiring that revenue sharing be monitored as recordkeeping compensation. Neither Shell nor *Alas* and *Marshall* grapple with this precedent.[11]

---

[5] Ex. 15 at 22, 26, 30–33 (Doc. 207-16). *Cf.* Mot. at 11.

[6] Ex. P6 at 11 (2014, $2,862,330); Ex. P7 at 11 (2015, $2,835,403); Ex. P8 at 11 (2016, $3,287,219); Ex. P9 at 10 (2017, $2,653,465); Ex. P10 at 11 (2018, $2,569,773); Ex. P11 at 11 (2019, $975,000); Ex. 3 at 11 (2020, $975,000) (Doc. 207-4). All "P#" exhibits are filed herewith.

[7] Ex. P1 at 3 (222:10–20); Ex. P2, ¶ 35; Ex. P3, at 2; Pla. Ex. 38 at 46 (Doc. 213-6).

[8] Pla. Ex. 38 at 46–48 (Doc. 213-6).

[9] Mot. at 23–24 (citing *Alas v. AT&T Servs.*, 2021 WL 4893372 (C.D. Cal. Sept. 28, 2021) and *Marshall v. Northrop Grumman Corp.*, 2019 WL 4058583, at *11 (C.D. Cal. Aug. 14, 2019)).

[10] Doc. 92 at 23–24; Doc. 139 (denying the motion to dismiss as to Count I).

[11] *Tussey*, 746 F.3d at 336 (affirming a finding of fiduciary breach for failure to "calculate the amount the Plan was paying Fidelity for recordkeeping through revenue sharing"); *see also* DOL Adv. Op. 97-15A (May 22, 1997); DOL Adv. Op. 97-16A, 1997 ERISA Lexis 17 (May 22,

Shell erroneously contends there is no evidence that any fiduciary controlled revenue sharing from a managed account provider or used it to lower recordkeeping fees.[12] The record is replete with evidence that prudent fiduciaries can and do exercise such control. In 2013, Bank of America offered to provide recordkeeping services to the Plan for $35 per-participant with no additional fees for providing access to managed accounts.[13] It was common for recordkeepers to provide data connectivity for no additional fee to large plans like the Plan.[14] GuidedChoice, another managed account provider, does not provide revenue sharing to recordkeepers.[15] Donald Stone, who has advised defined contribution plans on fees for decades, advised his clients to take this revenue into account and use it to negotiate lower recordkeeping fees.[16] Additionally, fiduciaries have negotiated full rebates of the revenue sharing from Financial Engines.[17]

*Second*, Shell ignores the Plan's payment of additional fees for communications, printing and postage for regulatory disclosure. These additional "a la carte" services could have been negotiated for in the core recordkeeping fee as they are part of the core recordkeeping function.[18] It is common practice to negotiate a budget for these types of service to control costs and include it in the core recordkeeping price.[19]

*Third*, Shell allowed Shell to be paid for administrative services from Shell employees

---

1997); DOL Adv. Op. 97-19A, 1997 ERISA LEXIS 34 (Aug. 28, 1997).

[12] Mot. at 24–25.

[13] Ex. 24 at 13 (Doc. 207-25).

[14] Pla. Ex. 37 at 10 (Doc. 213-5).

[15] Pla. Ex. 38 at 71 (Doc. 213-6).

[16] Pla. Ex. 37 at 65 (Doc. 213-5); Pla. Ex. 38 at 45 (Doc. 213-6).

[17] Pla. Ex. 38 at 50 (Doc. 213-6); Ex. P13.

[18] Ex. P12; Pla. Ex. 37 at 71 (Doc. 213-5).

[19] *Id.*

that overlapped with Fidelity's services as recordkeeper. The Trustees Support Unit ("TSU") provided "plan administration support" and "administrative and financial controls for the Plans."[20] The invoices do not delineate what tasks TSU actually provided for the fees and, therefore, it is impossible to determine what tasks overlapped with Fidelity's services.[21] The Court must resolve "[a]ny doubt or ambiguity" regarding the extent to which these services were for recordkeeping and administrative services against the breaching fiduciary. *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985).

Considering all recordkeeping compensation, the Plan paid $81–$124 per participant, much more than $30.[22] Shell's expert disagrees, but that only precludes summary judgment. *Webster v. Offshore Food Serv., Inc.*, 434 F.2d 1191, 1193 (5th Cir. 1970) ("summary judgment is often inappropriate where the evidence bearing on crucial issues of fact is in the form of expert opinion testimony"); *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 799 (7th Cir. 2011) (similar for a recordkeeping expert).

### B. Shell failed to adequately control recordkeeping expenses

Shell breached it fiduciary duty by failing to conduct a request for proposal ("RFP") for recordkeeping fees and failing to understand and control the uncapped revenue sharing that Fidelity received from Financial Engines. Fiduciaries must "incur only costs that are reasonable in amount," to "minimize costs" so as to avoid "[w]asting beneficiaries' money," and to use the "power the trust wields" to negotiate favorable pricing to benefit participants. *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir.

---

[20] Ex. 5 at 4 (Doc. 206).
[21] *See, e.g.*, Ex. 8.
[22] Pla. Ex. 38 at 56, 79 (Doc. 213-6).

2016) (citations omitted).

A fiduciary violates those principles if it fails "diligently to investigate" recordkeeping fees and "monitor and control" "excessive revenue sharing." *Tussey*, 746 F.3d at 336. Expert testimony that a plan overpaid due to a "failure to solicit bids" is enough to preclude summary judgment. *George*, 641 F.3d at 798–800. Failure to "calculate the amount the Plan was paying [its recordkeeper] through revenue sharing" and determine whether that amount "was competitive" also proves a breach of duty. *Tussey*, 746 F.3d at 336. The evidence shows Shell's failure in all these regards.

### 1.   Industry-accepted practices for monitoring recordkeeping fees

As the DOL recommends, and Shell's advisors agree, an RFP for a plan's recordkeeping fees every five years is needed to determine the reasonableness of fees and is the typical practice of similarly situated fiduciaries.[23] Even Shell's recordkeeping expert admits that he has never had a large client fail to conduct an RFP for over a decade.[24]

Because the cost of providing recordkeeping services is closely correlated to the number of participants in a plan and is unrelated to a plan's asset level, prudent fiduciaries price and/or evaluate recordkeeping fees on a per-participant basis rather than a percentage-of-assets basis.[25] Per-participant pricing is particularly important for large

---

[23] Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 75 FR 41600, 41625 (July 16, 2010) (providing "plans normally conduct" RFPs "at least" every three to five years.); Ex. P15 at 12 (advising in 2013 to conduct an RFP "[e]very 5yrs – No Exceptions"); Ex. P16  at 44. (similar statements in 2019); Pla. Ex. 37 at 55–60; Pla. Ex. 38 at 40–45 (citing seven additional articles).

[24] Ex. P1 at 2 (162:17-24).

[25] Pla. Ex. 37 at 51–53 (Doc. 213-5).

plans because recordkeeping costs are subject to economies of scale.[26] As the number of

participants grows, recordkeepers spread overhead costs among a greater number of

accounts, with each additional account involving a relatively low incremental cost. Thus,

a plan with 30,000 participants can obtain a much lower per-participant price than a plan

with 3,000 participants. Industry professionals universally recommend that fiduciaries

use a per-participant pricing method for recordkeeping fees.[27] As discussed above, even

Shell's expert advised clients that they needed to break out asset-based revenue sharing

and monitor it as compensation to the recordkeeper. *See supra* at 7.

