```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE SOUTHERN DISTRICT OF TEXAS

 3                          GALVESTON DIVISION

 4   HARMON ET AL.                  §      CASE NO. 3:20-cv-00021
                                    §      HOUSTON, TX
 5   VERSUS                         §      THURSDAY,
                                    §      MARCH 9, 2023
 6   SHELL OIL COMPANY              §      9:00 AM TO 10:20 AM

 7                      CLASS CERTIFICATION HEARING

 8              BEFORE THE HONORABLE ANDREW M. EDISON
                    UNITED STATES MAGISTRATE JUDGE
 9
                               APPEARANCES:
10

11        FOR THE PARTIES:              SEE NEXT PAGE

12        COURT REPORTER:               VANESA ARANDA

13        COURT CLERK:                  RUBEN CASTRO

14

15

16

17

18

19

20                  TRANSCRIPTION SERVICE BY:

21                  Veritext Legal Solutions
                  330 Old Country Road, Suite 300
22                      Mineola, NY 11501
              Tel: 800-727-6396 ▼ www.veritext.com
23
        Proceedings recorded by electronic sound recording; transcript
24              produced by transcription service.

25
```

1                            APPEARANCES:

2

3    FOR THE PLAINTIFFS:          SCHLICHTER BOGARD & DENTON LLP
                                  Michael Wolff
4                                 Sean Soyars
                                  100 South Fourth Street
5                                 Suite 1200
                                  St. Louis, MO 63102
6                                 314.621.6115

7

     FOR THE DEFENDANTS:          MAYER BROWN LLP
8                                 Michael Lennon
                                  Ankur Mandhania
9                                 700 Louisiana Street
                                  Suite 3400
10                                Houston, TX 77002
                                  713.238.2667

11

12                    (APPEARING TELEPHONICALLY)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          GALVESTON, TEXAS; THURSDAY, MARCH 9, 2023; 9:00 AM

2          THE COURT:  Okay, good morning, everyone.  This is

3    the United States District Court for the Southern District of

4    Texas.  I'm Judge Andrew Edison presiding.  We're here today on

5    Case 3:20-cv-21, Charles Harmon, et al. versus Shell Oil

6    Company, et al.  Can I get into introduction of counsel for the

7    record starting with the plaintiff?

8          MR. WOLFF:  Good morning, Your Honor.  It's Michael

9    Wolff for the plaintiffs.  And with me is Sean Soyars, who will

10   be arguing the motion this morning.

11         THE COURT:  Good to see both of you.  And for the

12   defendants?

13         MR. LENNON:  Good morning, Your Honor, Mike Lennon

14   here on behalf of the defendants.  I'm joined by my colleague,

15   Ankur Mandhania and Ann Stephens from Shell is also here with

16   us.

17         THE COURT:  Good to see all of you.  Okay.  We're

18   obviously here on the plaintiffs' motion for class

19   certification, Docket Entry 159.  And I think Fifth Circuit law

20   basically requires me to give everyone the opportunity to have

21   an evidentiary hearing and anything else they want to.  I

22   issued an order to have you all give me witness lists and

23   exhibit binders by a certain date.  And using the incredible

24   deduction powers, since I didn't get a witness list or any

25   exhibits, my assumption is that the parties are both agreeable

1    that the record is complete on summary judgment -- not summary

2    judgment.   Summary judgment is separate -- on class

3    certification.   And really we can resort to argument.   Is that

4    a fair summary from the plaintiffs' side?

5            MR. MANDHANIA:   Yes, Your Honor.

6            THE COURT:   And from the defendants?

7            MR. LENNON:   Yes, Your Honor.

8            THE COURT:   Okay.   With that said, here's the way I'd

9    like to proceed.   I have a bunch of questions asked and so let

10   me address my questions to both sides and then I promise at the

11   end, I'll take a break, talk to my brain trust, and then give

12   you all an opportunity to add anything else you would like to

13   add to address the issues.

14           So here's the way I see this.   Class certification,

15   there's really two main arguments that the defendants advance

16   for class certification not to be granted.   The first is

17   standing, which I separate both in the standing of the named

18   plaintiffs and the absent class members.   And then separately,

19   or aside from that, there's a typicality argument that there's

20   interclass conflicts.   Is that fair from the defense side?

21           MR. SOYARS:   Yes, Your Honor.   I think you're right

22   that those are the two main arguments that we've presented.

23   And I think there's some -- as to the sort of first question

24   is, can any class here be certified, I think you've identified

25   the two arguments we have.

1          THE COURT:  Okay.  So, well, let's start with

2    standard, right?  Because obviously standing, the Fifth Circuit

3    has said is an inherent prerequisite to the class certification

4    inquiry.  Once again, I just want to go through sort of how I

5    see this and have you-all tell me if you disagree or I'm wrong.

6    And I want to go plaintiff, named plaintiff by named plaintiff.

7    So if we start with Lawrence, there's no challenge to Lawrence

8    in the initial opposition at all to standing.  The only

9    standing challenge comes into play in the supplemental

10   authority submission that was made in February.  And as I

11   understand, the defendants' argument is as followers: Lawrence

12   invested in some Tier III funds, but he didn't invest in every

13   single Tier III fund.  So he only has standing to bring a Tier

14   III claim on behalf of those funds that he actively

15   participated or actively invested in.  Fair?

16          MR. MANDHANIA:  I think that's right, Your Honor,

17   with one caveat, which is, I think you're approaching this

18   question the right way, which is going, you know, what is the

19   claim and who has standing for that claim?  And as I was

20   rereading the plaintiffs' class certification papers here, I

21   think their argument is about a single breach with respect to

22   Tier III, that the decision to, I think as they put it, retain

23   Tier III on the plan is the decision of which they complain.

24   And if that's the claim we're talking about, then I think

25   defendants' position is, you know, there are interclass

1   conflict issues, but we have no objection to Mr. Lawrence's

2   standing.  I think it gets a little -- where it would differ

3   and where we would have a standing argument is if plaintiffs

4   are alleging that each individual fund in Tier III comprises an

5   independent breach, and if, you know, I don't think that issue

6   is before you because I don't think that's the way their motion

7   was brought.  But if that were their claim, as some of their

8   other papers in the case has suggested, then you've identified

9   what our standing objection would be, which is Mr. Lawrence

10  would have standing only for the claim that the funds that he

11  invested in.

12          THE COURT:  Well maybe this is going to be an easy

13  hearing because my understanding, help me out on the

14  plaintiffs' side, my understanding is your argument is the

15  process claim.  You are not challenging necessarily each

16  individual fund.  Is that accurate?