### 2.   Shell failed to follow prudent practices

### a.   Shell never conducted a request for proposal (RFP)

Shell has not conducted an RFP for the Plan's recordkeeping services for over 12

years.[28] This contrasts with to Shell's policies when using its funds to purchase services,

which require RFPs, and Shell's regularly putting other services out to bid.[29]

Conceding this, Shell instead asserts that ERISA does not require competitive

bidding.[30] Although the statute does not expressly mandate competitive bidding, it does

mandate compliance with the prevailing standards of knowledgeable and diligent

fiduciaries. 29 U.S.C. §1104(a)(1)(B). Whether a prudent fiduciary would have obtained

competitive bids is a question of fact, not law. *Sweda*, 923 F.3d at 329 ("Many

---

[26] *Id*.

[27] *Id*.

[28] Ex. P19 at 3 (48:10-13); Ex. P20 at 2 (161:15-18); Ex. P21; Ex. 18 (Doc. 206-6); Ex. 19 (Doc. 206-7).

[29] Ex. P20 at 3 (162:7–20); Ex. P22; Ex. P23; Ex. P24.

[30] Mot. at 23–25.

allegations concerning fiduciary conduct, such as reasonableness of 'compensation for service' are 'inherently factual question[s]' for which neither ERISA nor [DOL] gives specific guidance."). There is ample evidence from which a jury could reasonably conclude that it was imprudent for Shell not to conduct an RFP. *See supra* at 7; *Tussey*, 746 F.3d at 336 (finding fiduciary breach based on a similar failure to "determine whether Fidelity's pricing was competitive"). Expert evidence "that prudent fiduciaries would have solicited competitive bids" creates "a genuine issue of material fact as to whether defendants acted prudently." *George*, 641 F.3d at 798; *Spano v. Boeing Co.*, 125 F. Supp. 3d 848, 865 (S.D. Ill. 2014); *Cates v. Trs. of Columbia Univ.*, No. 16-6524, 2019 U.S. Dist. LEXIS 186573, at *23–24 (S.D.N.Y. Oct. 25, 2019), *adopted*, 2020 U.S. Dist. LEXIS 55409, at *13–14 (S.D.N.Y. Mar. 30, 2020). A "trier of fact could reasonably conclude that defendants did not satisfy their duty to ensure that [the recordkeeper's] fees were reasonable' where plan fiduciaries failed to, inter alia, solicit competitive bidding for more than fifteen years." *Sacerdote v. N.Y. Univ.*, 328 F. Supp. 3d 273, 293 (S.D.N.Y 2018), *rev'd in part* 9 F.4th 95 (2d Cir. 2021) (quoting *George*, 641 F.3d at 798–99).

Shell's reliance upon non-RFP benchmarking from other providers is not *per se* a prudent process.[31] "Although the fact that defendants engaged consultants and relied on their advice with respect to [a recordkeeper's] fee is certainly evidence of prudence, it is not sufficient to entitle defendants to judgment as a matter of law." *George*, 641 F.3d at

---

[31] Mot. at 21–23.

799; *see also Cunningham*, 716 F.2d at 1474 ("An independent appraisal is not a magic wand that fiduciaries may simply wave over a transaction to ensure that their responsibilities are fulfilled."). Shell's flaws benchmarking demonstrates why periodic RFPs are necessary. Three of the seven vendors sent the 2013 RFI[32] declined to respond, and one sent a response missing substantial information because they did not believe they would be allowed to compete with Fidelity.[33] Even though Tejera had concerns about the revenue sharing between Financial Engines and Fidelity, Tejera did not include the millions of dollars of revenue sharing that Fidelity was receiving from Financial Engines.[34] If the revenue sharing from Financial Engines was included, Fidelity's proposal was millions of dollars more annually than the offers from Bank of America and Mercer.[35] When doing its "benchmarking," Herronpalmer noted "[t]he only way to achieve an irrefutable fee comparison is to conduct a formal bid process."[36] Herronpalmer also did not take into account the additional revenue sharing.[37] Jim Smith, the Plan Administrator, called the generic benchmarks he reviewed not "apples to apples" and not "valid."[38]

### b. Shell failed to consider revenue sharing

Even though industry professionals overwhelmingly recommend that fiduciaries

---

[32] A Request For Information (RFI) is a "light" version of an RFP that requests information on a vendor's pricing rather than the specific, binding bids for services requested in an RFP. Ex. P18 at 2–4 (69:24–71:25). It is used to find vendors for an RFP. *Id*.

[33] Ex. 18 at 5, 7 (Doc. 206-6).

[34] Ex. 18 (Doc. 206-6).

[35] Pla. Ex. 37 at 69 (213-5).

[36] Ex. 19 at 5 (Doc. 206-7).

[37] *Id*. at 24.

[38] Ex. P25; Ex. P19 at 5, 6 (71:13-14, 74:16-20).

monitor any revenue sharing to ensure compensation is reasonable, Shell never monitored revenue sharing Fidelity received from Financial Engines. *See supra* at 3.

Shell asserts that the use of uncapped asset-based revenue sharing is not a basis for liability because "ERISA does not mandate a particular fee structure for service providers[.]"[39] Whether a prudent fiduciary would have viewed the use of revenue sharing as imprudent under the Plan's particular circumstances is a question of fact. And the basis of liability is not merely the use of revenue sharing, but rather the failure to calculate and monitor the amount to determine whether the total compensation was reasonable. *See Tussey*, 746 F.3d at 336.

### c.   The Plan's excessive recordkeeping fees caused loss

Compelling evidence demonstrates that Shell caused the Plan to pay unreasonable fees. To establish loss, Plaintiffs need only show breach and a excessive fees, which shifts the burden to Shell "to disprove any portion of potential damages by showing that the loss was not caused by the breach of fiduciary duty." *Sacerdote*, 9 F.4th at 113; *McDonald*., 60 F.3d at 237. Plaintiffs are not required to prove that their "alternative fee ranges...were the only plausible or prudent ones." *Sacerdote*, 9 F.4th at 113 (quotation marks omitted).

Even if Plaintiffs were required to prove the fact of damages, Plaintiffs provide evidence from which a jury could reasonably conclude that the Plan's fees were higher than they would have been had Shell acted prudently. *Trs. of Upstate NY, Eng'rs Pension*

---

[39] Mot. at 21.

*Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 567 (2d Cir. 2016). Whether the amounts paid were reasonable should be resolved at trial. *See Sweda*, 923 F.3d at 329 (claims regarding "reasonableness of 'compensation for services'" are "inherently factual question[s]"). Plaintiffs' burden is merely to provide "some relevant data from which the district court can make a reasonable estimated calculation of the harm suffered." *New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 89 (2d Cir. 2000). Any "uncertainties in fixing damages will be resolved against the wrongdoer." *Bierwirth*, 754 F.2d at 1056.

Here, the Plan would have paid significantly less if Shell had acted prudently. First, Bank of America bid $35 per participant to provide the recordkeeping services that the Plan needed, including data connectivity, in 2013.[40] Evidence that another recordkeeper was willing to provide the same services for significantly less creates an issue of fact. *Cates*, 2019 U.S. Dist. LEXIS 186573, at *28–29; *Cates*, 2020 U.S. Dist. LEXIS 55409, at *14. Second, the market rate for the Plan was between $25 and $35 dollars per participant.[41] Donald Stone specifically analyzed each of Fidelity's services and categorized them as either "core" services and "non-core" services that may result in additional charges.[42] Stone ensured that his comparators had the same complexities or non-core services as the Plan, access to managed accounts, and a company stock option.[43] Third, when participant count is controlled for and incorrect fees are excluded, Shell's

---

[40] Ex. 24 at 11 (Doc. 207-25).
[41] Pla. Ex. 37 at 77 (Doc. 213-5).
[42] Pla. Ex. 37 at 53–55 (Doc. 213-5). *Cf.* Mot. at 20.
[43] Pla. Ex. 37 at 75–77 (Doc. 213-5).

benchmarking demonstrates that $35 per participant was the market rate.[44] Finally, conducting an RFP results in fee reductions of 20%–50%.[45] This evidence creates an issue of fact as to whether Shell's breach caused a loss to the Plan.