17          MR. SOYARS:  I believe that's accurate, Your Honor.

18  I think  some of the experts have talked about on the merits,

19  that some of the funds provide examples of why retaining that

20  entire tier was imprudent.  But the overall claim is

21  challenging the decision to retain Tier III as a whole.

22          THE COURT:  Okay.  So if that's the case, on the

23  plaintiffs' side, we have no, there's no opposition, there's

24  really no discussion, no opposition to Lawrence as a, as a

25  class representative?

1          MR. MANDHANIA:  On standing grounds.  That's right,

2     Your Honor.  I'm caveating the other objections.  But yes.

3          THE COURT:  Absolutely.  And to be clear, I wasn't

4     trying to, I'm just focusing right now on the standing issue.

5     So based on the representations we've had here, the defendants

6     have no opposition on standing grounds to Lawrence?

7          MR. MANDHANIA:  As to the Tier III claim.  I will

8     just point out, Your Honor, while we're talking about Mr.

9     Lawrence, that I'm not sure the plaintiffs have put forward

10    evidence regarding whether any of the Tier III funds he

11    invested in actually paid recordkeeping.  And if so, what those

12    periods were when Mr. Lawrence paid recordkeeping.  So, you

13    know, for purposes of this discussion, if we assume that there

14    were at least some periods where Mr. Lawrence paid

15    recordkeeping, then Shell's position would be he had standing

16    as to those periods.  That some subset of the class, you know,

17    the six years plus that's encompassed by the class.  And I can,

18    you know, perhaps plaintiffs are better positioned to tell us

19    exactly what subset that is.  But that's not, there's at least

20    there's -- but if we assume that at least one of the funds Mr.

21    Lawrence invested in actually paid for recordkeeping in Tier

22    III, then I think we agree that he has standing as to the

23    recordkeeping claims for that period of time.

24          THE COURT:  Okay.  Hold on.  Does the defendants have

25    an injection to standing on Mr. Lawrence on any claim?

1           MR. MANDHANIA:  Yes.  Sure, Your Honor.

2           THE COURT:  On standing?

3           MR. MANDHANIA:  Yes, Your Honor.

4           THE COURT:  Which claim?

5           MR. MANDHANIA:  The recordkeeping claim, Your Honor.

6           MR. SOYARS:  Well why wasn't it in the brief?

7           THE COURT:  Hold on, hold on.  Mr. Soyars, you're

8   taking my role for a second.  And there's nowhere in the

9   briefing that Shell has provided in this case, right?

10          MR. MANDHANIA:  I believe that's correct, Your Honor.

11          THE COURT:  Okay.  So Shell's position originally was

12  Lawrence doesn't have standing -- Lawrence, there's no

13  opposition standing.  The first time the argument is made in

14  the supplemental grade which indicates, hey, there's a standing

15  issue on the Tier III claim, Count 2.  But now as I understand

16  it, Shell does not have an opposition to standing on the Tier

17  III claim, but now for the first time, Shell is claiming that

18  there's no standing for Lawrence on a recordkeeping claim?

19          MR. MANDHANIA:  The only thing that would have been

20  slightly there, Your Honor, is our objection to Mr. Lawrence's

21  standing, or I guess the standing problem that Mr. Lawrence has

22  with respect to the recordkeeping claim, isn't a, you know, he

23  has no standing to bring any sort of recordkeeping claim type

24  of argument.  It's really a question of what are the time

25  periods where he paid those fees and thus would have standing?

1    And if he --

2         THE COURT:  Okay, let me, let me make sure I

3    understand.  Until December 2020, as I appreciate it,

4    recordkeeping fees were assessed against funds in Tier III.

5    Starting in January 2021, the allegation at least, is that

6    Shell began charging $60 annual fee to everyone, right?

7         MR. MANDHANIA:  That is their allegation, Your Honor.

8    The one thing I would just point out is I think the parties are

9    in agreement that in that, you know, pre-December 2020 period,

10   there were some Tier III funds that paid recordkeeping, but not

11   all Tier III funds paid recordkeeping on behalf of the Shell

12   plan.  So merely telling us that someone was invested in Tier

13   III doesn't tell us that that person paid recordkeeping.  You

14   have to look and see whether the particular funds they invested

15   in were those which paid recordkeeping fees.

16        THE COURT:  Okay.  I'm curious in a second to hear a

17   response to Mr. Soyars, but I got to be honest with you, if

18   this is such a great argument, why is it not in a single paper

19   in this case until the oral hearing now?

20        MR. MANDHANIA:  It's a fair question, Your Honor.  I

21   and, you know, I definitely understand your frustration that

22   this is the first time, you know, this issue is being brought

23   to life.  All I can say is that I was reviewing the papers, you

24   know, pretty late last night in preparation to this argument.

25   I noticed, hang on a second, the only evidence we have about

```
 1    what these plaintiffs were invested in were in Shell's expert's
 2    declaration.  We identified the funds that one of the main
 3    plaintiffs was in for recordkeeping, but we didn't do it for
 4    Lawrence.  Where's that evidence?  How is the Court going to
 5    know that it has Article III jurisdiction over Lawrence's
 6    claim?  I had that question late last night and I haven't yet
 7    found the answer to that, which is why I thought it was
 8    incumbent upon me to raise the issue before the Court
 9    proceeded.
10              THE COURT:  Okay, Mr. Soyars, your turn.
11              MR. SOYARS:  Okay.  The premise that there's no
12    evidence of what Mr. Lawrence invested in is incorrect because
13    he discusses it in his deposition, which is attached as one of
14    the first three exhibits to the motion.  And then they have a -
15    - the defendant hired an expert at the rate of $730 an hour to
16    analyze these funds in Tier III.  And he points out in
17    Paragraph 8.173.2 that he had reviewed, reviewed every fund in
18    the tier and identify those that do not have revenue sharing.
19    And he said that was the case for Mr. Coble that he didn't
20    invest in any of those revenue sharing funds, but he didn't say
21    anything about Mr. Lawrence.  I think we can assume that at the
22    rate of $730 an hour, he looked at that and would have said
23    something about it if, if there were any question as to Mr.
24    Lawrence as well.
25              THE COURT:  It sounds like you have a firm belief
```

1    that Mr. Lawrence invested in Tier III funds and the

2    recordkeeping fees were assessed, right?