The Court cannot grant summary judgment on this claim.

### III. Shell's imprudence caused excessive managed account fees

Shell's arguments regarding Plaintiffs' managed account claims (Count III) fail for similar reasons. First, contrary to Shell's claim that no one provides services like Financial Engines, Financial Engines itself admits that Morningstar, GuidedChoice, ProManage LLC, Russell Advisors, and Strategic Advisors (Fidelity), among others, provide similar managed account services.[46] The fees for similarly sized clients of these competitors and the unsolicited pricing Shell received averaged a blended rate of 20 basis points ("bps", 0.20%), while the Plan's blended rate from Financial Engines was 30–35 bps.[47] Strategic Advisors (Fidelity) and Bank of America made unsolicited offers to provide managed account services for much lower rates than Financial Engines.[48] Even considering only Financial Engines, the Plan's fees were 5–20 bps higher than comparable plans with a prudent process.[49]

Second, Shell's assertions that its process for monitoring managed account fees was adequate rely upon misrepresentations of the law and evidence. Testimony from an

---

[44] Pla. Ex. 38 at 61 (Doc. 213-6).
[45] Ex. P15 at 54.
[46] Ex. P28 at 16.
[47] Pla. Ex. 37 at 169–70 (Doc. 213-5).
[48] Ex. 24 at 13 (Doc. 207-25); Ex. 28 at 4 (Doc. 206-11); Ex. P26 at 2.
[49] Pla. Ex. 38 at 75–76 (Doc. 213-6).

expert that periodic RFPs are necessary to evaluate fees creates an issue of fact as to whether fiduciaries that failed to do so breached its fiduciary duties. *See supra* at 7. Fiduciaries should conduct an RFP every five years to determine the market rate for managed account services.[50] Shell never did so.[51]

Shell did not even conduct an RFI or formal benchmarking.[52] It hired Tejera in 2013 to conduct an RFI on the Plan's recordkeeping fees, which did not include a "fee analysis" of managed account services.[53] Tejera merely noted the managed account fees were excessive on their face.[54] Tejera's analysis showed the *need* for competitive bidding. Although Shell planned to conduct an RFI for managed account services in 2016,[55] analysis of the Plan's managed account fees was delayed until the spring of 2017 because Shell had other "priorities."[56] There is no evidence that Shell conducted an RFI when it finally prioritized managed account fees a year later. Rather, Shell apparently collected price information from providers' websites.[57] Even this informal benchmarking should have sparked Shell to conduct competitive bidding—Financial Engines proposed pricing was the highest by far.[58] Shell's 2019 "review" consisted of "googl[ing]", visiting provider websites, discussions with BlackRock (the provider of the Plan's target date

---

[50] Pla. Ex. 37 at 90 (Doc. 213-5).
[51] Ex. P19 at 9 (211:13-18); Ex. P20 at 4 (183:8-16); Mot. at 19–21.
[52] Ex. P19 at 9 (211:13-18); Ex. P20 at 4 (183:8-16).
[53] Ex. 18 at 7 (Doc. 206-6).
[54] *Id.*
[55] Ex. 25 (Doc. 206-10); Ex. 26 (Doc. 207-27).
[56] Ex. P19 at 10, 11 (222:18–223:2).
[57] Ex. P29.
[58] Ex. 28 at 4 (Doc. 206-11).

funds) and inquiring if two outside vendors had generic benchmarking.[59] That is not a prudent process as a matter of law. Plaintiffs show this breach caused participants losses of $20,325,147.[60]

The Court cannot grant summary judgment on this claim.

## IV.  Shell imprudently retained Tier III in the Plan

### A.  Shell did not engage in a prudent process in deciding to retain Tier III

As Plaintiffs demonstrated in their Motion For Partial Summary Judgment (Pla. Mot.) and Reply (Reply) (Docs. 202, 213), Shell owed a duty to monitor the prudence of each of the 300+ investment options in Tier III, and Shell admits it did not do that.[61] Summary judgment should be entered against Shell, not in favor of Shell.

What Shell claims was a prudent process was not, legally or factually. A prudent process requires that a fiduciary come to a reasoned decision after balancing the relevant factors. *George*, 641 F.3d at 796; *Schweitzer*, 960 F.3d at 197 (citing *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 307 n.13 (5th Cir. 2007), *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 420 (4th Cir. 2007), and *Tatum*, 761 F.3d at 358).

Participants in defined contribution plans rely on their fiduciaries to provide a prudent menu of investment options from which to choose to invest their retirement savings. *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022). A fiduciary must "systematically consider all the investments of the trust at regular intervals to ensure that they are appropriate." *Tibble*, 843 F.3d at 1197. The fiduciary must determine that each plan

---

[59] Ex. 31 (Doc. 207-32).
[60] Pla. Ex. 37 at 103 (Doc. 213-5).
[61] *Cf.* Mot. at 27–31.

investment is reasonably designed, as part of the portfolio, to further the purposes of the plan, considering the risk of loss and the opportunity for gain from the investment. 29 C.F.R. §2550.404a-1(b)(2)(i) (2014); *Langbecker*, 476 F.3d at 307 n.13. Considering the risk and return characteristics of an investment option in light of the other investment options incorporates principles of Modern Portfolio Theory. *DiFelice*, 497 F.3d at 423. Plaintiffs' expert, Dr. Gerald Buetow, a Ph.D. in Finance with extensive experience in building investment menus for ERISA defined contribution plans and teaching Modern Portfolio Theory, applies these principles and demonstrates how Tier III provided no benefit to participants, such that a prudent fiduciary applying the care, skill, prudence, and diligence applicable to the Plan as of 2014 would have removed Tier III.[62]

Shell does not identify any minutes of Trustee meetings or other documents at which any other fiduciary considered and applied principles of Modern Portfolio Theory to determine whether it was prudent to keep Tier III in the Plan as of 2014. The is a failure to weigh the relevant factors and come to a reasoned decision to keep Tier III in the Plan and is a basis for granting summary judgment in favor of Plaintiffs, not Shell.

Shell claims three qualities of Tier III made it a valuable part of overall Plan design,[63] but Shell does not cite to minutes where the Trustees decided that was the purpose for having Tier III. Shell claims that the Trustees annually approved retaining Tier III as a whole, but this lacks evidentiary support. The August 25, 2014 minutes indicate only that Eric Perry presented charts to the Trustees that "suggests that the Mutual Fund Window

---

[62] Pla. Ex. 43 at 3–23 (Doc. 213-8).
[63] Mot. at 21–22.

continues to offer a reasonable choice to participants."[64] There is no indication that the Trustees came to a reasoned decision (or even any decision) to retain Tier III based on those factors. There is no explanation why (or if) the Trustees believed it was prudent to retain mutual funds that were more expensive that half of their "peers" or performed worse than half of their "peers."[65] There is no explanation why it was prudent or in participants' interest to include *five* money market funds in Tier III when Tier II already provided the Thrift Fund, which provided far superior returns.[66]

Shell does not authenticate Exhibits 68–80 or identify when (even if) they were presented to the Trustees.[67] *Cf.* Fed. R. Evid. 901(a); *Weinhoffer v. David Shoring, Inc.*, 23 F.4th 579, 582 (5th Cir. 2022). Shell does not point to any other minutes of the Trustees at which this information was addressed, including an explanation why the Trustees retained Tier III funds that were more expensive and worse performing than half their peers.[68] In addition to these deficiencies, Shell's charts only address the actively managed funds in Tier III. Shell did not determine why it was prudent to include index funds in Tier III when the same or similar index funds already were in Tier II at lower

---

[64] Ex. 67 at 4 (Doc. 206-27). Shell does not indicate which of its Exhibits 68–80 was presented at that meeting.