3              THE COURT: It that's true, there's no question

4    Lawrence has standing, right.

5              MR. SOYARS:  That is true.

6              THE COURT:  Okay.  Right?

7              MR. SOYARS:  Correct.  And Coble invested --

8              THE COURT:  I'm just focused on Lawrence.

9              MR. SOYARS:  Okay.  Just Lawrence, that's right.

10             THE COURT:  So why don't we just, just do this to

11   cover, just to cover the tracks so there's no uncertainty, why

12   don't the plaintiffs just supplement the record was something

13   clear as day that indicates that Lawrence, that Lawrence had

14   Tier III buns in which recordkeeping these were set sometime

15   during the class period?

16             MR. SOYARS:  That shouldn't be problem.

17             THE COURT:  If plaintiff does that, the defense has

18   no objection to Lawrence as class representative on standing

19   grounds alone?

20             MR. MANDHANIA: I think, I think we would say -- well,

21   let me just say what we would say, Your Honor.  He would then

22   have standing for the time period where he paid the fee.  And

23   we'll know what that period is at the time that he --

24             THE COURT:  Time out.  I got to stop there.  That

25   surely is not the law, right?  I mean, your position cannot be,

1   can it, can you say with a straight face that a class

2   representative has -- let's say it's a 10-year class period,

3   that the class, that the plaintiff has to be invested in all 10

4   years?  And if the only, if the plaintiff has only invested 9.5

5   of those years, they then have no standing to bring a claim on

6   behalf of the class?  Is that really --

7           MR. MANDHANIA:  I think if we were talking about like

8   a securities class action or something like that, Your Honor, I

9   don't think we would be making this argument.  But the

10   plaintiffs' position is that this fund was, as I understand the

11   recordkeeping claim, and I'm no recordkeeping expert, I think

12   their claim is that this scheme was unreasonable in 2014.  It

13   was unreasonable based on the market dynamics in 2015, '16,

14   '17, et cetera.  And so the evidence that you look at for each

15   of those years is different.  It's what was the prevailing

16   market rates that year?  The way that you would assess what,

17   you know, there were minor changes being made to what the fee

18   was during this period.  The prohibited transaction claim

19   refers to, you know how Shell allocated the money that was

20   rebated from this recordkeeping.  And there were some

21   transactions in some years that might have been kosher, other

22   transactions in other years.  So I don't know why someone who

23   paid recordkeeping, let's say just in 2018, would have standing

24   as to an allegedly improper transaction that occurred two years

25   before that person ever paid those fees.  So that's why.  I

1    think because of the nature of this claim, there's,

2    unfortunately, I do think that's the way the article treaty

3    analysis has to happen.

4             THE COURT:  Okay, I feel like I've just been thrown a

5    huge softball up here by the plaintiffs.  Mr. Soyars, I'll let

6    you respond.

7             MR. SOYARS:  Yeah, I mean the plaintiffs are going to

8    object to them, just coming up with these new standing

9    arguments on the fly that were never briefed.  And we put a lot

10   of time and effort into these papers and I don't think there's

11   any legal support for the theory that he's trying to come up

12   with here.

13            THE COURT:  Okay.  Let me ask you this.  If Lawrence

14   has standing, why does it matter about Coble and Harmon just

15   from a practical standpoint from the plaintiffs' side?

16            MR. SOYARS:  It doesn't.  I mean that's our argument.

17   As long as long as one main plaintiff has standing, that's the

18   end of the inquiry for Article III purposes.

19            THE COURT:  I guess here's what I mean.  Well each

20   named claimant has to have standing, right?  Meaning I could

21   have a case where Lawrence is the class rep and he has standing

22   and I'm the class rep when I don't have standing.  So my

23   question is if I find that Lawrence has standing, do I even

24   need to think or contemplate or concern myself with Harmon or

25   Coble?

```
1        MR. SOYARS:  For purposes of subject matter
2   jurisdiction, you do not, Your Honor.  But then the question
3   is, what do we do with Coble and Harmon?  And I think the
4   defendants have asked that they be stricken from the case and
5   we object to that.  As we pointed out, standing requires an
6   identifiable trifle.  And even if they didn't invest in Tier
7   III, the presence of Tier III caused higher fees in the Tier I
8   and II funds in which they did invest.  And it's in the record
9   now that there was over $6 million of planned losses due to
10  that fee differential.  And that's certainly an identifiable
11  trifle.  So they have, they have standing.
12       THE COURT:  Okay.  Well, let me ask you this.  If we
13  look at, if we move over to Coble and Harmon for a second.  At
14  least from the briefing, I'm not sure there's new argument that
15  Shell wants to make now, but at least from the briefing, there
16  is no question that Coble has standing for Count 1, Count 3 and
17  Count 8, correct?  Let me rephrase that.  I'm going to have to
18  divide this into two questions.  There is no argument in any
19  briefing that Shell has provided in this case that challenges
20  standing for Coble on Count 1, Count 3 and Count 8, right?
21       MR. MANDHANIA:  I apologize, Your Honor.  I'm used to
22  thinking about this in terms of the substance of the claim.  So
23  I'm just trying to make sure I mapped back to this into the
24  account of the, of the complaint before I answer your question.
25  I, I sincerely apologize.
```

```
1              THE COURT:  Count 1 is record keeping.

2              MR. MANDHANIA:  Right.

3              THE COURT:  By the way, I'm with you.  Count 2 is

4    Tier III, which causes me internal problems.  But Count 1 is

5    recordkeeping.  Count 3 is financial engines and Count 8 is

6    administrative expenses.  At least that's the way I consider

7    it.

8              MR. MANDHANIA:  Right.  And so to answer your

9    question, Your Honor, we have no objection or we haven't made

10   any arguments about the financial engine issue in our papers

11   other than to point out that I believe it's Mr. Harmon never

12   used the service.  As to Mr. Coble --

13             THE COURT:  I'm not talking about Harmon.  I have

14   talked about this.  One by one.  Coble, is there an objection

15   to Coble on the unreasonable recordkeeping claim as far as

16   standing is concerned?

17             MR. MANDHANIA:  No, Your Honor.

18             THE COURT:  Okay.  With respect to Count 3, the

19   financial engines, is there any objection in the briefing to --

20   I mean I think I know the answer to this.  The answer is no,

21   but I just sort of want to verify.  Right?

22             MR. MANDHANIA:  Correct, Your Honor.

23             THE COURT:  So is it fair to say the only objection

24   to Coble as a class rep is on Count 2, which is the Tier III

25   claim because Shell's argument is he did not invest in Tier III
```

1    funds.

2            MR. MANDHANIA:  No, Your Honor.  It is true that we

3    have an objection to Mr. Coble's standing on that claim, but

4    our objection is that he invested in Tier III funds, which made

5    money.  So he can't show a loss since he was successful in

6    that.