[65] Ex. 70 at 1–6 (Mar. 2014 expenses), Ex. 71 at 3–10 (Mar. 2014 returns) (Docs. 207-71, 207-72); Pla. Ex. 46 at 2 (85:4–12) (Perry: 50% line important) (Doc. 213-11). The remainder of Shell's Exhibits 68–80 contain similar outliers.

[66] Ex. 70 at 9 (Doc. 207-71); *see* Pla. Ex. 37 at 27–29 (explaining imprudence) (Doc. 213-5). As Perry revealed, "to the extent Fidelity offered money market funds, then by definition the fund window would contain money market funds." Ex. P47 at 5 (89:5–7).

[67] *Cf.* Doc. 207-1 at 10–11. Exhibit 72 includes a memorandum for which no author is identified, it is not authenticated, and there is no evidence it was presented to the Trustees.

[68] Shell did not provide these charts to participants, so they could see which Tier III funds were more expensive and worse performing than their peers. Ex. P47 at 3, 4 (85:17–86:12).

cost and better performance.[69] Shell's charts show performance versus "peers" over three and five years, but Shell does not provide any explanation why it included mutual funds in Tier III that did not have three or five years of performance, rendering impossible even the inadequate comparisons of these charts.[70]

Shell was informed of the imprudence of Tier III and its risks. Russell Investments provided Shell three reviews of the Plan's investment structure (2011, 2016, and 2019) and consistently recommended that Shell remove Tier III.[71] Russell noted that Tier III was duplicative of the Plan's other investment options, that removing it was no "material give-up in the investment quality or diversification opportunity for participants," that it provided participants an excess of options that made investing difficult, that it caused participants to invest $240 million in passively managed index funds for which there were lower cost alternatives in Tier II, that only certain funds in Tier III paid administrative expenses through revenue sharing and thus inequitably allocating those expenses among participants, and that Shell had to monitor the prudence of each investment option in Tier III because they were designated investment alternatives.[72]

Shell relies on Exhibit 44, but that is inadmissible. Shell provides no witness with

---

[69] Pla. Ex. 37 at 29–36 (Doc. 213-5). As Perry explained, these superfluous index funds were just automatically included in Tier III. Ex. P47 at 9 (104:4–24).

[70] Pla. Ex. 37 at 36–38 (Doc. 213-5). Stone has decades of experience managing and advising fiduciaries on the management of ERISA defined contribution plans. *Id.* at 5–10.

[71] Pla. Ex. 45 at 1 (Doc. 213-10). Eric Perry, Manager of Pension Administration until 2018, said Russell was always "a big proponent of killing Tier III" recommended removing it twice during his tenure. Ex. P47 at 2 (17:14–20), 9 (133:19–23). The third Russell recommendation was in 2019 (Mot. at 23), after Perry had left. Shell erroneously claims that Russell gave it different advice in 2011 (Mot. at 22).

[72] Pla. Ex. 26 at 5–6 (Doc. 204-15); Ex. 42 at 35 (Doc. 206-19); Ex. 43 at 34 (Doc. 206-20).

personal knowledge to identify that document (or even identify the author) and does not

provide any Trustee meeting minutes at which that document was presented (if it was

presented). *Cf.* Fed. R. Evid. 901(a); *Weinhoffer*, 23 F.4th at 582. Moreover, the

document is hearsay of what the unidentified author says was reported to him (whether

directly by Russell or not). It is inadmissible for that reason also. Fed. R. Evid. 802;

*Mersch*, 207 F.3d at 734–35.[73]

Shell does not identify the reasoned decision by the Trustees that addressed each of

the issues raised by Russell about Tier III.[74] Instead, Shell focuses on the alleged $12–

$15 million cost of eliminating Tier III in 2016.[75] Shell does not explain how that cost

was calculated or what cost it represents. The three Shell employees who allegedly

calculated that cost could not explain it.[76] Shell also did not calculate the *benefits* to

participants from removing Tier III to compare to these alleged costs. In 2019 Shell

calculated the benefits to be $17 million and the cost to be only $500,000.[77] Shell

provides no explanation for how the cost to remove Tier III somehow dropped 97%.

Shell contrived the $12–$15 million cost to provide a false justification for rejecting

Russell's recommendation. The Plan Administrator initially recommended following

Russell's recommendation, noting that it was consistent with Shell's overarching

---

[73] The exhibit also indicates none of Russell's clients used structures like Tier III and Russell recommended streamlining the Plan's investment menu and choosing the best managers instead of Tier III's 300+ duplicative funds and undifferentiated managers. Ex. 44 at 11, 59 (Doc. 206-21). That contradicts Shell's contention that Russell ever recommended keeping Tier III.

[74] Mot. at 22–23; Ex. 52 at 2–3 (Doc. 206-23); Ex. 47 at 2–3 (Doc. 206-22).

[75] Mot. at 23.

[76] Ex. P47 at 48 (198:2–6); Ex. P19 at 7, 8 (197:11–198:9); Ex. P42 at 5 (192:9–14).

[77] Ex. 82 at 7 (Doc. 206-28).

principle of streamlining and simplifying investment offerings and processes, that the actively managed funds were contrary to the IC's preference for passively managed (index) funds, that the large number of Tier III funds could be confusing for participants, and that Tier II provided sufficient funds to construct a well-diversified portfolio (among other reasons).[78] To the surprise of the other two IC members, Susan Ward (the third IC member and a Trustee) objected.[79] After that, the IC asked for additional information on "cost/benefit to participants if Tiers III and IV were eliminated" (but not for eliminating only Tier III).[80] Perry, an advocate for Tier III, responded with the $12–$15 million cost that no one can explain (which apparently is a cost for removing *both* Tiers III and IV), but no calculation of the benefits.[81] This is not a prudent process for rejecting Russell's advice, setting aside that it is over two years after the start of the limitations period. 29 U.S.C. §1113.

The additional factors that Shell claims it weighed also do not evidence a prudent process.[82] The IC noted that 70% of participants are within the band of what Fidelity considered "age appropriate equity allocation,"[83] but Shell does not identify how that was calculated or what "age appropriate equity allocation" even means. There is no indication of whether that 70% includes *all* participants (including those who did not invest in Tier III and thus are irrelevant) or only participants who invested in Tier III. If the former,

---

[78] Ex. P30 at 2–4; Ex. P31.
[79] Ex. P32.
[80] Ex. 46 at 2 (Doc. 207-47).
[81] *Id.*
[82] Mot. at 23.
[83] Ex. 47 at 2 (Doc. 206-22).

there were 37,064 participants in the Plan at the end of 2016,[84] of whom 30% is over

11,000 participants who were not in age appropriate equity allocations. The IC and the

Trustees did not address, and Shell does not justify, why it was appropriate to subject

11,000 participants to inappropriate allocations because of Tier III.[85]

Shell's claim that Tier III benefited participants by offering actively managed funds

makes no sense in light of its own in-house asset manager's (Shell Asset Management)

conclusion that its investment professionals in charge of Shell's $11 billion pension plan

could not find active managers who consistently outperformed index funds, confirming

multiple studies showing the futility of actively managed funds.[86] Shell does not explain

why Shell's own experience with the futility of active management did not apply equally

to the Plan.