7            THE COURT:  My fault on that.  You're correct.  Okay.

8    And so -- well, let me hear from Mr. Soyars on that issue.

9            MR. SOYARS:  Mr. Coble, he does have losses from Tier

10   III.  The defendants are trying to use the damages calculation

11   to show that he doesn't have standing, which is, is improper

12   because we have a competing damages calculation that uses

13   different benchmarks and shows that he did lose money and that

14   the plan lost over $600 million.  So resolving that merit issue

15   isn't an Article III, appropriate inquiry for Article III

16   standing.

17           THE COURT:  Why isn't that true on the defense side?

18   I mean, like, like basically I understand your argument, oh,

19   Coble made money.  And the plaintiffs argument he lost money.

20   Am I supposed to decide that merits-related issue at the class

21   certification stage?

22           MR. MANDHANIA:  Well, I think, of course not, Your

23   Honor, but I do think you have to ask yourself, what's the

24   evidence in the class certification record that's been

25   presented to you?  The expert reports were all issued after

1    class certification or after we completed the class

2    certification briefing.  And as you pointed out early,

3    plaintiffs just declined to put that expert reports they're now

4    referencing into the class certification record.  So they're

5    telling you they don't need that evidence in order to certify

6    the class.  The only people who put any actual evidence before

7    the Court on how you calculate loss for anyone is Shell.

8              We put the declaration of our expert in with our

9    opposition brief and that declaration calculates loss based on

10   the benchmarks of the funds, and says, hey, there's no loss

11   there.  I understand the plaintiff may not like that approach

12   to calculating damages, but then they should have either put in

13   an expert declaration with their reply and we would have, you

14   know, fought the Daubert fight there or they should have taken

15   your invitation to supplement the record last week when you

16   gave that to them.  So all they have really are the allegations

17   in the complaint.  And the Fifth Circuit has told us that at

18   the class certification stage, a district court cannot just

19   accept the allegations in a complaint as true and say, well, if

20   these allegations are true, can the class be certified?  The

21   Chavez decision in 2020 was exactly that saying much more is

22   required.  And if plaintiffs chose not to put that much more

23   before you, I mean, that was kind of their decision.

24             THE COURT:  Well, that's a question I ask

25   (indiscernible).  I mean, look, if the plaintiffs can

1   supplement the record with an iota of evidence that he, that

2   Lawrence invested in Tier III funds in which the recording fees

3   were assessed, I think it's absolutely clear and obvious that

4   Lawrence had standing and therefore, even if one plaintiff,

5   he's the named representative and at least there's no standing

6   issue when we talk about others conflicts.  And I'm just sort

7   of curious why at the end it really matters about Harmon and

8   Coble whether they are named plaintiffs or not in this case, or

9   at least for the time being?  Because it seems like we just, we

10   have to sort of go down this, I don't know, sort of down this

11   legal analysis on each claim and whether there's -- whether

12   they have standing on each claim and I'm not really sure that's

13   important at this time.  Mr. Soyars, any thoughts?

14          MR. SOYARS:  Well, I mean, we agree with you, you

15   know, getting into Coble and Harmon standing at this point

16   really doesn't serve any purpose.  We would just object to the

17   extent the defendants have requested that he be stricken from

18   the case.  And as far as submitting evidence of Coble's damages

19   calculations, we pointed this out in the brief.  It's true that

20   that Rule 23 compliance has to be proven by evidence.  But

21   under the standing approach at class certs, this is the

22   Deepwater Horizon 2014 opinion, this approach does not

23   contemplate scrutinizing or weighing any evidence of class

24   members standing during the Rule 23 stage.  So that, that's why

25   we didn't put it in and it wasn't necessary under Fifth Circuit

1    law.

2            I guess, you know, one consideration is it

3    strengthens the representation of the class to have multiple

4    representatives in case for some reason, you know, there were

5    any issues with Mr. Lawrence.  And, you know, for the reasons

6    we pointed out, Coble and Harmon do -- have demonstrated harm.

7            THE COURT:  Let me ask this.  Simple appearance would

8    say there's no objection of standing for Coble on Count 1,

9    Count 3 and Count 8, named as class representative on those,

10   simply at least in argument on Count 2, the Tier III.  We'll

11   hold him off as a class rep on that claim for now.  What's

12   wrong with that?  Isn't that simple?  At that end, how would

13   you-all be negatively impacted by that?  Maybe I'm overthinking

14   it.

15           MR. SOYARS:  Well, again, Your Honor, the inquiry for

16   Coble standing, he has, he has Count 2 standing, meaning Tier

17   III.  If he alleges an injury and they're trying to get into a

18   merits calculation, that does not negate his standing

19   whatsoever.  So he has standing.

20           THE COURT:  Okay, let me switch gears, Harmon.  We

21   have no doubt that he does not have standing on Count 3, the

22   financial injuries.  And he was not part of Tier III, right?

23           MR. SOYARS:  He did not invest in Tier III, but he,

24   again, was impacted by the fee elevation of the other tiers due

25   to Tier III's credit.

1          THE COURT:  Okay.  And with respect to Count 1, the
2    unreasonable recordkeeping and Count 8, the administrative
3    expense, he would not have been harmed, at least up until
4    3/2020, because the recordkeeping fees, as I mentioned, I think
5    the allegation is they were set against funds in Tier III and
6    since he wasn't in Tier III, that didn't happen to him.  But as
7    of January 2021, when Shell started charging the $60 annual fee
8    to everyone, and plaintiffs' argument, as I appreciate it, is
9    that fee was excessive.  At least for the time period of
10   January '21 moving forward, is there any doubt from the
11   defendants side that Mr. Harmon has standing?
12          MR. MANDHANIA:  No, Your Honor.  I just want to point
13   out that there is a factual dispute about whether that was a
14   $60 fee.  I wouldn't want the Court to, you know, misconstrue
15   that in its order.  But on the Article III question, I mean
16   whatever the fee he paid was, he paid it as of January 1st,
17   2021.  And so he has standing to assert that that fee is
18   unreasonable.
19          THE COURT:  Okay, let's talk about absent class
20   members for a second.  From the briefing, defendants argument
21   is that class cannot be certified if it contains member lacking
22   Article III standards.  I'm curious, hasn't the Fifth Circuit
23   already decided this?  I mean it seems to me in Mims versus
24   Stewart Title, which both sides reference, the Fifth Circuit
25   clearly adopted the Seventh Circuit's Kohen Test that says we

1    focus exclusively on the standing of named plaintiffs and

2    ignore absent class members entirely.  Why doesn't that Fifth

3    Circuit precedent, whether I like it or not, why doesn't that

4    control?