Shell claims that Tier III was popular among participants but does not explain how

this relates to the prudence of Tier III.[87] Many things are popular that are not prudent.

And that claim contradicts Russell Investment's warning that the amount invested in Tier

III (44% instead of an expected 0–5%) showed unsophisticated participants were

---

[84] Ex. P8.

[85] That is not a real factor in favor of Tier III. as demonstrated by the fact that it is not mentioned in 2019. Ex. 82 at 4–7 (Doc. 206-28); Ex. 56 at 3 (Doc. 207-57).

[86] Reply at 12–13; Pla. Ex. 41 at 50–60, Ex. 42 at 52–60 (Docs. 215, 217); *cf.* Mot. at 9, 23, 32. Given Shell's unique experience with the futility of active management even by investment professionals, whether other plans included actively managed funds (which plan fiduciaries may not have had the same experience) is irrelevant. *Cf.* Mot. at 32. Dr. Buetow's mention of the debate over active management has no bearing on Shell's actual experience that resolved that debate. *Cf.* Mot. at 31–32. Moreover, Dr. Buetow's opinion is that active management, particularly under these circumstances, is not prudent. Pla. Ex. 43 at 16–18.

[87] Mot. at 1, 9, 22, 26.

21

investing in Tier III imprudently.[88]

Shell claims there is no evidence of "*systemic* investing confusion" without explaining what that means or how it was measured.[89] Russell Investments repeatedly informed Shell that providing over 300 investment options was known to risk confusing participants.[90] Two other plan consultants gave Shell the same warning.[91] Shell does not prove that there was no significant confusion among Tier III investors or that the large number of investors in Tier III were sophisticated and knowledgeable (contrary to what Russell Investments indicated, *see* n.88). One investor in Tier III demonstrated his lack of investment experience and confessed "I don't know what I'm doing in this. If I did, I wouldn't be working. I'd be rich."[92] Shell claims that Exhibit 44 shows that a survey conducted in or before 2011 indicated 80% of participants approved of the number of investment options, but that is multiple levels of hearsay contained in an unauthenticated document, which is not evidence. Fed. R. Evid. 802; *Mersch*, 207 F.3d at 734–35. It also does not account for the apparent fact that 20% of participants (well over 6,000 people)[93] disagreed and apparently found the choices overwhelming.

Shell claims participants benefited from the revenue sharing provided by certain Tier

---

[88] Ex. 43 at 8 (Doc. 206-20); Ex. P33 at 5, 13; Ex. 45 at 3 (Doc. 207-46) (Russell Investments (Teborek) indicating most Tier III investors likely there because of inertia and only 5% were looking for expanded choice). Plaintiffs' experts reinforce the fact that the excessive investment in Tier III was a warning, not a benefit. Pla. Ex. 38 at 20 (Stone rebuttal report) (Doc. 213-6).

[89] Mot. at 26.

[90] Ex. 42 at 35 (Doc. 206-19); Ex. 43 at 5–6, 34 (Doc. 206-20).

[91] Ex. P34 at 7, 9, 12; Ex. P35 at 19–20, 98, 109, 120–21.

[92] Ex. P46 at 7 (99:20–21); *see also id.* at 2–7 (11:4–12, 23:6–10, 30:10–16, 96:7–12).

[93] *See* Mot. at 2 (well over 30,000 participants).

III funds.[94] *Eliminating* revenue sharing is what would have benefited participants. Since only certain mutual funds in Tier III paid revenue sharing and Shell did not disclose which funds those were or how much they paid in revenue sharing, only participants who unwittingly invested in revenue-sharing mutual funds paid Plan administrative expenses, even though the services benefited all participants.[95] The revenue sharing paid not just Fidelity's recordkeeping fees, it also funded the payments to Shell.[96] When Shell removed Tier III, it charged all participants directly for administrative expenses: a $30 "Recordkeeping Fee" and a $30 "Administrative Fee," primarily to Shell.[97] Using revenue sharing to pay itself put Shell in a conflict of interest regarding Tier III, the source of those payments. In 2014, the IC decided not to use institutional shares of 33 Tier III mutual funds because of the loss of revenue sharing from those funds.[98] The lower fees in those funds would have benefited participants who invested in them, but that threatened the source of Shell's payments. So again in 2017 the IC recommended not removing Tier III because of the loss of revenue sharing and having to charge participants directly for administrative costs, revealing the payments to Shell.[99]

Relying on an email three years after this decision, Shell contends there was no

---

[94] Mot. at 14, 23.

[95] Pla. Ex. 37 at 45– 47 (Doc. 213-5).

[96] Ex. P36 at 1 (SHELL0049159); Ex. P20 at 5–8 (228:10–231:11).

[97] Ex. P37 at 1 (SHELL0018056); Ex. P36 at 1 ("Staff Costs" $450,000 out of $874,000, estimated to be $27 per 32,000 participants in 2021).

[98] Pla. Ex. 18 at 12 (Doc. 204-09).

[99] Ex. 47 at 2 (Doc. 206-22). Shell suggests another benefit of Tier III was providing cheaper versions of some Tier IV funds (Mot. at 8). As noted above, Shell did not always move to the lowest cost shares of funds in Tier III. And through Mr. Perry's tenure (2018), only 40% of the Tier III funds were institutionally priced. Ex. P47 at 6, 7 (90:1–91:2). So this was a minimal benefit, disregarding whether the cheaper versions were prudent funds in the first place.

"catalyst for change" in 2016.[100] The same email notes, however, there "still is really not a catalyst" for the change in 2019.[101] So that was not a factor in the Trustees' decision. Also, the Trustees in 2017 did not ask the Plan Administrator to "revisit the issue down the line,"[102] they asked him to "develop sign posts for reconsidering the investment structure and provide an annual review."[103] There is no evidence he did that.

Shell claims two facts changed that led to its decision to remove Tier III in 2019. Mot. at 24. First, Shell claims there was no longer a concern about a significant number of participants leaving the Plan. That was never cited as a concern by the IC or Trustees in 2016 and 2017 and there is no analysis of how an "exodus" would have harmed the Plan. Second, Shell claims that the cost/benefit ratio inverted. Shell never calculated the benefits in 2016 was and cannot explain how it calculated the costs. Therefore, Shell never even had a legitimate cost/benefit calculation before 2019. Shell also fails to explain why it asked Russell to provide another recommendation just three years after the 2016 recommendation but waited five years after Russell's 2011 recommendation.[104]

Shell's argument that retaining Tier III was justified for catering to participant preferences is not supported by the facts or law.[105] "[E]ven in a defined-contribution plan where participants choose their investments, plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included

---

[100] Mot. at 23; Ex. 81 at 1 (Doc. 207-82).
[101] Ex. 81 at 1 (Doc. 207-82).
[102] *cf.* Mot. at 23.
[103] Ex. 52 at 2 (Doc. 206-23).
[104] Shell removed the Plan from Russell's consulting agreement in 2014. Ex. P38.
[105] Mot. at 25.

in the plan's menu of options." *Hughes*, 142 S. Ct. at 742. *Schweitzer* involved allowing participants to keep pre-existing investments in a frozen stock fund. *Schweitzer*, 960 F.3d at 198. *Smith* and *Forman* involved allowing participants to invest in active or passive funds. *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1165 (6th Cir. 2022); *Forman v. TriHealth, Inc.*, 40 F.4th 443, 448 (6th Cir. 2022). None of those cases involved a massive tier of over 300 funds that the fiduciaries did not monitor for prudence. It is "obvious, even reckless, imprudence" for fiduciaries to provide hundreds of investment options and shift to the participants the responsibility for choosing among them. *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). The Court would err in relying on the participants' ultimate choice over their investments to excuse Shell's imprudence. *Hughes*, 142 S. Ct. at 742.