5              MR. MANDHANIA:  Well, respectfully, Your Honor, I

6    mean, the Fifth Circuit said in its 2020 opinion Flecha v.

7    Medicredit, that this was an open question.  The panel that

8    heard arguments in Chavez yesterday was asking a lot of

9    questions about the standing of uninjured class members and

10   whether the district court's certification order could be

11   sustained, given the presence of large numbers of a major class

12   members.  So I frankly think it would come as a surprise to the

13   Fifth Circuit to find that it actually had resolved this issue,

14   you know, many years prior.

15             In any event, I actually think this is a little bit

16   of an academic dispute.  I actually don't think anything hinges

17   on figuring out whether Mims is the standard here.  And here's

18   why.  I mean what the court said it means is that the class as

19   defined was sufficiently narrow as to exclude the likelihood

20   that many plaintiffs were improperly included.  So in other

21   words, what Mims says is that if you defined the class in a way

22   such that, you know, that people in the class suffered Article

23   III injury, the fact that there might be one or two outliers

24   isn't going to defeat class certification.  And that's

25   consistent with what courts adopting Shell's approach have said

1    that, you know, of course.  Look, if it's a 35,000 class

2    members or 35,000 member class and there's like two people who

3    lack Article III standing there from some strange fact, it's

4    not our position that there's no certifiable class there.  I

5    mean, if you really had to, you could define the class in a way

6    that excluded that de minimis number of uninjured people.

7         The problem here is the same.  It is that the

8    plaintiffs can't even satisfy that Mims test.  They can't

9    define the class in a way that excludes the likelihood of many

10   improperly included plaintiffs.  So I think the plaintiffs are

11   wrong about whether the Fifth Circuit has taken a position

12   here.  But I also don't think the Court really needs to weight

13   into that issue in order to deny the class certification

14   motion.

15        THE COURT:  And it's Shell position that there could

16   be any -- so I guess you're arguing you cannot define the class

17   in any way to limit it to those folks who unquestionably have

18   standing?

19        MR. MANDHANIA:  Well, you certainly can't do it the

20   way the plaintiffs have, which is an omnibus class for these

21   three claims of everyone who was in the plan from I think it's

22   January 21, 2014 to the present.  I mean, there's just -- that

23   class definition definitely doesn't work and that's the class

24   definition that we've been using, you know, to litigate this

25   case to date.  And I think an 11th hour change there to a

1   wildly different definition would be somewhat prejudicial, at

2   least without the opportunity to supplement the record with

3   respect to plaintiffs new theory.

4           But I mean setting that issue aside ignoring, you

5   know, just could you fashion the definition here?  I don't

6   really see how you could while satisfying the rest of Rule 23

7   dictates.

8           THE COURT:  Mr. Soyars.

9           MR. SOYARS:  Well, they still have no answer for the

10  fact that every class member was injured because the tier, the

11  presence of Tier III drove up funds, the cost of the funds in

12  Tier I and Tier II.  So no matter where a participant chose to

13  invest, they were harmed by this, the actions here and they

14  have Article III standing.  Although you correctly point out,

15  Your Honor, the Mims approach of looking at the class member,

16  class representative standing is, is all that's required at

17  this stage.

18          THE COURT:  Well I guess the question becomes with

19  respect -- and I got to focus claim by claim.  So I'm just

20  focusing on Count 2, the Tier III claim, the way the class is

21  defined or proposed by the plaintiffs, it would cover all those

22  invested in Tier III.  Is it your argument that all those that

23  invested in Tier III, even if it happened to be they invested

24  in the fund, you know, bet entirely on the Kansas City Chiefs

25  and the (indiscernible), in other words, assuming they made

1    money in their Tier III funds, how are they injured?

2           MR. SOYARS:  Well the remedy in this case, it's not

3    an individual damages award.  It's recovering the losses to the

4    plan.  And the only way to do that is to, is to have everyone

5    in the plan.  And this is how these classes, we've been

6    appointed in 34 of these and they've all been defined this way

7    to include all the participants in the plan.  So the question

8    for standing purposes really, were they exposed to the

9    defendants' misconduct?  And they were because they invested in

10   Tier III.  If they ultimately made money, that's a question of

11   damages on the merits.  It's not a question of standing.

12   Otherwise you'd have to certify a class, you have to, you have

13   to have the trial first, calculate the damages, and then do a

14   calculation for 30,000 - 50,000 people to decide if you can

15   certify class.  It doesn't make any sense.  And that's not how

16   any court has done it.

17          THE COURT:  And, in fact, on the Shell side, in the

18   reply brief, the plaintiffs mentioned the Supreme Court case

19   from I think it was 2016, Tyson Foods versus Bouaphakeo.  I

20   mispronounced that and I apologize up front.  But as I

21   understand in that case, what happened is that it went to a

22   jury verdict.  There were a number of plaintiffs who I guess

23   under the damage calculations were not injured.  And the

24   Supreme Court allowed that case to proceed as a class action

25   and just said we'd remedy that later on, going back to the

1    trial court.  Why isn't that dispositive on this issue?

2            MR. MANDHANIA:  I think that, well, what the court

3    had before it in Tyson, and in other cases were similar

4    approaches have been used, is a model that actually was offered

5    at the class certification stage, I believe, that allowed you

6    to identify who was and wasn't injured and make sure that the

7    people who were uninjured, you know, were a de minimis amount

8    is the language that some of the cases used here, and I must

9    admit I chuckled a little bit at counsel's suggestion that no

10   court does it this way, given my, you know, in an antitrust

11   case, it's entirely common to have a rigorous expert, you know,

12   statistical model at the certification stage who tells you

13   here's the number of people who are injured, here's the average

14   price premium vacate, and so on and so forth.  I mean I just

15   think it's, you know, the question is, can we be certain that

16   the number of people in the class who did not suffer injury,

17   you know, is a trivial or de minimis amount?  And I just don't

18   know how the Court can be comfortable of that conclusion given

19   the limited record and you know, the facts of the case.

20           THE COURT:  Help me out on the plaintiffs' side.

21   People who invested in Tier III are injured how?

22           MR. SOYARS:  People who invested in Tier III?  There

23   was an imprudent option with retaining the plan with no sort of

24   monitoring done by the defendants.  And the expert reports have

25   demonstrated that the plan lost over $600 million because those

1    funds were retained.  So they would have made more money in

2    their individual accounts if that option had been eliminated at

3    the start of the class period.