**B. Plaintiffs show losses to the Plan.**

As detailed in Plaintiffs' Reply, the Plan suffered losses of $684,042,902 from the inclusion of Tier III.[106] In addition, the transfer of assets from Tier III to Tiers I and II would have reduced the fees in those funds (just as it did in 2019), creating additional losses to the Plan of $6,309,969.[107] Shell claims there are no losses based on a different calculation that compares the Tier III funds to the median returns of another set of 300+ funds, which contradicts the basis for Shell's liability and is not an investable alternative that could have been provided in the Plan. Conflicting expert testimony precludes

---

[106] Reply at 14–15; Pla. Ex. 37 at 15–49 (Doc. 213-5); Pla. Ex. 43 (Doc. 213-8); Pla. Ex. 39 at 8–28 (Doc. 213-7); Pla. Ex. 37 at 39–43 (Doc. 213-5); Pla. Ex. 43 at 15–18 (Doc. 213-8); Pla. Ex. 41 at 50–60 (Doc. 215); Pla. Ex. 42 at 52–60 (Doc. 217); Pla. Ex. 47 at 8, ¶21 (Doc. 213-12).
[107] Pla. Ex. 47 at 9, ¶25 (Doc. 213-12).

summary judgment. *Webster,* 434 F.2d at 1193; *George*, 641 F.3d at 799.

**C.   Shell had a duty to monitor each investment option in Tier III.**

Shell's arguments for why it owed no duty to monitor each Tier III investment are all

refuted in Plaintiffs' Motion and Reply, as well as by the advice that Fidelity and Russell

repeatedly provided to Shell.[108]   Neither ERISA nor DOL through its regulations exempt

particular investment options from §1104(a)(1)'s prudent expert standard of care.[109] The

regulations Shell relies on all address what investment options are subject to DOL

*disclosure* requirements.[110] Even then, the Tier III investment options are designated

investment alternatives because Shell specifically identified them for participants as Plan

investment options in the Guides and Disclosures.[111] For that reason, Tier III is not

similar to a brokerage window, which is exempt from the *disclosure* regulations. Also,

brokerage windows have additional restrictions that Tier III did not have.[112] *Ramos v.*

*Banner Health*, 461 F. Supp.3d 1067, 1127 (D. Colo. 2020), addressed a similar

arrangement but did not decide the legal issue of the duty to monitor. Shell's contention

that it "reasonably believed" it had no duty to monitor is both legally invalid and

factually unsupported.[113] Shell also cannot rely on its disclaimers from monitoring the

Tier III funds to avoid its fiduciary responsibility and liability.[114]

**D.   Shell has not met its burden of proving a prudent fiduciary would have**

---

[108] Pla. Mot. at 7–8.
[109] Pla. Mot. at 10–14; Reply at 9–10.
[110] Pla. Mot. at 14–23.
[111] Pla Mot. at 13–28; Reply at 10–12.
[112] Pla. Mot. at 20–25; Reply at 1–2, 7–10.
[113] Pla. Mot. at 25–28; Reply at 2–5.
[114] Pla. Mot. at 28–30; Reply at 11–12.

**retained Tier III or specific funds in Tier III**

Shell contends that it is Plaintiffs' burden to show that no prudent fiduciary has ever used any of the funds included in Tier III.[115] That is the reverse of the burden-shifting framework under ERISA. It is *Shell's* burden to show that "a prudent fiduciary *would have* made the same decision," that is, retained Tier III despite all of the advice showing that it lacked benefits and risked significant harm. *Tatum*, 761 F.3d at 364; *see also Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 300 (5th Cir. 2000) (fiduciary's burden to show the investment options "would have been chosen had the fiduciary conducted a proper investigation"); *McDonald.*, 60 F.3d at 237. Shell has not met that burden. Shell also has not met its burden for any investment in Tier III because it has not shown, in the context of the Shell Plan, that any of the Tier III funds provided a risk/return benefit to participants.[116]

Tier III provided no benefit under the investment standards that apply to this fiduciary decision (Modern Portfolio Theory).[117] Donald Stone, with decades of experience in such matters, shows that no prudent fiduciary would have included in the Shell Plan either the 300+ investments in Tier III or the specific funds he identifies as particularly imprudent.[118] John Hare, also with extensive experience with defined contribution plans, explains that Tier III was rare and practically impossible to prudently monitor.[119]

---

[115] Mot. at 31–32.

[116] In fact, Russell said it did not. Ex. 26 at 5–6 (Doc. 207-27).

[117] Pla. Ex. 43 at 18–23 (Doc. 213-8) (Dr. Buetow).

[118] Pla. Ex. 37 at 15–39 (Doc. 213-5); Dr. Buetow also demonstrates why sector funds introduce non-systematic risk, contrary to principles of MPT. Pla. Ex. 43 at 21–22 (Doc. 213-8).

[119] Pla. Ex. 39 at 3–8 (Doc. 213-7).

Shell erroneously claims Dr. O'Neal contradicted Mr. Stone's opinion that sector funds have a place in a prudent plan investment menu. Dr. O'Neal's article explored "industry momentum," but did not recommend adding sector funds, particularly for defined contribution plans.[120] Dr. O'Neal explained that, in his role as an investment consultant (rather than an academic), he *never* recommended the inclusion of sector funds in a portfolio and only recommended index funds.[121] While another O'Neal paper describes potential benefits from multiple uncorrelated managers in the same asset class, that also did not apply to defined contribution plans generally or Shell's Plan and Tier III specifically,[122] in which Shell did not engage in any process to determine which actively managed funds to include in each asset class. As Dr. Buetow points out, the actively managed funds in Tier III were highly correlated and thus provided no benefit to participants.[123]

The Court cannot grant summary judgment on this claim.

## V.  Shell's self-dealing constitutes prohibited transactions

Shell has the burden of proving that it complied with the prohibited transaction exemptions of 29 U.S.C. §1108(b)(2) [ERISA §408(b)(2)] and 29 C.F.R. §2550.408b-2 (2014). *Allen*, 835 F.3d at 676 (citing *Cunningham*, 716 F.2d at 1467-68, *inter alia*). Shell cannot meet that burden because it has not submitted all invoices upon which Shell received payment. It submitted only one invoice (Ex. 8). That invoice does not describe

---

[120] Ex. P39.
[121] Ex. P40 at 2 (88:6–15).
[122] Ex. P17.
[123] Pla. Ex. 43 at 19–21 (Doc. 213-8).

the work performed by the referenced individuals, and Shell has produced no witness to identify that work. Without that information, the Court cannot determine whether the work was necessary for the establishment or operation of the Plan. 29 C.F.R. §2550.408b-2(a)(1), §2550.408b-2(b).