4              THE COURT:  I guess Shell's response, argument or

5    response is, is it true maybe certain took a loss, but certain

6    people might have gained, right?  It all depends on what fund

7    they invested in.  In other words, there might be -- I'm just

8    taking a pure hypothetical out of thin air -- there might be

9    some, you know, really highly spectacular fund that the

10   plaintiffs in effect are arguing, hey, it was imprudent to have

11   that fund in there.  But lo and behold, it went way up.  Those

12   individuals would have lost nothing.  In fact, those

13   individuals would have gained from the imprudent operation

14   while others would have lost.  Right?

15             MR. MANDHANIA:  Yes, Your Honor.  I think that's what

16   --

17             THE COURT:  Hold on.  That's more directed to the

18   plaintiffs.  I'm sorry.

19             MR. MANDHANIA:  Oh, I apologize, Your Honor.

20             THE COURT:  You both, you both thought I was going

21   the opposite way.

22             MR. SOYARS:  Yeah, it's possible they ultimately made

23   money.  But that is the question of damages on the merits and

24   not Article III standard.

25             THE COURT:  But your view is as long as the

1    allegation is made in the complaint that they've been damaged,

2    then that suffices for Article III standing and that we should

3    sort of later on figure out whether each individual plaintiff

4    lost or gained?

5            MR. SOYARS:  Essentially with the clarification that

6    it's not even necessarily to decide if individuals lost or

7    gained, because the monetary award is ultimately to the plan

8    itself and then the money will be distributed by a plan

9    trustee.  So the statute, any losses to the plan resulting from

10   the breach of fiduciary duty.  So essentially, if the plan lost

11   money that, that makes a prima facie case, then would sustain

12   an award to the plan itself.  And then the way that money is

13   divided up would take into account whether individuals lost or

14   gained.

15           THE COURT:  But this case is brought on behalf of the

16   plan -- is brought on behalf of the individuals.  That's the

17   class you asked me to certify is those individuals who invested

18   into it or at least with respect to that count.

19           MR. SOYARS:  Well, no, it's brought on behalf of the

20   plan.  That's the cause of action under 1130(2)(a)(2).  We

21   pointed this out in the first argument section of our opening

22   brief that this is an inherently representative claim brought

23   on behalf of a retirement plan itself.  And because of that

24   representative nature, is the reason why the courts have found

25   these cases to be paradigmatic, classic examples of claims that

1    should be certified as a class action.

2            THE COURT:  Okay, let me switch gears for a second.

3    The argument, I don't think there's any question that, I don't

4    think I'm wrong on this -- there's no question in terms of

5    numerosity, commonality and adequacy.  The question defendants

6    focus on is typicality and perspective intraclass conflicts,

7    right?

8            MR. MANDHANIA:  That's right, Your Honor.

9            THE COURT:  Help me out.  What is the conflict?  I'm,

10   in all candor, I'm confused.

11           MR. MANDHANIA:  Sure.  Which claim would you like me

12   to focus on first?

13           THE COURT:  The reason I'm pausing, I'm curious to

14   see how this is going to be different.  Let's start with

15   (indiscernible).

16           MR. MANDHANIA:  Sure.  So post 2021, I don't think

17   we're, you know, we're not bringing an argument about any

18   conflict because if everyone pays the same fees, either that

19   fee is reasonable or it wasn't.  Fair enough.  Pre that, you

20   had a system where some people were paying all of the

21   recordkeeping and administrative fee while other people paid

22   nothing.  And there's an obvious conflict there where some

23   folks essentially got to free ride on those who paid the higher

24   allegedly imprudent fee.  I mean I think the way the

25   plaintiffs' counsel put it in some of the depositions was,

1    isn't this an unfair system that benefited some people and

2    harmed others?  And so that's, that's the essential conflict

3    there.  It's pretty similar, actually, to the conflict

4    presented in the Prudhomme v. Geico case that the Fifth Circuit

5    decided last year where the challenge was to the way that Geico

6    figured out the value of a vehicle that had been totaled.  And

7    the allegation was that Geico was using the wrong formula,

8    violated Louisiana law, et cetera.  Fifth Circuit said, well,

9    hang on.  The evidence is that some people actually got more

10   money for their totaled vehicle thanks to Geico's formula than

11   they would have had Geico complied with state law.  That's --

12   those people are in conflict with the folks who got less money

13   under the Geico formula than they would have under Louisiana

14   formula.  That's exactly the kind of conflict we're talking

15   about here where some people got to obtain recordkeeping and

16   administrative services and paid nothing.  Other people paid

17   for those services on behalf of the entire plan.

18           THE COURT:  Okay.  I guess two questions.  I'll go

19   read the Geico case.  I don't think that's cited anywhere in

20   the briefing either, is it?

21           MR. MANDHANIA:  I think it came out after the

22   briefing was concluded, Your Honor.  So we apologize for not

23   filing a notice of supplemental authority on it.

24           THE COURT:  Let me ask you this.  I understand, I

25   mean in effect, the plaintiffs' argument is that the folks in

1   Tier III had to shoulder an unfair burden and that the folks

2   who weren't invested in Tier III basically got the, got a

3   benefit.  They didn't have to pay the fees that they should

4   have had.  But at the end of the day, what's the conflict?

5   Meaning the relief that the plaintiff is requesting in this

6   case is that the plan reimburse or basically pay those Tier III

7   folks for, in their view, the unnecessary recordkeeping fees,

8   and administrative expenses that they incurred.  There's no

9   impact to the Tier I -- or not Tier I -- the folks who do not

10  invest in Tier III at all.  Right?  It's not as if they're

11  negatively impacted.  So that's what I mean.  I guess to put it

12  another way.  In the reply brief, defendants say Shell has

13  already eliminated Tier III and the practices of charging all

14  fees to Tier III investors.  Thus, the relief sought: recovery

15  from Shell of excessive fees paid, cannot possibly harm any

16  class members.  I'm guessing (indiscernible).

17              MR. MANDHANIA:  And I do think -- and this is why I

18  brought up the Prudhomme case, Your Honor.  Because, you know,

19  it wasn't like Geico was going to go back and take money out of

20  the hands of the folks who got more under its formula than they

21  would have received under Louisiana law.  Right?  I mean, the

22  question, the question the Fifth Circuit concerned itself with,

23  and I think the question for the Court here is, if Shell had

24  done what the plaintiffs now say it should have done, there are

25  people who would benefit from that, right?  The folks who paid,

1    who paid for recordkeeping from their Tier III investments

2    would be better off if Shell had, for example, a flat per

3    participant fee that everyone paid.  But the folks like Mr.