Shell submitted 43 invoices to the Plan.[124] Those invoices total $2,392,821.[125] Invoices produced by Shell show total payments of $3,180,519.[126] Shell's annual reports to the DOL (Form 5500) show total payments of $2,973,933.[127] Shell does not explain the discrepancy in these amounts and does not explain what services were provided for each invoice. Without that explanation, there is no evidence that all of those payments were for necessary services or that the compensation was reasonable.

Shell also claims there was an agreement with the Plan for these services, but Shell did not produce that agreement.[128] The Plan had detailed written contracts with its other service providers, which described the services to be provided, the cost, and the method of payment.[129] The Plan should have had a similar contract with Shell, particularly since

---

[124] Ex. P41 at 3–4.

[125] Ex. P27. Declaration of Michael A. Wolff ¶27 (filed herewith).

[126] Ex. P14. Wolff Decl. ¶14.

[127] Ex. P5; Wolff Decl. ¶5; Exs. P6–P11. Shell did not reveal to the DOL that *Shell* was paid from the Plan, an obvious prohibited transaction. It discloses only that certain of its *employees* were paid. Ex. P6 at 8–10; Ex. P7 at 7–9; Ex. P8 at 7–9; Ex. P9 at 8–9; Ex. P10 at 7–9; Ex. P11 at 8–9; Shell Ex. 3 at 9–12. In 2014–2016 Shell falsely told DOL those individuals were not its employees. Ex. P6 at 8–10; Ex. P7 at 7–9; Ex. P8 at 7–9. In 2014–2016 Shell falsely told DOL those individuals were not its employees. Ex. P6 at 8–10; Ex. P7 at 7–9; Ex. P8 at 7–9.

[128] Mot. at 41; 29 C.F.R. §2550.408b-2(a)(2) (service must be furnished under a contract or arrangement which is reasonable"). Apparently, it does not exist. Ex. P42 at 3, 4 (67:23–68:4); Ex. P43 at 2 (38:14–20).

[129] Ex. 35 (Fidelity Recordkeeping Agreement) (Doc. 207-36); Ex. 15-17 (Fidelity Amendments) (Docs. 207-16, 206-4, 206-5); Ex. 30 & 35 (Financial Engines Amendments) (Docs. 206-13, 207-36); P38 (Russell Investments contract).

Plan assets are not supposed to inure to Shell's benefit. 29 U.S.C. §1103(c)(1).[130]

Shell recognized that receiving payments from the Plan is a prohibited transaction. It admitted its subsidiary Shell Asset Management (SAMCo) could not be paid from pension plan assets.[131] It should have strictly complied with §1108(b)(2), including, at the least, having a written agreement specifying the services and compensation. Any agreement should have been reviewed and approved by the Trustees as the fiduciaries acting on behalf of the Plan.[132] Shell provides no evidence of that. In fact, Shell identifies no Trustee minutes approving paying Shell for necessary Plan services (much less determining that those services were necessary or the compensation reasonable or could not have been provided by anyone else at lower cost). 29 C.F.R. §2550.408b-2(a)(1)–(3). In fact, because the Trustees were all Shell executives, a conflict of interest existed, and an *independent* fiduciary should have made this determination. 29 C.F.R. §2550.408b-2(e) (2014); 29 C.F.R. §2550.408b-2(f) (Example 7).[133] None of the §1108(b)(2) requirements were met.[134]

Shell falsely claims the "Trustees reviewed the TSU's total reimbursements...as part

---

[130] That prohibition makes the exchange of services for plan assets in this case unique from a standard service provider arrangement which is not prohibited *per se*. *Cf.* Mot. 33 and n.13.

[131] Ex. P44 at 27. Shell recognized these are "significant restrictions." Even though SAMCo was not going to be paid by the plan, it entered into formal agreements regarding the services it was to provide, which were approved by the Trustees. *Id.*

[132] *E.g.*, DOL Adv. Op. 97-03A, 1997 ERISA LEXIS 3, at *7 (Jan. 23, 1997) ("The appropriate plan fiduciary(ies) must determine, based on all of the relevant facts and circumstances, whether the conditions of [§]408(b)(2) are satisfied.").

[133] *See also* DOL Adv. Op. 93-06A, 1993 ERISA LEXIS 6,  at *8–15; DOL Adv. Op. 97-03A, 1997 ERISA LEXIS 3, at *12. Employer and employees are parties in interest  29 U.S.C. §1002(14)(C) and (H).

[134] Ex. P20 at 7–8 (230:15–231:11).

of their annual review of service provider charges."[135] The February 24, 2020 minutes state only that "Ms. Deere discussed the annual service provider report included with the pre-read materials and responded to questions."[136] There is no indication of Trustee review or approval of what work Shell employees provided to the Plan or the amount paid for those services, much less a determination that compensation was reasonable or in accord with any contract between the Plan and Shell. That "service provider fee report" states only that "Employees & Misc." totaled $435,851 in 2019.[137] A cursory review of "Employees & Misc." is insufficient to confirm the reasonableness of Shell's charges. Plus, that amount does not even match Shell's DOL reports or invoices.[138]

Shell does not indicate who authorized the payment of Shell invoices. The Trustees did not.[139] The evidence shows that Shell executives, at the direction of Shell and acting in Shell's interest, authorized payments to Shell, not that any fiduciary acting on behalf of the Plan authorized any payment. In other words, Shell paid itself from the Plan (or Shell employees paid Shell), which clearly violates 29 U.S.C. §1106(b)(1) and (2),[140] for which there is no exemption under 29 U.S.C. §1108. *Reich*, 57 F.3d at 287–88; 29 C.F.R. §2550.408b-2(a)(1); *Barboza*, 799 F.3d at 1269; *Hi-Lex*, 751 F.3d at 750.[141]

Shell's documents do not show that it delegated this responsibility to other fiduciaries.

---

[135] Mot. at 3, 34.
[136] Ex. 11 at 3 (Doc. 207-12).
[137] Ex. P45 at 108. Shell did not submit this document.
[138] Ex. P5; Ex. P14; Ex. P27.
[139] Ex. P42 at 2 (66:14–21); Ex. P43 at 11, 12 (131:23–132:5).
[140] *See* 29 C.F.R. §2550.408b-2(e); 29 C.F.R. §2550.408b-2(f) (Example 7). A fiduciary is anyone who "exercises any authority or control respecting...disposition of its assets." 29 U.S.C. §1002(21)(A).
[141] Shell has stipulated that it is liable for the fiduciary breach of its employees. Doc. 153.

At most, Exhibit 4 gives the IC authority for "*recommending*" the hiring of major service providers and investment providers to the Trustees.[142] Hiring responsibility was limited to "investment managers."[143] Shell was not an investment manager. Shell identifies no "recommendation" from the IC to the Trustees to hire Shell. In addition, Exhibit 5 became effective only as of February 26, 2015, which does not cover the first year of the damages period. Although Exhibit 5 identifies the TSU, it does not indicate the Plan would pay Shell for TSU's services. Exhibit 10 purports to identify the authority of the IC and TSU in 2019, but does not indicate that either entity had authority to hire Shell to provide Plan services or pay Shell for TSU work, apart from ensuring the Plan meets "Contractual Obligations" with service providers.[144] There was no contract between the Plan and Shell.

Shell claims there are further delegations of the IC's authority to others, but the exhibits do not support that claim, and, even if they did, the IC could not delegate authority it did not have. The delegations were to Shell employees in their personal capacities who left the Plan in 2018, and did not go into effect until February 26, 2015.[145] Exhibit 7 gives authority to interact with and direct investment related vendors, which Shell was not.[146] The delegation to Perry and Duhon only authorized the payment of

---

[142] Ex. 4 §1.2 (Doc. 207-5). Exhibit 5, in fact, indicates the Trustees retained authority over the hiring and firing of Plan service providers. Ex. 5 ¶5(c) (Doc. 206).