4    Harmon who didn't invest in Tier III, would have been worse off

5    under that regime.  He would have had to pay that fee of

6    however much it was or would have been in that world.  And so

7    the theory being advanced is adverse to his interest even if,

8    you know, no one is suggesting that Shell is going to surcharge

9    their accounts and take that money back or anything like that.

10            THE COURT:  Okay.

11            MR. MANDHANIA:  And I'm happy to provide the Westlaw

12   cite for that case if that would be helpful to the Court or

13   their clerks.  It's up to you.

14            THE COURT:  I already got it.  It's already on my

15   screen.  Modern technology works in amazing, amazing ways.

16   Okay.  One of the questions for the plaintiffs, in your reply

17   brief, you propose or should suggest some alternative

18   modifications to the class definitions which you suggest would

19   cure.  And I understand you totally disagree with Shell and

20   think their arguments are bogus, but you make the comment, hey,

21   here's some proposals that would cure the alleged problems with

22   the class definition.  And I guess I'm questioning, how do, how

23   do those revised definitions solve the alleged problems?  And I

24   fully understand you totally disagree with them.

25            MR. SOYARS:  Yeah, if I could just pull that part up.

1    So --

2                THE COURT:  I've actually put on my screen.

3                MR. SOYARS:  Okay.

4                THE COURT:  As I understand it, these are your

5    proposed, would be the -- right now there are, in effect, two

6    subclasses and the third subclass, there's no argument.

7                MR. SOYARS:  Right.

8                MR. MANDHANIA:  I mean, that's conceded by Shell

9    that's a proper subclass.  And I just, to sort of help me think

10   through this, I've just taken, you had one class in your

11   suggestions, which just so you're clear, stopped at 188 -- Page

12   19 or Page 14 of the brief, Page 19 of 22 on what's on the ECF.

13   You say although Shell's conflict standing arguments are

14   meritless, any issue could probably be cured through a modified

15   definition.  And then as I understand it, these are your

16   modified definitions.  Just in all candor, I'm sort of curious

17   how these, how these cure those issues?  Well let me say this -

18   - well, go ahead, go ahead.

19               MR. SOYARS:  Well, I'll start with Number 3, the

20   managed account.  That's, that's not altered and that's not

21   been opposed.

22               THE COURT:  Correct.

23               MR. SOYARS:  So on one and two, I think it, it

24   eliminates the problem, for Number 1, it's a Tier III issue.

25   The defendant's argument that people didn't, who didn't invest

1    in Tier III that makes that class overbroad.  So that would

2    eliminate those individuals and would negate that argument.

3    And now on Tier II, it would eliminate people who the defendant

4    claims have a conflict because they didn't actually pay any

5    part of the recordkeeping fees, that they weren't in the

6    revenue sharing funds.  So that eliminates that conflict.  And

7    I would just also point out that the defendant suggested that

8    it would be prejudicial somehow to modify the class at this

9    point.  But that's what they suggested in their opposition

10   brief on Page 10, Doc 171.  They cite the Avila case pointing

11   out that a court sua sponte redefined at a class that was found

12   to be overbroad and that's also supported by Fifth Circuit

13   precedent including a case called Monumental Life Insurance

14   Company, In Re Monumental Life, 365 F.3d 408 at 414.  District

15   courts are permitted to limit or modifying class definition to

16   provide the necessary precision.

17             So I think those refinements, we don't, we don't

18   agree they're necessary.  And there is a downside in that the

19   people who are excluded could then file another case.  They

20   could say that Shell shouldn't have removed Tier III and should

21   have stuck with it, which would then cause the sorts of

22   problems that Rule 23(b)(1) is designed to prevent.  So it's

23   not without some risk, but that would certainly, I think,

24   answer the argument that Shell made.

25             THE COURT:  Okay.  Okay, let me do this.  This has

```
1    been very helpful for me.  Let me take a quick break, talk to

2    my brain trust, and then come back with any additional

3    questions I have.  And if I don't have any other questions, as

4    I say, I will give each side a full and fair opportunity to

5    address whatever issues that I might have failed to address.

6            So with that, let me do this, let me go off the

7    record and we'll be back in a second.

8        (Recess)

9            THE COURT:  Okay, I am back.  So I got one thought.

10   And then -- well let me see.  Let me see if there's any, I

11   don't have any questions right now.  But is there anything

12   else, I know we've gone through this a lot, but any other

13   issues that either side would like to address and I believe

14   since it is plaintiffs' motion, I should give plaintiffs the

15   opportunity to go first.

16           MR. SOYARS:  Nothing else at this time, Your Honor.

17   Thank you.

18           THE COURT:  Okay.  And behalf of the defendants,

19   anything else you want to chime in on?

20           MR. MANDHANIA:  There was one issue that was

21   discussed during the first half of the argument, Your Honor,

22   that I just like to make a couple comments about which was sort

23   of the Article III issue and the way that plays with loss to

24   the plan and that language in the ERISA statute.  I just want

25   to remind the Court that the Supreme Court did say in Thole
```

1    that there's no ERISA exemption to Article III.  And the

2    question is really whether these plaintiffs have suffered an

3    injury, in fact, of the kind that Article III contemplates.

4    Only once that showing is made do we get into the contours of,

5    you know, what would that relief look like and issues of that

6    kind.

7            And to sort of bring that home, I was thinking about,

8    you know, given the arguments that Shell has made, what should

9    plaintiffs have done if they wanted to certify this class?  And

10   what is the kind of evidence that we're saying they needed?

11   And on Article III, I think what we're saying they needed is a

12   plaintiff who lost money by investing in Tier III, coupled with

13   evidence that the plan, as a whole, suffered loss due to the

14   inclusion of Tier III.  And because there's -- and if they put

15   that expert evidence in the class certification stage, so we

16   had an opportunity to rebut that evidence, we would explain to

17   the Court that actually the plan was better off with the

18   inclusion of Tier III. And you would have the record needed to

19   come to a full conclusion on that issue.

20           THE COURT:  Say that again?  You're saying that you

21   think in order to prove (indiscernible), it had to have named

22   plaintiff who they could show lost money by their investments

23   in Tier III and that the plan as a whole lost money?