[143] *Id.* §1.3(a); Ex. 5 at ¶6(a) (Doc. 206).

[144] Ex. 10 at 6 (Doc. 206-2).

[145] Ex. 7 at 1, 3 (Doc. 207-8); Ex. 9 (Doc. 207-10); Ex. P19 at 2 (35:6–11).

[146] Ex. 7 at 3, ¶2 (Doc. 207-8).

invoices for "*contracted services*[.]"[147] There was no contract between the Plan and Shell.[148]

Shell also does not prove the compensation paid to Shell was reasonable (*e.g.*, no more than what the Plan would have paid by hiring someone else). *Cf.* 29 C.F.R. §2550.408b-2(c); 29 C.F.R. §2550.408c-2(a)(1) (2014). Shell cites only corporate compensation policies, which relate only to Shell's "strongly competitive pay package" to attract employees and demonstrate that Shell "aims to pay employees well."[149] They have nothing to do with whether Shell's payments were reasonable *for the Plan*.[150]

The other documents Shell relies on are inadmissible because they are not authenticated: Exhibits 10, 13, 14. Fed. R. Evid. 802; *Mersch*, 207 F.3d at 734–35. Shell identifies no minutes (or other document) showing Exhibit 10 was even presented to the Trustees or IC. Exhibit 10 was a presentation for Shell's internal audit.[151]

Exhibit 13 purports to be a "Guide for Salary and Burden Calculation." Shell does not identify any minutes that show this procedure was agreed to by the IC or the Trustees on behalf of the Plan. Teresa Duhon-Browning, a TSU member, admitted she did not know who created the document, believed it had been modified, and admitted it did not accurately describe Shell's process.[152]

---

[147] Ex. 9 at 4, 5 (¶4) (Doc. 207-10) (emphasis added).
[148] Moreover, Perry and Duhon were both paid over $770,000 and $467,000 respectively. Ex. P5. If they were authorized to pay themselves from the Plan, that is a clear breach of §1106(b)(1), or of §1106(b)(2) to the extent they were acting on Shell's behalf in obtaining reimbursement of their compensation as Shell employees.
[149] Ex. 97 at 5 (Doc. 207-98); Ex. 99 at 4 (Doc. 207-100).
[150] In addition, the invoices include charges for expenses, not just salaries.
[151] Page 7 is just an organization chart of the TSU in 2019.
[152] Ex. P43 at 4–10 (47:18–48:8, 49:17–23, 51:23–54:20).

Exhibit 14 shows the hours in months during 2015 that certain employees claimed to have worked for the benefit of the Plan. It does not even match with Exhibit 8—the lone invoice Shell submitted. It also provides no indication of services performed.

Shell claims it did not receive reimbursement for the salary, benefits, and expenses of employees unless they spent at least 70% of their time on "trust-related" work (Shell's pension plan, another pension plan, and the Plan).[153] Shell does not identify the significance of this claim. DOL regulations prohibit plan fiduciaries from receiving compensation when they are full-time employees of the plan sponsor. 29 C.F.R. §2550.408c-2(b)(2). Plan fiduciaries are allowed to receive *reimbursement* from the plan for "direct expenses properly and actually incurred and not otherwise reimbursed." *Id.*; 29 C.F.R. §2550.408b-2(e)(3). An expense is not a direct expense "to the extent it would have been sustained had the service not been provided or if it represents an allocable portion of overhead costs." 29 C.F.R. §2550.408c-2(b)(3).

Shell does not indicate how its payments from the Plan constitute *reimbursements* of direct expenses sustained by a Plan *fiduciary*. (Shell contends it is not a fiduciary, Mot. 33) As noted above, Shell has not shown that any Plan *fiduciary* agreed to have Shell provide these services or to pay Shell for these services. If Shell concedes it is a fiduciary (beyond controlling Plan assets to pay itself), Shell does not indicate how the expenses for which it was reimbursed were expenses that Shell sustained in the course of providing *its* fiduciary services.

---

[153] Ex. 13 at 3 (Doc. 207-14). That is factually erroneous, as described below.

Shell has not shown that it would not have incurred each of the items for which it was reimbursed but for the fact that those employees provided services *to the Plan.* Under Shell's 70% rule, so long as any of its non-fiduciary employees spent at least 70% of their time on *any* Shell plan, then Shell was entitled to a pro rata share of that employee's compensation, even if that constituted only 1% of that Shell employee's work at Shell. Shell provides no evidence it would not have employed that individual had she not spent 1% of her time on the Plan. The expense of that employee is not a direct expense because Shell would have incurred that expense regardless of the time spent on the Plan.[154]

Shell did not consistently apply the 70% rule. Exhibits 10 and 13 limit employees' compensable "Trust-related" activities to three plans (SPT, SPF, and APP), but not the Health and Wellness Plan (H&W).[155] Exhibit 14 at 11 shows, however, that Shelly Griffith reported a total of 178 hours, including 79 personal time, 72 H&W, 1 SPT, and 26 SPF. Under the Exhibit 10 calculation, Griffith spent only 27.3% of her time on the three authorized plans $((1 + 26)/(178 - 79))$. Exhibit 14, however, shows Ms. Griffith spent 100% on the plans by including H&W $((72 + 1 + 26)/(178 - 79))$. This recurs throughout Exhibit 14. In fact, Ms. Griffith failed the 70% rule for *every month* of 2015, yet the Exhibit 8 invoice shows charges for Griffith's salary.[156]

The Court cannot grant summary judgment on this claim.

---

[154] *See* Adv. Op. 97-03A, in which the investment services were provided to a master trust that held the investments of multiple plans. The services were the same for all of the plans, allowing for pro-rata allocation of the cost of those services among the plans.

[155] Ex. 10 at 28 (Doc. 206-2); Ex. 3 at 13 (Doc. 207-4).

[156] Ex. 14 at 11—23 (Doc. 206-3); Ex. 8 at 5 (Doc. 206-1). This is one example. The page limit for this brief precludes more.

Respectfully submitted,

September 23, 2022            By: */s/ Jerome J. Schlichter*

\*Jerome J. Schlichter, Esq., Attorney-in-Charge
(Missouri Bar #32225)
\*Michael A. Wolff, Esq., of counsel
(Missouri Bar #38207)
\*Sean E. Soyars, Esq., of counsel
(Missouri Bar #57317)
\*Joel D. Rohlf, Esq., of counsel
(Missouri Bar #67540)
SCHLICHTER BOGARD & DENTON, LLP
100 South Fourth Street, Suite 1200
St. Louis, Missouri 63102
Telephone: (314) 621-6115
Facsimile: (314) 621-5934
jschlichter@uselaws.com
mwolff@uselaws.com
ssoyars@uselaws.com
jrohlf@uselaws.com
*\*Admitted Pro Hac Vice*
*Attorneys for Plaintiffs*

Robert M. Tramuto, of counsel
Texas Bar #20186300
S.D. Texas Bar #6863
Jones Granger
10000 Memorial Drive
Suite 888
P.O. Box 4340
Houston, TX 77210
Telephone: (713) 668-0230
Facsimile: (713) 956-7139
btra@jonesgranger.com
*Local Counsel for Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on September 23, 2022, I electronically filed the foregoing using the court's CM/ECF system, which will send notification of such filing at all counsel of record.

*/s/ Jerome J. Schlichter*
Jerome J. Schlichter
Attorney-in-Charge for Plaintiffs