24           MR. MANDHANIA:  No, Your Honor.  I apologize if I

25   misspoke.  The latter half is what they would need to overcome

```
1   our, or at least blunt the weight of our arguments regarding

2   interclass conflict.  I mean if they had an expert who had put

3   his opinion in the records backed by relevant and reliable

4   methodology, who could say, you know, here's the amount of

5   money that was lost, Shell would have an opportunity to

6   question the way those calculations were made.  You would have

7   a full record and you have the evidence that you would need to

8   figure out, okay, what happened here?

9          And just the point I wanted to make is, you know,

10  Shell's arguments should not be misconstrued as saying that no

11  claim can be certified.  That's obviously not our position.

12  And that's not, we know that that's not what the law is.  Our

13  objection is really to this claim based on these facts and, in

14  particular, on this record.

15          MR. SOYARS:  May I respond?

16          THE COURT:  Sure.  Mr. Soyars?

17          MR. SOYARS:  Yeah, the point about (indiscernible) is

18  a straw man.  We're not arguing that the plan's loss eliminates

19  the need for the main plaintiffs to show their own loss.  But

20  they haven't contested Mr. Lawrence's standing and that, that's

21  really dispositive here.  And these, these arguments about what

22  kind of evidence should have been put in, these are again new

23  arguments that were never made in their briefs and they should

24  have made them before.  That's all I have.  Thank you.

25          MR. MANDHANIA:  I was not planning to respond further
```

1    unless the Court had questions.

2             THE COURT:  I'm thinking here.  Based on the argument

3    that Shell now makes, and this is the first time we've ever

4    heard it, right, in oral argument, there is no standing

5    argument on Lawrence until today.

6             MR. MANDHANIA:  I want to be careful here, Your

7    Honor.  I did not intend by my comments to suggest that

8    Lawrence lacks Article III standing with respect to his

9    investments in Tier III.  I'm not trying to raise that issue.

10   We discussed it at some length in the opening.

11            We do have a problem with, you know, the standing of

12   people like plaintiff, like Mr. Coble.  And we think that the

13   lack of injury for the people who either didn't invest in Tier

14   III or invested and made money is going to be a reason

15   ultimately that the Tier III class can't be certified.  But

16   that's a, that's an issue regarding the Rule 23 prerequisite,

17   that's not an argument with respect to Mr. Lawrence's Article

18   III standing on that claim.

19            THE COURT:  But that is a standing argument.  It's a

20   Lawrence standing issue.  It's an unnamed class standing issue.

21            MR. MANDHANIA:  That's right.  I mean our contention

22   is that there are large swaths of the class who were not

23   injured and, in fact, were benefited by the inclusion of Tier

24   III.  And that given the best situation here --

25            THE COURT:  Where is that argument?  This is the

1    first time I've ever heard that argument, at least I think.

2    Maybe I'm mistaken.  Where is that argument?

3              MR. MANDHANIA:  That argument is in our brief -- I

4    think this is the argument that is made in the section of our

5    brief that begins on ECF Page 15, Page 10, brief Page 10 about

6    the intraclass conflicts that prevents the certification of the

7    class.

8              THE COURT:  Hang on for one second.  I apologize.  I

9    don't want you to leave before I make sure I get all my

10   questions answered.  Okay.  I think the briefing speaks for

11   itself.  It says what it says.  I'll look at that.  Anything

12   else from defendants or the plaintiffs?

13             MR. MANDHANIA:  Nothing further for the defendants,

14   Your Honor.

15             MR. SOYARS:  Nothing further, Your Honor, from the

16   plaintiffs.

17             THE COURT:  Okay.  Well thank you both very much.  I

18   really appreciate it.  Excellent briefing by everyone.  And

19   obviously I'm going to take this under advisement.  There's a

20   couple of things I want to look at.

21             I guess two other things real quick.  One, Mr.

22   Soyars, I mentioned earlier that I'd give you-all a chance just

23   to make sure there's no issue here since I don't think there

24   will be.  But, you know, to have you supplement the record to

25   indicate whether Lawrence invested in Tier III funds to which

1    recordkeeping fees were assessed.  I know Shell raised that

2    argument here today for the first time.  So I'll give you an

3    opportunity to do that.  How much time do you need?

4              MR. SOYARS:  Five minutes probably.  We can file it

5    today, I would think.

6              THE COURT:  Okay.  That's too late, no.  I'll tell

7    you what, I feel generous.  I'm going to give you until Friday,

8    at the end of the day Friday to file.  And then I guess the

9    only other thing I'd asked on Shell side if -- and obviously, I

10   got to take a look at it.  I'm curious.  At the end of the day,

11   if I think the class should be certified and I had to pick

12   between the proposed class and sort of the modified definitions

13   I put up there before -- and I totally understand Shell

14   vehemently opposed class certification for all the reasons you

15   eloquently stated.  But if I had to choose between one of

16   those, which should I choose?

17             MR. MANDHANIA:  I'll start by noting, I'm going to

18   order a, I'm going to frame a page of the transcript in which

19   you refer to me as eloquent, Your Honor.  But setting that

20   aside for the moment --

21             THE COURT:  Show it to your parents, show it to, you

22   know, everyone at the firm.

23             MR. MANDHANIA:  Yes, Your Honor.  I think we would,

24   if forced to choose between the unpalatable alternatives, we'll

25   pick the narrower class.  I think there is going to be some

1   issues with how that class has tried, but there are probably

2   fewer issues than with the thought class.

3         THE COURT:  And then the other thing, let me throw

4   out there a couple things.  Mr. Soyars, Mr. Mandhania had

5   mentioned the Geico case from the Fifth Circuit, which I took a

6   look at it over the break, 2022 WL 5101713021, 2022.  And he

7   gave some arguments as to why he thought that applied.  If for

8   any reason, you know, I don't want to, I'm going to give you a

9   chance, obviously you haven't read it, I assume, since he just

10  mentioned the case.  But if there's any response to retort to

11  that case that you want, not that you're required to do so, I

12  invite you to submit a letter on that by the end of the day

13  tomorrow as well.

14        MR. SOYARS:  Okay.  Yeah, we took a quick peek at it

15  and just notice it's a non-precedential opinion.  So there

16  wasn't much detail explaining the basis, but I will take a look

17  at it.

18        THE COURT:  I just glanced as well, but I think it's

19  only fair if a case is raised, at least you get the opportunity

20  to, if you want, to say.  So with all that said, once again, I

21  really appreciate it.  I'm going to take it under advisement,

22  get to it.  I know I have some other issues in front of me

23  which we are working hard on.  And you should have orders on

24  all those in short course.  So we're plugging through and I

25  really appreciate it.  Have a great day, great rest of the week

1    and we're on -- we're off the record.  Thanks so much.  Take

2    care.

3                    MR. MANDHANIA:  Thank you, Your Honor.

4                    MR. SOYARS:  Thank you, Your Honor.

5              (Hearing adjourned at 10:20 AM)

6                                    * * * * *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 42

```
1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  March 17, 2023
```